IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2007 JUN 11  A 11: 34

JOHNNY W. SASSER,                    )
                                     )
        PLAINTIFF,                   )
                                     )
vs.                                  )    CASE NO.: 2:06cv593-CSC
                                     )
RYDER TRUCK RENTAL, et al.,          )
                                     )
        DEFENDANTS.                  )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiff, by and through his undersigned attorney and in response to

the Defendant's Motion for Summary Judgement states as follows:

## THE PLAINTIFF TAKES ISSUE WITH THE DEFENDANT'S
## STATEMENT OF UNDISPUTED FACTS.

This lawsuit did arise out of a worker's compensation claim wherein the Plaintiff, Johnny

Sasser, sustained an injury to his back in September 1995. There was a lawsuit filed and a

settlement was which in February 1998 providing that amongst other things the Defendant would

continue to pay for the Plaintiff's reasonable and necessary medical treatment for his injury.

There was no dispute at that time as to what the injury was it was clearly an injury to his lumbar

spine. The Plaintiff was provided with a treating physician Dr. McGahan. There was another

dispute that arose in 1999 a year later wherein the Defendant was refusing to pay the reasonable

and necessary medical bills and refusing the treatment that Dr. McGahan the treating physician

had in fact authorized. That case was resolved by the Judge directing that Dr. McGahan would

be the one who would decide what was related and that the Defendant would pay all bills that Dr.

McGahan felt were related. Subsequently another settlement was reached wherein the Defendant had to pay $6,000.00 in past medical bills and it remained part of the Court Order and Judgment that the Defendant's were to continue to pay reasonable and necessary treatment that was prescribed by Dr. McGahan. (Defendant's Exhibit 6).

Unfortunately Dr. McGahan discontinued his medical practice and left town. That is not in dispute. What is in dispute however is that the Defendant never provided another treating physician to the Plaintiff after that time despite their knowledge that Dr. McGahan had left practice. (Plaintiff's deposition, p. 130, 160-164, Exhibit 1). What began to happen after that was that the Defendant's set forth on a plan and scheme to cut the Plaintiff off from medical treatment. They set about getting opinions under the guise of peer reviews or utilization reviews. Dr. McGahan was not available or around to dispute those reviews as claimed by Ryder.

Dr. McGahan had referred the Plaintiff to Dr. John Marsella a pain management specialist in Dothan, Alabama. Dr. Marsella began treating the Plaintiff and continued to treat the Plaintiff until 2004. These bills were paid for by the worker's compensation company and there was no dispute at that time as to whether this treatment was in fact work related. The true motive of these peer reviews was not disclosed to the Plaintiff until he had a conversation with the adjuster and co-defendant, Martye Lloyd wherein she revealed the true motivation for the peer reviews. He had a conversation with her about her refusing to pre-certify one of Dr. Marsella's treatments, although he was in fact the recognized pain management doctor at that time. The Plaintiff continued to treat with Dr. John Marsella through April 2004 seeing him approximately every three months (Plaintiff's deposition p.102). The Plaintiff testified in his deposition that the first letter he received about peer reviews and pre-certifications occurred from a letter dated May 25, 2004 and he then he called Ms. Lloyd the adjuster and called Dr. Marsella about getting his

appointment handled the correct way. He was supposed to be getting trigger point injections

which he had already been having in the past which had already been paid for in the past

(Plaintiff's deposition p. 109-110). The company was also not going to pay for his blood

thinning medication although Dr. McGahan had written the prescription due to the cramps and

spasms in his legs and thighs and hips that he had been having (Plaintiff's deposition p. 112).

The Plaintiff also testified that his doctor's had told him, specifically Dr. McGahan had told him

that the medication was necessary and related to his on the job accident because it was to stop the

spasms and cramps and pain in his legs by helping thin his blood (Plaintiff's deposition p. 113).

There was a letter dated June 17, 2004 indicating that he was to get all treatment and

prescriptions pre-certified. However he no longer had a treating physician because Dr. McGahan

was gone and he could not get it pre-certified from Dr. McGahan any longer (Plaintiff's

deposition p. 115). Mr. Sasser attempted to try to appeal Ryder's decision however he was told

that he could not appeal only the doctor's could appeal but Dr. McGahan was gone and could not

appeal for him. He said Dr. Marsella had tried to appeal and he was being told by Dr. Marsella's

office they were appealing to try to get the treatment reinstated (Plaintiff's deposition p. 116-

117). When the Plaintiff received the June 2004 letter he talked to Martye Lloyd at Ryder and

told her that Dr. Marsella's office said they were appealing the decision and that they were not

going to let him have anymore appointments unless the company approved the appointments. He

said Dr. Marsella was trying to get the trigger point injections paid for and continued but was told

that he had been "cut off" (Plaintiff's deposition p. 119). Plaintiff received a letter on June 17,

2004 stating that he had to get things pre-certified however on that letter Ms. Lloyd had hand

wrote the says Mr. Sasser had been cut off as of that date (Plaintiff's deposition p. 120). Mr.

Sasser had a telephone conversation with Martye Lloyd again in 2005 about the appeal and about

his medicals and she specifically told him "you have cost Ryder an awful lot of money over the years, and I am going to try legally through Alabama's Workman's Compensation Laws to legally get it stopped" (Plaintiff's deposition p. 124). The Plaintiff testified that he told her she could not cut him off because the two Circuit Judges had ordered it to be paid for life and she said "it didn't matter what the Judges said that peer reviews overruled everybody and he was being cut off of all drugs, all doctors no matter what the procedures" (Plaintiff's deposition p. 134). The Plaintiff was cut off according to Ryder's documentation on June 17, 2004 although that is the exact same date that indicated he must start getting pre-certifications. It is difficult to fathom one could get a pre-certification after June 17, 2004 when that is the same date he was allegedly cut off from treatment. The Plaintiff then sought legal counsel in a lawsuit and sued in the Circuit Court of Barbour County for both the Tort of Outrage and for a Petition for Rule NiSi before the Circuit Judge for Ryder's continued failure once again to pay for the Plaintiff's medicals. The suit was removed to this Court by the Defendant.

## STANDARD OF REVIEW

The Plaintiff agrees with the Defendant's statement of the standard of review in that summary judgment is proper for the moving party only if they have made a credible showing that there is no genuine issue of material fact to be decided by a jury. Any doubt as to the facts should be resolved in favor of the non-moving party in this case Mr. Sasser. Clearly the Defendant has failed to make the initial showing that there are no genuine issues of material fact. There are in fact numerous issues of fact that are before this Court which should be decided by a jury, including but not limited to the following:

A) What was the motive of the Defendant in cutting off the Plaintiff's medical treatment. The Defendant argues that it was no evil motive, but simply reliance on peer reviews.

However the Plaintiff contends it was the outrageous and evil motive of cutting off an expensive claimant because it was costing the company too much money.

B) Did the company in fact rely on the peer reviews versus using them simply as a tool to mask their true intent.

C) Are the peer reviews even accurate that these issues are not related in that the overwhelming medical records up to that point indicate that the Plaintiff received an on the job injury and was treated for almost six years for these same injuries in a consistent manner with the same treating physicians.

Each one of these factual disputes would prevent a summary judgment in this case. In the Defendant's brief and submissions do not rule out any of these factual issues as will be seen below:

## ARGUMENT

I.      The Defendant argues that as a matter of law they did not commit outrage because there is no evidence of evil intent. However there is in fact evidence of evil intent in this case. The Defendant's argue that simply refusing to authorize treatment is not evidence of evil intent. However the facts of this case go much further than that.

As the Plaintiff's deposition demonstrates the motive was revealed by the Defendant Martye Lloyd in her capacity as an agent of Ryder. She clearly stated to the Plaintiff that she **would do whatever it took to cut him off because he was costing Ryder "an awful lot of money"**. The intent of Ryder was not simply to rely on peer reviews the intent of Ryder was to cut off this expensive claimant. They had been paying for him for six years and they had no intention of paying for him any longer. This undisputed statement by Ms. Lloyd clearly puts forth a substantial evidence of a genuine issue of material fact that a jury should decide that issue.

The jury can believe Ms. Lloyd and find no outrage because there would be no evil intent or the jury can believe Mr. Sasser and find that Ms. Lloyd's actions were outrageous and were uncivilized.

This case is more analogous to the <u>Gibbs v. Aetna Casuality and Surety Company</u>, 604 S.2nd 414 (Ala. 1992) case. In <u>Gibbs</u> the Court allowed the tort of outrage because the carrier, CNA, set out on a scheme to save the company money by delaying payments to hospitals, pharmacies, doctor's by refusing to provide medication to the Plaintiff, by refusing to provide prescribed instruments for the Plaintiff such as a whirlpool for the purpose of getting him to take a much smaller settlement than he otherwise would take just to get them off his back. The Court found that CNA was intentionally causing the Plaintiff in that case severe emotional distress and attempted to use that distress for its gain .

The case at hand is very similar. In this case, Maryte Lloyd reveals that the company set out on a systematic plan and scheme to do whatever it took to cut Mr. Sasser off from his medical benefits for the **sole purpose** of saving the company money, the same motive that CNA was determined to have in the <u>Gibbs</u> case. It is unconscionable to think that you would cut off a man's medical treatment and pain medication simply to save a corporation money. They were obligated under the laws of the State of Alabama and under the Court Orders from the Circuit Court of Barbour County to continue to pay for this man's medical treatment and their refusal to do so was nothing short of a tactic to save a company profit. There can be nothing more outrageous or evil. He was cut off "cold turkey" from Oxycontin and described the pain and withdrawal he went through because of Ryder's actions. (Exhibit 2).

Ryder simply wants to couch this case in terms that they simply denied treatment because their peer reviews said they should. That is not what occurred in this case.

Another bit of evidence demonstrating Ryder's true motive is contained in their own peer review report by Dr. Cabot. He stated in May, 15, 2002 letter that "[i]f indeed this patient does have a foot drop on the right then I feel it is **mandatory** that he have a repeat MRI as well as repeat EMGs and NCS. . . . I would recommend an IME at this point to determine whether he does or does not have a foot drop. . . . If he does not have a foot drop, my recommendation would be to **continue** with a conservative treatment program." (Defendant's Exhibit 9, emphasis added). **None of these recommended "mandatory" tests were ordered by Ryder**. If, in fact, they were going to defer to these peer reviews, they should have set up these tests for Mr. Sasser. Clearly, they are not using the peer reviews for any purpose other than to justify **not** paying for treatment. Again, this is more substantial evidence of the **fact** that Ryder was not innocently insisting on its legal rights as they claim. At least this issue should be allowed to go to the jury.

What is plainly obvious is that Ryder had been forced to pay for Mr. Sasser's medicals, as it should have been, for nearly 6 years, and he was costing the company money. The company had before it a great quantity of medical records and physicians opinions undisputedly telling them that Mr. Sasser was injured on the job and needed continued medical treatment, including medication. They were not happy with all of those opinions and set out to "cut him off" by abusing the utilization review procedures. If a jury believes Ryder had this motive, they are free under the law of Alabama to find in favor of Mr. Sasser on the outrage claim. Because these documents provide overwhelming evidence of a factual dispute, summary judgment is not warranted in this case.

**II.**    Ryder secondly argues that it cannot be liable because it simply existed on its legal rights for peer reviews. That too seems like an innocent act on behalf of the company and under Alabama law employers can use utilization review procedures to deny unreasonable or

unnecessary medical treatment in worker's compensation cases. However they must **justify doing so in a Court** if an employee insists on judicial review as the Plaintiff has in this case. Simply hiring some doctors to review the records and say that it doesn't look reasonable to them does not defeat their obligation in this case and does not make them "innocent".

The attached medical records clearly demonstrate that a material issue of fact exists as to the validity of the opinions of the utilization review doctors. Clearly, Dr. Kesserwani conducted a nerve conduction study and EMG that found objectively that Mr. Sasser suffered from "bilateral L5/S1 radiculopathy." (Exhibit 3).    This was in June of 1998. Since then Mr. Sasser treated with Dr. Rachelle Janush at the Center For Physical Medicine and Rehabilitation, Inc. in Montgomery. Dr. Janush was a physician authorized by Ryder for the worker's compensation injury that this suit is about. Dr. Janush's impression was that Mr. Sasser had suffered an original worker's compensation injury affecting his back and neck. She also said he had "myofascial pain syndrom of the trapezius, rhomboids, gluteus maximus, levator scapulae and erector spinea, sacral iliac joint dysfunction of the R and L, and chronic pain syndrome." (Exhibit 4). She stated that he would benefit from "procedures of injection and manipulation." During this time, the Plaintiff filed a Petition for Rule Nisi in the Circuit Court of Barbour County because Ryder had cut off his medical card in January of 1999. They had refused to pay for his medicals since that time. The Circuit Judge ordered Dr. McGahan, who had been Mr. Sasser's approved worker's compensation doctor, to review the medicals and Ryder was to pay what Dr. McGahan said was work related.

Dr. McGahan did just that. He sent a letter to Judge Smithhart stating:

> "Mr. Sasser, in my medical opinion, received a work related injury
> on or about September 8, 1995. I reached this opinion after several
> office visits and examinations. I do not believe that Mr. Sasser has

> anything to gain from a neurological examination. Although I
> would be happy to schedule him a visit or visits. In my opinion,
> Mr. Sasser's approximate medical expenses should be $10,000.00
> per year."

(Exhibit 5).

Clearly, this expert opinion by Mr. Sasser's approved physician demonstrates there is a material issue of fact as to whether Ryder's reviewing physicians were accurate with their opinions. A jury should decide. There are literally thousands of pages of medical records for Mr. Sasser's treatment from 1995 until 2004. The Plaintiff does not submit all of those records for the purpose of this Motion. However, a few samples have been pulled out to demonstrate the overwhelming factual dispute that exists on that issue to defeat summary judgment.

Following that letter to Judge Smithhart, Ryder settled with Mr. Sasser and paid $6,000,00 of past medicals that they had wrongfully denied. They were not happy.

In 2000, Dr. McGahan continued to treat Mr. Sasser without interference from Ryder. He ordered an orthopedic mattress and electric bed, which Ryder paid for. (Exhibit 6). He also referred him to the pain management clinic in Dothan for continued conservative treatment. (Exhibit 7). Mr. Sasser then began treatment with Dr. John Marsella for pain management. This was approved and paid for from 2000 until 2004 when Ryder finally said he was costing too much, and they set out to cut him off.

There is a genuine issue of material fact as to whether these peer reviews were even purport to the regulations set forth by the Alabama Department of Industrial Relations. They are to supposed to be board certified in the same area as the treating physician who was authorizing the treatment. However neither Defendant's Exhibit 9 nor Exhibit 10 indicate that either one of these physicians were board certified in the area of pain management or pain management

doctor's. That is a requirement under Alabama law in order to use these peer reviews to deny a employee treatment. As to Exhibit 11 it does appear from the credentials that this doctor has a sub-speciality certification in pain management. It does not indicate that he actually treats patients in the area of pain management as is also required under the Industrial Relations regulations. Those are questions of fact which a jury should be allowed to determine whether Ryder could even have relied on these peer reviews to begin with.

**III.**     Further, this is not a situation where an employer simply insists on its legal rights in a permissible way. This is a situation where an employer tries to distort its legal right for an impermissible purpose which was to get itself out of a judgment. Specifically, Dr. Cabot opined, at the request of Ryder, that the Plaintiff either was never injured to begin with or that his injuries should have been resolved within six months. If that were true Mr. Sasser's problems would have resolved no later than 1996. However he was receiving treatment paid for by the company as late as 2004. The Court even has this issue reviewed by Dr. McGahan, his treating physician, and Ryder had to back up and pay $6,000.00 worth of medicals in 2000. That clearly would not have occurred had his injury resolved in six months. That is credible evidence of a factual dispute as to whether these peer reviews or even accurate to begin with and should be for a jury to determine.

These peer reviews are not intended to allow an employer to go back and re-litigate whether a Plaintiff was injured or not. There has already been a settlement agreement and a judgment and two subsequent judgments ordering them to pay the Plaintiff's medical treatment. It is *res judicata* on that issue. Using these peer reviews was nothing more than a tactic to try to go back and set aside the original settlement agreement and deny any liability for Mr. Sasser's injury.

The most important fact that a jury can use to determine whether there is evil motive or whether there was simply reliance upon your rights is the fact that the company never replaced Dr. McGahan. When Dr. McGahan left practice the Plaintiff was left without a primary treating physician and Ryder never attempted to replace him in any way. This left Mr. Sasser without a treating physician, without anyone to appeal these outrageous peer reviews and with no remedy whatsoever to get his medical treatment, prescriptions or procedures that were necessary. That was taken completely out of his hands and had Ryder in fact been attempting to fulfill its legal obligation it would have provided him with another treating physician and if that treating physician disagreed with Dr. McGahan so be it.

It must be pointed out that in just the last several weeks Ryder has in fact provided Mr. Sasser with a **new treating physician**, Dr. Henry Barnard, an orthopedic specialist in Dothan, Alabama. Mr. Sasser has only recently been able to see him and his deposition was unable to be obtained in the time frame given between the time the Defendant filed his Motion for Summary judgment and the deadline set by this Court. As such, the Plaintiff would request this Court to reserve its ruling on this Motion until the Plaintiff has an opportunity to take the deposition of the new treating physician. It is clear that manifest judgment would require that the Plaintiff have the ability to get the most recent credible evidence before this Court before the Court makes a ruling on this case. The deadlines to take depositions under the scheduling order has not passed. However the summary judgment motion was filed on the Thursday before the Memorial Day weekend and the Plaintiff was not made aware of the motion until Tuesday, May 29, 2007, leaving only thirteen calendar days to obtain affidavits and testimony before the submission deadline. If the Court believes that such medical evidence is necessary then the Plaintiff requests the Court pursuant to Rule 56(f) Fed. R. Civ. Pro. for a continuance for the depositions to be

obtained.

The Plaintiff believes that he has submitted substantial evidence as to the above stated issues of material fact to be decided by a jury to overcome the Defendant's Motion for Summary Judgment. All of these issues are **fact** and are not matters of law that this Court should rule on.

WHEREFORE THE PREMISES considered, the Plaintiff respectfully request that summary judgment in this case be denied.

Respectfully submitted,

Amy M. Shumate (SHU015)
Attorney for the Plaintiff
519 South Oates Street
Dothan, Alabama 36301
(334) 673-0729

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by U.S. Mail, postage prepaid and properly addressed, on this _8th_ day of June, 2007 to:

Conley W. Knott
Austill, Lewis & Simms, P.C.
P.O. Box 11927
Birmingham, Alabama 35202-1927
        Attorney For: Ryder Truck Rental, Inc.


William A. Austill
Austill, Lewis & Simms, P.C.
P.O. Box 11927
Birmingham, Alabama 35202-1927
        Attorney For: Ryder Truck Rental, Inc

Amy M. Shumate