EXHIBIT 1

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
CLAYTON DIVISION

CIVIL ACTION NUMBER
CV-1997-01

JOHNNY W. SASSER,
    Plaintiff,
vs.
RYDER TRUCK RENTAL, INC., D/B/A
RYDER DEDICATED LOGISTICS, INC.,
A/K/A RYDER INTEGRATED LOGISTICS,
INC., ET AL.
    Defendants.

DEPOSITION TESTIMONY OF:
JOHNNY W. SASSER

August 23, 2006
10:30 a.m.
COURT REPORTER:
APRIL R. BENDINGER, CSR

Page 3

1  offered in evidence, or prior thereto.
2      In accordance with Rule 5(d) of the
3  Alabama Rules of Civil Procedure, as amended,
4  effective May 15, 1988, I, April R. Bendinger,
5  am hereby delivering to MR. CONLEY KNOTT the
6  original transcript of the oral testimony taken
7  August 23, 2006, along with exhibits.
8      Please be advised that this is the same
9  and not retained by the Court Reporter, nor
10  filed with the Court.
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 2

1  S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of JOHNNY W. SASSER
5  may be taken before April R. Bendinger, Notary
6  Public, State at Large, at the Law Offices of
7  Amy Shumate, 519 South Oates Street, Dothan,
8  Alabama 36301 on August 23, 2006, commencing at
9  approximately 10:30 a.m.
10      IT IS FURTHER STIPULATED AND AGREED
11  that the signature to and the reading of the
12  deposition by the witness is waived, the
13  deposition to have the same force and effect as
14  if full compliance had been had with all laws
15  and rules of Court relating to the taking of
16  depositions.
17      IT IS FURTHER STIPULATED AND AGREED
18  that it shall not be necessary for any
19  objections to be made by counsel to any
20  questions, except as to form or leading
21  questions and that counsel for the parties may
22  make objections and assign grounds at the time
23  of trial or at the time said depositions is

Page 4

1          I N D E X
2  EXAMINATION BY:        PAGE NO.
3  Mr. Knott
4  Certificate        6
5                  188
6      EXHIBIT INDEX
7  DX-1
8  DX-1A        11
9  DX-1B        171
10  DX-2        171
11  DX-3        20
12  DX-4        28
13  DX-5        31
14  DX-6        33
15  DX-7        36
16  DX-8        36
17  DX-9        39
18  DX-10        41
19  DX-11        41
20  DX-12        42
21  DX-13        43
22  DX-14        44
23  DX-15        45
                47

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

INDEX OF EXHIBITS CONTINUED

| | | |
|---|---|---|
| 2 | DX-16 | |
| 3 | DX-17 | 49 |
| 4 | DX-18 | 50 |
| 5 | DX-19 | 51 |
| 6 | DX-20 | 51 |
| 7 | DX-21 | 53 |
| 8 | DX-22 | 56 |
| 9 | DX-23 | 56 |
| 10 | DX-24 | 56 |
| 11 | DX-25 | 57 |
| 12 | DX-26 | 59 |
| 13 | DX-27 | 59 |
| 14 | DX-28 | 61 |
| 15 | DX-29 | 61 |
| 16 | DX-30 | 62 |
| 17 | DX-31 | 63 |
| 18 | DX-32 | 65 |
| 19 | DX-33 | 68 |
| 20 | DX-34 | 69 |
| 21 | DX-35 | 70 |
| 22 | DX-36 | 71 |
| 23 | DX-37 | 60 |
| | | 72 |

Page 7

INDEX OF EXHIBITS CONTINUED

| | | |
|---|---|---|
| 1 | | |
| 2 | DX-60 | |
| 3 | DX-61 | 122 |
| 4 | DX-62 | 143 |
| 5 | DX-63 | 154 |
| 6 | DX-64 | 156 |
| 7 | DX-65 | 168 |
| 8 | DX-66 | 170 |
| 9 | DX-67 | 176 |
| 10 | DX-68 | 176 |
| 11 | | 179 |

Page 6

EXHIBITS OF INDEX CONTINUED

| | | |
|---|---|---|
| 1 | | |
| 2 | DX-38 | |
| 3 | DX-39 | 72 |
| 4 | DX-40 | 72 |
| 5 | DX-41 | 72 |
| 6 | DX-42 | 76 |
| 7 | DX-43 | 77 |
| 8 | DX-44 | 82 |
| 9 | DX-45 | 83 |
| 10 | DX-46 | 85 |
| 11 | DX-47 | 86 |
| 12 | DX-48 | 88 |
| 13 | DX-49 | 89 |
| 14 | DX-50 | 90 |
| 15 | DX-51 | 91 |
| 16 | DX-52 | 95 |
| 17 | DX-53 | 96 |
| 18 | DX-54 | 100 |
| 19 | DX-55 | 104 |
| 20 | DX-56 | 101 |
| 21 | DX-57 | 108 |
| 22 | DX-58 | 109 |
| 23 | DX-59 | 111 |
| | | 121 |

Page 8

A P P E A R A N C E S

FOR THE PLAINTIFF:
Mrs. Amy Shumate
ATTORNEY AT LAW
519 South Oates Street
Dothan, Alabama 36301

FOR THE DEFENDANT:
Mr. Conley Knott
AUSTILL LEWIS, P.C.
2101 Highland Avenue
Suite 500
Birmingham, Alabama 35205

2 (Pages 5 to 8)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    I, April R. Bendinger, a Court
2    Reporter of Dothan, Alabama, and a Notary Public
3    for the State of Alabama at Large, acting as
4    Commissioner, certify that on this date,
5    pursuant to the Alabama Rules of Civil
6    Procedure, and the foregoing stipulation of
7    counsel, there came before at the Amy Shumate,
8    519 South Oates Street, Dothan, Alabama 36301
9    commencing at approximately 10:30 a.m. on August
10   23, 2006, JOHNNY W. SASSER in the above cause,
11   for oral examination, whereupon the following
12   proceedings were had:
13
14          JOHNNY W. SASSER,
15   being first duly sworn, was examined and
16   testified as follows:
17
18   EXAMINATION BY MR. KNOTT:
19      Q.    Would you state your full name for
20   the record?
21      A.    Johnny W. Sasser.
22      Q.    And the W stands for Wanza,
23   W-A-N-Z-A?

Page 10

1       A.    Right.
2       Q.    My name is a Conley Knott. I'm an
3    attorney and I represent Ryder in this suit here
4    you filed -- a motion that's continuing in
5    this Barbour County suit for your medical
6    benefits. So we're not going to go back and
7    cover every little detail that we would have
8    covered in your -- if it were a brand new work
9    comp claim. I'll ask you about your medical
10   treatment you've had. And you've had a lot
11   since then, since it's been ten years. But what
12   I've done is I've gone through and I've marked
13   some medical records. And I think we can kind
14   of go through it real orderly. Hopefully, those
15   will jog your memory. And if they don't jog
16   your memory, then we'll move on to the next one,
17   but it might at least kind of keep us -- keep us
18   going along instead of grasping at straws and
19   wondering about dates. What I'd like to do
20   first -- I've marked as Defendant's Exhibit 1 --
21   it's actually a couple of things stapled
22   together. It's got interrogatories that we sent
23   y'all. And stapled to the back of those, it's

Page 11

1    also got plaintiff's answer to defendant's
2    interrogatories.
3
4          (WHEREUPON, a document was marked
5    as Defendant's Exhibit Number 1 and is attached
6    to the original transcript.)
7
8       Q.    (BY MR. KNOTT) You may
9    remember -- after your lawyer got all these
10   typed up for you -- and I imagine you didn't do
11   your own typing. My clients usually don't. You
12   may remember signing -- after reviewing and
13   making sure they're accurate, you signed these?
14      A.    Yes, sir.
15      Q.    These are accurate, to the best of
16   your knowledge and belief?
17      A.    Well, yeah, to the best of my
18   knowledge and belief, yes.
19      Q.    Your date of birth is March 24,
20   1951?
21      A.    Yes, sir.
22      Q.    And your Social Security number is
23   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?

Page 12

1       A.    Yes, sir.
2       Q.    And do you still live at 8218
3    Highway 51 North in Aritox, Alabama?
4       A.    Yes.
5       Q.    Where about is Ariton?
6       A.    51 north out of Ozark -- or out of
7    Dothan. It's about 40 miles north of Dothan,
8    where we're at now. About four miles off of
9    231.
10      Q.    So is it in Henry County?
11      A.    No, it's in -- right on the Dale
12   and Barbour line.
13      Q.    All right. Why don't we just kind
14   of start off this way. Like I said, we're going
15   to kind of go through orderly in your medical
16   records. So why don't we just start off as you
17   tell us today, as we're sitting here, what kind
18   of health problems you're currently having that
19   you believe are related to your work comp
20   accident.
21      A.    I've got back, I've got
22   degenerative disc, herniated bulges. I have
23   pains that run down from my back even to my

3 (Pages 9 to 12)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1  hands, runs down in my legs, knees. I have
2  frequent falls. My knees are completely gone.
3  I've fell so many times, they say I now need
4  a -- both knees replaced, and I cannot go
5  through that due to my emphysema. I couldn't go
6  through the therapy. It's never ending pain.
7  I've got canal stenosis, which that's a topic
8  all around, but that's a bad ordeal. Some days
9  it's a lot worse than others. It's still -- has
10  been there and has been the whole time. It's
11  just the general pain that I've had the whole
12  time: spasm, cramps, my legs and back and the
13  discs. It never -- you know, it's not getting
14  better, it's getting worse. And the pain is --
15  it's there all the time. It never stops. I
16  sleep in a hospital bed. You can change so many
17  positions, but you get very little -- till you
18  wake up again. It's just not good, you know,
19  what I'm going through. The pain and the ordeal
20  with my back, hands, cramps, spasms, knees,
21  falls. And that about covers most of what was
22  originally, and I still have it.
23      Q.    Okay. I know that you've got some

Page 14

1  other health issues that you've been dealing
2  with also just from the medical records I've
3  looked over. So I want to make sure we know
4  which ones -- I'll ask you which ones you
5  believe are related. You've had some heart
6  problems. Do you have any reason to believe
7  that those are related to -- the heart problems
8  you've had are related to the accident?
9      A.    No, sir.
10      Q.    How about the emphysema that you
11  mentioned?
12      A.    No, sir.
13      Q.    Do any other major kind of health
14  conditions that you've gotten treatment for come
15  to mind that you can think of that you don't
16  believe are related? You mentioned the heart
17  disease and the emphysema. High blood pressure?
18      A.    What other problems are you saying
19  do I have that is not related to my injury?
20      Q.    That's right. I'm just kind of
21  trying to streamline it from the outset of the
22  deposition.
23      A.    You know, I've got emphysema, I've

Page 15

1  got carpal tunnel. Surgery was done. But I
2  guess that pretty well -- the heart problems and
3  the emphysema is ruled out. The rest of it I'll
4  say is related to my injury.
5      Q.    Okay. Also, before we kind of
6  start going through chronologically, currently
7  what doctors are you seeing kind of on a regular
8  or semi regular basis?
9      A.    I'm seeing Dr. Charles Wood --
10  he's just internal medicine -- Ozark, Alabama.
11  I was seeing an orthopaedic surgeon that scoped
12  and cleaned my knees out, but that's all he
13  could do. He said knee replacement is out due
14  to my lung problem.
15      Q.    That's Dr. Granger?
16      A.    Dr. Granger.
17      Q.    Do you still consider yourself to
18  kind of be under his care?
19      A.    Ain't no need because the next
20  step was knee replacement.
21      Q.    Okay.
22      A.    And I can't go through that due to
23  my lung doctor, the pulmonary.

Page 16

1      Q.    Okay. Are there any other doctors
2  that you're still seeing now?
3      A.    Just that one is all that I can
4  afford.
5      Q.    How about Dr. McGahan? What
6  happened with him?
7      A.    I have no -- and I'm answering
8  truthful. I have no idea. Rumored, he moved
9  away, way before anybody knew he did, to
10  somewhere in north Alabama. I just -- I don't
11  know what -- anyway, I know for a fact he moved
12  his office. When it was his office, he worked
13  maybe a half a day. And I could not never get
14  to see him. He was just -- I didn't have a
15  representing doctor as far as a company doctor,
16  really, because he never worked. And when he
17  did work, he wouldn't work but two or three
18  hours and then he would be gone.
19      Q.    How about Dr. Marsella? You're
20  still seeing Dr. Marsella?
21      A.    No, sir, I can't afford
22  Dr. Marsella. I've still got a bill with
23  Dr. Marsella. And when you lose your primary

4 (Pages 13 to 16)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1  doctor, you have to be assigned another one.
2  And I can't be assigned another one until I can
3  get somebody refer me to him. And I couldn't
4  afford him anyway, the medicine and his bill, so
5  I stay in pain.
6      Q.    Are you still seeing -- is
7  Dr. Alfano your cardiologist? Is that what he
8  is?
9      A.    He was. Dr. Allabadi --
10     Q.    Dr. Allabadi, A-L-I-B-A-D-I (sic?)
11     A.    I would say A-B-A-I-D -- sir, I
12  really --
13     Q.    Is he with Heart South? Is that
14  the --
15     A.    Heart South, that's him.
16     Q.    We'll use that. It's easier to
17  spell. The doctors at that group are your
18  current cardiologists?
19     A.    Yes.
20     Q.    And you're no longer seeing
21  Dr. Alfano?
22     A.    No, sir.
23     Q.    Are there any other doctors that

Page 18

1  you still consider yourself a patient of? Did
2  Dr. Benton die?
3      A.    Yes. She deceased in -- I done
4  forgot the year. Seems like it was late '90's
5  or --
6      Q.    She had a partner in her group.
7  Hugh?
8      A.    McGuire.
9      Q.    Did you continue to see him after
10  she died?
11     A.    No, sir.
12     Q.    Okay.
13     A.    He referred me to Alan Prince.
14  Just -- the only thing he referred me for was --
15  not my back. I was having sleep problems, and
16  he referred me to a neurologist he knew in
17  Dothan, is what that was for. Nothing except
18  that.
19     Q.    Was that Dr. King? Dr. William
20  King?
21     A.    I hadn't ever been to a William
22  King, that I know of.
23     Q.    Okay. How about --

Page 19

1      A.    Dr. Alan Prince was the one that
2  tried to do the sleep study.
3      Q.    Okay.
4      A.    If there's a William King I'm
5  missing -- I don't know of a doctor by that
6  name -- or I don't remember.
7      Q.    Are you still seeing Dr. Robert
8  Allen?
9      A.    No, sir.
10     Q.    How about Dr. Kesserwani?
11     A.    No, sir.
12     Q.    Now, the original work comp
13  complaint in this lawsuit was -- the settlement
14  agreement and the order was based on a September
15  8, 1995 accident. Does that comport with your
16  memory?
17     A.    Correct, that was the date.
18     Q.    That's the accident?
19     A.    Right.
20     Q.    Yeah. So I'm going to -- what I'm
21  going to -- I've got them already marked and
22  everything, so I'll try to move through some of
23  these just as quickly as you're comfortable

Page 20

1  with. I don't want to cut you off.
2      A.    No problem.
3      Q.    The records I have closest to
4  that, which I'm going to start off with, are
5  marked as Defendant's Exhibit 2. And I'll
6  represent that these are records from -- there's
7  a few pages here. I'll represent they're
8  records from Dr. Mellanie Benton or Hugh
9  McGuire, whoever was treating you at that point
10  in time.
11
12          (WHEREUPON, a document was marked
13  as Defendant's Exhibit Number 2 and is attached
14  to the original transcript.)
15
16     Q.    (BY MR. KNOTT) And they go from
17  February 21, 1994, through December 10, 1996.
18     A.    I didn't ever saw McGuire but one
19  time. That would have been Mellanie Benton.
20     Q.    Okay. Sometimes it's hard for me
21  to tell which doctor in a practice is actually
22  writing the notes.
23     A.    Yes, sir.

5 (Pages 17 to 20)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  Q.    Was Dr. Benton your regular doctor
2  at that point in time? Kind of your family
3  doctor?
4     A.    Yeah. She was -- I was using her
5  as a general doctor at that time, correct.
6     Q.    Whenever you got sick or whenever
7  you needed a checkup or something, you'd go to
8  see her?
9     A.    Right.
10    Q.    And according to her notes, I see
11 in 1994 a couple of notations, March and August,
12 where it refers to disc disease. Did you ever
13 talk to Dr. Benton about having disc disease?
14    A.    I can't remember any
15 conversations --
16    Q.    You can look at these.
17    A.    I can't remember any conversations
18 that we had about disc disease, because I don't
19 remember knowing I had any in '94, knowing I had
20 anything -- disc disease until -- it was after
21 the accident in '95. So I don't know about her
22 records, but I can't remember that.
23    Q.    Aside from using doctor terms like

Page 22

1  disc disease. Do you remember going to
2  Dr. Benton to get treated for neck or back pain
3  before the September 8, '95 accident?
4     A.    No, I don't.
5     Q.    I know it was a long time ago.
6     A.    I don't remember -- she did some,
7  you know, minor adjusting of blood pressure and
8  stuff like that, but I can't remember until
9  after the accident a minor little cyst one time
10 she removed. But I can't remember anything due
11 to any back until after September 8, of '95. I
12 can't remember anything.
13    Q.    And you mentioned blood pressure.
14 It's high blood pressure that you deal with; is
15 that right?
16    A.    Well, I used to. But she got it
17 --
18    Q.    Right. But that's your concern?
19    A.    Right. It was at that time,
20 right.
21    Q.    It wasn't low blood pressure. And
22 she treated you for that? Was one of the things
23 she treated you for?

Page 23

1     A.    Right.
2     Q.    Angina. Have they told you what
3  angina means? Is that chest pain is basically
4  what that is?
5     A.    Right.
6     Q.    Okay.
7     A.    But I didn't have a heart
8  condition until later on.
9     Q.    Was Dr. Benton the first doctor
10 you saw after the September 8, 1995 accident?
11    A.    I believe she was.
12    Q.    I have a -- like I said, I don't
13 want to hide anything from you today, especially
14 because I know it's almost ancient history.
15 This one says Sept. 11, 1995, and it talks about
16 pain in back and neck.
17    A.    First visit after the 8th, then.
18 But I don't remember any other -- she was my
19 doctor and I went to her. That would have had
20 to have been the first visit. So that would
21 have been it.
22    Q.    I'm kind of just making sure I'm
23 not missing like an emergency room record or

Page 24

1  something like that that I might need to go out
2  and find somewhere.
3     A.    I don't remember -- it could have
4  happen, but I don't remember an emergency room
5  record because we had, seems like -- didn't have
6  Hurricane Opal come through here during that
7  time? I think it was October 10. I'm not for
8  certain. Anyway, we had a hurricane in '95. I
9  don't know when. But I think it disrupted a lot
10 of things going around here.
11    Q.    Okay. Things like that are good
12 to kind of help you jog your memory sometimes.
13    A.    Right.
14    Q.    I know it is with me. It looks
15 like you returned to her on October 6, 1995.
16 PT -- which I think usually means patient --
17 fell, complaints of pain to lower back. Is that
18 the type of thing you'd go to Dr. Benton for?
19    A.    Well, whatever -- at that time,
20 whatever I needed treated for, I would go to
21 her. I don't think she was referring me to
22 anybody else at that time.
23    Q.    Okay.

6 (Pages 21 to 24)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1   A.   I don't remember a referral.
2   Q.   Up on this November 3 record --
3   this might be what you're talking about. It
4   says, day of hurricane, fell on -- this might be
5   a different incident. November 3, '95, day of
6   hurricane, going down steps October 4. Is that
7   a different --
8   A.   I remember falling then, right. I
9   did fall. Which I fall frequently.
10  Q.   Okay. That was -- I don't know if
11  it says Hurricane George or if that was -- but
12  that was one of the hurricanes that came
13  through. And whatever came through October 4
14  would be the one; right?
15  A.   That would have been -- sometime
16  in October was Opal.
17  Q.   How did that happen when you were
18  going down the stairs?
19  A.   Some ice melted out of the
20  refrigerator, to the best of my knowledge, and I
21  slipped and just -- my legs give way, and I
22  fell.
23  Q.   Okay. Where was that?

Page 26

1   A.   At home.
2   Q.   Okay. What were the steps made
3   of? Were they concrete steps or --
4   A.   Just regular --
5   Q.   Inside or outside?
6   A.   -- interior wood.
7   Q.   Okay.
8   A.   Large steps. Made out of 2 by
9   12s, 2 by 10s.
10  Q.   Okay. Do you remember going to
11  the emergency room or a hospital after that
12  fall, or do you think Dr. Benton was the
13  first --
14  A.   It would have been Dr. Benton
15  because I didn't think it was that big of --
16  Q.   I'm looking at an October 25
17  record from Dr. Benton, and she talks about
18  sleep, sudden onset of sleep, problems going to
19  sleep during the day. Do you remember seeing --
20  A.   I don't know who did these
21  records, but Dr. Benton -- you couldn't even
22  read her handwriting. But somebody did these
23  records. That's not her handwriting.

Page 27

1   Q.   Okay. Do you remember seeing her
2   for sleep problems?
3   A.   The only person I seen for sleep
4   problems, that I can remember, was this McGuire
5   guy. And then he sent me to this sleep guy -- a
6   neurologist in Dothan. It was too far for me to
7   -- since Dr. Benton is deceased. And that's --
8   the best of my knowledge, all I know about that
9   one.
10  Q.   Okay. This record looks like it
11  said -- and this might jog your memory or not.
12  It says, drove off the road, sudden onset while
13  driving. I can't read those words. It says,
14  drove off road, looks like. Does that ring a
15  bell? Do you remember that happening? While
16  you were driving, having a sudden onset of sleep
17  back then?
18  A.   Well, sometimes -- I don't have
19  that problem now. I don't know what it was.
20  That sleep study didn't prove anything. But I
21  would get drowsy and just drift off the road.
22  But I didn't have any wrecks or -- I'm accident-
23  free from anything. So there is no --

Page 28

1   Q.   All right.
2   A.   In fact, I've got millions of
3   miles with no accident.
4   Q.   Defendant's Exhibit 3 is a short-
5   term disability application. There is four of
6   them because they have different dates right
7   here. So I don't know if it was something that
8   had to be reapplied for on a weekly basis. But
9   I figured I'd put them all in there since they
10  were different.
11
12       (WHEREUPON, a document was marked
13  as Defendant's Exhibit Number 3 and is attached
14  to the original transcript.)
15
16  Q.   (BY MR. KNOTT) Is that your
17  signature up at the top?
18  A.   That's it.
19  Q.   Actually, on all of them. You
20  signed all of those?
21  A.   I signed that one.
22  Q.   You signed all of them?
23  A.   Signed that one.

7 (Pages 25 to 28)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1    Q.    So do you remember how these
2 work?  Would the doctor have this filled out
3 before you signed it?
4    A.    I had to do that in order to get
5 my check.
6    Q.    Right.  That was through a private
7 disability plan through Ryder?
8    A.    Right.  The short-term was
9 different.
10    Q.    Would the doctor have his section
11 at the bottom filled out before you signed, or
12 would you sign a blank form and take it to the
13 doctor?
14    A.    To get my check -- I can't
15 remember, but usually I would sign, and then he
16 would fill out whatever, best I can remember.
17    Q.    Did he fill it out based on --
18 would y'all talk about what needed to go in
19 there, or would he go from his records?  Do you
20 know?
21    A.    Sir, I do not remember what we
22 discussed.
23    Q.    Okay.  You remember applying for

Page 30

1 short-term disability based on --
2    A.    I remember that.  I see that
3 injury to the lower back.  I see that on there.
4    Q.    Okay.
5    A.    That was -- my injury was my back.
6    Q.    Okay.
7    A.    So I guess most of them would have
8 back or carpal tunnel.  They'd have to have.
9    Q.    Do you remember making the claim
10 saying that the symptoms began on 10/3 or
11 October 4?  Do you remember telling your doctor
12 that -- that's not your handwriting, first of
13 all?
14        MRS. SHUMATE:  I'm going to object
15 at the moment.  Maybe you and I need to clarify
16 something.  And we can do this off the record.
17
18        (WHEREUPON, a document was marked
19 as Defendant's Exhibit Number 4 and is attached
20 to the original transcript.)
21
22        11:01 a.m.
23        (Off the record discussion)

Page 31

1
2        11:01 a.m.
3    Q.    (BY MR. KNOTT)  Next I'll show you
4 Defendant's Exhibit 4, which looks like it's
5 kind of the same type of application.  Looks
6 like you applied separately for your risks?
7    A.    On the short-term, I'll answer
8 your question, but the short term is -- again, I
9 wrote carpal tunnel because -- I mean, I had
10 back and carpal tunnel.  And the injury to
11 carpal tunnel was due to the same, but it got
12 through the cracks.  They didn't have to pay for
13 that one.  It was paid by the insurance company
14 if.
15    Q.    These are -- there are several
16 different forms with different dates, but those
17 are, again, your signature on these?
18    A.    Carpal tunnel, carpal tunnel.  You
19 see it on there.
20    Q.    Okay.  And Dr. Hugh McGuire, do
21 you remember seeing him-
22    A.    One time only.
23    Q.    One time only?  Was he one that

Page 32

1 somebody sent you to?
2    A.    He worked with Dr. Mellanie
3 Benton, or they worked together, whatever.  I
4 don't know the setup on that.  They were in the
5 same office.
6    Q.    He says that on October 4, you
7 slipped and fell down some stairs, hitting your
8 back, neck and head as you went down.  Is that
9 based on what you told him?
10    A.    I didn't tell him anything about
11 that.  He wasn't my doctor.  When Dr. Benton
12 passed away, I guess he pulled records.
13    Q.    Did he talk to you about sleep
14 apnea?
15    A.    That's what he -- we just went
16 over that with Alan Prince.  Narcolepsy, he
17 thought, to be checked in a sleep center.
18    Q.    So was it in 1995 that you did
19 that sleep center study?
20    A.    I would assume it was right about
21 that time, yes.
22    Q.    Okay.  Do you remember the name of
23 that sleep center?

8 (Pages 29 to 32)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1  A.   Dr. Alan Prince, Southeast Alabama
2  Medical Center.
3  Q.   It was his deal?
4  A.   Right.
5  Q.   Now, Number 5 is one of
6  Dr. Granger's records from Southern Bone &
7  Joint. And you first started treating with him
8  in November of '95?
9  A.   Carpal tunnel.
10  Q.   You started going to him for
11  carpal tunnel?
12  A.   Correct.
13
14      (WHEREUPON, a document was marked
15  as Defendant's Exhibit Number 5 and is attached
16  to the original transcript.)
17
18  Q.   (BY MR. KNOTT) At that time, were
19  you having back pain yet? His note says, back
20  pain. Like I said, I'm not trying to hide
21  anything from you. It talks about carpal tunnel
22  and then also lists severe low back pain. And
23  it says, without evidence of radiculopathy in

Page 34

1  lower or upper extremities. Do you remember
2  having pain in your legs or down below your back
3  in the fall of '95?
4      MRS. SHUMATE: I'm going to
5  object. In the fall meaning that season of the
6  year or --
7      MR. KNOTT: Good point. In the
8  autumn. In the autumn of '95 --
9      MRS. SHUMATE: And you're asking
10  him something from 11 years ago.
11      MR. KNOTT: Yeah, what he
12  remembers.
13  A.   Yeah. I was having problems,
14  because the fall was the 10th of September, or
15  whatever you said, and now we're in November.
16  So, yes, it'd done been -- it was dated I had
17  the problem, the accident before that, so I
18  would assume I told him I had back problems.
19  Q.   The reason I asked the question
20  is sometimes I know that -- I've talked to
21  people whose back problems start off in a fall,
22  and then they progress and other symptoms arise.
23  So what I'm trying to break down is whether or

Page 35

1  not you remember that you were having leg pain
2  and numbness in November of '95 or if that had
3  not come up yet. Based on this record is the
4  only reason I asked where he says, without
5  evidence of radiculopathy?
6  A.   I didn't have no MRI or anything.
7  It would just have been a verbal or physical
8  exam. I was down there for the carpal tunnel.
9  Q.   Okay. And the main reason for
10  your visit was the carpal tunnel?
11  A.   Exactly, both hands.
12  Q.   And y'all did talk about your back
13  and your other pain, but focused on the carpal
14  tunnel?
15  A.   Correct.
16
17      (WHEREUPON, a document was marked
18  as Defendant's Exhibit Number 6 and is attached
19  to original transcript.)
20
21  Q.   (BY MR. KNOTT) Defendant's
22  Exhibit 6 just shows he -- Dr. Granger gave you
23  a carpal tunnel release on your right wrist. He

Page 36

1  did that first; right? He didn't do it at the
2  same time?
3  A.   To the best of my knowledge, we
4  did in '95 -- I think it was the right one first
5  and the left one next.
6  Q.   It was around Christmas or New
7  Years?
8  A.   I know three months later he did
9  the other one. I can't remember the dates.
10
11      (WHEREUPON, a document was marked
12  as Defendant's Exhibit Number 7 and is attached
13  to the original transcript.)
14
15  Q.   (BY MR. KNOTT) During that time
16  you -- you're referring now to Defendant's
17  Exhibit 7. You returned back to Dr. Granger and
18  you followed up again, still focusing on your
19  carpal tunnel without focusing on your low back
20  at that point in time; is that fair?
21      MRS. SHUMATE: Give him a chance
22  to read it, I guess. If you're going to ask him
23  what the record says, let him read every one of

9   (Pages 33 to 36)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1  them.
2      Q.    You can read them all.  If I go to
3  too fast, you can stop me and slow me down.
4  Also attached to this -- there is an MRI, which
5  appears to be an MRI of your low back as well.
6  It looks like it's dated February 13, '96.  Do
7  you remember getting an MRI around that time?
8      A.    Who did the -- who is the doctor?
9      Q.    This is Southern Bone & Joint.
10 This is -- Defendant's Exhibit 7 is Keith
11 Granger.  The Southeast Alabama Medical Center
12 is at the top of the MRI.  It's dated February
13 1996.
14     A.    I remember taking an MRI.  I
15 couldn't remember the date, but there it is on
16 paper:  the 2nd, the 13th of '96.
17     Q.    Do you remember if this would be
18 the first MRI you had after your September 8,
19 1995 fall?
20     A.    Sir, I would --
21     Q.    Did you have an earlier one?
22     A.    Sir, I would assume -- all this
23 was hashed out by the judge, and he plainly

Page 38

1  told -- this is not you an answer.  But he
2  plainly told the other representative from
3  Ryder, the case has been settled.  We're not
4  going to go back and hash it out again.  That's
5  what the judge told the other -- I remember that
6  distinctly in Clayton.  It's done been settled,
7  his disability.
8      MRS. SHUMATE:  Just answer his
9  questions.
10     Q.    I'm just trying to get -- put a
11 little bit of history on your medical conditions
12 to bring --
13     A.    As far I know, that's my first
14 MRI.
15     Q.    -- to bring them up to date so we
16 know how they've progressed and gotten to where
17 they are today and then put it in the hands of
18 the doctors, and, as Amy pointed out, the Court
19 ultimately.
20
21     (WHEREUPON, a document was marked
22 as Defendant's Exhibit Number 8 and is attached
23 to the original transcript.)

Page 39

1
2      Q.    (BY MR. KNOTT) Defendant's
3  Exhibit 8 is a medical record, or it looks like
4  one.  I don't know where it's from.  It doesn't
5  have a date on it.  But I will suggest that it
6  discusses that at that point in time, February
7  '96, you were still having low back pain.  It
8  comments that you were having lower extremity
9  weakness and pain in your back, climbing and
10 walking down -- I guess that means climbing and
11 walking down stairs.  Does that sound right to
12 you about the way you would have been feeling
13 and reporting it to a doctor around that point
14 in time?
15     A.    I've always had problems with
16 walking, climbing and falling a lot, yes.  So
17 that would be in my range.  I don't see a name.
18     Q.    I don't either.
19     A.    I don't see a doctor.  I don't see
20 nothing but my name, and that's it.
21     Q.    And a date.  And that's all.  I
22 was just wondering if that would sound right to
23 you, though, that you were having those problems

Page 40

1  with weakness and pain in your back, climbing
2  and walking down at that point in time?  Is that
3  something that you would have reported and saw a
4  doctor about it?
5      A.    By not knowing the doctor's name
6  or whoever, I'd just have to say -- it's got my
7  name on it.  I guess so.  But I don't know.
8      Q.    You don't know if you would have
9  reported having pain in your back?
10     A.    Yes, I would have reported it.
11 But I don't see any --
12     Q.    That's all I was asking.  If that
13 sounded like the kind of complaint you would
14 have made?
15     A.    All right.
16
17     (WHEREUPON, a document was marked
18 as Defendant's Exhibit Number 9 and is attached
19 to the original transcript.)
20
21     Q.    (BY MR. KNOTT) Defendant's
22 Exhibit 9 is -- says a report of operation for
23 left carpal tunnel syndrome.  That, again, I

10  (Pages 37 to 40)

# American Court Reporting
## toll-free (877) 320-1050

Page 41

1  guess, would be in line with doing one of them
2  first and then the other at Southern -- with
3  Dr. Granger?
4      A.    Yes.
5      Q.    You continued to see Dr. Granger
6  after that just to follow up and still focusing
7  on the carpal tunnel?
8      A.    I definitely remember I had to
9  follow up on the carpal tunnel.
10     Q.    That continued to be the focus of
11 your treatment with Dr. Granger at that point in
12 time.
13     A.    To the best of my knowledge.
14
15         (WHEREUPON, a document was marked
16 as Defendant's Exhibit Number 10 and is attached
17 to the original transcript.)
18
19     Q.    (BY MR. KNOTT)  That was
20 Defendant's Exhibit 10 that's some follow-up
21 notes with Dr. Granger.
22
23         (WHEREUPON, a document was marked

Page 42

1  as Defendant's Exhibit Number 11 and is attached
2  to the original transcript.)
3
4      Q.    (BY MR. KNOTT)  Defendant's
5  Exhibit 11 is a long-term disability claim form
6  that appears to be signed by Dr. Allen.  And it
7  seems to represent that your claim for
8  disability is based on a combination of carpal
9  tunnel and low back pain.  Would that be fair to
10 your recollection, that that would be --
11     A.    Yes.
12     Q.    Do you remember applying for this
13 long-term disability?
14     A.    Yes.
15     Q.    Was that something you and
16 Dr. Allen did together?
17     A.    Yes.
18     Q.    How did you get into seeing
19 Dr. Allen?  Was that a referral from somebody?
20     A.    I just looked in the Yellow Pages
21 and got me a neurologist.
22     Q.    Had one of your doctors told you
23 you needed a neurologist, or did you just know

Page 43

1  from common sense that you probably ought to go
2  see one?
3      A.    Common sense.  I knew there was
4  something definitely wrong, more than a regular
5  doctor could tell me.
6      Q.    Defendant's Exhibit 12 is a note
7  that is on letterhead that says, Robert Allen.
8
9          (WHEREUPON, a document was marked
10 as Defendant's Exhibit Number 12 and is attached
11 to the original transcript.)
12
13     Q.    (BY MR. KNOTT)  And again, it
14 appears to indicate that carpal tunnel syndrome
15 was the primary treatment concern at that point
16 in the time.  It also -- I'll direct your
17 attention to the bottom -- discusses low back
18 pain.  Do you remember seeing Dr. Allen and
19 consulting with him about low back pain in
20 addition to your carpal tunnel syndrome?
21     A.    Yes, I remember discussing low
22 back pain and carpal tunnel.
23     Q.    Before seeing Dr. Allen, had any

Page 44

1  other doctors characterized your back problem as
2  degenerative disc disease, or do you know?
3      A.    Sir, I don't know.
4      Q.    Okay.  Number 13 is another -- it
5  says, Standard Insurance Company.  I don't know
6  if it's another disability insurance
7  application.  Their name is on the other
8  applications.
9
10         (WHEREUPON, a document was marked
11 as Defendant's Exhibit Number 13 and is attached
12 to the original transcript.)
13
14     Q.    (BY MR. KNOTT)  I'll represent
15 that appears to be signed by Robert Allen at the
16 bottom.  It looks like it's one of those things
17 that gets submitted with the disability
18 applications.  Do you see where it says your low
19 back pain is persisting, and now you have leg
20 pain and numbness also?
21     A.    I see that.
22     Q.    And you signed this.
23     A.    That is my signature.

11  (Pages 41 to 44)

## www.AmericanCourtReporting.com
## August 23, 2006

Page 45

1    Q.    So that would have been based on
2  information that you gave to Dr. Allen about leg
3  pain and numbness at that point in time?
4    A.    Yes.
5
6        (WHEREUPON, a document was marked
7  as Defendant's Exhibit Number 14 and is attached
8  to the original transcript.)
9
10    Q.    (BY MR. KNOTT) Number 14 is a
11 small stack of records from Dr. Allen.  They go
12 from 7/17/96 to 12/30/96.  It appears from my
13 review of that, that all the way up until
14 December of '96, your treatment with Dr. Allen
15 was focused on the carpal tunnel without mention
16 of the back pain before December of '96.  Does
17 that comport with your recollection?
18    MRS. SHUMATE:  Sorry.  Ask the
19 question again.
20    MR. KNOTT:  This is his continuing
21 treatment with Dr. Allen.
22    MRS. SHUMATE:  Uh-huh,
23 (affirmative).

Page 46

1    MR. KNOTT:  These are records from
2  7/17/96 all the way up to December 30, '96, and
3  they focus on the carpal tunnel.  And the
4  question was:  It appears from that that the
5  treatment was focused on carpal tunnel syndrome
6  and the wrist syndrome up until -- after that
7  period of time up until December 30 without
8  mention of treatment in the doctors' notes.
9    MRS. SHUMATE:  I'm going to object
10 to the question because basically you're just
11 asking him is that what the record says.  I'll
12 object and say the record speaks for itself.  It
13 says what it says.
14    MR. KNOTT:  The question was
15 whether --
16    MRS. SHUMATE:  That doesn't mean
17 he's not complaining of things to other doctors
18 during that same period of time.
19    MR. KNOTT:  I agree.  And the
20 question is whether it comports with his
21 recollection.
22    MRS. SHUMATE:  If you remember
23 what you told Dr. Allen in 1996, you can

Page 47

1  answer.  Otherwise --
2    A.    I don't remember.  There's where I
3  -- you just showed me the paper that it's got
4  the same date -- back -- that you just told me
5  same date, same time.
6    Q.    I didn't ask you if you weren't
7  having back pain because I read it also.
8    A.    Right.
9    Q.    But just regarding the treatment
10 Dr. Allen was following is all I was asking
11 about.
12    A.    Yes, sir.
13
14        (WHEREUPON, a document was marked
15 as Defendant's Exhibit Number 15 and is attached
16 to the original transcript.)
17
18    Q.    (BY MR. KNOTT) Do you remember
19 going back to see -- during this time, did you
20 continue to go back to see Dr. Benton from time
21 to time as your regular doctor just for this and
22 that?
23    A.    Sometimes I would go back to see

Page 48

1  her, yes, sir, that's correct.  I can't
2  remember, though, the dates.
3    Q.    I know.  Defendant's Exhibit 15,
4  says Jan. 03, 1997.  And the writing appears to
5  say something along the lines of, stepped down
6  off -- maybe it says pavement and right leg gave
7  way.  Patient fell onto -- and I'm not sure what
8  that word is.  Do you remember that incident
9  happening back around New Years of '97?
10    A.    I don't remember falling --
11 stepping down and falling on the pavement.  I
12 don't remember.
13    Q.    If the pavement word is wrong, do
14 you remember a fall around New Years of 1997?
15    A.    I don't remember it, sir.
16    Q.    Okay.  Next thing, kind of staying
17 with the chronological theme, is Defendant's
18 Exhibit 16.  And it's your complaint for
19 workers' compensation benefits that was filed in
20 this.  And that was signed by you after you
21 reviewed it; is that right?
22    A.    Right.
23

12  (Pages 45 to 48)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1    (WHEREUPON, a document was marked
2  as Defendant's Exhibit Number 16 and is attached
3  to the original transcript.)
4
5    Q.    (BY MR. KNOTT)  And I wasn't
6  personally involved in that lawsuit.  I see that
7  on the original complaint it talked about a May
8  22, 1995 accident.  I know that at some point
9  that got straightened out and that the order
10  says September 8, 1995.  Do you know how that --
11  I don't know if it was a typo or what.  Do you
12  know how that came about?
13    A.    I have no idea how they -- one
14  date was one date one time, and one date was
15  another.  I would asked a question -- I don't
16  have no idea.  Don't nobody seemed to know.
17
18    (WHEREUPON, a document was marked
19  as Defendant's Exhibit Number 17 and is attached
20  to the original transcript.)
21
22    Q.    (BY MR. KNOTT)  Okay.
23  Defendant's Exhibit 17 is more stuff with Robert

Page 50

1  Allen's name on it.  One of the things attached
2  to it is another MRI report.  Do you remember
3  getting another MRI?
4    A.    I do remember getting one from
5  Dr. Allen.
6    Q.    Okay.  And this was an MRI on your
7  back for your low back; is that right?
8    A.    Right.
9    Q.    Okay.
10    A.    For my -- not upper part, my
11  lower.  L-2 and S-1, that's lower.
12    Q.    Do you remember discussing that
13  MRI with Dr. Allen or anything he told you about
14  it?
15    A.    Sir, we discussed everything he
16  did, so I know we discussed it.
17    Q.    Okay.  Do you remember after that
18  MRI if you and Dr. Allen discussed treatment
19  possibilities?  I saw one thing in there that
20  talked about disc bulge, possibly with some
21  impingement.  Do you remember discussing with
22  Dr. Allen what your options might be?
23    A.    No, I don't remember what he

Page 51

1  advised me of my options at that time.
2
3    (WHEREUPON, a document was marked
4  as Defendant's Exhibit Number 18 and is attached
5  to the original transcript.)
6
7    Q.    (BY MR. KNOTT)  Defendant's
8  Exhibit 18.  This, again, would be
9  Dr. Benton's.  You would have -- when you would
10  go see Dr. Benton or Dr. McGuire, you would tell
11  them about the same problems you were having,
12  the problems with your back; is that right?  I
13  see a note on there regarding LS disc disease.
14    A.    Yes.
15    Q.    Okay.
16    A.    I would assume that I did.
17
18    (WHEREUPON, a document was marked
19  as Defendant's Exhibit Number 19 and is attached
20  to the original transcript.)
21
22    A.    I can't read all that.
23    Q.    I can't read it all either.  Did

Page 52

1  Dr. Allen give you some injections?  Do you
2  remember that?
3    A.    He would give me side injections
4  with a long needle.  I remember the long needle
5  that'd go in my spinal column, in the sides.
6    Q.    Defendant's Exhibit 19 talks about
7  some B-12 injections in each hip.  Is that the
8  injections you're thinking about?
9    A.    It would come through and go into
10  my spine.
11    Q.    Do you remember if you got any
12  relief from those, even temporary or --
13    A.    Might have been temporary, but I
14  don't remember nothing ever relieving it.
15    Q.    Nothing long-lasting?
16    A.    No, sir.
17
18    (WHEREUPON, a document was marked
19  as Defendant's Exhibit Number 20 and is attached
20  to the original transcript.)
21
22    Q.    (BY MR. KNOTT)  Defendant's
23  Exhibit 20 is a -- from Dale Medical Center, a

13  (Pages 49 to 52)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1  hospital record from the emergency room. It
2  says, July 3, 1997, a lawn mower accident. Do
3  you remember going to the emergency room for a
4  lawn mower overturning?
5      A.    I remember going -- a defect in a
6  lawn mower. When I was pulling it on a trailer,
7  it broke the steering.
8      Q.    Was it a riding lawn mower?
9      A.    Right.
10     Q.    Did it roll all the way over on
11  you?
12     A.    It rolled off and, I think, grazed
13  my leg, the best I remember, or part of my --
14     Q.    Gave you a cut on your leg?
15     A.    I can't remember. It might have
16  nicked me, but they wanted me to go to the
17  emergency room.
18     Q.    Were you on a hill? Did it --
19     A.    No, it was flat. I went to drive
20  it on a trailer, and the little steering axle
21  broke. It was a factory defect. They replaced
22  it and was going to replace the mower because it
23  was a defect.

Page 54

1      Q.    Okay.
2      A.    MTD was the name of the mower.
3      Q.    Did you file a lawsuit coming out
4  of that or make a claim?
5      A.    No.
6      Q.    The record looks like it says
7  something about your right side. I think a
8  laceration on your right calf. Does that sound
9  like that might be -- again, we're talking about
10  a doctor's handwriting on this. I'm just
11  wondering if it'll refresh your memory.
12     A.    Sir, I've had a lot of falls and
13  accidents. It could have been a cut on my calf,
14  right.
15     Q.    They ran some tests on you. I
16  know sometimes different medications can show up
17  different ways. The way it's listed in this
18  test is that it was positive for cocaine. And
19  I know that you were taking a lot of different
20  medications. Do you think that would be why it
21  showed up positive to some of the medications
22  from your doctors?
23     A.    They explained to me that it was

Page 55

1  medication. I've never done any cocaine in my
2  life.
3      Q.    That's why I asked you that way,
4  because I didn't want you to think I was
5  suggesting it the other way. Was it the
6  emergency room doctors that explained that to
7  you, or was it your treating doctors?
8      A.    It was --
9      Q.    The hospital?
10     A.    I don't -- no, it had to have been
11  the emergency room doctors because they were
12  there to explain it to me when I called back.
13  And they said the medicine could definitely show
14  it. It wasn't enough of it to prove it was
15  of any substantial amount for the medication I
16  was taking.
17     Q.    Numbers 21, 22, and 23.
18
19         (WHEREUPON, documents were marked
20  as Defendant's Exhibit Numbers 21, 22 and 23 and
21  are attached to the original transcript.)
22
23     Q.    (BY MR. KNOTT) These are

Page 56

1  settlement papers from your lawsuit initially
2  from February '98 where you settled the work
3  comp claim leaving medicals open; right?
4      A.    All medicals are left open,
5  correct.
6      Q.    You took $7,000 for the
7  compensation part, for the compensation
8  payments, with the right to continue to receive
9  medical treatment for the September 8, 1995
10  accident?
11     A.    Right. And I kept the medical,
12  like you said.
13     Q.    Right, you kept the medical open.
14
15         (WHEREUPON, a document was marked
16  as Defendant's Exhibit Number 24 and is attached
17  to the original transcript.)
18
19     Q.    (BY MR. KNOTT) Number 24 is the
20  earliest record I've seen from Dr. Kesserwani.
21  I guess I'm pronouncing that right. He's a
22  neurologist, apparently. It appears to be dated
23  June 3, 1998. Do you remember how it was you

14  (Pages 53 to 56)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1  came to go to Dr. Kesserwani? Was it a referral
2  from another doctor?
3      A.    I guess I decided to go to another
4  neurologist. I don't remember any referral.
5      Q.    Again, it was kind of like
6  before: just common sense. You needed to see
7  somebody --
8      A.    Right.
9      Q.    -- and you found somebody?
10     A.    Yes, sir.
11     Q.    And there's some handwritten
12  notes -- and he's not any better at it, in my
13  opinion, than any other doctor in terms of
14  penmanship. Can you make out what's written on
15  Exhibit 24? The question is: In looking at
16  that, if that comports with what you believe you
17  would have told him about your -- kind of
18  bringing him up to speed on your accident, your
19  injury and your condition?
20          MRS. SHUMATE: Can you read that?
21     A.    No, not half of it. Not even
22  three-fourths of it. I can't even read it.
23     Q.    Okay. Would you have told him you

Page 58

1  were having back pain and it was worsening, do
2  you believe? It was getting worse?
3      A.    I think I would have told him
4  that.
5      Q.    Do you think you would have told
6  him that your legs give way sometimes?
7      A.    I would think so, because they do.
8      Q.    Do you think you would have told
9  him that you were having numbness and tingling
10  in your legs for the last year and a half?
11     A.    Sir, I have no idea if I told him
12  that.
13     Q.    Okay.
14
15          (WHEREUPON, documents were marked
16  as Defendant's Exhibit Numbers 25 and 26 and are
17  attached to the original transcript.)
18
19     Q.    (BY MR. KNOTT) Defendant's
20  Exhibits 25 and 26 are more from
21  Dr. Kesserwani. I don't know why I marked them
22  separately. It appears to be just some of his
23  notes from the course of your treatment. Was he

Page 59

1  looking to try to find a reason that you were
2  having the -- that you were falling and that you
3  were having leg pain and leg weakness? Do you
4  remember?
5      A.    Sir, I don't remember. The man
6  did -- I remember him doing his first nerve
7  test, and I never went back because he -- I call
8  him Dr. Pain. He hurt me that bad, so I didn't
9  go bad.
10     Q.    The nerve test hurt so bad?
11     A.    Right. It was his first, he said,
12  on that machine. And I can well remember.
13     Q.    So he told you -- basically, you
14  were his guinea pig, it sounds like?
15     A.    Right. And I never did go back to
16  him.
17     Q.    Did you ever -- I'll jump ahead to
18  see if -- do you think maybe you went back to
19  him a couple of years late in 2000? This is
20  Defendant's Exhibit 36 where it says, Johnny
21  comes to me for a follow-up visit. He continues
22  to fall. Does that help you remember?
23

Page 60

1          (WHEREUPON, a document was marked
2  as Defendant's Exhibit Number 36 and is attached
3  to the original transcript.)
4
5      A.    I don't remember. But if I went,
6  they wasn't no -- it was basically -- there
7  wasn't any machines hooked up to me.
8      Q.    (BY MR. KNOTT) When you went back,
9  you didn't let him hook you up again?
10     A.    Never.
11     Q.    I went ahead and jumped ahead to
12  Defendant's Exhibit 36 hoping that would jog
13  your memory in going back.
14     A.    I can't remember. If I did, it
15  was just for something that -- it says something
16  about circulation in leg and nerve conduction
17  study. That might have been when he done the
18  nerve conduction study. That's when I didn't
19  ever go back, because that says he did do one.
20  Yeah, that would have been the day I never went
21  back. It was a new machine and --
22     Q.    Okay.
23     A.    -- he said I was his first one. I

15 (Pages 57 to 60)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  couldn't take it.
2      Q.   Okay.
3      A.   I need to go to the bathroom. I'm
4  sorry.
5      Q.   That's okay.
6
7          11:32 a.m.
8          (Off the record)
9          11:40 a.m.
10
11          (WHEREUPON, documents were marked
12  as Defendant's Exhibit Numbers 27 and 28 and are
13  attached to the original transcript.)
14
15      Q.   (BY MR. KNOTT) Defendant's
16  Exhibit 28. This is another from Dr. Kesserwani
17  that follows between the last two we talked
18  about. I jumped ahead to 36. This talks
19  about -- down in the third paragraph, talks
20  about cramping in your legs and calves. I've
21  seen that in other places of Dr. Kesserwani's
22  note. Do you remember discussing that issue of
23  cramping with Dr. Kesserwani?

Page 62

1      A.   No, I don't.
2      Q.   You don't?
3      A.   But I still cramp.
4      Q.   You do? Do you remember how long
5  the cramping has been going on or how soon
6  after --
7      A.   Since the accident.
8
9          (WHEREUPON, a document was marked
10  as Defendant's Exhibit Number 29 and is attached
11  to the original transcript.)
12
13      Q.   (BY MR. KNOTT) Number 29. This
14  is just kind of filling in some gaps. It
15  doesn't have anything to do with -- this is your
16  heart -- Defendant's Exhibit 29 is from Dale
17  Medical Center, and it discusses your heart
18  problems. You had triple bypass surgery at UAB;
19  is that right?
20      A.   Yes.
21      Q.   In 1998? Dr. Pacifico?
22      A.   Yes, '98, I believe.
23      Q.   And that was triple bypass. After

Page 63

1  being discharged from UAB, you came back home,
2  and then you were still having chest problems so
3  you went into Dale Medical Center?
4      A.   Yes, sir. Nobody -- my doctor,
5  Alfano, that you asked earlier was he still my
6  doctor, could not be got a hold of to regulate
7  -- write my medicine. They don't write it at
8  UAB, so I had to go to these people.
9      Q.   And they admitted you for a little
10  while --
11      A.   Just till he could get it
12  regulated.
13      Q.   I just threw that in there just to
14  kind of fill out the picture.
15      A.   That was just to get medication
16  regulated.
17      Q.   Defendant's Exhibit 30 is a
18  records from another time you went to Dale
19  Medical Center. It says 4/10/99.
20
21          (WHEREUPON, a document was marked
22  as Defendant's Exhibit Number 30 and is attached
23  to the original transcript.)

Page 64

1
2      Q.   (BY MR. KNOTT) It mentions fell,
3  back injury. And if you look through those, I
4  think it's saying something about fell off the
5  back of his truck, landed on two-by-four, broke
6  two ribs, hurt back. Do you remember that?
7      A.   Yeah. I was doing a little
8  pruning with a little small pruning saw, and I
9  fell. I remember that.
10      Q.   Standing on -- was it like a
11  flatbed, I guess, so you could reach it.
12      A.   Yeah, it was like a little
13  flatbed.
14      Q.   You mention breaking two ribs. do
15  you remember any other injuries coming out of
16  that?
17      A.   Did it have two ribs -- and what
18  else?
19      Q.   And hurt back. I'm sorry. But
20  aside from that, anything else?
21      A.   Yeah, back --
22          MRS. SHUMATE: I'm going to object
23  to your -- where it says diagnosis, it says

16  (Pages 61 to 64)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1  contusion to the back and two rib fractures, not
2  hurt back.
3       MR. KNOTT: I was speaking
4  loosely, I suppose. I'm sorry.
5       MRS. SHUMATE: Yes, you were.
6       Q.   Do you remember getting any other
7  follow-up treatment besides --
8       A.   I don't --
9       Q.   -- the fall out of the truck?
10      A.   I don't remember, but I might
11  have.
12      Q.   All you can do is tell me what you
13  remember and what you don't.
14      A.   Right.
15      Q.   Defendant's Exhibit 31.
16
17           (WHEREUPON, a document was marked
18  as Defendant's Exhibit Number 31 and is attached
19  to the original transcript.)
20
21      Q.   (BY MR. KNOTT) This is a bunch
22  of pages from Dr. Rachelle Janush. Do you
23  remember going to see her?

Page 66

1       A.   In August of 1999? Yes, I
2  remember this lady.
3       Q.   Okay. How did you come to see
4  her? Do you remember?
5       A.   Ryder sent me to see this lady.
6       Q.   What was your experience with
7  Dr. Janush?
8       A.   She just did some x-rays and
9  exams. I don't know -- I can't remember.
10      Q.   Do you remember if it did any
11  good, just from your own point of view?
12      A.   No good.
13      Q.   On Page 8 it references another
14  fall nine days ago. It's dated 8/18/99, so that
15  would be early August '99. Do you remember
16  anything about that or is that just --
17      A.   Sir, don't remember the dates of
18  when I fell.
19      Q.   And you don't remember how that
20  fall -- what that fall she would have been talking
21  about either?
22      A.   No, sir, because I fall a lot.
23      Q.   All I can do is ask you -- maybe

Page 67

1  there is some details there, maybe there
2  aren't.
3       A.   Right.
4       Q.   On Page 7, if y'all could look at
5  Page 7, there's a diagram. Did you color that
6  diagram in yourself?
7       A.   I guess I did. That's my
8  signature.
9       Q.   If you could keep it on Page 7 for
10  just a moment. Do you think you can explain
11  what the shading on the legs indicates or is
12  intended to show?
13           MRS. SHUMATE: Objection. You're
14  asking him to give something from seven years
15  ago without any indication of what his
16  instructions were from the office staff. I just
17  think that's an improper question.
18           MR. KNOTT: Well, the question
19  was, do you think you can. If he can, he can.
20           MRS. SHUMATE: All right.
21      A.   I have no idea what she told me to
22  color, what the reason, and discussed if it
23  was -- could have been pain or cramping or

Page 68

1  whatever. I don't have no idea.
2       Q.   That's exactly what I was
3  wondering. It's got dull, burning, numb,
4  stabbing, cramping -- all these words under it.
5       A.   But, see, nothing is --
6       Q.   Can't tell which one it is, and
7  you can't remember which one --
8       A.   I have no idea.
9       Q.   Or if it's a combination of them?
10      A.   No.
11
12      I    (WHEREUPON, documents were marked
13  as Defendant's Exhibit Numbers 32 and 33 and is
14  attached to the original transcript.)
15
16      Q.   (BY MR. KNOTT) Defendant's
17  Exhibits 32 and 33, are the first petition for
18  rule, which were filed back in the Autumn 1999.
19  It's a petition, and it's the order. Do you
20  remember going through that when y'all went to
21  the court the first time?
22      A.   The first judge order for --
23      Q.   When you went back to court the

17  (Pages 65 to 68)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1  first time for the medicals.
2      A.    Yes, sir.
3      Q.    And that he said -- do you
4  remember the Judge saying for you to go back to
5  Dr. McGahan and just basically to see what
6  Dr. McGahan thinks?
7      A.    Correct.
8      Q.    Defendant's Exhibit 34 is on
9  letterhead that looks like Dr. Magahan's. It's
10  a poor copy.
11
12      (WHEREUPON, a document was marked
13  as Defendant's Exhibit Number 34 and is attached
14  to the original transcript.)
15
16      A.    I remember he had to write a
17  letter. I looked -- I never could read the
18  thing, because I've got a copy of the same thing
19  you've got.
20      Q.    (BY MR. KNOTT) You've got the same
21  as mine. Okay. A few words you can make out.
22  It says that, Johnny Sasser, in my medical
23  opinion, received a work-related injury on or

Page 70

1  about September 8, 1995?
2      A.    Right.
3      Q.    Do you remember Dr. McGahan
4  putting in writing or going down a laundry list
5  and saying, this is related, this thing's not,
6  this thing's related, this thing's not? Do you
7  know if he did that?
8      A.    No, sir. I tried to get the
9  files, and they were destroyed.
10      Q.    Okay. Do you remember how long
11  ago it was that you tried to get the files from
12  this -- from Dr. McGahan as to where they were
13  destroyed from?
14      A.    It was really last year. I don't
15  know the date, no.
16      Q.    Well, last year -- I'm just kind
17  of wondering roughly how long --
18      A.    When he left town, I tried to get
19  my file.
20      Q.    That was sometime last year that
21  you found out that he left?
22      A.    Finally.
23

Page 71

1
2      (WHEREUPON, a document was marked
3  as Defendant's Exhibit Number 35 and is attached
4  to the original transcript.)
5
6      Q.    (BY MR. KNOTT)  Number 35 is
7  another note that appears to be from
8  Dr. McGahan.  Down at the bottom is his name,
9  and it's dated 2/23/2000.  Referring, again, to
10  pain in back and legs.  And it appears to
11  indicate that you reported your legs had given
12  out again and you'd fallen again in February of
13  2000.  Do you remember that fall occurring?
14      A.    Sir, I can't remember every fall I
15  had, no.
16      Q.    But you can't --
17      A.    I did fall a lot.
18      Q.    Okay.  But just in terms of
19  specifically, you can't specifically remember
20  that fall?
21      A.    No, sir.
22      Q.    Just for continuity's sake,
23  Defendant's Exhibit 36 is the note from

Page 72

1  Dr. Kesserwani that you and I jumped ahead to a
2  little while ago, the 2/28/2000 note.  And you
3  said you believe that was the last time that you
4  saw him.
5      A.    To answer --
6      Q.    It's not even a question.  Just
7  keeping them in order is all.  I'm sorry.  I let
8  it hang out there like I was waiting for you to
9  tell me something.  Defendant's Exhibits 37, 38,
10  39, and 40.
11
12      (WHEREUPON, documents were marked
13  as Defendant's Exhibit Numbers 37, 38, 39 and 40
14  and are attached to the original transcript.)
15
16      Q.    (BY MR. KNOTT)  These appear to
17  be some settlement paperwork.  When y'all had
18  the dispute about the medical bills last time,
19  the Judge entered an order and y'all finally
20  reached a settlement, an agreement as to how the
21  past medical bills could be handled up to that
22  point; is that right?  I think your signature's
23  on there somewhere.

18  (Pages  69 to 72)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1      MRS. SHUMATE:  This is the
2  original 2000 settlement.
3      MR. KNOTT:  Okay.  I might have it
4  in there twice, then.
5      MRS. SHUMATE:  This is the
6  original settlement for --
7      MR. KNOTT:  37 and --
8      MRS. SHUMATE:  For the $6,000.
9      MR. KNOTT:  Oh, wait.  No --
10      MRS. SHUMATE:  That's the 2000
11  settlement, the one you had already put in here.
12      MR. KNOTT:  The first --
13      MRS. SHUMATE:  The first one you
14  put in here.
15      MR. KNOTT:  The first ones were
16  dated February of '98.
17      MRS. SHUMATE:  '98.  Yeah, that's
18  the 2000 one.
19      MR. KNOTT:  Right.  And the 2000
20  one is when -- after the Judge ordered medical
21  bills paid, they reached an agreement about what
22  had been -- the past medicals that were owing
23  and got them paid.

Page 74

1      MRS. SHUMATE:  I see.  So that is
2  a result of the October '99 order?
3      MR. KNOTT:  Right.  So that they
4  got -- that's an order approving settlement of
5  past medical expense.  Still leaving future
6  medicals open.
7      MRS. SHUMATE:  Leaving the futures
8  open, that's right.
9      MR. KNOTT:  Just kind of, I guess,
10  starting the --
11      MRS. SHUMATE:  The last settlement
12  petition was the April of '05, settling the Rule
13  Nisi, based on the Judge's order.
14      MR. KNOTT:  April of 2000.
15      MRS. SHUMATE:  April of 2000.
16  What did I say?
17      MR. KNOTT:  '05.
18      MRS. SHUMATE:  April --
19      MR. KNOTT:  If there is one of
20  those, I need to know.
21      Q.   Okay.  So after that order was
22  entered where the Judge told them to keep paying
23  the medical bills according to whatever

Page 75

1  Dr. McGahan said, you continued seeing
2  Dr. McGahan for a while after that?  This is
3  still back in 2000.
4      A.   Right.
5      Q.   Here is some medical records with
6  Dr. Magahan's name on them.  These are --
7  they've got dates that reflect June, July,
8  August, September of 2000.  The August record,
9  8/7/00, do you see a note in there that reflects
10  you reported having a fall at home?  Do you
11  remember telling Dr. McGahan about that fall, or
12  do you remember having that fall?
13      A.   I don't remember having a fall.  I
14  had frequent falls.  And if I went, I had a
15  fall.
16      Q.   But you don't remember that one
17  specifically as we sit here today six years
18  later?
19      A.   No, sir, I'm sorry, I don't.
20      Q.   You don't even have to apologize.
21  I'm sorry for having to ask tedious questions.
22  At this point, you're having swelling in your
23  legs and ankles?  Do you remember that?

Page 76

1      A.   Yes.
2      Q.   Do you still have swelling in your
3  legs and ankles?  Is that still a problem?
4      A.   Yes.
5      Q.   How long has that been a problem?
6  That's the first time I personally noticed it in
7  your office notes.  It doesn't mean that's the
8  first time it happened, but I'm just wondering
9  if you remember when that occurred?
10      A.   It's been going on for years.  I
11  don't know.  I don't remember the date, sir.
12      Q.   Do you remember if it was
13  happening before 1995, or is this things that
14  happened after you started having your back
15  problems?
16      A.   Happened after.
17
18      (WHEREUPON, a document was marked
19  as Defendant's Exhibit Number 41 and is attached
20  to the original transcript.
21
22      Q.   (BY MR. KNOTT)  Also, in
23  Defendant's Exhibit 41, I saw a note indicating

19  (Pages 73 to 76)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

1  a referral to a pain clinic. Do you remember
2  Dr. McGahan referring you to a pain clinic?
3      A.   Dr. John Marsella.
4          MRS. SHUMATE: Dr. John who?
5      A.   John Marsella.
6          MR. KNOTT: M-A-R-S-E-L-L-A.
7      Q.   Dr. Magahan's note that he wrote
8  to the Court was hard to read. And you're going
9  to love Defendant's Exhibit 42, which I'll
10  represent to you it starts off with four or five
11  pages of Dr. Marsella's notes.
12     A.   Oh, my God.
13
14         (WHEREUPON, a document was marked
15  as Defendant's Exhibit Number 42 and is attached
16  to the original transcript.)
17
18     Q.   (BY MR. KNOTT) Do you remember
19  going to see Dr. Marsella in the autumn of
20  2000? There is two pages in the back -- at
21  least is easier to read. I don't know if they
22  will be helpful to you or not. Do you remember
23  going in to see Dr. Marsella?

Page 78

1      A.   The first of 2000?
2      Q.   Autumn of 2000. Back in the fall
3  of that year. Or autumn, I should say.
4      A.   I remember the first visit, but I
5  don't remember when it was.
6      Q.   Okay. Do you remember -- do you
7  have a feel for -- I guess that's the best way
8  to ask these kind of questions. Do you have a
9  feel for how many times you went to see
10  Dr. Marsella or like what time period your --
11     A.   Seems like it was -- to start off
12  with maybe it was once every month or two, and
13  then after that he'd stretch it sometimes to
14  three. Then he could bring it back to one or
15  two. You'd never know, best I remember.
16     Q.   Do you have a feel for when the
17  last time you saw him was, how along ago?
18     A.   '94 -- May, I believe, or June of
19  '94.
20     Q.   Of 2004?
21     A.   2004. I'm sorry.
22     Q.   Just kind of briefly tell us what
23  was the course of his treatment for you. What

Page 79

1  was he doing?
2      A.   He was my pain management doctor.
3      Q.   How did he do that? Did he give
4  you pills?
5      A.   Pills. He'd give me muscle
6  relaxers.
7      Q.   Did he do anything else other than
8  manage your prescription medicine regimen?
9      A.   Well, he would do, you know, his
10  physical exam regularly. He would also check
11  regularly of any other drugs you were on. That
12  was a policy of the pain clinic.
13     Q.   Part of managing any prescription
14  drug regimen?
15     A.   Right.
16     Q.   Did he give you any kind of
17  injections?
18     A.   Trigger point, finally, at the
19  last stages before I quit seeing him.
20     Q.   So this would have been closer to
21  2004 when he was doing those?
22     A.   Last of -- I believe it would have
23  been the first of 2004, and then it wound up

Page 80

1  about the middle. Or it could have been the
2  first one. I don't know when the first one
3  might have been, but I know she was giving them
4  in 2004 for so many months.
5      Q.   Where was he giving those trigger
6  point injections?
7      A.   He wanted to do my back, but I
8  talked him into putting them in my knees instead
9  of in my back because I'd been hurt real bad
10  with shots in my back.
11     Q.   Did he tell you why he thought
12  initially that the back would be the place to do
13  it?
14     A.   He said the back was the worst
15  part.
16     Q.   And did he give you trigger point
17  injections in both your knees?
18     A.   Both.
19     Q.   Okay. And what was your -- how
20  did that do? Did it give you any kind of
21  relief?
22     A.   It seemed it was some relief.
23     Q.   Did the relief last?

20  (Pages 77 to 80)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1  A.  Not long periods, no.
2  Q.  After it wore off, did you go back
3  to Dr. Marsella?
4  A.  Right.
5  Q.  Did he give you more trigger point
6  injections?
7  A.  Right.
8  Q.  Do you remember how many times you
9  went back to him?
10  A.  I think it was just three, was all
11  there were.
12  Q.  Did he tell you why -- or whose
13  decision was it not to go fourth or to keep
14  doing them, whenever y'all did stop?
15  A.  He wanted to continue to see me,
16  but I couldn't pay it because my medical was
17  stopped.
18  Q.  Okay.
19  A.  So I couldn't pay to see him and
20  pay for the medicine.
21  Q.  When the medicals were stopped,
22  did he tell you at that point in time about any
23  particular treatment that he wanted to continue

Page 82

1  doing with you if the medical bills were being
2  paid?
3  A.  He tried to get me an appointment,
4  you know, back into seeing him, but they never
5  would do it so he couldn't see me.
6  Q.  Okay.  Did y'all -- do you know
7  whether or not he was intending to continue the
8  trigger point injections?
9  A.  See, I have no idea.
10  Q.  Now, Defendant's Exhibit 43, again
11  looks like more stuff from Dr. McGahan.
12
13  (WHEREUPON, a document was marked
14  as Defendant's Exhibit Number 43 and is attached
15  to the original transcript.)
16
17  Q.  (BY MR. KNOTT)  Do you remember
18  going to him in January of 2001 and having him
19  refer you to Southeastern Pain Management?
20  A.  I remember when he told me he was
21  going to refer me to the pain management.  I do
22  remember that.  But I don't know when it was.
23  Q.  Was Dr. Marsella with Southeastern

Page 83

1  Pain Management, or were they separate?
2  A.  He's the same -- that's the same.
3  The medical center and pain management, I think,
4  are all one big family, that hospital.  I think.
5  Q.  So when you were talking earlier
6  about going to Dr. Marsella in 2000 and
7  continuing through 2004, you were talking
8  Southeastern Pain Management, Dr. Marsella kind
9  of all in one -- it's the same thing.
10  A.  I think it's all the same.
11  Q.  Okay.
12  A.  Because I remember when I would --
13  I know it's all the same, because I would go be
14  tested in one place in the hospital sometimes,
15  and I'd be tested in the office, and it was --
16  it had to be connected to --
17  Q.  Okay.
18  A.  You know, if they had your file.
19  That's the only reason I say that.  So it was
20  all one, I think.  Well, I know it was all one.
21  Q.  Okay.
22
23  (WHEREUPON, a document was marked

Page 84

1  as Defendant's Exhibit Number 44 and is attached
2  to the original transcript.)
3
4  Q.  (BY MR. KNOTT)  Defendant's
5  Exhibit 44 is a document on Ryder letterhead.
6  At the bottom it says, cc: John Sasser.  Do you
7  remember if you received a copy of that
8  document?  Looks like a letter that's addressed
9  to Center Drug Company.
10  A.  I never received this letter, as I
11  can remember.  I don't remember seeing it.
12  Q.  Does it seem fair to you for Ryder
13  to try to pay -- or try to not pay prescriptions
14  that weren't related to the work comp claim?
15  Things like the heart condition, does that seem
16  like something that would be fair for Ryder
17  to -- be trying to be make sure that they don't
18  pay for the heart condition, for example?
19  A.  No, they shouldn't have to pay for
20  the heart condition.
21  Q.  So it's okay for them to be -- to
22  look through the medical records and
23  prescriptions to make sure that they're not

21  (Pages 81 to 84)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1  paying for things that are not related to the
2  work comp claim?
3     A.  Certain letters they use for
4  certain things, though.
5     Q.  Right.  But just in principal --
6     A.  No.  Just the regular heart
7  medicine, no.
8
9     (WHEREUPON, a document was marked
10  as Defendant's Exhibit Number 45 and is attached
11  to the original transcript.)
12
13     Q.  (BY MR. KNOTT)  Number 45 is
14  another one on -- looks like Dr. Magahan's got a
15  new kind of form that he's using there.  It
16  appears to be dated 6/6/01.  And it appears to
17  record another incident that you had at home?
18     A.  I don't remember when I fell.
19     Q.  You don't remember on 5/31/01
20  stepping in a hole at home while working in the
21  yard?
22     A.  I don't remember -- I remember the
23  holes.  I've still got them, but I don't

Page 86

1  remember the fall at that date.
2     Q.  Right, five years ago.
3     A.  No.
4     Q.  Okay.  I'll show you Defendant's
5  Exhibit 46, records on paper with William
6  D. King, MD.  It appears to show office
7  visits -- of two different office visits in
8  August of 2001.  We talked a little about
9  Dr. King at the very outset.  Do you remember
10  going to see him?  It might jog your memory --
11  on the first office visit, there is a note that
12  says something along the lines of he's changing
13  doctors for work comp.
14
15     (WHEREUPON, a document was marked
16  as Defendant's Exhibit Number 46 and is attached
17  to the original transcript.)
18
19     A.  I remember going to Dr. King.  I
20  went -- McGahan was unavailable at the time.  I
21  can remember that.  He was vacationing or
22  whatever.
23     Q.  (BY MR. KNOTT)  Was the -- did

Page 87

1  Ryder refer you over to Dr. King because McGahan
2  was unavailable?
3     A.  He was just the closest doctor in
4  Barbour County that I could -- just picked it
5  out of the thing and go to.
6     Q.  Referred in the Yellow Pages?
7     A.  Right.
8     Q.  Do you remember -- it might not be
9  your words, you know, so that's why I'm asking.
10  Do you remember telling him you were changing
11  your work comp doctor or is that maybe something
12  that --
13     A.  No, there's no way I could do
14  that.
15     Q.  That's why I was wondering how
16  that got in there.
17     A.  No.
18     Q.  Maybe it's wishful thinking on his
19  part.
20     A.  I couldn't do that if I wanted
21  to.  You know who rules on that.
22     Q.  Okay.  Do you remember seeing
23  Dr. King anymore except for those two visits?

Page 88

1     A.  No, I don't.  Just those two, as
2  far as I know.
3     Q.  Anything in particular about
4  anything he was able to do for you or anything
5  he told you?
6     A.  He wanted to do an MRI, the best I
7  remember, and I told him I didn't want to -- I
8  didn't want to have to pay out of my pocket, so
9  I didn't go back.
10     Q.  Looks like Dr. McGahan was still
11  in practice in October 2001.  Defendant's
12  Exhibit 47.
13
14     (WHEREUPON, a document was marked
15  as Defendant's Exhibit Number 47 and is attached
16  to the original transcript.)
17
18     Q.  (BY MR. KNOTT)  So you were still
19  seeing Dr. McGahan in Autumn of 2001.  Does that
20  fit your recollection?
21     A.  I saw McGahan until he moved away
22  sometime in -- I don't know the exact time he
23  moved, really.

22  (Pages 85 to 88)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    Q.    Okay.  Number 48 is on no
2  particular letterhead, but it appears to be a
3  letter drafted to Center Drug Company from
4  Martye Lloyd, again, kind of sorting out
5  prescriptions.  Have you ever seen that
6  correspondence?
7
8        (WHEREUPON, a document was marked
9  as Defendant's Exhibit Number 48 and is attached
10  to the original transcript.)
11
12    A.    I've never seen any letter to --
13  see, Center Drug was the one filling my
14  Workman's Comp prescription.
15    Q.    (BY MR. KNOTT)  Was Center Drug
16  also filling your heart condition prescriptions?
17    A.    They were at that time, to the
18  best of my knowledge.
19    Q.    But you weren't driving across
20  town to take one to the other and one to the
21  other?
22    A.    No.
23    Q.    You just took the prescriptions

Page 90

1  where you go?
2    A.    I had insurance at that time, best
3  I remember.  I don't remember when the insurance
4  ended.
5    Q.    Okay.  Do you think Ryder would be
6  in their rights communicating with your pharmacy
7  like that to figure out which were work comp
8  drugs and which were not work comp drug?
9    A.    Would the pharmacy?
10    Q.    Uh-huh, (affirmative).
11    A.    I would think so, and with the
12  doctor too.
13    Q.    Okay.  Number 49 appears to be one
14  more from Dr. McGahan.  If you'd like to break
15  after this one, we can.
16
17        (WHEREUPON, a document was marked
18  as Defendant's Exhibit Number 49 and is attached
19  to the original transcript.)
20
21    Q.    (BY MR. KNOTT)  And it appears to
22  be February 19, 2002.
23    A.    What happened in this one?  Do you

Page 91

1  know?
2    Q.    Down at the bottom it looks like
3  he referred you to the pain clinic again.  Do
4  you remember being referred there twice?
5    A.    The best of my knowledge -- now, I
6  may be wrong -- it has to be a yearly referral
7  there.  I may be wrong, now.
8    Q.    Okay.
9        MR. KNOTT:  This would be a good
10  stopping point for me if y'all want to go ahead
11  and get a sandwich.  We can take half an hour.
12        MRS. SHUMATE:  That's fine.
13    A.    I can take my medicine.
14
15        12:14 p.m.
16        (Off the record)
17        12:25 p.m.
18
19    Q.    (BY MR. KNOTT)  This is --
20  Defendant's Exhibit 50 is on Ryder letterhead.
21  It appears to be addressed to Dr. Alfano.
22
23        (WHEREUPON, a document was marked

Page 92

1  as Defendant's Exhibit Number 50 and is attached
2  to the original transcript.)
3
4    Q.    (BY MR. KNOTT)  It doesn't have a
5  cc on there.  Have you ever seen a copy of that?
6    A.    Yeah, Dr. McGahan showed it to me.
7    Q.    What did you and Dr. McGahan
8  discuss about this?
9    A.    McGahan said that he didn't know
10  what Alfano was doing because he wasn't over-
11  prescribing anything.
12    Q.    Who was not prescribing anything?
13    A.    Dr. McGahan wasn't because my
14  medications was regulated through the pain
15  clinic.  They drug tested me regularly on what I
16  was taking.  So this 2002 is --
17    Q.    This letter was about a concern
18  that had come up that there with two different
19  doctors -- true or not, that a concern had come
20  up that two different doctors might have been
21  prescribing Lorcet at the same time without
22  knowing about it.
23    A.    Right.

23  (Pages 89 to 92)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1    Q.    So that's what you -- you and
2  Dr. McGahan had a discussion about this?
3    A.    Right.
4    Q.    And Dr. McGahan said that --
5  Dr. McGahan was not prescribing Lorcet for you?
6    A.    And the pain clinic wasn't either.
7    Q.    The pain clinic wasn't either?
8    A.    Uh-huh, (negative). So we don't
9  know where Alfano came up with that, is what we
10 discussed. That wasn't his exact words, but
11 that's what he meant.
12   Q.    Were you getting Lorcet at that
13 time from Dr. Alfano?
14   A.    I tried them for a while. But I
15 was on a pain clinic regimen, it seems like, in
16 2002 -- I might not have been, but seems like I
17 was on it from 2001 to 2004, straight through.
18 So if I was on that, I wouldn't have been on
19 that. So I don't know.
20   Q.    How did that pain clinic regimen
21 work? Would they test you every time you came
22 in to make sure that you had the right amount of
23 drugs in your system, based on what they're

Page 94

1  prescribing?
2    A.    At one time, they were testing
3  everybody at one swipe. And then they were --
4  like any other company -- like a company, they
5  were random. But they would you enough, they
6  knew exactly to the letter -- you know, you
7  didn't go two, three months, four months. You'd
8  got within -- maybe every two, three, four
9  months, you'd be definitely -- because that
10 man -- he knows to the detail what you're taking
11 at the pain management, Dr. Marsella.
12   Q.    Did anyone at the pain clinic ever
13 tell you that there was anything not right with
14 any of your test results? That your test
15 results suggested you were taking the drugs the
16 wrong way?
17   A.    Never.
18   Q.    Or not as prescribed?
19   A.    If I would have been, I wouldn't
20 have been going back. That was his policy.
21   Q.    His policy was fire the patient?
22   A.    Right. He has the right.
23   Q.    Okay. And that never happened to

Page 95

1  you?
2    A.    No. I was dropped by a different
3  way.
4    Q.    Okay.

5
6          (WHEREUPON, a document was marked
7  as Defendant's Exhibit Number 51 and is attached
8  to the original transcript.)
9
10   Q.    (BY MR. KNOTT) Here is
11 Defendant's Exhibit 51. It's not on any
12 letterhead. It's dated June 13, 2002, to
13 Dr. McGahan from Martye Lloyd. There is no cc
14 written on it. Have you ever seen that letter,
15 or do you remember Dr. McGahan discussing it
16 with you?
17   A.    I'm sorry. I'm completely -- I
18 don't take penicillin.
19   Q.    Do you remember ever seeing that
20 letter or Dr. McGahan discussing that with you?
21   A.    My father-in-law took penicillin
22 from Dr. McGahan, but I never did. I never
23 took -- I take Amoxicillin when I get sick, but

Page 96

1  I never took penicillin -- I can't remember,
2  except when I was a little boy.
3    Q.    And Dr. McGahan never discussed
4  the letter with you?
5    A.    Never discussed the letter with
6  me.
7    Q.    Okay. I'll show you Defendant's
8  Exhibit 52. There is a letter on Ryder
9  letterhead dated July 10, 2002, to Dr. McGahan.
10 There is another letter attached to it.
11
12          (WHEREUPON, a document was marked
13 as Defendant's Exhibit Number 52 and is attached
14 to the original transcript.)
15
16   Q.    (BY MR. KNOTT) There is no cc
17 reflected on it, so first I would just ask you
18 if you've ever seen the letter?
19   A.    Never seen it.
20   Q.    Or if you remember Dr. McGahan
21 discussing it with you.
22   A.    Do you know what it consist of?
23   Q.    Yeah. I can give you a thumbnail

24  (Pages 93 to 96)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1 sketch, and you can look at it yourself as
2 well. Take all the time you want. I'll
3 represent that it's an opinion by a different
4 doctor, who was not one of your treating
5 doctors, who had looked at your case history for
6 the purpose of giving an opinion with respect to
7 whether or not the work-related accident was the
8 cause for the treatment that you're currently
9 having with Dr. McGahan.
10    A.    I've never seen anything of these
11 letters before.
12    Q.    Did Dr. McGahan ever tell you
13 anything about Ryder or anybody else telling
14 them about some other doctor who wasn't your
15 treating doctor giving a different opinion?
16    A.    He never told me --
17    Q.    Never came up?
18    A.    Except that one that you just
19 described about Dr. Alfano. That's the only
20 doctor I ever heard discussed. No doctor --
21 nothing.
22    Q.    Okay. Do you think it's okay for
23 Ryder to consult with other doctors about what

Page 98

1 their opinion might be about if treatment is
2 necessary or what the cause of it is?
3    A.    I think they should go with what
4 the two judges ruled on.
5    Q.    Well, if they've got an opinion,
6 would with want them to consult with
7 Dr. McGahan, your treating physician, to find
8 out what he thought about the other doctors'
9 opinions?
10    A.    I can't speak for what McGahan
11 would say, but --
12    Q.    But would you want Ryder to be
13 bringing him into the loop to ask Dr. McGahan
14 what he thought about the other doctors'
15 opinions?
16    MRS. SHUMATE: I'm going to object
17 to the form of those questions.
18    A.    (No response.)
19    Q.    Rather than keeping Dr. McGahan in
20 the dark.
21    A.    I don't know how to answer
22 anything I've never seen him, and he never
23 discussed it with me.

Page 99

1    Q.    Is that the kind of thing, though,
2 that -- and your lawyer has noted an objection
3 to the question so that she can raise it later
4 if the question is asked later in a hearing.
5 But if Ryder did go and get an opinion like that
6 from a different doctor, would you want him to
7 bring your treating physician into the loop and
8 to report that different finding to your
9 treating physician and ask him what he thought
10 about that?
11    MRS. SHUMATE: Again, I'm going to
12 object to the form of the question.
13    A.    I'll have to go with what -- my
14 lawyer's advice.
15    Q.    Well, see --
16    MRS. SHUMATE: I objected --
17    Q.    She put an objection on the
18 record.
19    MRS. SHUMATE: You haven't asked
20 for my advice on whether Dr. McGahan should have
21 been brought into the loop. So he's just asking
22 do you think Ryder should do that. That's your
23 opinion.

Page 100

1    A.    I would think, yeah, I'd
2 definitely want my doctor to know what's going
3 on, and I would think definitely I would like to
4 know what's going on too.
5    Q.    Okay.
6
7    (WHEREUPON, a document was marked
8 as Defendant's Exhibit Number 53 and is attached
9 to the original transcript.)
10
11    Q.    (BY MR. KNOTT) Defendant's
12 Exhibit 53 is some Southeast Pain Management
13 Center forms. And I'll tell you that the dates
14 on them are 10/21/02, 1/20/03 and April 9,
15 2003. Does that fit your recollection of still
16 being in the course of their treatment at that
17 time?
18    A.    Pain management 2003. I was
19 definitely -- and 2001, 2004, so yes, I was in
20 the pain management.
21    Q.    That was on Dr. Magahan's
22 referral, still, wasn't it?
23    A.    He had to refer me like we

25 (Pages 97 to 100)

**www.AmericanCourtReporting.com**
**August 23, 2006**

Page 101

1  discussed, yes.
2      Q.    During that period of time, were
3  you still going back to Dr. McGahan? Did he
4  have some kind of role in the --
5      A.    He had certain things that he
6  would write, and there were certain things that
7  this doctor would write, him being my primary
8  doctor. And then Dr. Marsella would write his
9  things -- prescriptions, McGahan would write
10 his.
11     Q.    So during this period of time,
12 would you still go back to Dr. McGahan and kind
13 of report to him about what was going on with
14 your pain management?
15     A.    I went enough -- I was reporting,
16 yes, to him. He knew I would -- I know we did
17 because we discussed it.
18     Q.    Okay.
19     A.    Whether he listened, I don't
20 know.
21     Q.    Yes, that's two different things.
22
23          (WHEREUPON, a document was marked

Page 102

1  as Defendant's Exhibit Number 55 and is attached
2  to the original transcript.)
3
4      Q.    (BY MR. KNOTT) I'll go a little
5  bit out of order and I'll come back.
6  Defendant's Exhibit 55 is more Southeastern Pain
7  records. And I'll represent to you that those
8  go up through 2004, with the last one in this
9  stack being 4/16/04. Does that fit -- earlier,
10 you said you believe that you continued your
11 pain management up till sometime in 2004. Do
12 you believe April 16, 2004, would probably be
13 about the last time you saw them?
14     A.    It was then, seems like, on a
15 three-months' basis so it definitely could have
16 been the last time.
17     Q.    Okay. Looking at that last page
18 of this exhibit -- well, these may be out of
19 order. Looks like the second to last page is
20 dated 5/20/04, which would be after April -- for
21 5/25, sometime in May of 2004.
22     A.    I don't know. It might have been
23 -- it definitely had to have been because I was

Page 103

1  cut off --
2      Q.    That time frame sounds right to
3  you?
4      A.    In the fifth or sixth month, I was
5  cut off. I remember that.
6      Q.    Now, after that last visit, do you
7  remember going back -- that last visit with
8  Southeastern Pain?
9      A.    No. The bill was not paid, and I
10 couldn't afford it.
11     Q.    Do you remember going back to
12 Dr. Givhan?
13     A.    McGahan?
14     Q.    Yeah, sorry. Dr. McGahan after
15 your last visit --
16     A.    During that time, he was working
17 maybe a couple of hours, and then he'd be off
18 working somewhere else. And I don't know if I
19 got to see him one more last time or not.
20     Q.    All right.
21     A.    It's a possibility I did, but I
22 don't rightly remember.
23     Q.    Okay.

Page 104

1
2          (WHEREUPON, a document was marked
3  as Defendant's Exhibit Number 54 and is attached
4  to the original transcript.)
5
6      Q.    (BY MR. KNOTT) I'll show you
7  what's marked as Defendant's Exhibit 54. It's,
8  again, on Ryder letterhead, with an August 22,
9  2003 date to Dr. McGahan. There is a letter --
10 and attached to it is another letter from a
11 different doctor. Not the same one as in the
12 other letter. A doctor by the name of
13 Dr. Wilson, who is not one of your treating
14 physicians, I understand.
15     A.    This is the one that came up with
16 the peer review --
17     MRS. SHUMATE: Let him ask his
18 question.
19     A.    I'm sorry.
20     Q.    You're not cc'd. I don't see a cc
21 reflected on this August 22 letter, Defendant's
22 Exhibit 54. Have you ever seen this letter?
23     A.    No, sir.

26  (Pages 101 to 104)

# American Court Reporting
## toll-free (877) 320-1050

Page 105

1  Q.    Have you ever discussed it with
2  Dr. McGahan or anyone else?
3     A.    No, sir.  Dr. McGahan never showed
4  me any letter concerning --
5     Q.    When I mentioned Dr. Wilson's
6  name, it seemed to -- or IntraCorp, one or the
7  other, it seemed to ring a bell with you.  What
8  do you know about them?
9     A.    They were the one that did the
10 peer review in May and July of 2004.
11    Q.    And did you ever see the letter
12 prepared by IntraCorp and Dr. Wilson?
13    A.    Not this one, no, sir.
14    Q.    Okay.  There is one attached by a
15 nurse, and this one would be by Dr. Wilson
16 himself, apparently.  You've never seen this one
17 either?
18    A.    No, sir.
19    Q.    How did you -- how did you learn
20 about the IntraCorp peer reviews?
21    A.    They did send me a copy of the
22 review in 2004.
23    Q.    Who sent them to you?

Page 106

1     A.    I guess it was Martye Lloyd or --
2  who knows?  I got it -- it might have been
3  IntraCorp itself.  I don't know.
4     Q.    Okay.  Was it this letter that you
5  received?
6     A.    No.
7     Q.    Okay.
8     A.    I never received this letter.
9     Q.    Okay.
10    A.    This was '93 -- 2003.
11    Q.    Okay.  Did you ever have any
12 discussions with Dr. McGahan about any kind of
13 peer reviews?
14    A.    He never discussed anything about
15 peer reviews.  But that last letter that we got
16 before he went out of business in 2004, that's
17 when he commented about peer review.
18    Q.    What letter was that?
19    A.    It was just --
20    Q.    Is it one that I've shown you or
21 is it different --
22    A.    No, it's the last letter that
23 they -- I guess they mailed it in May of 2004

Page 107

1  and then -- might have been July.  I can't
2  remember a date.  But anyway, it was saying I
3  had to be precertified through them, is what the
4  gist of it was, before I could see a doctor.
5     Q.    Okay.  Dr. McGahan was relaying
6  that to you?
7     A.    No, I relayed it to him.  He
8  hadn't received anything yet.
9     Q.    Because you had received --
10    A.    -- a copy of that saying he had --
11 to make an appointment, I had to go through --
12 he had to call -- a nurse call through IntraCorp
13 and make my appointments through them.
14    Q.    To get it precertified?
15    A.    Right.
16    Q.    What did Dr. McGahan say about
17 that when you told him that?
18    A.    He said, well, we'll get Candy to
19 do it.  That was his nurse.
20    Q.    Okay.  Did he seem like that was
21 something that -- I guess a type of thing or
22 procedure or whatever that he was familiar with?
23    A.    He didn't -- sir, he didn't say

Page 108

1  nothing except he'd get the nurse to do it.  But
2  then he left right after that, so I never knowed
3  if he did or didn't.  Or he never practiced
4  where I could see him.
5     Q.    Okay.
6
7        (WHEREUPON, a document was marked
8  as Defendant's Exhibit Number 56 and is attached
9  to the original transcript.)
10
11    Q.    (BY MR. KNOTT)  We did 55 earlier
12 out of order so now we're skipping over that to
13 Defendant's Exhibit 56.  This is another
14 document -- a different document on IntraCorp
15 letterhead dated May 10, 2004.  The document on
16 top is labeled Nurse Summary Review.  And a few
17 pages in there's another document labeled
18 Workers' Compensation Physician Advisory Review
19 dated May 2, 2004.  Have you seen either one or
20 both of these documents ever before?
21    A.    Never.
22    Q.    Okay.
23

27  (Pages 105 to 108)

## www.AmericanCourtReporting.com
## August 23, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1      (WHEREUPON, a document was marked
2  as Defendant's Exhibit Number 57 and is attached
3  to the original transcript.)
4
5      Q.   (BY MR. KNOTT) Defendant's
6  Exhibit 57 also has IntraCorp's logo on it, and
7  it's dated 5/25/2004. It's typed a little bit
8  differently. Is this the one you saw?
9      A.   That is the one I saw. The first
10  one.
11      Q.   Okay. How did you receive this?
12  In the mail?
13      A.   Mail.
14      Q.   Okay. You don't know if it came
15  directly through IntraCorp or was routed through
16  somewhere else?
17      A.   Sir, I don't remember looking at
18  the letter -- you know, the envelope, if it came
19  from -- I just file it in my filings.
20      Q.   Okay. What did you do when you
21  got the letter -- when you read the letter?
22      A.   Well, I called Mrs. Lloyd and --
23  called Dr. Marsella and talked to the lady who

Page 110

1  made the appointments, and she told me that, you
2  know, Mrs. Lloyd said she needed four days to
3  review my files the doctor did, and then I could
4  get my treatment. And she waited the four days,
5  and they gave me the trigger point and the
6  treatment. It says in here about Brenda --
7  denying Brenda. So I don't know if Brenda
8  talked to her and she said four days -- because
9  I'm not Brenda.
10      Q.   When you talked to Dr. McGahan
11  about it, did you talk in person or on the
12  telephone?
13      A.   I talked to him, but -- you know,
14  in person, but I got the feeling then, by the
15  hours he was working, he was not concerned about
16  me or nobody else, about my little case or
17  anybody else's case. And I was right. It
18  wasn't but a few days or a few weeks that he was
19  down to a day or two a week, and he was gone. I
20  never could see him anymore.
21      Q.   Do you know one way or the other
22  whether you gave him a copy of that or
23  anything --

Page 111

1      A.   I had the original, but I don't
2  think he even wanted a copy of it, because I
3  think -- I'm not speculating what he had in his
4  mind, but he left shortly.
5      Q.   Okay.
6
7      (WHEREUPON, a document was marked
8  as Defendant's Exhibit Number 58 and is attached
9  to the original transcript.)
10
11      Q.   (BY MR. KNOTT) Number 58 is a
12  series of faxes on Ryder letterhead, or fax
13  stationery, to Cleo Pharmacy Drug Company,
14  Dr. McGahan, Dr. Marsella from May and June of
15  2004. Have you seen any of these --
16      A.   That's my first --
17      Q.   Have you seen this before today?
18      A.   No. I have seen that letter.
19      Q.   Okay. You're referring to the
20  last page on that exhibit, a letter on Ryder
21  stationery to Cleo Pharmacy, dated June 17,
22  2004, from Martye Lloyd, and it's got cc to
23  Johnny Sasser. Did you receive a copy of that

Page 112

1  in the mail?
2      A.   Correct.
3      Q.   Is it correct, according to your
4  memory, that the adjuster before Martye Lloyd
5  told you that medication was authorized for
6  circulation problems in your leg?
7      A.   Correct. McGahan wrote it. It's
8  a blood thinner used for different things
9  besides the heart. It thins your blood, where I
10  would have better circulation and fewer cramps
11  and spasms in my legs, thighs and hips.
12      Q.   Okay. Are you still taking that,
13  or did you continue taking that after you
14  stopped seeing Dr. McGahan?
15      A.   I have now got to the point where
16  I cannot afford it no more.
17      Q.   Okay.
18      A.   So I'm giving out this month.
19      Q.   Have any doctors other than
20  Dr. McGahan prescribed that for you?
21      A.   All of them. If I asked, they'd
22  write it right then.
23      Q.   Did Dr. Alfano ever prescribe it

28  (Pages 109 to 112)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1  for you?
2      A.    Alfano would have wrote it, yes.
3      Q.    Have the doctors at Heart South --
4  have they prescribed that for you since you
5  stopped seeing Dr. McGahan.
6      A.    I would say Heart South -- it was
7  either Heart South was writing it or my other
8  doctor. That's the only two I'm seeing. It'd
9  be Dr. Wood.
10     Q.    Okay. Did any of your doctors
11 tell you in particular whether or not that
12 medication was related to your on-the-job
13 accident in 1995?
14     A.    Due to the spasms and cramps,
15 McGahan said it was definitely related, to try
16 to stop some of the spasms and cramps and pain
17 by thinning my blood.
18     Q.    Did you --
19     A.    The other adjuster you just asked
20 me about gave it to me for about a year and a
21 half, but Mrs. Lloyd said she couldn't find it
22 in that letter on her records. So there was a
23 computer blitz there too.

Page 114

1      Q.    After you received the June 17,
2  2004 letter, did you take any action in response
3  to that letter? This letter.
4      A.    I talked to Dr. McGahan, and he
5  acted like he didn't even hear me. So I knew
6  something was wrong with him. And again, he was
7  leaving.
8      Q.    Did you talk to anyone other than
9  Dr. McGahan about that? Did you call Ryder?
10     A.    I talked to Dr. Wood about it, and
11 he said I needed to continue. Due to my back
12 and all my problems with -- my cramps and
13 spasms, to continue to stay on it. So I had to
14 go to a generic because I couldn't afford that
15 drug.
16     Q.    Did Dr. Wood write a prescription
17 for the generic?
18     A.    Right. It's a generic blood
19 thinner.
20     Q.    Do you know whether or not
21 Dr. Wood submitted the prescription for
22 precertification or sent it to Ryder or anything
23 like that?

Page 115

1      A.    Dr. Wood was not in the picture
2  when I was -- you're talking about 2004. I had
3  survived till now. So I had to get my own
4  doctor and pay it out of my pocket.
5          MRS. SHUMATE: Off the record.
6
7              1:17 p.m.
8          (Off the record discussion)
9              1:19 p.m.
10
11     Q.    (BY MR. KNOTT) So after this
12 June 17, 2004 letter, you never submitted any
13 more bills or requests or anything to Ryder with
14 regard to the Plavix or the generic version of
15 Plavix; is that correct?
16     A.    There's not a generic. And I
17 couldn't do it because McGahan was gone. He's
18 my lead doctor, and Marsella wouldn't do it.
19     Q.    You didn't try to do it directly
20 either?
21     A.    I couldn't. I can't write a
22 prescription for that.
23     Q.    I didn't mean write a

Page 116

1  prescription, but in terms of going to Ryder to
2  get them to pay, you didn't ask them directly?
3      A.    No. I had to pay that bill, $700,
4  out of my own pocket where the other ones
5  approved it.
6      Q.    Okay. Referring back to Defendant
7  Exhibit 57, did you read the whole letter when
8  you got it?
9      A.    Yeah, I read the whole letter when
10 I got it.
11     Q.    On the second page, it says, you
12 may appeal this determination by submitting a
13 written request providing additional
14 information. Please send the appeal request and
15 information to the IntraCorp address listed on
16 this letter or fax to 800-233-5507. And there's
17 additional instructions for if you believe this
18 determination warrants immediate appeal, a
19 telephone number to call. Did you --
20     A.    I tried to talk to them people and
21 do an appeal, but they said it had to be the
22 doctors. And Dr. McGahan was gone. And
23 Marsella tried to go through with one, and that

29 (Pages 113 to 116)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1  was -- I don't know why.  It didn't go too
2  good.  And I couldn't do the appealing because
3  they wouldn't listen to me.  I wasn't a doctor.
4      Q.    Did you send any paperwork by
5  fax --
6      A.    I called --
7      Q.    -- like it's listed?
8      A.    -- to ask them how could I do it,
9  and they said, you can't.
10     Q.    Which number did you call?
11     A.    I called the number that's on
12  here.
13     Q.    On Page 2?
14     A.    Yeah.  It's back there on the back
15  where it says, 1-800 something, wherever it's
16  at.  There it is.  1-800-388 --
17     Q.    Okay.  Was that an IntraCorp
18  person who answered the phone?
19     A.    They said they were IntraCorp,
20  yes.
21     Q.    Did you -- when they told you
22  that, would that have been, I guess, within a
23  month of May 25, 2004?  Would you have made that

Page 118

1  phone call soon after this letter?
2      A.    Yeah.  I made it in June, yeah.  I
3  know I did.
4      Q.    So around the same time, then, did
5  you call Ryder about that?
6      A.    Yes.  I talked to Martye Lloyd
7  about it.
8      Q.    Did you tell Martye that you tried
9  to appeal the case to IntraCorp?
10     A.    I don't remember at the time if I
11  told her that or not.
12     Q.    Did you send Ryder any
13  correspondence in that time frame?
14     A.    Just verbal, because it had to be
15  the doctors to do it, and I couldn't -- McGahan
16  was gone and Marsella was trying to appeal, is
17  what his secretary or nurse would tell me.  And
18  that's all I could go by, sir.
19     Q.    What did Dr. Marsella's office
20  tell you about them trying to appeal?
21     A.    Said he was pretty upset and he
22  was appealing.
23     Q.    Did you talk to Dr. Marsella

Page 119

1  personally about it or his staff?
2      A.    You're not going to get to talk to
3  a doctor that busy.  I talked to a nurse.
4      Q.    Did you ever see any of the appeal
5  paperwork, any copies of any of that stuff?
6      A.    They're not going to let me go in
7  unless I've got the money to make an
8  appointment.  And then I don't know if they'd
9  let me see it or not.
10     Q.    Did you have more than one
11  conversation with his office about appealing it?
12     A.    His office people, yes.
13     Q.    Okay.  How did the first
14  conversation go?
15     A.    Well, Brenda said she got -- the
16  one who made the appointment said she'd try to
17  get it refiled.  Dr. Marsella was trying to get
18  the appeal done.  They're having to pay for the
19  trigger point and continue where he could
20  continue seeing me, but said I'd been cut off.
21     Q.    So then --
22     A.    I couldn't see Dr. Marsella no
23  more.

Page 120

1      Q.    So then after that first
2  conversation with Brenda, did he wait a little
3  while for the appeal?
4      A.    Maybe a week or so, in June.
5      Q.    Did you call her back?
6      A.    Yeah, I called back, and she said
7  that I'd been cut off.  Martye Lloyd -- she said
8  I needed to precertify on the same date, and she
9  sent me a handwritten letter that I'd been cut
10  off.  So on the date I precertify on 6/17, she
11  writes me a letter on 6/17, and handwrote it --
12  and I've got a copy, she has -- where she said
13  I'd been cut off.
14     Q.    The second time you spoke to
15  Brenda, did you ask her about the appeal
16  process?
17     A.    She says she was doing everything
18  she could.
19     Q.    Did she mention specifically the
20  appeal or do you know if she was just --
21     A.    She said she was trying to get it
22  straightened out.  Dr. Marsella was trying to
23  get the appeal where I could start back to

30  (Pages 117 to 120)

Page 121

1  seeing the doctor.
2      Q.   Was that the last time you spoke
3  to somebody at Dr. Marsella's office about the
4  appeal, about --
5      A.   Except the bill. They kept
6  hounding me about owing $2,300.
7      Q.   Other than the bill, was that the
8  last conversation you had with his office
9  regarding either the appeal or precertification
10 process or any of that?
11     A.   I might have talked to Brenda one
12 more time to see if she'd heard anything, but
13 that was the extent of all my seeing or going to
14 Marsella. That was it.
15     Q.   Okay.
16
17          (WHEREUPON, a document was marked
18 as Defendant's Exhibit Number 59 and is attached
19 to the original transcript.)
20
21     Q.   (BY MR. KNOTT) Defendant's
22 Exhibit 59 is on Ryder paperwork dated
23 08/17/04. Have you seen that?

Page 122

1      A.   I think we did get a copy of that.
2  We didn't get a copy of that bottom thing,
3  though.
4      Q.   The bill? Have you seen a copy of
5  that bill? Did a copy of that get sent to you
6  separately?
7      A.   I finally got a copy, yeah. Now,
8  that -- it didn't look like that bill, but it
9  was $2300. What's the date on that?
10     MRS. SHUMATE: The date on the
11 bill?
12     A.   The date on this --
13     MRS. SHUMATE: The date on this is
14 8/17/04.
15     Q.   Let me show you another one with
16 the same date on the same type of Ryder
17 paperwork, it being Defendant's Exhibit 60.
18 This one is with Anesth Consults Med Group.
19 Have you seen a copy of that?
20     A.   I didn't get that.
21
22          (WHEREUPON, a document was marked
23 as Defendant's Exhibit Number 60 and is attached

Page 123

1  to the original transcript.)
2
3      Q.   (BY MR. KNOTT) There's what
4  appears to be a bill attached to it. Have you
5  seen a copy of that bill, either together or
6  apart from --
7      A.   Yeah. It's been turned over to a
8  collection agency.
9      Q.   Okay. Now, in your interrogatory
10 answers, we asked if you had any conversations
11 with Ryder or its adjusters, and you listed some
12 conversations with some time frames, quoted in
13 your answer number 11. Since we've been going
14 through this May and June time frame, I'd like
15 to ask you a few questions about these
16 conversations that are listed for the same time
17 frame.
18     A.   Tell me where we're at.
19     Q.   Let's start with A. It just says
20 in 2004, phone conversation where you quote
21 Martye Lloyd as saying, quote, you have cost
22 Ryder a lot of money over the years. In fact,
23 you have cost Ryder an awful lot of money over

Page 124

1  the years. I am going to get it stopped legally
2  through Alabama's worker comp laws.
3      A.   Going to try is what she said.
4      Q.   I'm reading it upside down so if I
5  missed a word, I apologize.
6      A.   Right.
7      Q.   How did the conversation come up?
8  A telephone conversation?
9      A.   Telephone conversation.
10     Q.   Who called whom, just for
11 starters?
12     A.   I don't know if she called me or I
13 called her, but she couldn't -- but anyway, it
14 just came up and, you know, she told me that I'd
15 cost Ryder -- exact words, I'd cost Ryder a lot
16 of money. She said, you have cost Ryder an
17 awful lot of money over the years, and I'm going
18 to try legally through Alabama's Workman's Comp
19 laws to legally get it stopped. And that's what
20 she set out to do.
21     Q.   Do you remember what else y'all
22 talked about in that conversation?
23     A.   I told her that she couldn't cut

31 (Pages 121 to 124)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  me off due to two circuit judges ordering it to
2  be for life.
3      Q.    And you read in here the rest of
4  that answer on your interrogatory answers.
5      A.    That's what I told her.
6      Q.    Really what I was driving at, and
7  that question was:  Do you remember if y'all
8  were discussing a particular doctor's service or
9  a particular medical bill or a particular type
10 of -- I'm just wondering how that came about?
11     A.    I don't remember, but it was -- it
12 had to have been six or seven months earlier.
13 It wasn't during 2004.  It was earlier.  Like
14 six or seven, eight months earlier.  I can't
15 remember the exact date, but it was definitely
16 back in time when she told me that.
17     Q.    Here on your interrogatory answer
18 11-A, it says in 2004 --
19     A.    It had to have been the early part
20 of 2004.
21     Q.    Okay.  Like January-ish?
22     A.    I don't know the date, but I well
23 remember the exact words she said.

Page 126

1      Q.    Maybe around winter?
2      A.    I don't know -- it was several
3  months before this date -- I mean, before I got
4  cut off.
5      Q.    Okay.  I'm just trying to figure
6  out a reference point.
7      A.    Right.
8      Q.    And you don't know how that came
9  up or anything else y'all talked about in that
10 phone conversation?
11     A.    No, that was it.
12     Q.    Did you -- was the phone call
13 recorded?
14     A.    No.
15     Q.    There is no tape recording?
16     A.    Not unless she recorded it.
17     Q.    I was wondering -- you've got
18 quotes, and that's --
19     A.    Because I remembered it.
20     Q.    It always kind of tips people off
21 to at least ask if there is a tape recording of
22 it.
23     A.    Right.

Page 127

1      Q.    Did you take notes of it at the
2  time?  Did you keep a note pad?
3      A.    I had a note in my head exactly to
4  the date and when it was.
5      Q.    Do you keep a journal?
6      A.    No, I don't keep a journal.
7      Q.    Or a calendar where you write
8  things --
9      A.    I started keeping some things --
10 after they cut me off, I started keeping
11 everything -- the correspondence with them.  But
12 before that, no, I didn't.
13     Q.    At the time of this phone
14 conversation, you weren't keeping those kind of
15 notes?
16     A.    No.
17     Q.    The next phone conversation you
18 have listed in that time frame in your answer to
19 interrogatory 11-B is sometime in April or May
20 of 2004?
21     A.    Uh-huh, (affirmative).
22     Q.    You say that Martye Lloyd sent a
23 letter about peer review from Texas.  And you

Page 128

1  say that you called Martye and asked for an
2  explanation.  So you called Martye in that
3  conversation?
4      A.    Uh-huh, (affirmative).
5      Q.    To ask her about -- here, are we
6  referring to that same Exhibit Number 57, that
7  IntraCorp document?
8      A.    Right.  And she's also sent me a
9  letter that I had to be precertified that you
10 haven't showed me or I've got a copy of I can
11 show you.
12          MRS. SHUMATE:  Just wait for him
13 to ask you questions, Mr. Sasser.
14     A.    I'm sorry.
15          MRS. SHUMATE:  That's it.
16     Q.    This is part of Defendant's
17 Exhibit 1.  I won't tear it out.  Defendant's
18 Exhibit 1 has a note on Ryder stationery dated
19 June 17, 2004.  And it's got Martye Lloyd's name
20 at the bottom of it.  It has some handwriting in
21 the upper right-hand corner and a handwritten
22 name or signature of Martye Lloyd.  At the
23 bottom, and handwritten, it says, cc'd CLT.  Did

32 (Pages 125 to 128)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1  you receive a copy of this at your home?
2      A.    I sure did.
3      Q.    Was all of this writing on this
4  when you received it?
5      A.    No. The letter was without this.
6      Q.    When you received the letter, it
7  did not have this handwritten thing with the
8  heading note from adjuster 8/2005?
9      A.    I called Mrs. Lloyd.
10     Q.    Okay. You called Mrs. Lloyd just
11 like it's mentioned in interrogatory answer
12 11-B?
13     A.    I don't know what -- send me a
14 letter of peer review.
15     Q.    Wait a minute. We're getting
16 ahead of ourselves.
17     A.    Okay.
18     Q.    We'll get to that after we finish
19 11-B. This is after you got Exhibit 57 from
20 IntraCorp. And you had not yet gotten the
21 letter dated June 17, and you called Martye
22 Lloyd and asked her about it?
23     A.    Right.

Page 130

1      Q.    You've quoted a couple of lines
2  here. What else can you tell us about that
3  conversation?
4      A.    Well, you know, she sent me a
5  letter where I was precertified and -- had to be
6  precertified through a doctor. And I said,
7  well, you know, I'll get a nurse to do that.
8  I'll asked her to. That's all I can do. She
9  said, if they don't, you can't see them. And I
10 said, I understand. So I was telling McGahan
11 and -- I hadn't really gotten to Marsella then.
12 And was going to tell him -- well, I did tell
13 him over the phone, but they had to do that, be
14 precertified, or they wouldn't pay it.
15     Q.    Did you tell Martye Lloyd about
16 the -- your attempt to have it appealed?
17     A.    I'd told, you know, that Brenda --
18 Dr. Marsella's was trying and McGahan was gone.
19 And I needed a doctor, but nobody knew about
20 McGahan, where he was at or what about him, if
21 he was coming back or gone forever or whatever.
22     Q.    After this April or May telephone
23 conversation, was your next communication from

Page 131

1  Mrs. Lloyd the June 17, 2004 letter?
2      A.    I can't -- I can't remember.
3      Q.    Can you remember another one
4  between these --
5      A.    Yeah. I called after that. There
6  had to have been one in between, or I would
7  assume I called her about -- and she made some
8  remarks about my back and different things, and
9  said I had speech problems and was -- sounded
10 like I was drugged a lot and hoped I wasn't
11 driving a vehicle. I told Mrs. Lloyd I still
12 had a CDL and was accident free.
13     Q.    What you're telling me now sounds
14 a lot like what you've listed as the July 2005
15 phone conversation. Do you think that's the one
16 that you have in mind right now?
17     A.    I talked with Greg Pitts when I
18 messed up my knees, and he told me he'd get
19 right on it. Martye Lloyd was on vacation.
20 When Mrs. Lloyd came back, she said he didn't
21 know how to use the computer, and he was a
22 supervisor, is what she told me, and that I'd
23 been cut off. And the lady before I talked to

Page 132

1  Mr. Pitts told me I'd been cut off.
2      Q.    Are you talking about a
3  conversation where you indicated she said that
4  your speech was slurred, and you talked about a
5  CDL? And that's what you have down here in --
6      A.    Right.
7      Q.    -- these paragraphs for July
8  2005. You think that July 2005 conversation was
9  what you had in mind a minute ago?
10     A.    Right, I really do. And that's
11 when she --
12     Q.    Okay. Let's try to stay going
13 chronologically if we can.
14     A.    Okay.
15     Q.    As much as we can, at least.
16 After this conversation in your interrogatory
17 answer 11-B, April and May 2004, do you think
18 your next communication with Martye Lloyd was
19 when you received the June 17, 2004, letter from
20 Ryder?
21     A.    Sir, it would be pure
22 speculation. I can't remember.
23     Q.    You don't remember any other

33  (Pages 129 to 132)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1  conversation between --
2      A.    No, I don't.
3      Q.    After you got this June 17th
4  letter, which is attached to Defendant's Exhibit
5  1, your interrogatory answer 11-C indicates that
6  you had a phone call with Martye Lloyd regarding
7  that letter. And you initiated that telephone
8  call? You called Mrs. Lloyd on the phone?
9      A.    Right. That was the one before --
10  you know, that I had to be precertified before I
11  could see doctor.
12      Q.    How did you start the conversation
13  off? It looks like this quote kind of comes in
14  after you and her had exchanged a few lines.
15      A.    Well, she told me it was -- I was
16  being cut off, that was the end of my -- you
17  know, I was being -- no more doctor and no more
18  drugs.
19      Q.    Did she say you were being -- did
20  she say you were being cut off of everything, or
21  did she say you were being cut off of things
22  that were not precertified in accordance with
23  the procedure?

Page 134

1      A.    She told me -- that's her --
2  unless it -- I was being cut off of all drugs
3  and all doctors, no matter what the procedures.
4  That the peer reviews overruled everybody.
5      Q.    In this phone conversation in June
6  of 2004, interrogatory answer 11-C, did you and
7  Mrs. Lloyd discuss the appeal process or the
8  lack of an appeal being pursued?
9      A.    I don't remember. I really don't.
10      Q.    Okay.
11      A.    I told her what we did. I might
12  have said, McGahan -- it's up to McGahan and
13  Marsella. I can't make them do it. But I don't
14  know if I told her that or not. I can't
15  remember. But I couldn't make them do it.
16      Q.    Now, this handwritten note on the
17  June 17, 2004, letter that's attached to
18  Defendant's Exhibit 1 has an 8/2005 wrote on it?
19      A.    Right.
20      Q.    Is it your recollection that you
21  received this note around August 2005?
22      A.    Right.
23      Q.    Okay.

Page 135

1      A.    I got it --
2      Q.    I'm trying to keep on track. So,
3  then, is the conversation listed in
4  interrogatory answer 11-D -- is that the next
5  conversation you can remember or the very next
6  communication you can remember having with
7  Mrs. Lloyd or Ryder after the June 2004
8  conversation?
9      A.    I might have called her again
10  about the peer reviews. I don't know about
11  IntraCorp. I don't remember. I know I was
12  concerned, so I probably did.
13      Q.    If you did, you can't remember
14  anything specific that y'all talked about in
15  those conversations?
16      A.    She said I had to get
17  precertified. Make sure -- I had to call in and
18  explain to McGahan and them that they wouldn't
19  get paid until they was precertified. And then
20  it wasn't long after that that she told me that
21  was the last month; I was being cut off.
22      Q.    July 2004, is when you talked to
23  Dr. Marsella's office, according to

Page 136

1  interrogatory answer 11-D?
2      A.    Right. Yeah, I talked to Brenda.
3      Q.    That was a telephone conversation?
4      A.    Correct.
5      Q.    Was that the first conversation
6  you had with Brenda about the precertification
7  and the denial and the appeal process?
8      A.    I had called her several times,
9  and she told me, like I done told you before,
10  she wanted four days for them to review my case,
11  and then I could go ahead and make my
12  appointment, but if I was -- Martye Lloyd
13  refused to pay because she said she didn't say
14  that. So I can't say what Brenda said and what
15  Martye said, who's telling what. All I can go
16  by is what Brenda said because I didn't talk to
17  Martye.
18      Q.    So in any case, this was not --
19  this conversation reflected in interrogatory
20  answer 11-D, this was not your first
21  conversation with Brenda regarding the appeals
22  process and precertification?
23      A.    I talked to her -- because if you

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  got a bill for $2,300, you're kind of upset
2  about it.  You're going to call several times to
3  try to find out what's going on.  I can't tell
4  you how many times I called.
5      Q.    And can you tell for sure if this
6  was the first or a different one?
7      A.    I can't tell you --
8      Q.    Just not sure?  Okay.
9      A.    But I definitely called her
10  because that's a big bill.
11      Q.    Now, the next communication
12  reflected in interrogatory answer 11-E, which
13  you have a specific date for this, and it's July
14  12, 2004.  And it reflects what you had a phone
15  conversation with Martye Lloyd.  How were you --
16  how do you recall the specific date?  How does
17  that stick out in your mind?
18      A.    That was one of the times that, I
19  believe, I kept somewhere -- a halfway close
20  note because it looked like it was coming to a
21  halt.  I started to document some of the stuff
22  that's ending.  But I don't know if I did or
23  not.  I don't know if that's the exact date or

Page 138

1  not.  But we definitely talked about why I was
2  being cut off.
3      Q.    Now, backing up here to the
4  conversation in 11-D.
5      A.    Right.
6      Q.    Here you've quoted Brenda to say
7  that Mrs. Lloyd said she needed four days.  Do
8  you believe you waited four days and then called
9  Martye Lloyd?
10      A.    Brenda waited four days and called
11  me to come in.  That's what Martye Lloyd
12  instructed her.  She needed a review for four
13  days.
14      Q.    So Brenda waited four days and
15  then Brenda called you?
16      A.    Called me and said, you can come
17  in for your appointment.
18      Q.    And when you went in for your
19  appointment with Dr. Marsella --
20      A.    Dr. Marsella seen me for the last
21  time.  I don't know what date that is, though.
22      Q.    At that time, did you and
23  Dr. Marsella discuss anything about the

Page 139

1  precertification process?
2      A.    (Witness shakes head.)
3      Q.    You're shaking your head.  Is that
4  a no?
5      A.    Did I discuss with Dr. Marsella in
6  person?
7      Q.    Right.  You did meet Dr. Marsella
8  in person for your appointment?
9      A.    Right.  But that was earlier.  I
10  didn't get to see him.  I think that was in
11  May.  My last appointment was in June.
12      Q.    I'm confused, then.
13      A.    I'm confused, too, because I
14  didn't make it.
15      Q.    Let's start over.  In 11-D, you
16  quote Brenda saying Martye Lloyd said she needed
17  four days?
18      A.    Right.  That was for my last
19  appointment, the reason she didn't pay the bill.
20      Q.    Was it four days later that you
21  called Martye Lloyd when --
22      A.    When I found out they weren't
23  paying the bill, I called her immediately.  I

Page 140

1  don't know if it was four days or one day.
2      Q.    Okay.  Then moving to the
3  conversation reflected in interrogatory answer
4  11-E on July 12, 2004, it appears the topic of
5  that conversation is getting your medicine.  You
6  just mentioned you weren't getting your bills
7  paid.  Is that the same thing -- are you talking
8  about the same thing, getting your medicine, as
9  when you say you're not getting your bills paid?
10      A.    They didn't pay for my doctor's
11  visit, but they were still paying for the
12  medicine.  And she said she wasn't going to pay
13  for the medicine anymore either.  That was the
14  last time; this was the last month.
15      Q.    Were y'all talking about any
16  particular prescription?
17      A.    All of them.
18      Q.    All of it?
19      A.    Okay.
20      Q.    Is this the whole conversation?
21  You have three lines here -- or four lines.
22      A.    I don't know if it's all.  I can't
23  remember, but I did tell her the circuit

35 (Pages 137 to 140)

# American Court Reporting
## toll-free (877) 320-1050

Page 141

1  judge -- that was his order, for the original
2  amount of meds to be paid and that both the
3  judges ordered that I would receive my meds for
4  life, and I'd been cut off. And I didn't think
5  they would do that. And she said, the peer
6  reviews came ahead of the circuit judge's
7  ruling.
8      Q.    Here you do quote Mrs. Lloyd
9  saying that the peer reviews haven't been
10  appealed by any of your doctors. Did you say
11  anything about that appeal process when she
12  brought it up?
13     A.    I told them I was trying to find
14  McGahan and get up with him, to the best of my
15  knowledge. I was trying to do everything I
16  could to get them doctors to do it. And they
17  told me -- his nurse told me that Dr. Marsella
18  was definitely trying to appeal. And I think he
19  tried to appeal. To the best of my knowledge,
20  he tried to appeal it, but he didn't get
21  anywhere.
22     Q.    Okay. And you believe you told
23  Mrs. Lloyd that?

Page 142

1      A.    I don't know. I would assume I
2  did. I'm not for certain on it. I know I told
3  Brenda, and she told me what he was trying to
4  do.
5      Q.    Now, in the next telephone
6  conversation you have listed in your
7  interrogatory answers is dated July 5, 2005.
8  Just about a year later. Is that the best of
9  your recollection? You didn't talk to Martye
10  for about 51 weeks, on the phone at least?
11     A.    I had to talk to her since then
12  because I was cut off on July 17th. So, no,
13  that couldn't have been the last.
14     Q.    Okay. So you think there's other
15  conversations between July 12, 2004 and July 5,
16  2005?
17     A.    I know there are.
18     Q.    Do you have an estimation of how
19  many?
20     A.    No, I don't.
21     Q.    Do you know what was said in those
22  conversations?
23     A.    No, I don't remember.

Page 143

1      Q.    Okay. Now, we've covered the 2004
2  things, and so I'm going to set this aside while
3  we move into 2005, and then we'll pick back up
4  and round it out.
5
6          (WHEREUPON, a document was marked
7  as Defendant's Exhibit Number 61 and is attached
8  to the original transcript.)
9
10     Q.    (BY MR. KNOTT) Defendant's
11  Exhibit 61 is -- it says, Emergency Room
12  Outpatient Record from -- date of service,
13  7/05/05. Do you remember going to Dale Medical
14  Center Emergency Room on July 5, 2005?
15     A.    Right.
16     Q.    Okay. What was the reason for you
17  going to the emergency room?
18     A.    My back went out. I went across a
19  little foot and a half fence and I -- or less
20  than that on the height, and I fell on my knees.
21  I was going to look at my wife's little garden,
22  and I hit both knees and went face forward on
23  clay.

Page 144

1      Q.    What type of surface is this? Is
2  it level, sloped?
3      A.    Just a little rise up, and then
4  you step up and a little fence you cross, and
5  that was it.
6      Q.    Is it a level yard? Is that what
7  we're talking about?
8      A.    Level where I was standing, yes.
9      Q.    Okay. And the fence is a foot and
10  a half, or two and a half feet, I think I saw
11  somewhere?
12     A.    Not over that.
13     Q.    Okay. Is it one of those little
14  wooden miniature picket fence?
15     A.    It was just a one wire piece of
16  fence, like -- it was an old fence like somebody
17  had run an electric fence real low.
18     Q.    Okay. And was one of your feet up
19  in the air when your back went out?
20     A.    One -- I started to step over --
21     Q.    Which foot were you stepping over
22  with? Which foot was coming up?
23     A.    My right was the one I stepped

36 (Pages 141 to 144)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1  over with.
2  Q.  Okay.
3  A.  I thought my left was clear. My
4  back got real numb and my leg got real numb. I
5  lifted as high as I could, but it wasn't high
6  enough, so my foot got -- touched the top of the
7  fence, and I fell face forward. And both knees
8  hit as my hands hit, and it was clay soil.
9  Flat, clay soil.
10  Q.  Which foot hit the fence?
11  A.  Left.
12  Q.  So your right -- you stepped with
13  your right and got your right all the way over?
14  A.  I was clearing it with my right in
15  the air.
16  Q.  That was on the ground --
17  A.  I didn't make it to the ground.
18  Yeah, I assume I was in the air because I was
19  just balancing -- yeah, you've got to be right.
20  Once I made it with the right foot, I went to
21  the left.
22  Q.  You weren't jumping?
23  A.  I wasn't jumping. No, I can't

Page 146

1  jump. So then that's when I -- the whole body
2  went face forward. No, I can't do that.
3  Q.  When your foot came down on the
4  fence, did it come down with the sole on the
5  fence?
6  A.  Just the top of my foot. I
7  remember my toes.
8  Q.  The same way that it would happen
9  if someone were stepping over and trip with the
10  wire across the dorsal surface of the toe?
11  Would that be right, as opposed to the sole of
12  the shoe?
13  A.  Top of the foot and toes is all I
14  know. I fell face forward in the clay.
15  Q.  July 2005, you were stepping over
16  a little fence, it was like a wire fence, kind
17  of like a low electrical fence?
18  A.  Right.
19  Q.  It was just a single wire going
20  horizontal to the ground?
21  A.  Right.
22  Q.  What kind of shoes were you
23  wearing? Boots or --

Page 147

1  A.  No, I don't wear boots. I
2  can't -- they're too heavy. Just regular slide-
3  on shoes like I've got now. I mean tie up.
4  Q.  Yeah. Like topsiders or --
5  A.  Just like a regular pair of slide-
6  ons.
7  Q.  And was your wife there with you
8  at the time?
9  A.  She was about 25 or 30 feet behind
10  me.
11  Q.  Did she see it happen?
12  A.  Right.
13  Q.  What did she do or what did you
14  hear her?
15  A.  She screamed, and I told her I'd
16  have to just lay still for a while. And I
17  finally -- she came over and was trying to help
18  me up. It was hurting so bad, I told her, no,
19  leave me alone for a few minutes and I'd get up
20  and then she could help me. And that's what
21  happened. And I had a torn cartilage.
22  Q.  Now, you mentioned that you came
23  down on your knees?

Page 148

1  A.  Both knees.
2  Q.  That was the first thing to hit
3  the ground, was your knees?
4  A.  Right, and then my hands.
5  Q.  Both knees?
6  A.  Both knees.
7  Q.  And you mentioned being on hard
8  clay?
9  A.  Right.
10  Q.  Was there any grass or any kind of
11  other covering on top of the clay?
12  A.  No, it was just regular clay.
13  Q.  So you came down on both knees?
14  A.  Both knees.
15  Q.  And you said one hand or two
16  hands?
17  A.  Both hands.
18  Q.  So kind of in a bear crawl
19  position. Then you went all the way to the
20  ground? Did your face hit the ground?
21  A.  Well, my chin, best I can
22  remember, was as far as I got with it.
23  Q.  That kind of broke it up there.

37  (Pages 145 to 148)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1  Was it more of a constant motion?
2      A.   Right.  Once your knees and your
3  hands and -- the knees was what really took the
4  impact.
5      Q.   Okay.  Had you ever fallen and
6  landed on your knees like that before?
7      A.   No, not --
8      Q.   I know you'd fallen several
9  times.
10      A.   I've fallen sideways and fallen
11  and broke them ribs and stuff, but I've never
12  really done that -- maybe one leg on the side or
13  whatever, but I've never fallen directly,
14  whether it be on grass or something soft or -- I
15  would always luck out, but I didn't luck out
16  this time.
17      Q.   It might be -- I don't know if you
18  can answer this question or not.  It might be
19  too hard to separate things out.  If you
20  can't --
21      A.   We'll try.
22      Q.   -- then tell me.  Exactly.
23  Because I know you've had pain and cramping and

Page 150

1  so forth in your legs.  But had you ever had
2  pain in your knees before you fell in July of
3  2005?
4      A.   I can't -- you've got to --
5  Dr. McGahan called it sciatic nerve.  It runs
6  down your legs and you hurt -- you know, like
7  shooting down the sides.  But, no, I never had
8  nothing that hurt in the insides like that.
9  Never.
10      Q.   Okay.
11      A.   They always call it the sciatic
12  nerve running down the side of your leg or
13  somewhere.  I don't know what -- I guess the
14  sciatic nerve off your back.
15      Q.   Do you remember what they -- while
16  you were there in the hospital on July 5,
17  2005 --
18      A.   It happened July 4th.
19      Q.   July 4th?
20      A.   I thought I could take it, but I
21  couldn't.
22      Q.   Are you saying the actual accident
23  happened on the 4th of July?

Page 151

1      A.   Yeah.
2      Q.   What time of day was it?
3      A.   Between 8:30 and 9:30 in the
4  morning.  It was pretty early.
5      Q.   What did you do after you fell?
6      A.   Went --
7      Q.   How long did you stay outside,
8  first?
9      A.   I went -- she got me a folding
10  chair to sit in, and I sit there about -- I
11  don't know how many minutes until I got able to
12  make my movement.  And then I went back and I
13  got in my hospital bed and got on my back and --
14  I thought, well, it'll quit hurting after
15  awhile, but it just got worse and worse and
16  worse, the pain.
17      Q.   Okay.  Did you see anybody else
18  that day besides your wife on the 4th of July?
19      A.   No.
20      Q.   Nobody came over to visit?
21      A.   No.
22      Q.   Did y'all have plans to do
23  something that day?

Page 152

1      A.   No, sir.
2      Q.   So it was the next day.  And it
3  was in the morning when you went to the
4  emergency room?
5      A.   Right.
6      Q.   Okay.  And did your wife drive
7  you?
8      A.   Right.
9      Q.   Okay.  What do you remember going
10  on in the emergency room that day?
11      A.   Well, they came and examined it
12  and said they'd take an x-ray and do this and
13  the typical "he'd be with me in a minute".  Here
14  comes a heart patient.  It was just hurry up,
15  we'll be with you after a while.
16      Q.   Are you sure it was July -- the
17  4th of July holiday, or do you think it was a
18  few days before?  The reason I'm asking is the
19  emergency room records --
20      A.   I don't know what they wrote down,
21  but it was July 4th.
22      Q.   Nurses' notes say, fell a week and
23  a half ago and started hurting yesterday on the

38  (Pages 149 to 152)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1 4th of July.
2     A.    No, because that was July 4th.
3     Q.    So that note would be inaccurate?
4     A.    Yeah. I don't know where she --
5 my wife might have told her something. I don't
6 know where she got it. No, I know exactly when
7 it happened because I was thinking about facing
8 the 4th of July, and I said, no, I can't take
9 the emergency room, not on a holiday.
10     Q.    This note also would be inaccurate
11 where it says, fell a week ago. Pain's been
12 getting worse since -- that would be inaccurate?
13     A.    Yeah, she wrote one week there and
14 the other wrote a week and a half. No, it was
15 July 4th. I know exactly when it happened.
16     Q.    Okay. Now, you told us how it
17 happened. Would it be accurate to describe that
18 July 2005 fall to say that you fell while you
19 were climbing over a gate and lost your balance,
20 or would that not be the right way to say it?
21     A.    July 2005, climbing over a gate?
22     Q.    Yeah. July 2005, the one you just
23 told me about, the garden.

Page 154

1     A.    That was a fence a foot and a half
2 high. A gate is a lot different than a little
3 fence that's rotted down.
4     Q.    How about the part about that you
5 lost your balance? Do you think that would be
6 an accurate way to put it?
7     A.    I've got numbness, spinal -- just
8 went -- everything went numb, and I lost -- my
9 back went out, is what they call it, and I went
10 face forward.
11
12         (WHEREUPON, a document was marked
13 as Defendant's Exhibit Number 62 and is attached
14 to the original transcript.)
15
16     Q.    (BY MR. KNOTT) They didn't admit
17 you to the hospital that day?
18     A.    No. They was talking like it, but
19 I said no, I can't do this.
20     Q.    They did give you an MRI of your
21 knee a few days later?
22     A.    Right.
23     Q.    Defendant's Exhibit 62. On this

Page 155

1 it says 7/13/2005. Does that sound about right?
2     A.    About a week, week and a half
3 after is when I got the -- I went on the --
4 well, they've got the dates right. That sounds
5 about right.
6     Q.    And it says that was ordered by
7 Dr. Wood.
8     A.    Right.
9     Q.    Do you discuss this MRI with
10 Dr. Wood?
11     A.    No, not really. He just told me
12 they found that -- in the x-ray that I needed to
13 have an MRI done and just set it up.
14     Q.    Did you -- after the MRI was done,
15 then you discuss the results of the findings
16 with Dr. Wood?
17     A.    Yeah. He told me that they had a
18 Dr. Beranek, an orthopaedic surgeon. He was
19 going to leave shortly in two or three months,
20 but he would probably take care of me. He told
21 me it was torn cartilage in that one knee that
22 they did the MRI on then, and he referred me to
23 Keith Granger. That there might be

Page 156

1 complications during the arthroscopic, the
2 cleaning out.
3     Q.    Next I'll show you Defendant's
4 Exhibit 63.
5
6         (WHEREUPON, a document was marked
7 as Defendant's Exhibit Number 63 and is attached
8 to the original transcript.)
9
10     Q.    (BY MR. KNOTT) This is one of
11 those time saver exhibits with a few different
12 dates on it. It's on Wiregrass Orthopaedics'
13 paper. And it has dates 7/28/05, 8/4/05,
14 8/9/05. Do you remember going to Wiregrass
15 Orthopaedics after getting your MRI on your
16 knee?
17     A.    That was that doctor I just
18 named. That Dr. Beranek, that orthopaedic
19 surgeon. Yes, I remember going to him.
20     Q.    Okay. Here on the second page of
21 this, there is a space where it says, give
22 description of how accident happened. Is this
23 your handwriting or --

39 (Pages 153 to 156)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    A.    That's mine.
2    Q.    That's yours? Okay. Do you see
3  the date of the injury?
4    A.    Yeah, I see it.
5    Q.    Are you thinking now that maybe --
6    A.    Huh-uh, (negative), the 4th.
7    Q.    So --
8    A.    It was July 4th.
9    Q.    Where you wrote 7/1/05, that was
10  just a writing error?
11    A.    Yeah, it wasn't --
12    Q.    It'd be a typo if it was a
13  typewriter, but you just wrote the number
14  wrong?
15    A.    No, I just wrote it down wrong.
16  It was the 4th.
17    Q.    And you said it happened at home
18  in your yard?
19    A.    And I got the right leg up high.
20  It was the right that went over and the left is
21  what caught it.
22    Q.    This says crossing -- you wrote
23  crossing --

Page 158

1    A.    Two foot high fence. Couldn't
2  pick up right leg up high. It should have been
3  couldn't pick up left leg up high.
4    Q.    Okay. So the way you described it
5  earlier when you were talking to me --
6    A.    Yeah, it was the right leg.
7    Q.    -- is the correct way. And you
8  got it a little bit backwards on Defendant's
9  Exhibit 63?
10    A.    Backwards, right.
11    Q.    Did you talk to Dr. Beranek?
12    A.    Yeah. He showed me a thing where
13  it was torn and said he would --
14    Q.    Had you ever seen Dr. Beranek
15  before?
16    A.    That was the first time.
17    Q.    In the course of meeting with him,
18  did you discuss kind of the drawn-out history,
19  as it were, of your work comp injuries and
20  treatment and kind of -- I know you'd been to
21  this practice before, but --
22    A.    No, I hadn't.
23    Q.    Oh, you hadn't been to his

Page 159

1  practice before?
2    A.    No, I hadn't been to his practice
3  before.
4    Q.    Did you discuss --
5    A.    Just vaguely, I told him I was
6  disabled and had a bad back. And he said that's
7  what's causing my back -- asked me did I have
8  any problems. I said, yeah, it got numb, and I
9  couldn't lift my leg up. He said, well, that's
10  what the problem was.
11    Q.    Did you tell him that the bad back
12  was a work comp?
13    A.    I don't remember if I did or not.
14    Q.    Okay. Did you tell him that --
15  did you tell him Ryder might pay for those
16  bills? I'm not saying they would. I'm just
17  saying, did you tell him that they would?
18    A.    I'd done been rejected July of
19  '04, so I didn't have any idea Ryder was going
20  to pay anything.
21    Q.    Like I said, I wasn't saying that
22  they would or wouldn't, but did you say anything
23  to him about submitting them to Ryder?

Page 160

1    A.    I don't remember if I did or
2  didn't. I really don't. I might have; I might
3  not. It was just that one visit, and he was
4  gone.
5    Q.    Okay. We're back up to July,
6  which is where we left off on the conversations
7  you've listed in your interrogatory answers. So
8  let's pick up -- your interrogatory answer 11-F
9  in Defendant's Exhibit 1 is a conversation dated
10  July 5, 2005. It kind of goes on to the other
11  page. Did you prepare this answer fully from
12  memory or was this from some notes that you had
13  taken?
14    A.    I guess it would have been from
15  memory and might have been a few notes. I got
16  July 1st, but I'm certain it's July 4th.
17    Q.    Okay. So on July 5th -- that
18  would be the same day you went to the emergency
19  room; is that right?
20    A.    We know I went the 5th because
21  it's got the date on there.
22    Q.    So the same date you went to the
23  emergency room, you called Mrs. Lloyd at Ryder?

40 (Pages 157 to 160)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1   A.   Mrs. Lloyd wasn't in.
2   Q.   Okay. And you spoke to her
3 supervisor?
4   A.   Spoke to Sandy Tifton, and I spoke
5 to supervisor, Greg Pitts. I think that's his
6 name. He said he would call Dr. Wood and call
7 Dr. Marsella, to give him a couple of days. And
8 I followed his exact words that he told me.
9   Q.   So July 8th, after giving him a
10 couple days, you called him back?
11   A.   Right. He said he hadn't been
12 able to get up with -- he'd left word, but the
13 doctors hadn't been able to get back up with
14 him. You know how doctors are. They take two
15 or three days or longer. I said, yeah, I'm well
16 aware of that. I checked with Dr. Wood's
17 office, what personnel I could talk to, and they
18 said they don't remember talking to anybody.
19 Which I'm not saying he didn't call, but they
20 couldn't remember Greg Pitts calling. So
21 Mrs. Lloyd came back and told me that Mr. Pitts
22 didn't know how to pull up the records.
23   Q.   Now you're moving up to

Page 162

1 interrogatory answer 11-H, the July 5th call?
2   A.   Right. She told me that Mr. Pitts
3 didn't know my records -- didn't know how to
4 pull them up. He was just trying to help me.
5 He didn't know I'd been cut off on a peer
6 review, you know. And I told her what
7 happened. She told me that I was getting very
8 old, and I had to -- half the people in the
9 office had degenerative disc and didn't know
10 it. And I said, well, I don't think they've got
11 bulges and canal stenosis, some herniated and a
12 little arthritis. She said, well, I ain't
13 saying they got all that.
14   Anyway, she told me I'd called in and my
15 speech was very -- you couldn't understand me,
16 like I was drugged up. I shouldn't be driving a
17 vehicle. And I think I told her I'd backed up
18 more miles than she drove forward. But
19 anyway -- and I've got a CDL. That was the
20 extent of your conversation, seems like, that
21 day.
22   Q.   Okay. Did you tell Mrs. Lloyd or
23 Mr. Pitts or Ms. Tifton, anybody else at

Page 163

1 Ryder -- did you tell them about the fall you
2 had in July of 2005?
3   A.   That's exactly what I told them.
4   Q.   I didn't see it specifically. I
5 might have missed over it.
6   A.   I told them. I don't know -- I
7 told, right here, Sandy Tifton was the first
8 one, to give me a Workman's Comp doctor. Martye
9 Lloyd was on vacation. I needed a Workman's
10 Comp doctor. She told me I'd been cut off
11 earlier by Workman's Comp.
12   Q.   Did you tell them, though, that
13 you'd fallen again because of your back, or did
14 you just tell them you needed to get back in --
15   A.   I told her I had fallen because of
16 my back.
17   Q.   Okay.
18   A.   I told him I needed a Workman's
19 Comp doctor. That's why he had Dr. Wood and
20 Marsella's name down -- Greg Pitts.
21   Q.   Okay. I think you reached the
22 bottom of the page when you were talking about
23 the July 2005, Monday a.m. conversation in

Page 164

1 interrogatory answer 11-H. I think there was
2 more to it. Did y'all talk about the appeal
3 process, you and Mrs. Lloyd, in that
4 conversation?
5   A.   I don't remember if we did or not.
6 But after that conversation, you know, she told
7 me that I was still cut off, you know. So I
8 don't remember if we talked or not.
9   Q.   Okay.
10   A.   But I remember asking her that
11 day, you know, to send me when I was cut off,
12 the exact date, because nobody ever did that.
13 That was the handwritten thing.
14   Q.   Let's go, then, to interrogatory
15 11-K, because it appears to me that this
16 conversation would have taken place right before
17 you got that handwritten thing.
18   A.   Yeah.
19   Q.   Tell us about this conversation
20 and how that took place. You called Mrs. Lloyd?
21   A.   I called and asked her -- I called
22 Mrs. Lloyd. And I needed the date I was cut off
23 and the reason. Would she mind writing me a

41  (Pages 161 to 164)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1  letter where I could -- the hospital -- I was
2  getting bills from everywhere. I didn't know
3  what was what. She said, well, if it was July,
4  she -- well, she didn't tell me a time, but
5  she'd put the date in. If any of it was bills
6  that might be hers, to send them to her. She
7  sent me a letter. And then I got this letter
8  when I was to be precertified, to call in. I
9  was cut off the same day, on July 17th. So I
10  couldn't really understand that, but wasn't
11  nothing I could do.
12      Then I told her -- I said, you remember
13  about six, seven, eight months ago when you told
14  me you were going to get me cut off? She said,
15  yes, I remember. And she said, I did my job.
16  Q.   Did you say anything?
17  A.   Wasn't no need to say no more,
18  because she was being courteous enough at that
19  time to send me my thing, and I didn't have no
20  way of knowing when it was. I didn't have no
21  letter on it. So I needed to know exactly
22  when. She did say she would pay for -- if there
23  was anything that she'd missed besides the

Page 166

1  Marsella and one thing McGahan didn't fill right
2  out or something, she would pay for it before
3  July 17. She said that was cutoff day, so to
4  speak.
5      MRS. SHUMATE: June 17th.
6  A.   I mean June, I'm sorry. 6/17/04.
7  Q.   I'm finally going to mark the
8  Ryder letter, dated June 17, 2004, as an exhibit
9  with a number, and it's going to be 1-B, and
10  we'll mark the interrogatory answers as a
11  composite exhibit, 1-A. That'll make it easier
12  for us to just get through this.
13
14      (WHEREUPON, documents were marked
15  as Defendant's Exhibit Numbers 1-A and 1-B and
16  are attached to the original transcript.)
17
18  Q.   (BY MR. KNOTT) So the next
19  communication you had with Martye Lloyd after
20  the telephone conversation you just told us
21  about in interrogatory answer 11-K. Would the
22  next communication be when you received this
23  handwritten note?

Page 167

1  A.   That's, as far as I know, the last
2  time we talked.
3  Q.   So you had already received a copy
4  of this letter before. But the first copy you
5  received didn't have this handwriting in the
6  upper right-hand corner?
7  A.   No. No date of cutoff. See, this
8  says, precertified through IntraCorp. Had to
9  call that number.
10  Q.   So the new part was the --
11  everything under note from adjuster --
12  A.   6/17, 6/17th. The letter she sent
13  me that I'd be precertified, to call in, they'd
14  have doctors, she cut me off the same day.
15  That's her own handwriting and her own letter.
16  I traveled a lot that day.
17  Q.   You traveled a lot?
18  A.   Precertified and then cut off the
19  same day.
20  Q.   After that -- after receiving the
21  handwritten note marked in Exhibit 1-B, did you
22  have any other communication with Ryder at all,
23  except through your lawyer, maybe, but

Page 168

1  personally? Not with Mrs. --
2  A.   I don't think I did. If I did --
3  I might have did a weird call to try to talk to
4  somebody, but I don't think I did.
5  Q.   Okay.
6
7      (WHEREUPON, a document was marked
8  as Defendant's Exhibit Number 64 and is attached
9  to the original transcript.)
10
11  Q.   (BY MR. KNOTT) The next thing I
12  have for you is Defendant's Exhibit 64, and it's
13  from Southern Bone & Joint Specialists. Do you
14  remember going to see them about your knee?
15  A.   Right.
16  Q.   Seeing Dr. Granger on August 23,
17  2005?
18  A.   Right.
19  Q.   Okay. Now, is this also your
20  handwriting, the first page?
21  A.   Uh-huh, (affirmative).
22  Q.   Down here in the bottom where it
23  says, not W/C, is that your handwriting or

42  (Pages 165 to 168)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1 somebody else?
2    A.   Somebody else.
3    Q.   Did you have a conversation with
4 the people at Southern Bone & Joint
5 Specialists --
6    A.   Right.
7    Q.   -- about the situation with work
8 comp and Ryder and everything that'd been going
9 on?
10   A.   I don't really think I did.
11   Q.   Okay.
12   A.   Because there wasn't no need of
13 it. I wasn't being represented. They said did
14 I have insurance or Workman's Comp or whatever.
15 I said, no, I used to have Workman's Comp. I
16 remember telling them that. But I didn't have
17 it now, to the best of my knowledge. Yeah, I
18 told them that.
19   Q.   You just didn't give them any of
20 the nitty-gritty details about --
21   A.   I didn't see any reason.
22   Q.   Yeah.
23   A.   Said they'd bill it on Medicare.

Page 170

1    Q.   Defendant's Exhibit 65 is more of
2 Dr. Granger's notes.
3
4        (WHEREUPON, a document was marked
5 as Defendant's Exhibit Number 65 and is attached
6 to the original transcript.)
7
8    Q.   (BY MR. KNOTT) These with the
9 dates 8/24/2005 and 10/4/2005. Do you remember
10 having a conversation with Dr. Granger about how
11 your July 2005 fall occurred?
12   A.   Yeah, we talked about how it
13 occurred.
14   Q.   Did you and Dr. Granger even talk
15 about how to proceed and what the treatment
16 options were for it?
17   A.   Yeah. He said he would go in and
18 scope it and clean it out and go from there. He
19 examined it and said it was real tight, but it
20 wasn't tight when he got through.
21   Q.   Okay.
22   A.   Then he checked the other one
23 before he got through with the first one.

Page 171

1    Q.   Now, again, do you see on Exhibit
2 65 where it refers to July 1, 2005, as the date
3 of the accident?
4    A.   I guess it was. How I come up the
5 date was 2004 -- it's still sticking with July
6 1st, so I guess it was July '04. Maybe I was
7 wrong on the date. Because it's July 1 on
8 everything. I've been seeing it on three or
9 four different things.
10   Q.   Okay. In this note, it refers to
11 -- now, ultimately, you got both knees scoped;
12 right?
13   A.   Right.
14   Q.   And Dr. Granger did that?
15   A.   Right.
16   Q.   He did the scope on your right and
17 your left?
18   A.   Right.
19   Q.   On the 8/24/2005 visit, were y'all
20 chiefly discussing your pain with your right
21 knee at this particular point?
22   A.   At that point, my right one was
23 bothering me worse than the left, but then my

Page 172

1 left started bothering me more than my right.
2    Q.   Did you come down on them
3 differently?
4    A.   No. I came down
5 exactly (indicates with noise). It was level,
6 just with flat knees, straight.
7    Q.   You didn't hit one before the
8 other?
9    A.   No, it was exactly.
10   Q.   Okay. They both hit in the same
11 way, positioned the same way?
12   A.   Fall forward from my weight.
13   Q.   Okay. Did they -- can you
14 describe what the difference was in the way they
15 felt there before you got them scoped?
16   A.   Well, the first one -- the right
17 one was hurting on the side -- or kind of to the
18 right side or left side. I can't remember.
19 Like an awful, awful pain. Then the left one
20 was -- had some pain, but not like the right
21 one. But I guess it moved that -- whatever you
22 call it -- cartilage moved around. And the
23 other one, I just went to almost screaming with

43 (Pages 169 to 172)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

1  pain when it was moving around, when you like
2  walk or bend or whatever, when you sit down and
3  bend your knee.  It just really got to the point
4  I couldn't take it.
5      Q.    That's the one to the right side
6  that was --
7      A.    The right was the very worst when
8  I went, but the left turned out to be worse than
9  the right.  When I got to bending my knee, I
10 guess it got to moving around more.
11     Q.    Now, around that same point in
12 time, you were having another heart procedure
13 done; is that right?
14     A.    Heart cath.  Come out fine.
15     Q.    Where did you have that done?
16     A.    Medical Center, same place I
17 had that done.
18     Q.    Dale Medical Center?
19     A.    No, Southeast Medical Center.
20     Q.    Okay.  Did your heart problems --
21 did your -- have your doctors ever told you they
22 think you might have had a heart attack?  I know
23 some people have heart attacks and not know it.

Page 174

1      A.    I've been told I had a heart
2  attack in '94, '95 -- no, in '96.  Sometime,
3  anyway, after I left Ryder.
4      Q.    Was it one of those that you hear
5  about sometimes that you don't remember it
6  happening?
7      A.    I knew I hurt real bad in my
8  chest.  I didn't go to the doctor or nothing.
9      Q.    And aside from having heart
10 attacks, have you also had, like, chest pain?
11     A.    I've had open heart surgery.
12     Q.    So that's probably kind of -- not
13 a bright way to phrase the question.  Have you
14 had angina and just kind of tightness in your
15 chest aside from having heart attacks?
16     A.    Right, I have that.
17     Q.    Have you ever fallen down because
18 of pain in your chest or because of anything
19 that you would believe would be related to your
20 heart?
21     A.    I didn't fall down when I had the
22 heart attack.  I had it standing up.
23     Q.    Okay.  You were shaking your head,

Page 175

1  but just for the record, you've never been
2  caused to fall down because of pain in your
3  chest --
4      A.    Never.
5      Q.    -- and heart-type pain?
6      A.    Never.  Not even with the heart
7  attack.  I stood there a minute on my deck and
8  caught -- I guess caught my breath, and I went
9  back inside and went to bed.
10     Q.    How about because of shortness of
11 breath?  Have you ever fallen because of having
12 shortness of breath?
13     A.    No.
14     Q.    Have you ever fallen because of
15 being dizzy?
16     A.    I don't get dizzy.  Not like --
17 no, I don't have dizziness.  Maybe like when you
18 first wake up or something or jump up, inside
19 you might be a little.  But no, I've never
20 fallen because I'm dizzy.
21     Q.    Do you still have the condition
22 that the doctors told you was sleep apnea?
23     A.    No, that's gone.  I don't have a

Page 176

1  problem with that no more.
2      Q.    When did y'all get that taken care
3  of?
4      A.    I don't know.  It just left.  I
5  really don't know what happened.
6      Q.    It wasn't a particular procedure
7  or treatment that you --
8      A.    I don't know if it was some kind
9  of drug they had me on or some kind of
10 procedure, but it just quit.
11
12        (WHEREUPON, a document was marked
13 as Defendant's Exhibit Number 66 and is attached
14 to the original transcript.)
15
16     Q.    (BY MR. KNOTT) Defendant's
17 Exhibit 66.  You had MRI's for your knee?
18     A.    Okay.
19
20        (WHEREUPON, a document was marked
21 as Defendant's Exhibit Number 67 and is attached
22 to the original transcript.)
23

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1  Q.  (BY MR. KNOTT) Defendant's
2  Exhibit 67, going back to Dr. Granger, again,
3  several office notes going from October 2005 all
4  the way up to February 2006.  He did
5  arthroscopies on both of your knees?
6  A.  Right.  He was the man who told me
7  that I needed a knee replacement.
8  Q.  But after the arthroscopies, did
9  that improve how your knees feel and how they
10  felt?  Did it improve the condition?
11  A.  No.
12  Q.  Not that it made them brand new.
13  A.  It made the pain go away, but
14  it -- no, it didn't improve.
15  Q.  Okay.  Well, it made the pain go
16  away?
17  A.  Made the pain for a little bit go
18  away for a few days, and then it started -- when
19  you get to walking, that bone rubbing bone, it
20  went back to double pain.
21  Q.  Okay.  As we sit here today, do
22  you still have the pain in both knees?
23  A.  Sir, I have that every day of my

Page 178

1  life.
2  Q.  How does the pain that you
3  experience in your knees today compare to the
4  pain in your knees of August of 2005?  Putting
5  it close to the time of the fall and before you
6  had the arthroscopies on them.
7  A.  I didn't have any problems with my
8  knees, not at that time, as I can remember of
9  any -- now, it's just terrible pain.  You know,
10  it's just bone against bone, is all it is.
11  Q.  I think I phrased the question
12  wrong.  How does the pain you're having in your
13  knees now compare to the pain after you fell in
14  July, but before you had the arthroscopy.  Is it
15  worse, the same?  Can you compare?
16  A.  There's no way you can compare
17  before you have surgery and then after you have
18  surgery, how does it feel right before you have
19  surgery.  It's going to hurt both ways.  I can't
20  tell you from one to ten what the pain scale is.
21  I can tell you what is now.  It hurts.
22  Q.  What is it on a scale of one to
23  ten?

Page 179

1  A.  Four to five.  Certain days worse
2  than that.
3  Q.  Is it better some days, or is this
4  as good as it gets?
5  A.  Well, if you try to exercise, you
6  just really go downhill because you know what
7  it's doing.  You have to try to do some.
8  Q.  Defendant's Exhibit 68 is a March
9  29, '06, chart note from Keith Granger.
10
11  (WHEREUPON, a document was marked
12  as Defendant's Exhibit Number 68 and is attached
13  to the original transcript.)
14
15  Q.  (BY MR. KNOTT) Have you seen
16  Dr. Granger since then?
17  A.  Not since the last injection.
18  He's got there the last injection -- I don't
19  know about these dates.  Maybe he's right.  I
20  don't know who's right no more on the dates.
21  Q.  Okay.
22  A.  2/15, that sounds about right.
23  Q.  Okay.

Page 180

1  A.  He gave me gel shots and five
2  shots in my knees.  That's the last time I've
3  seen him, once every week.
4  Q.  Okay.  Are you seeing -- strike
5  that.  What medications are you on currently on
6  a regular basis?  What are you taking these
7  days?
8  A.  You want -- I don't really have a
9  list of that.
10  Q.  Okay.
11  A.  The only thing I'm taking to deal
12  with the cramps in my back is Valium, the cramps
13  and spasms.  I take no pain pills.  That's it.
14  I've been that way since -- they write
15  prescriptions for the pain pills, but I can't
16  take it.  I try a few of their pain pills, and
17  they make me sick.
18  Q.  Who has written those
19  prescriptions?
20  A.  Dr. Wood wrote a few.  He quit
21  writing them because I told him I didn't want
22  them.
23  Q.  Where is Dr. Wood?

45  (Pages 177 to 180)

**www.AmericanCourtReporting.com**
**August 23, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1    A.    He's in Ozark.
2    Q.    Ozark Medical Clinic?
3    A.    Dr. Charles Wood. I don't know if
4  you'd call it a clinic or not.
5    Q.    Who prescribes the Valium for you?
6    A.    Dr. Wood.
7    Q.    Okay.  When was the last time you
8  saw Dr. Wood?
9    A.    Two or three week ago.
10    Q.    What did y'all discuss in that
11  visit?
12    A.    Discussed that -- my knees.  And
13  he suggested that I never even try to have
14  surgery of any kind again, especially my knees.
15  I couldn't go through the therapy.
16    Q.    What was it about your condition
17  that he thought would prevent you from being
18  able to go through therapy?
19    A.    Six weeks or more of rehab.
20    Q.    Was it your heart, was it other
21  things?
22    A.    Emphysema.
23    Q.    You mentioned that when we were

Page 182

1  first getting started.  I apologize for asking
2  again.  Did he suggest anything for you that
3  could help your condition?
4    A.    No, sir, he didn't.
5    Q.    Or that could help you cope with
6  your condition?
7    A.    Just like Granger said, you'll
8  just have to live with it.
9    Q.    Have you talked with Dr. Wood
10  about whether or not it would be a good idea for
11  you to get back on pain management if money were
12  not an issue.
13    A.    No.  I didn't talk to him because
14  I had no reason to speculate because I didn't
15  have no way to pay for it.  So I'm not going to
16  discuss anything I can't do.
17    Q.    How long have you been a patient
18  of Dr. Wood?
19    A.    About a year.
20    Q.    How regularly do you see him?
21    A.    Whenever I need to go.
22    Q.    Your last visit was about a week
23  ago.  When was your visit before that?

Page 183

1    A.    Three months later.
2    Q.    Three months earlier than that?
3    A.    No.  In three months after the
4  last visit.
5    Q.    No, I'm --
6    A.    Every three months.
7    Q.    Every three months?
8    A.    Unless I get a virus or a cold.
9    Q.    Your most visit was about a week
10  ago.  Does that mean --
11    A.    Before that, about week and a half
12  or two weeks.
13    Q.    Does that mean before that visit,
14  your most recent visit would have been
15  about three months before that?
16    A.    I think about a month.  He found
17  something he thought was protein in my blood,
18  but it turned out to be what I ate.
19    Q.    He thought it was protein?
20    A.    Yeah, that's what he thought, in
21  my urine or blood.  But it turned out to be --
22  everything is A-okay.
23    Q.    Okay.  Have you discussed the work

Page 184

1  comp situation with Dr. Wood?
2    A.    No.  Really, I ain't got no need
3  to.
4    Q.    Okay.
5    A.    I think he asked me how I got
6  hurt, and I told him, and that was it.
7    Q.    Okay.
8        MR. KNOTT:  I'm almost done.  I'm
9  going to go ahead and offer the exhibits before
10  I forget because I am out of exhibits.
11    Q.    Without going through and listing
12  every single prescription medication you're
13  taking now, can you list the doctors that are
14  prescribing medications for you now?
15    A.    Dr. Allabadi, Heart South, and
16  Dr. Wood -- well, Dr. Allabadi would know the
17  latest update of what I'm taking, but a lot of
18  it I had to drop off because I couldn't afford
19  it.
20    Q.    Where do you get your
21  prescriptions filled?
22    A.    I get my prescriptions filled
23  at -- I can't think of that guy.  It's Jack's

46  (Pages 181 to 184)

**www.AmericanCourtReporting.com**
**August 23, 2006**

# American Court Reporting
## toll-free (877) 320-1050



Page 185

1  Drugs in Midland City. That's a discount drug.
2      Q.    At Midland City?
3      A.    Right, Jack's Drugs.
4      Q.    Have any of the doctors told you
5  what makes your legs cramp, like biologically or
6  whatever it is?
7      A.    Tell me it's coming off my back.
8  Then they tell me the sciatic nerve causes a lot
9  of my problems with my feet and legs. Then they
10 tell me, you know, a lot of different things,
11 why they do this and that. A lot of them tell
12 me it's nerve damage. I don't know.
13     Q.    They've told you different things
14 about how it's connected or what makes it
15 happen?
16     A.    Right. A lot of them don't be --
17 won't tell you a lot, but you can see a
18 checklist where they've examined you. You don't
19 know -- you know, he'll see you in so many days
20 or months.
21     Q.    Okay.
22         MR. KNOTT: That's all I have
23 right now.

Page 186

1          MRS. SHUMATE:  I have no
2  questions.
3
4          ENDED AT 3:03 p.m.
5
6      FURTHER DEPONENT SAITH NOT
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 187

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY)
5
6          I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype, and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the deposition
12 give by said witness upon said hearing.
13         I further certify that I am
14 neither of counsel nor of kin to the parties to
15 the action, nor am I in any way interested in
16 the result of said cause.
17
18
19      APRIL BENDINGER, CCR
        CERTIFICATE NUMBER CCR-384
20
21
    My Commission Expires
22  June 8, 2008
23

## www.AmericanCourtReporting.com
## August 23, 2006