# Exhibit A

1

1 IN THE U. S. DISTRICT COURT

2       MIDDLE DISTRICT OF ALABAMA

3         NORTHERN DIVISION

4

5 JOHNNY W. SASSER,

6     PLAINTIFF,

7     VS.         CASE NO: 2:06-CV-593-CSC

8 RYDER TRUCK RENTAL,
  et al.,

9     DEFENDANTS.

10

11     The deposition of DR. J. JERRY

12 MARSELLA, JR., taken by the Plaintiff,

13 pursuant to the Federal Rules of Civil

14 Procedure, before Stacey Watkins, RPR, and

15 Notary Public, State at Large, at the offices

16 of Anesthesia Consultants Medical Group,

17 Dothan, Alabama, on the 20th day of July,

18 2007, at 7:10 a.m., CDT, pursuant to notice.

19         * * * * *

20 APPEARANCES:

21 FOR THE PLAINTIFFS:    FOR THE DEFENDANTS:

22 MS. AMY M. SHUMATE     MR. CONLEY W. KNOTT
  Attorney at Law       Attorney at Law

23 Dothan, Alabama       Birmingham, Alabama

24 ALSO PRESENT:

25 JOHNNY SASSER

---

2

STIPULATION

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

---

3

DR. J. JERRY MARSELLA, JR. having been first duly sworn, testified as follows, to-wit:

EXAMINATION

BY MS. SHUMATE:

Q   Dr. Marsella, my name is Amy Shumate, and I represent Johnny Sasser in a lawsuit that's been filed regarding his workers' comp claim. I'm going to be asking you questions. And, of course, I know you've done this before. But, if, at any time, you don't understand the question, certainly let me know --

A   Certainly.

Q   -- and I can rephrase it. Would you please state your name for the record?

A   John Jerry Marsella, Jr.

MS. SHUMATE: And for the record, the attorneys have stipulated, prior to going on the record, Dr. Marsella's qualifications as a physician and his licensing, and we have agreed

---

4

to attach his CV to this deposition as Plaintiff's Exhibit No. 1.

Q   Now, I would like to ask you a couple of questions about your specialty. You are a physician, licensed in Alabama? Correct?

A   Yes.

Q   Do you have an area of specialty in medicine that you practice in?

A   My primary specialty is anesthesiology, and my subspecialty is pain management.

Q   Okay. Now, what, specifically, does it mean to have a subspecialty in pain management?

A   That implies extra training in that area, in this case, pain management, which, in my case, was a six-month postgraduate fellowship with concentration in all aspects of pain medicine and pain management.

Q   And what does a pain management doctor do? What do you do for your patients?

A   We handle, primarily, chronic pain problems, but we also do some acute

7

1 postoperative pain management.  The chronic
2 pain problems are anything from back pain to
3 headache to special types of nerve pain to
4 basically all kind of pain.  We manage those
5 by using various techniques and methods,
6 including injections, physical therapy,
7 occupational therapy, medications.
8     Q    So, is it a fair statement that
9 you're not necessarily in the business of
10 curing the problem, but helping them live
11 with the pain that's associated with it?
12     A    Yes.
13     Q    Okay.  And are you board certified
14 in anesthesiology?
15     A    I am.
16     Q    Is there a board certification for
17 pain management?
18     A    Yes, there is, and I'm board
19 certified.
20     Q    All right.  Is that a separate
21 certification?
22     A    It is.
23     Q    How long have you practiced in the
24 area of pain management?
25     A    In private practice 16 years.

6

1     Q    All right.  Now, you have had an
2 occasion to see and treat Mr. Johnny Sasser?
3 Is that correct?
4     A    I have.
5     Q    Can you tell the jury when the
6 first time was that you saw Mr. Sasser, and
7 what the reason for his visit was?
8     A    Mr. Sasser's first visit here, not
9 in this particular building, but with our
10 practice, was on September the 5th of the
11 year 2000.  He came in with the chief
12 complaint of low back pain, had diagnosis of
13 degenerative disc disease of the lumbar spine
14 and lumbar spinal stenosis.
15        The history that he gave was that he had
16 been dealing with his pain since 1995, at
17 which time he said that he was doing his
18 usual work, and he was helping to lift a
19 motor, an 800-pound motor, at the General
20 Electric plant.  And while he was attempting
21 to lift the motor and secure it, he strained
22 his back, and since that time, he had had the
23 back pain and the problems with his back.
24     Q    Okay.  Now, to bring you up to
25 speed, so you'll know what we're doing here

1 today, Mr. Sasser had already settled his
2 case with the workers' comp company regarding
3 that back injury, and they were ordered to
4 continue to pay medical treatment that was
5 related to that back injury on the job.
6        Now, was he referred to you by another
7 physician?
8     A    Let me look.
9     Q    Sure.
10     A    Typically, they are.  At that time,
11 our primary way of obtaining patients was by
12 referral.  And I didn't refer in my notes
13 specifically to the referring physician.  Let
14 me look.
15     Q    I had in my notes -- and I
16 certainly want you to look for yours -- that
17 it was Dr. Wallace McGahan.  But if you would
18 check and make sure that's what you
19 understood.
20     A    Yes.  Yes.
21     Q    So, Dr. McGahan sent him to you to
22 treat what part of the body, was your
23 understanding at that time?
24     A    I don't know specifically.
25 Typically, the request is worded "evaluate

8

1 and treat."  Sometimes they'll put in
2 specific area.  But, at the time, the pain
3 was primarily where he stipulated.  Now, I do
4 have here -- let's see.  This is written on a
5 prescription.  Unfortunately, it's -- it says
6 September the 5th, 11:30.  So, I'm assuming
7 that was the time of that appointment.
8        At the bottom, it says, "Diagnosis,
9 spinal stenosis and carpal tunnel syndrome."
10 Written on the bottom of that is "sciatica,"
11 "HNP," which is herniated nucleus pulposus,
12 or a disc, "LS spine," lumbosacral spine.
13 And this, I think, is Dr. McGahan's
14 signature.
15     Q    Is that on a note from
16 Dr. McGahan's office?
17     A    It's on a prescription sheet.
18     Q    Okay.  And that's Dr. McGahan's
19 prescription pad?
20     A    It is.  It has his name at the top.
21     Q    And is that note there part of your
22 file?
23     A    It is.
24     Q    And is that the type of things that
25 you have in your file that you keep in the

9

1  regular course of your business?

2      A    It is.

3      Q    And is the information contained on

4  that note the type of information you receive

5  from referring physicians that you review and

6  use in your evaluation and treatment of the

7  patient?

8      A    Yes.

9      Q    All right.  And did you do so in

10  this case?

11      A    I did.

12      Q    All right.  So, basically, it

13  appears as if he was sent here by Dr. McGahan

14  for back problems, and you're evaluating him

15  and treating him for what he reported to you

16  to be back pain?

17      A    Yes.

18      Q    Okay.  Now, the carpal tunnel was

19  not part of his settlement, so we won't

20  really deal with any of your treatment, if

21  any, dealing with carpal tunnel.

22      A    Okay.

23      Q    We're specifically dealing with the

24  back.

25      A    Okay.

10

1      Q    Would you go through -- I guess,

2  after your history that he gave you in

3  September, did you do an examination?

4      A    I did.

5      Q    And what did you do for the exam,

6  and what were the results of the examination?

7      A    A sort of general physical exam

8  showed, for the most part, things were

9  reasonably normal, as far as his heart and

10  lungs and those sorts of things.

11      On neurological examination, there was

12  some decreased sensation to light touch -- I

13  didn't do pinprick at the time -- in a

14  nonradicular pattern of the right leg

15  compared to the left.  "Nonradicular" meaning

16  it didn't follow, necessarily, specifically,

17  the pathway that a particular nerve root

18  would follow on a normal -- what we call a

19  dermatome chart.

20      Q    Okay.  What did you do after that

21  exam?

22      A    The first thing that I did was to

23  initiate a trial of pain medication,

24  Methadone 2.5, or two and a half milligrams,

25  three times a day, a muscle relaxer,

11

1  Zanaflex, four milligrams, three times a day,

2  and then, just set the patient to come back

3  in a month for a follow-up visit.

4      Q    All right.  Do you have any other

5  medical records from Dr. McGahan, or did the

6  group send any, or did Mr. Sasser bring in

7  any other medical records that dealt with

8  this injury, for you to know how long he had

9  been treating or what types of treatment he

10  had had in the past?

11      A    The only thing that I had from

12  outside were some faxed records, which are

13  difficult to read, because they transmitted

14  poorly.

15      Q    Who faxed those to you?  Do you

16  know?

17      A    Again, the header, you can't really

18  read, because it didn't transmit well.  Now,

19  I have another fax sheet here, but this was

20  dated 3-1-02, so that doesn't have to do with

21  the initial visit.  Really, it's hard to

22  read.

23      Q    So, that fax note that's hard to

24  read really wasn't part of your --

25      A    It wasn't something that I relied

12

1  on to help me make my decision.

2      Q    That's what I needed to know.  All

3  right.  Now, I heard you state that you gave

4  him Methadone.  Now, for members of the jury

5  who might not understand the use of Methadone

6  other than for treatment of someone who's

7  addicted to methamphetamines, would you

8  explain that to them, please, why Methadone

9  would be prescribed?

10      A    Methadone is an excellent

11  analgesic.  Initially, it was developed for

12  that purpose, not for rehabilitation.  The

13  advantage of Methadone in a chronic pain

14  patient is twofold, really.

15      One is that, because of the way the body

16  handles the medication, it stays in the body

17  for a long time.  So, it has the ability to

18  have a prolonged relief.

19      The other thing is that, because of its

20  chemical nature, it can treat certain special

21  kinds of pain, particularly nerve-type pain.

22  Not necessarily specifically for -- it's not

23  used necessarily specifically for that type

24  of pain.  In other words, some patients get

25  that medication even if they don't have a

13

1  nerve-generated pain.
2      But the basic reason for a medication
3  like Methadone is, number one, it's
4  effective.  Number two, it can have a
5  prolonged effect.  And, number three, from an
6  economic standpoint.  It's very cost
7  effective.
8      Q    All right.  Did you follow up with
9  Mr. Sasser -- did he follow up with you, I
10  should say, following that initial visit?
11      A    He did.  Now, at the time that Mr.
12  Sasser was coming to the pain center, we
13  typically would dictate notes.  And I have
14  some handwritten nurse's vital signs from
15  several dates, October the 17th of 2000,
16  January the 4th of 2001.  But, unfortunately,
17  I don't have dictated notes from those days.
18  I can't tell you why.  The next dictated note
19  that I have is January the 30th of '01.
20      Now, let me just interject here, in
21  another part of the record, we have a
22  medication log.  And for those dates that I
23  mentioned --
24      Q    Yes.
25      A    -- I do have, in my log, that he

14

1  received, again, the medication, the
2  Methadone.  And it's reflected here that the
3  dosage was upped from two and a half
4  milligrams, three times a day, to five
5  milligrams every eight hours, or three times
6  a day.
7      Also, a change was made from Zanaflex to
8  Baclofen, which is another muscle relaxer of
9  a similar nature and of a comparable
10  strength.  That was dated 9-5, 2000 and 9-27,
11  2000.
12      Q    Okay.  Now, if I could, I want to
13  show you what I've received.  The defense
14  attorney subpoenaed records from the Medical
15  Center --
16      A    Right.
17      Q    -- and that covered yours.  And as
18  part of that, I've received a dictated note
19  from 9-27.  Does that appear to be --
20      A    Yes.
21      Q    -- your dictated notes?
22      A    (Witness nodding head in
23  affirmative.)
24      Q    Were those kept separately than the
25  chart you have here?

15

1      A    Yes.  This is sort of a tortuous
2  system that we have.  The hospital is the
3  owner of the pain management center facility
4  itself, and so, any records generated within
5  the facility are official hospital records.
6  And, as such, they become part of the
7  patient's permanent hospital record.
8      However, because of policy, those
9  physical charts can't leave the hospital
10  building.  And since our clinic building is
11  physically separate, the only way for us to
12  have access immediately to the patient's
13  record, without having to send someone across
14  to the hospital, is to have our own -- what
15  we call convenience record, which has
16  everything that we generate out of the pain
17  center.
18      And, actually, there are some things in
19  this convenience record that may not be up to
20  this point in the hospital record, such as
21  lawyer letters, insurance company letters,
22  things that don't necessarily have to do with
23  official hospital business, that really are
24  only unique to our pain practice.
25      Our current practice, now, is that we

16

1  basically scan everything into the patient's
2  record.  But, in essence, this is only for
3  our convenience, and it's not the official
4  record.
5      Q    But it is a record kept here in
6  your office --
7      A    Yes.
8      Q    -- in the normal course of your
9  business?
10      A    Yes.  And, normally, we should have
11  these.  As I said, I can't explain why they
12  aren't in here.
13      Q    All right.  I would like to have
14  that stack of documents from 9-27, 2000,
15  admitted as Plaintiff's Exhibit No. 2, so we
16  will have them attached to your deposition.
17  But, if you would, could you review them
18  now and --
19      A    Sure.
20      Q    -- let's talk about that visit?
21  Now, I'm going to -- for the sake of brevity
22  and for the sake of the jury's understanding,
23  I would prefer not to necessarily go through
24  visit by visit, unless you need to.
25      A    No, I don't.

17

Q    Once we get past the first few visits, if you could just explain your general course of treatment --

A    Sure.

Q    -- and how he fared with you, that would be more natural in the way we talk about things.

A    Let me just take a look at this real quick.

Q    Sure.

A    In essence, I followed Mr. Sasser on an average of every three months, with an occasional visit in between those. The main modalities during that time were medication management, with an occasional trigger point injection for some complaints of muscle spasms in the legs.

Q    Okay. Can you explain the trigger point injections to the jury?

A    Certainly. A trigger point injection is an injection into the muscle with a small amount of, in our case, local anesthetic and anti-inflammatory steroid medication, the purpose of which is to quiet down an inflammatory process in the muscle

18

which can lead to localized pain.

Q    The pain that you saw him exhibit and the muscle spasms and things of that nature that you document, are they consistent with the original diagnosis that was sent from Dr. McGahan of the lower back pain, the spinal stenosis, and things of that nature?

A    Yes. But, in some cases of people who have a back problem, because the pain may alter their gait, that may pose more of a strain on certain muscles, which cause the muscle pain.

Q    Okay. So, the muscle spasms are a result of an altered gait?

MR. KNOTT: Object to the form.

A    They can be.

Q    In his situation, did you have an opinion as to what was causing the muscle spasms that required the trigger point injections?

A    Not really, other than what I just said.

Q    Was there anything that was unusual about that presentation to you --

A    No.

19

Q    -- or that gave you concern?

A    (Witness shaking head in negative.)

Q    Okay. Now, I would want you to assume, hypothetically, because you don't have the records in your chart, that, on September the 13th, 2000, which was a few days after your first visit with Mr. Sasser, that Dr. McGahan, who was his workers' comp-approved treating physician, has a note in his chart indicating the diagnosis for Mr. Sasser was low back pain, muscle spasms, CAD, and spinal stenosis. Is that also your understanding of his diagnosis when you were treating him?

A    Well, the CAD, the typical meaning for that is coronary artery disease, which --

Q    Has nothing to do with his back? Is that pretty much correct?

A    That's right.

Q    But the lower back pain, muscle spasms and spinal stenosis is consistent with your treatment?

A    Yes.

Q    Now, you treated him from September of 2000 until when?

20

A    The last note that I have is dated 5-20-04, May 20th of '04.

Q    Okay. And in between September of 2000 and May 20th of '04, were you treating him for the same thing, the lower back pain, the spinal stenosis, and the muscle spasms?

A    Yes.

Q    Was there anything during that time that changed about his condition, where you were treating him for something other than what he was originally referred by Dr. McGahan for?

A    No.

Q    Okay. And your treatment, I believe you said, was basically --

A    Medication.

Q    -- medication and occasional trigger point injections?

A    Yes. That's correct.

Q    In your opinion, was the medication and the occasional trigger point injections necessary to treat the chronic back pain that he was sent here by Dr. McGahan for?

A    Yes.

Q    In your opinion, were those

21

1  medications directly related to the back
2  injury that he had suffered?
3      MR. KNOTT:  Object to the form.
4      Object to the leading.
5  A  Yes.
6  Q  The judge in this case, back in
7  Barbour County, basically had asked that
8  Dr. McGahan review all the medicals and
9  determine whether there was an injury on the
10  job, and report to him.
11      And Dr. McGahan submitted a letter to
12  the judge that basically said, "Mr. Sasser,
13  in my medical opinion, received a
14  work-related injury on or about September the
15  8th, 1995.  I reached this opinion after
16  several office visits and examinations.
17      I do not believe Mr. Sasser has anything
18  to gain from a neurological examination at
19  this time, although I will be happy to
20  schedule him a visit or visits.
21      In my opinion, Mr. Sasser's approximate
22  medical expenses should be $10,000.00 per
23  year.  I could elaborate on the nature of his
24  injury, if necessary.  So, if more
25  information is needed, please let me know."

22

1      And that was dated January the 3rd of
2  2000.  Do you have any information at all,
3  either from Mr. Sasser's presentation, from
4  any other source, from your own observations,
5  examinations of him or anything, that lead
6  you to believe Dr. McGahan was incorrect when
7  he stated that he had received an on-the-job
8  back injury in 1995?
9      MR. KNOTT:  Object to the form and
10      the predicate.  Based on
11      hearsay.
12  A  Well, from my standpoint --
13  Q  Yes.
14  A  First of all, I didn't have access
15  to that information.  But, second of all, you
16  know, when a patient presents to us or any
17  physician and states the reason for their
18  visit, we have to believe what they say is
19  true.
20      And when Mr. Sasser came in, he said
21  that the reason he had his back pain was
22  because he was involved in a work-related
23  accident, lifting a large motor at the
24  General Electric plant.
25  Q  Sure.

23

1  A  So, as far as I was concerned, that
2  was the reason that he had his back problem.
3  Q  And before he came to you -- again,
4  you may or may not be aware of this.  Before
5  he came to you, there had been a settlement
6  and a finding of fact and an order.
7      And, specifically, there was one, I
8  believe, in 1998.  And then, again, in 2000,
9  the judge specifically found that the
10  plaintiff sustained a back injury as a result
11  of an accident which occurred on or about
12  September the 8th, 1995, which arose out of
13  and in the course of plaintiff's employment.
14      And then, the judge issues an order
15  stating that the defendant shall continue to
16  be responsible for future medical expenses as
17  provided in paragraph three, which is future
18  medical expenses related to that injury.
19      Assume, hypothetically, for me, now that
20  you know Dr. McGahan's opinion that it was
21  work related, the judge has issued an order
22  that it was work related, and that that
23  work-related injury was to his lower back.
24  And you now know Dr. McGahan's diagnosis at
25  the time he sent him to you.

24

1      In your opinion, is the condition you
2  were treating him for the same condition that
3  it appears Dr. McGahan had been treating him
4  for and that the judge issued an order
5  regarding?
6      MR. KNOTT:  Object to the form.
7      Object to the hypothetical and
8      the predicate.  Object to the
9      leading.
10  Q  Assuming those facts are true.
11  Assuming what I read to you was --
12      MR. KNOTT:  Same objection.
13  A  Well, all I know is that -- yes, I
14  assume that they were the same.  But, again,
15  when Mr. Sasser came in, he told me that his
16  back hurt --
17  Q  Sure.
18  A  -- that he got hurt on the job.
19  And that's what I knew.
20  Q  Sure.  Now, during the course of
21  your treatment of him, did you have him --
22  when he's taking his medication, are these
23  scheduled medications, meaning they have to
24  be regulated in the disbursement of them?
25  A  Yes.

25

1    Q    And did you, as part of your normal
2    practice, monitor a patient's medication and
3    medication level to see that they're not
4    taking too much medication and things of that
5    nature?
6    A    I did.
7    Q    Okay.  Was there anything in Mr.
8    Sasser's chart or anything that you observed
9    in him through testing or through your
10   observations directly that made you feel that
11   he was exaggerating or malingering in his
12   symptoms in any way?
13   A    Well, the purpose of our monitoring
14   of medication, and, in our case, the use of
15   urine drug screens, really is only a purely
16   objective test to determine the presence or
17   absence and the levels of certain medication.
18   Really doesn't address or even look into the
19   reasons for the medications or the incentives
20   or disincentives of a particular patient.
21       I understand your question.  As I
22   understand your question, was I using the
23   testing to determine whether he was
24   legitimate.  That's not the reason.  The
25   reason is to determine, just like you --

26

1    Q    If he was taking it or he was
2    taking too much of something else?
3    A    Just like you check a person's
4    blood sugar to monitor whether they are
5    getting enough diabetic medication.
6    Q    Before you prescribe medication
7    such as Methadone and Oxycontin and other
8    medications for a patient, do you make an
9    independent determination that, in your
10   opinion, they need that medication for their
11   medical condition?
12   A    Yes.
13   Q    And that they have a legitimate
14   medical need for it --
15   A    Yes.
16   Q    -- rather than just someone who's
17   addicted, and comes to a doctor, pain seeking
18   -- I mean, medication seeking?
19   A    Yes.  Well, we make an effort to do
20   that.
21   Q    Is that a concern of yours to make
22   sure patients aren't coming here --
23   A    Just to get medication?
24   Q    -- just to get medication, just to
25   get these controlled substances?

27

1    A    Yes.  Oh, it's a great concern of
2    ours.
3    Q    Was there anything about Mr.
4    Sasser's presentation or history or
5    information you learned during his case that
6    made you think he was here simply for the
7    purpose of seeking controlled substances?
8    A    No.
9    Q    Okay.  Now, you saw him last in May
10   of '04?
11   A    Yes.
12   Q    Do you have anything in your record
13   to indicate why his treatment stopped?
14   A    He just didn't come back.
15   Q    Okay.  Do you have knowledge as to
16   whether the workers' compensation carrier, or
17   the company who was paying for his medicals,
18   decided to no longer pay for that treatment?
19   A    I have no knowledge of that.
20   Q    I have a letter dated July 12th of
21   2004, that was sent from Intracorp, allegedly
22   addressed to you.
23   A    And I allegedly have it in my
24   chart.
25   Q    And you do have that note in your

28

1    file?
2    A    I do.
3    Q    If we could go over it.  It
4    basically is a letter denying your request
5    for office visit for medication management.
6    They state -- the rationale in the letter is
7    stated as, "The claimant has low back pain.
8    It is" -- no.  Your rationale, I'm assuming.
9    "... low back pain.  It is worse with riding
10   long periods of time.  TPIs" -- I'm not sure
11   what TPI is.  Do you know what that means?
12   A    Trigger point in injections.
13   Q    Okay.  -- "were given 1-20-04 and
14   5-20-04.  He is taking Oxycontin and Valium.
15   There is insufficient recent objective
16   documentation of the claimant's response to
17   the TPIs of 5-20-04 to determine if
18   medications are still needed in support of
19   the request.  There is insufficient
20   documentation of failed conservative
21   treatment to support the necessity of the
22   request, such as daily compliance with the
23   home exercise program."
24       So, basically, this is their rationale,
25   apparently, for denying your request for a

29

1  preapproval of this treatment.

2  A   Uh-huh.

3  Q   And the treatment you were asking

4  for was another trigger point injection or

5  just continued pain management? Do you know?

6  A   I would assume that, from the

7  wording in the letter.

8  Q   Okay. In your opinion, was the

9  treatment you were requesting from -- for

10  your office visit that you requested of them,

11  in your opinion, was that necessary --

12      MR. KNOTT: Object to the form.

13  Q   -- for his ongoing pain management

14  related to his back problems?

15      MR. KNOTT: Object to the

16          hypothetical.

17  Q   I'm going to go on the record right

18  now. I mean, I'm asking you -- I'm not

19  hypothetically asking you anything. I'm

20  asking you, in your opinion -- am I correct

21  that your office requested, I guess through

22  the normal channels, a preauthorization for

23  treatment for Mr. Sasser through workers'

24  comp? Is that correct?

25      MR. KNOTT: Object to the form and

30

1          foundation.

2  A   I would assume so.

3  Q   And if you did that, would you be

4  asking for preapproval of something you

5  thought was medically necessary for him?

6      MR. KNOTT: Object to the form and

7          foundation.

8  A   Yes.

9  Q   In your opinion, was the treatment

10  that you requested that they pay for here,

11  that they denied, a necessary treatment for

12  his pain management for his back injury?

13      MR. KNOTT: Object to form,

14          foundation and leading.

15  A   Yes.

16  Q   Okay. Do you agree with their

17  rationale for having denied that? That they

18  didn't think there was sufficient objective

19  documentation of his response to the trigger

20  point injection?

21      MR. KNOTT: Object to the form.

22  Q   Do you agree with that rationale?

23      MR. KNOTT: Object to the form.

24  A   Well, since I don't know what their

25  guidelines are, going into it, for sufficient

31

1  objective documentation, it would be hard for

2  me to say whether I agree with it or not.

3  Q   Was there sufficient information

4  for you to ask for that continued treatment?

5  A   Yes.

6  Q   Okay. And as his treating

7  physician, in your opinion, would that be

8  your decision to make, whether he needs

9  medical treatment? Regardless of whether

10  they're going to pay for it or not, is it

11  your decision, in your opinion, to decide

12  what he needs medically?

13      MR. KNOTT: Object to form and

14          foundation.

15  A   Yes.

16  Q   When you last saw him, in May of

17  '04, was it your understanding and your -- I

18  guess this. Did you have an opinion or an

19  expectation that Mr. Sasser was continuing to

20  treat with you as he had done for the last

21  four years? That he would continue to treat

22  with you?

23  A   Yes. As a matter of fact, I've got

24  a little handwritten addendum on the note

25  dated -- well, not dated, but on that day,

32

1  that says, "Follow-up already set." So,

2  apparently, having asked for Mr. Sasser to

3  come back another time, the secretary had put

4  that appointment on our books.

5  Q   And is that the normal course for

6  your office, that, when they're here, and

7  they're going to do a follow-up, your

8  secretary goes ahead and schedules the next

9  appointment?

10  A   Yes.

11  Q   Okay. Was there anything that had

12  changed about Mr. Sasser's condition from

13  2000 to the May 2004 that made it no longer

14  necessary for him to need this treatment for

15  his back pain?

16  A   Not that I could tell.

17  Q   Did he suddenly get better to the

18  point that he would not need to come in for

19  pain management?

20  A   Not that I could tell.

21  Q   At the time that they denied him

22  continued treatment, can you tell the jury

23  what medication he was taking, what

24  prescriptions you had given for him?

25  A   Well, I can tell you, on that

33

1 particular date, based on our log. The last
2 prescriptions that I have logged in are
3 actually 6-18-04, and, just prior to that,
4 5-18-04. The medication was Oxycontin, 40
5 milligrams, one every eight hours.
6     He had also, prior to that, in December,
7 December the 29th of '03, had been issued a
8 prescription for a medicine, Topamax, which
9 we use sometimes as an adjutant medication,
10 or an additional medication for certain types
11 of pain, one to two at bedtime. 62 pills
12 prescribed with as-needed refill. So, that
13 meaning he wouldn't have needed another
14 prescription for another year.
15    Q    Now, the Oxycontin, how long had he
16 been taking Oxycontin prescribed through your
17 office?
18    A    First prescription for that was
19 January the 30th of '01.
20    Q    Was that something he took, then,
21 consistently, or at least was prescribed
22 consistently from '01 until '04?
23    A    Yes.
24    Q    If you decide to take a patient off
25 of Oxycontin, do you have any prescribed

34

1 protocols you follow in -- especially someone
2 who has been on the medication for over three
3 years, for taking them off of that
4 medication?
5    A    Usually, if someone is going to
6 voluntarily come off of a medication -- and
7 not just with opioids, but typically other
8 medications, as well, we'll use a weaning
9 protocol. There's no specific percentage or
10 milligram dosage. It just depends on what
11 the patient is taking.
12    But, typically, every three to five to
13 sometimes seven days, the dose will be
14 decreased by a little bit, until such time as
15 the medication is completely discontinued.
16    Q    And why do you do a weaning process
17 with those medications, in particular,
18 Oxycontin?
19    A    Well, particularly with the opioids
20 -- not just Oxycontin, but with all of the
21 opioids -- one of the things that we're
22 concerned about in patients who are using
23 these sorts of medications long term, they
24 can develop physical dependence. And if the
25 medication is stopped suddenly, they can go

35

1 through withdrawal or experience what's
2 called an abstinance -- acute abstinance
3 syndrome.
4    Q    And can you describe what that
5 withdrawal or abstinence syndrome typically
6 -- how it presents?
7    A    Well, it usually presents as
8 agitation and anxiety, cold sweats, GI
9 cramping, diarrhea, sometimes headache,
10 sometimes difficulty sleeping. Typically,
11 these things start about -- anywhere from
12 three to five days after the medication is
13 stopped, and they usually last for three to
14 five days.
15    Q    In Mr. Sasser's situation, when the
16 workers' comp company -- or when the
17 defendant in this case, Ryder, no longer
18 approved your treatment, they no longer
19 approved medication prescription refills, as
20 well.
21    Would you expect Mr. Sasser, having been
22 on Oxycontin for more than three years, if he
23 was simply cut off, without weaning him,
24 would you expect he would experience the
25 withdrawals that you've talked about?

36

1        MR. KNOTT: Object to the form and
2            predicate. Improper
3            hypothetical.
4    A    It's not consistent. In other
5 words, it doesn't happen to everybody. I've
6 seen people who are on much larger doses of
7 medication stop suddenly, for whatever
8 reason, and not have any problem with that.
9 I've seen people who are on much smaller
10 doses have what we call microwithdrawal
11 between doses of medication that they
12 continue to be on.
13    So, in essence, the answer is, I
14 wouldn't expect it, but I wouldn't be
15 surprised. I neither expect it nor unexpect
16 it, if you will.
17    Q    Okay. He answered some
18 interrogatories that the defendant asked him
19 over a year ago, certainly before he sat in
20 here today and heard your testimony, and
21 stated that he laid in a hospital bed at home
22 in cold sweats, unable to eat, taking bottles
23 of nitro tablets, vomiting, diarrhea, cramps,
24 thinking I was dying. And that's his
25 description of when he suddenly stopped

37

1  taking the Oxycontin, because Ryder cut him
2  off.
3      Does that sound consistent with what you
4  would expect, if someone, in fact, went
5  through that type of withdrawal?  That
6  description of it?
7      A    Yes.
8      Q    Okay.  Is that a pleasant
9  experience, based on what you've seen?
10     A    I've never been through it.
11     Q    Have you had patients describe it
12  to you?
13     A    I would assume that it is.  I have
14  had it described as unpleasant.  But, having
15  no personal experience, I can't say that it
16  is or not.
17     Q    But, as a physician, you do your
18  best to stop that from happening for a
19  patient?
20     A    Certainly.
21     Q    Okay.  Because it's not something
22  that you, as a physician, would like to see
23  your patients go through?
24     A    Exactly.
25     Q    Okay.  Now, I'm going to ask you

38

1  some questions.  Ryder sent medical records
2  to some other doctors -- they call them peer
3  reviews -- and asked them about some things,
4  including your treatment of Mr. Sasser.
5      One of them, specifically, was Terrance
6  Wilson, who is board certified in physical
7  medicine and rehabilitation, with a
8  subspecialty certification in pain management
9  -- or pain medicine.  Is that the same board
10  certification you have?
11     A    I don't know.
12     Q    Your board certification is in
13  anesthesiology?  Is that correct?
14     A    Well, your question is a little
15  more complicated than you think.
16     Q    Okay.  Maybe you can explain it to
17  me.
18     A    First of all, physical medicine and
19  rehab is an entirely different specialty from
20  anesthesiology.  Basically -- well, it's a
21  specialty also known as phsiatry.  So, they
22  do physical modality, physical therapy,
23  occupational therapy.  They're physicians.
24  They're not just physical therapists.
25  They're physicians.  But, what his specialty

39

1  focus in pain medicine and pain management
2  is, I couldn't say, because I don't know
3  anything about their board process.  And I
4  don't know when he received that extra
5  certification, which makes a difference,
6  because there may or may not have been a --
7  formal process, and certification may be a --
8  having gone through a truncated process or it
9  may be a formal process.  That entitlement
10  doesn't tell me the nature of his extra
11  training.
12     Q    Okay.  So, you are board certified
13  in anesthesiology?
14     A    Yes.
15     Q    And you have a subspecialty through
16  the anesthesiology board for pain management,
17  or is it pain medicine?
18     A    Well, it depends on who you go to.
19  My boards in pain medicine are through the
20  American Academy of Pain Medicine, not
21  through the American Society of
22  Anesthesiology.
23     Q    Okay.  If you are a member of the
24  American Academy of Pain Medicine, does that
25  mean you're automatically certified through

40

1  them?
2      A    No.  You have to take an
3  examination.
4      Q    So, the membership is just
5  something you can do without being board
6  certified?
7      A    Right.
8      Q    Okay.  So, the fact that this
9  Doctor is a member of the American Academy of
10  Pain Medicine doesn't give us any more
11  information regarding his certification in
12  pain medicine or not?  Is that correct?
13     A    That's correct, although -- not to
14  say that he didn't take the examination --
15     Q    Sure.
16     A    -- and pass it.
17     Q    It doesn't help us one way or
18  another?
19     A    No.
20     Q    Is that fair?
21     A    I mean, I'm a member of lots of
22  societies, which typically don't provide
23  certification, so --
24     Q    All right.  He specifically states
25  that he reviewed -- it says available medical

41

1 records. I'm not quite sure what was
2 available. But, initial record review
3 performed by this evaluator recorded in the
4 report of 3-17 of '03. Additional
5 documentation has been submitted for review.
6 Medical treatment provided during 2004
7 included bilateral trigger point injections
8 into the vastus lateralis muscles, performed
9 on 1-20 of '04. During the calendar year
10 2003, there was documentation of medical
11 encounters on 4-9 of '03, 5-7 of '03, 6-24 of
12 '03, 7-18 of '03, 10-28-03, 12-29-03.
13 Trigger point injections were performed into
14 the left peroneus longus muscle on 10-28-03
15 and 12-29-03. Is that your treatment?
16 A    Yes.
17 Q    Okay. So, he's basically saying he
18 has reviewed your treatment records?
19       MR. KNOTT:  Object to the form.
20 A    Right.
21 Q    Is that correct?
22       MR. KNOTT:  Object to the form.
23 Q    At least based on what he states
24 here, those dates would correlate with your
25 treatment?

42

1 A    Those dates correlate with my
2 treatment.
3 Q    And the trigger point injections
4 were things performed by you here in your
5 office --
6 A    Yes.
7 Q    -- or at the clinic?
8 A    Except -- I'll just take issue with
9 the 12-29. That was a follow-up visit. My
10 records don't reflect trigger point
11 injections being done at that time. That's
12 nitpicking, but --
13 Q    Well, no. I mean, he's basing his
14 opinion on saying that those trigger point
15 injections were performed on those he listed
16 in this record. You're taking issue that you
17 did not do a trigger point injection on
18 12-29-03?
19 A    Right, but -- yes.
20 Q    Now, he states, "Based on his
21 review of the available records, it is my
22 professional medical opinion that none of the
23 treatment documented during 2003 and 2004 is
24 causally related to the work injury of 9-8 of
25 '95."

43

1 Now, in your opinion, was the treatment
2 you provided to him, as documented in those
3 treatment records, a necessary treatment to
4 treat the back injury he came in here from
5 Dr. McGahan for?
6       MR. KNOTT:  Object to the form and
7             hypothetical.
8 A    Yes.
9 Q    Do you disagree, then, with his
10 assessment -- if, in fact, the injury on 9-8
11 of '95 was the low back injury that
12 Dr. McGahan was treating him for, do you
13 disagree with that assessment and that
14 opinion of this man?
15       MR. KNOTT:  Object to the form and
16             predicate and hypothetical.
17 A    Yes.
18 Q    As a physician, do you prefer to
19 see a patient and actually examine that
20 patient and follow that patient in order to
21 offer an opinion about that patient's
22 condition, versus reading records from other
23 doctors?
24 A    Yes.
25 Q    Which one, in your opinion, as a

44

1 physician, is more helpful to making an
2 accurate assessment of a patient?
3 A    Direct contact with the patient.
4 Q    Okay. And you had had direct
5 contact with this patient from September of
6 2000 all the way through May of 2004?
7 A    Yes.
8 Q    Okay. I have another opinion they
9 submitted from William Cabot, a diplomate of
10 American Board of Orthopedic Surgery, fellow
11 of the American Academy of Disability
12 Evaluating Physicians. And it says,
13 apparently, he's president of that. That
14 physician, is he board certified, based on
15 this record, in any area that you're board
16 certified in?
17 A    No.
18 Q    In his opinion, he thought that Mr.
19 Sasser needed epidural blocks --
20       MR. KNOTT:  Excuse me, Amy. What
21             date record are you looking at?
22       MS. SHUMATE:  I'm looking at the
23             letter that you attached to
24             your summary judgment motion
25             dated May 15th, 2002.

45

1   MR. KNOTT:  Is that something in
2       his file or is it --
3   MS. SHUMATE:  No.  It's something
4       outside -- it's what you
5       presented to the court.  I'm
6       just going to ask him questions
7       about it.
8   MR. KNOTT:  Well, I know you and
9       Bill have had some
10      communications about the
11      deposition.  Bill had raised
12      some concerns about expert
13      designation.
14  MS. SHUMATE:  Sure.
15  MR. KNOTT:  And you had indicated
16      that you were just taking his
17      deposition as a treating
18      physician.
19  MS. SHUMATE:  I am.
20  MR. KNOTT:  So, I think the scope
21      of this deposition should be
22      based on his treatment and his
23      opinions concerning --
24  MS. SHUMATE:  And I agree.
25  MR. KNOTT:  -- his treatment and

46

1       the conditions.  And I think if
2       we go outside of that and start
3       having him comment on other
4       opinions of other people that
5       were not involved in
6       Dr. Marsella's course of
7       treatment and with his
8       discussions with other -- or
9       communications with other
10      physicians about the
11      conditions, then I think we're
12      kind of going outside his role
13      as a treating physician, and I
14      think we would be putting
15      Dr. Marsella more in the place
16      of being a regular sort of
17      court expert as opposed to a
18      treating physician.  And so, I
19      think we need to -- so, we're
20      going to object --
21  MS. SHUMATE:  Okay.
22  MR. KNOTT:  -- to the extent that
23      this line of questioning is
24      going beyond his regular role
25      as a treating physician, and

47

1       he's not been designated for
2       that purpose.
3   MS. SHUMATE:  Okay.  And your
4       objection is noted on the
5       record, and I appreciate it.  I
6       am certainly going to ask him
7       questions, if there's another
8       physician who has disagreed
9       with his treatment regimen,
10      whether he feels his treatment
11      regimen was, in fact,
12      necessary.  And I'm going to
13      ask him that, and he can answer
14      those regarding a treating
15      physician, without being hired
16      as an expert.  So, your
17      objection is on the record.
18  Q     Now, this Dr. Cabot, when he gets
19  to the discussion of your treatment,
20  basically he felt the nondermatomal numbness
21  that you mentioned, the nondermatomal
22  pattern, was significant, because -- I guess,
23  to him, that would be significant.
24      Did you find anything about that
25  particular note you entered on 9-5, about him

48

1   having nondermatomal pain or numbness, that
2   made you feel like he was not being truthful
3   or honest with you?
4       MR. KNOTT:  Object to the form and
5           the predicate.
6   A     No.
7   Q     Do you believe anti-inflammatory
8   medication, rather than the narcotic
9   medication you were providing to Mr. Sasser,
10  would have been appropriate in this case?
11  A     Are you asking instead of or in
12  addition to?
13  Q     No.  Instead of.  Do you think that
14  would have helped him, given what you saw him
15  with for four years?
16  A     I think it would have been
17  inadequate.
18  Q     Inadequate.  And is that based on
19  your observation of the way he did respond to
20  narcotic medication from September of 2000 to
21  May of 2004?
22  A     Yes.
23  Q     Do you believe an epidural block
24  would have been more helpful than the
25  treatment you gave him for the treatment of

49

1  his spinal stenosis?
2      MR. KNOTT:  Object to the form and
3          the predicate.
4      A    I have a little hand comment,
5  handwritten comment, on the follow-up visit
6  note of 1-20-03, in which I have said, the
7  patient had five to six LES, or lumbar
8  epidural steroid injections, without benefit.
9  That being the case, on that date, from
10  1-20-03, from that point onward, I would have
11  seen little benefit to do more of those.
12      Q    Okay.  He also makes the statement
13  that narcotics for degenerative disc disease
14  typically take a patient down a road which
15  does not have a good outcome.  Would you make
16  that assessment in Mr. Sasser's case?  Would
17  you agree with that statement in Mr. Sasser's
18  particular case?
19      A    Well, since I don't know what that
20  statement means, I can't say.
21      Q    In your opinion, for your treatment
22  for Mr. Sasser, based on your hands-on exams
23  and evaluations of him throughout that
24  four-year period of time, did you believe
25  that the medication and trigger point

50

1  injections were the best, most conservative
2  treatment for his pain?
3      MR. KNOTT:  Object to the form.
4      A    Yes.
5      Q    And were those treatments of the
6  medication and the trigger point injections,
7  in your opinion, a medical necessity to treat
8  the pain he suffered in his lower back?
9      MR. KNOTT:  Object to the form and
10          the predicate.
11      A    Well, again, you know, I understand
12  the legal point of medical necessity.  There
13  aren't very many things in life that are
14  necessary.  It's certainly medically
15  appropriate.  I don't like that "medically
16  necessary" term, personally.
17      Q    Sure.  You understand, legally,
18  that is the term --
19      A    I think it was appropriate
20  treatment for his problem.  In that sense,
21  medically necessary, if that's how that term
22  is used.
23      Q    And without that medication and
24  trigger point injections, and, thus, with no
25  other treatment, would you expect that his

51

1  pain would be significantly worse than what
2  you had got it regulated to?
3      MR. KNOTT:  Object to the form and
4          the predicate.
5      A    Well, I couldn't say.  All I can
6  say is that, with the medication and the
7  treatments that I provided, Mr. Sasser wasn't
8  cured, wasn't 100 percent better, was not
9  pain free, but seemed to me to be at least
10  able to function and maintain some -- have
11  some quality of life that he may not have
12  been able to enjoy without the medication and
13  treatments.
14      Q    Did he have a higher level of
15  functioning, physical functioning, while he
16  was taking the medication and having the
17  injections, meaning he could do more things,
18  he could be more active, because pain wasn't
19  as limiting?
20      MR. KNOTT:  Object to the form and
21          the predicate.
22      A    I don't have any objective
23  information in that regard.
24      Q    Would that be what you would
25  anticipate in his condition?

52

1      A    You know, typically, pain scores,
2  which we sometimes relate and sometimes
3  don't, were on a scale of ten.  Zero, no
4  pain.  Ten, great pain.  His typical pain
5  scores were five, six, seven, in sort of the
6  middle range.  So, in our patient population,
7  that usually implies reasonable pain relief.
8      Q    And I'm going to ask you this based
9  on your experience with Mr. Sasser and with
10  other patients who have similar-type
11  conditions.
12      If he was not able to take the
13  medication because the company either
14  wouldn't pay for it or he had no financial
15  resources, whatever, and he was suddenly
16  taken off that medication and no longer
17  allowed to have medical treatment, including
18  any pain management at all, would you
19  anticipate that, based on your four years
20  with him, that his pain complaints would go
21  up?
22      MR. KNOTT:  Object to the form and
23          the predicate.
24      A    Yes.  I would expect that, yes.
25      Q    You would expect that.  That would

53

1  be something that, based on your treatment of
2  him, you would expect that to happen to him,
3  if he were not able to have pain management?
4         MR. KNOTT:  Object to the form and
5             the predicate.
6  A    Yes.
7  Q    Is that correct?
8         MR. KNOTT:  Object.
9  A    That's correct.
10  Q    I mean, the whole point of your job
11  for him is to help reduce his pain?  Correct?
12         MR. KNOTT:  Object to the leading.
13  A    Part, yes.  One of the things.  I
14  mean --
15  Q    What else would it be?
16  A    Well, typically, we reduce pain,
17  reduce the subjective symptoms of pain,
18  improve quality of life, and improve
19  function.
20  Q    Okay.  The medication that he was
21  taking, the Oxycontin and things like that,
22  do they have side effects that would affect
23  him when he's taking them?
24  A    They have side effects that could
25  affect anybody.

54

1  Q    Such as?
2  A    Well, the typical ones are itching,
3  nausea, vomiting, constipation, urinary
4  retention.  At higher doses, respiratory
5  depression or arrest.  Typically, that's at
6  toxic doses.  Those are sort of the -- well,
7  sedation, confusion, mental status changes.
8  Q    Okay.  Is that something -- someone
9  who, certainly, like Mr. Sasser, who had been
10  taking this medication for years, is that the
11  type of confusion, sedation -- does that mean
12  sleepiness, things of that nature --
13  A    Yes.
14  Q    -- that he would experience?
15  A    Possibly.
16  Q    The level of pain he was
17  subjectively reporting to you, as well as the
18  medication regimen he was on, would that
19  interfere with his ability to hold down a
20  40-hour-a-week job, in your opinion?
21  A    I can't say.
22  Q    Do you find a lot of your patients
23  who come in with his level of pain and the
24  four years of pain management to be -- a lot
25  of them are in the disabled category,

55

1  workwise?
2         MR. KNOTT:  Object to the form and
3             the predicate.
4  A    I can't say that.
5  Q    Okay.  Was there anything about him
6  that made you feel like he was faking?  I
7  mean, no better word a jury will understand
8  than the word "faking."  Is there anything in
9  his presentation to you or in his tests that
10  made you feel like the man was faking his
11  problems?
12  A    No.
13  Q    Would it be fair to say you would
14  not have continued him on this narcotic
15  regimen had you felt that?
16  A    That's correct.
17  Q    As his treating physician as of May
18  of '04, do you have an opinion as to whether,
19  at that time, he should have continued with
20  pain management?
21  A    My opinion is that he should have.
22  Q    Okay.  And would that be to a
23  reasonable degree of medical certainty that
24  that pain management treatment would have
25  continued to be necessary for his back pain?

56

1  A    Yes.
2  Q    Now, did you have any discussions,
3  or did, to your knowledge, your office have
4  any discussions with Ryder or Intracorp
5  regarding their cutting him off?
6  A    Not that I know of.
7  Q    Were you told about appeal
8  processes or that you, as a physician, were
9  supposed do something to get him reinstated
10  or anything along that line?
11  A    Well, the only -- you referred
12  earlier to a communication of 7-12-04.
13  Q    Yes.
14  A    In my record here in front of me,
15  that is the only communication that I
16  received.
17  Q    And was that indicating to you that
18  they weren't going to ever let him come back,
19  or just they weren't going to approve that
20  particular request for treatment?
21  A    You know, I really don't know the
22  answer to that question.  It only says that
23  -- they refer to specific dates of treatment.
24  And it just sort of generically says that I
25  can receive -- the treating physician may

57

1   receive a copy of the guidelines used in the
2   review.  If I have additional clinical
3   information, et cetera, et cetera, that I
4   have the capability of appealing, and tells
5   me to whom to appeal.
6       Q    And did you follow up with any
7   appeal or send any additional records to
8   them, to your knowledge?
9       A    Not to my knowledge.
10      Q    Did you send any further requests
11  for treatment for Mr. Sasser to Intracorp
12  that were denied?
13      A    Not to my knowledge.
14      Q    Did you send any further requests,
15  whether they were denied or not?
16      A    I don't think so.
17      Q    Okay.  Do you have any independent
18  recollection, outside of what's in your
19  chart, that deals with this issue of them
20  having cut him off?
21      A    About what?
22      Q    About whether Intracorp was going
23  to continue to pay for him or anything.
24      A    I have no idea.
25      Q    If, in fact, Ryder -- I have a

58

1   letter dated June 17th, 2004, that the
2   defendant submitted for his summary -- excuse
3   me -- that I had in my file from Ryder -- or
4   Intracorp.  Excuse me.  No.  It's from Ryder
5   -- that says, to Dr. McGahan, to
6   Dr. Marsella, to Clio Pharmacy.  "As the
7   adjustor for this workers' compensation case,
8   I am currently notifying you that, effective
9   immediately, any and all medical services,
10  procedures and prescriptions provided to this
11  patient must go through the workers'
12  compensation precertification process."  Did
13  you receive that letter from Marty Lloyd?
14      A    Well --
15      Q    Would that be something you would
16  keep in this chart versus the Medical Center
17  chart?
18      A    That would be something that I
19  would have in this chart, and I don't have it
20  here.
21      Q    Okay.  And if it states that no
22  further action or precertification was ever
23  requested, therefore, Mr. Sasser's med
24  treatment/coverage under workers' comp was
25  denied effective 6-17-04, were you given any

59

1   information from Intracorp or Ryder that that
2   was the case?  That he had been cut off
3   totally?
4            MR. KNOTT:  Object to the form and
5            the predicate.
6       A    I don't have that letter in my
7   chart here.
8       Q    To your knowledge, did you receive
9   any information from them as to the need for
10  precertifications?
11      A    Typically, that doesn't come to me.
12      Q    If, in fact, you had received that,
13  would you have done the procedures necessary,
14  to your knowledge, or your office staff would
15  have done the procedures necessary to see
16  that Mr. Sasser continued to get his
17  treatment?
18      A    Typically, yes.
19      Q    And based on what I've talked to
20  you about Dr. Cabot and Dr. Wilson's opinions
21  regarding your treatment, do you disagree
22  with their opinions regarding your treatment?
23           MR. KNOTT:  Object to the form and
24           the predicate.
25      A    Well, I never really heard Dr.

60

1   Cabot's opinion.  I'm sorry.  I think we
2   got --
3       Q    We went off on some of the
4   treatments.  He would have said the opinion
5   regarding needing anti-inflammatories --
6       A    Oh, yes.
7       Q    -- the need for epidurals, and the
8   need that narcotic medication is not
9   necessarily a good outcome.  Those opinions.
10  Do you disagree with those two doctors'
11  assessments of this particular man's case?
12           MR. KNOTT:  I'll object to the form
13           and the predicate.  And I'll
14           point out that Dr. Marsella
15           has, I believe, not even
16           reviewed the whole --
17      MS. SHUMATE:  I understand.
18      MR. KNOTT:  -- written opinion of
19           Dr. Cabot, and that what he's
20           being asked to comment on now
21           are the pieces of the letter
22           that have been quoted or
23           summarized by plaintiff's
24           counsel.
25      MS. SHUMATE:  I'm sorry.  Did we

61

1  have usual stipulations on this
2  deposition, that all other
3  objections besides form of the
4  question will be reserved for
5  trial?
6  COURT REPORTER:  None were stated.
7  MS. SHUMATE:  Do we have usual
8  stipulations, or do we need to
9  go back over this?
10  MR. KNOTT:  We have the usual
11  stipulations.
12  MS. SHUMATE:  Thank you.
13  Q  You can answer the question,
14  despite his objection.
15  A  Well, I think we already addressed
16  the first -- not Dr. Cabot, but the other
17  opinion.  As far as Dr. Cabot's opinion, I
18  guess we did discuss that.
19  No, I don't think nonsteroidal
20  anti-inflammatories by themselves would have
21  been adequate.
22  No, I don't think that epidurals would
23  have been appropriate, because, as I
24  mentioned earlier, back in January of --
25  whenever it was.  1-20-04, I think it was.  I

62

1  think that was the date -- that Mr. Sasser
2  told me -- yeah.  1-20-03.  I'm sorry -- Mr.
3  Sasser had said he had had five or six
4  epidurals without benefit.  And I didn't see
5  any point in continuing with that.
6  The third thing about the -- I don't
7  want to say he's saying probable, but
8  possible poor outcome with the continued
9  opioid use is true in anybody's case.
10  In Mr. Sasser's case, he was complying
11  on his medication regimen, as evidenced by
12  the fact that he never, in my opinion,
13  requested overages of his medication or early
14  refills, and by urine drug screen, was always
15  compliant and within the parameters for the
16  use of those medications that I prescribed
17  for him.
18  Q  And would those drug screens have
19  shown if he were overmedicating?
20  A  Yes.
21  Q  And that was not a concern
22  throughout all those urine tests that your
23  office performed?
24  A  That's correct.
25  Q  Okay.  The use of those particular

63

1  medications he was on, would they give
2  someone the slurred speech at times, or seem
3  drowsy and things of that nature, to someone
4  who maybe doesn't know what they're taking?
5  A  Theoretically?
6  Q  Uh-huh.
7  A  Yes.
8  Q  Okay.  So, if there were times when
9  someone might notice if he had slurred speech
10  or seemed drowsy or sleepy, that would not
11  give you great concern, given you knew he was
12  compliant with his medication?  Is that fair
13  to say?
14  A  There are a lot of reasons for
15  people to slur their speech and be sleepy.
16  If you stay up for three days in a row, it
17  will do that to you.  So, I wouldn't say that
18  slurred speech and sedation, sleepiness, are
19  necessarily indicative of overuse of
20  anything, any substance.
21  Q  And you specifically tested him
22  regularly and routinely, through the urine
23  drug screens, to make sure there was no
24  overmedicating going on?  Is that correct?
25  A  That was the intent.

64

1  Q  And that's what you do for your
2  patients who take narcotics like this, to
3  make sure they're not overmedicating
4  themselves -- is that correct? -- or getting
5  medication from sources other than what you
6  give them?
7  A  In general terms, we use the
8  screens to determine compliance.
9  Q  That they're taking it, and they're
10  not selling it somewhere, and that they're
11  not taking too much?
12  A  Right.  And that what is being
13  prescribed is what's being taken, and what is
14  being found has been prescribed.
15  Q  If he had been determined by --
16  hold on a second.  I'm sorry.
17  MS. SHUMATE:  I'll tell you what.
18  I'll probably save that for
19  rebuttal, because I'm sure
20  something will come up about
21  it.  So, that will be all the
22  questions I have.
23  I would ask that your
24  convenience chart that you've
25  testified from today be copied

65

1  and attached in its entirety as
2  Plaintiff's Exhibit No. 3.
3  That way, we'll have a clear
4  picture of what you had versus
5  what the Medical Center had, if
6  that's all right.
7  DR. MARSELLA:  Fine with me.
8  MS. SHUMATE:  All right.  And
9  that's all the questions I
10  have.  If you would certainly
11  answer Mr. Knott's.
12
13  EXAMINATION
14
15  BY MR. KNOTT:
16  Q  Hi, Dr. Marsella.  My name is
17  Conley Knott, and I represent Ryder in this
18  case.  And I have a few questions to ask you
19  about the course of your treatment and some
20  of your opinions.
21  Amy has already covered a lot of the
22  course of treatment, so, hopefully, we'll be
23  biting off smaller and smaller chunks as we
24  go, as we put a finer point on things.  And
25  also, for that reason, I might seem like I'm

66

1  jumping around a bit, because there's no
2  point in starting at the very beginning,
3  chronologically.
4  But, that being said, I do kind of want
5  to start at the beginning of your treatment
6  in 2000, and ask you -- and it was the year
7  2000 that you first saw him, or was it 2002?
8  A  No.  It was 2000.  September the
9  5th of 2000 was my initial visit date.
10  Q  And there was some discussion about
11  the information that you, as a treating
12  physician, have had with regard to the
13  original causative event that might have led
14  to the conditions and the complaints that Mr.
15  Sasser came here for, specifically, just for
16  the layperson's parlance, what it was that
17  made him have the back pain, what happened to
18  him.
19  Is it your testimony that you have been
20  relying on the patient's own reports of what
21  happened to him to cause his pain?
22  A  That's true.
23  MS. SHUMATE:  Object to the form of
24  the question.
25  Q  Is the patient's verbal report to

67

1  you about what happened to him to cause his
2  pain, is that the only thing that you, as a
3  treating physician, have relied on in terms
4  of your opinions concerning what caused him
5  to have the pain?
6  A  Yes.
7  Q  Now, I want to ask you a little bit
8  about one of the terms in your office notes
9  that you testified to a little while ago, a
10  nonradicular pattern.  A nonradicular pattern
11  is what you found with Mr. Sasser?  Is that
12  right?
13  A  Yes.
14  Q  You explained something about how
15  that relates to a nerve root.  Could you
16  explain that?
17  A  Certainly.  There are nerve roots
18  that come off of the spinal cord.  Imagine,
19  if you will, a large taproot, underground,
20  and off of that come smaller roots.  Well,
21  the large taproot would be comparable to the
22  spinal cord, which comes off of the brain.
23  Smaller nerves come off of that, which
24  we call the nerve roots.  And each of those
25  -- there's one on each side of the body at

68

1  various levels, from the top of the spine all
2  the way down to the bottom of the spine.
3  These nerve roots exit the spine, and then,
4  go to parts of the body, depending on where
5  they come off.  Each of those nerve roots
6  then gives off smaller nerves, which give off
7  smaller nerves, eventually going to the end
8  of the line.
9  Typically, each nerve root serves a
10  certain part of the body, and historically
11  have been mapped out in what have been called
12  dermatomes.  Now, obviously, everybody is
13  different.  And so, a dermatome in one person
14  for a particular nerve root would be
15  different, to an extent, than another person.
16  But, in general, we rely on these maps to
17  give us an idea about what nerve root may be
18  involved.
19  Sometimes there's crossover between
20  dermatomes, as you get further out, so that,
21  sometimes, the picture is not quite as
22  distinct.  And so, a nonradicular -- the term
23  "nonradicular" is only meant to imply that it
24  doesn't strictly follow the course of a
25  dermatome or a nerve root map, if you will.

69

1    Q    Okay.  Now, in a patient where the
2  complaints of pain do follow that roadmap, is
3  that what you would call a radicular pattern?
4    A    Right, if it's consistent with what
5  we know as the dermatomes.
6    Q    And when you find a radicular
7  pattern in a patient, are you able to
8  conclusively relate that complaints of pain
9  to some sort of condition with the spine?
10   A    In many cases, yes.
11   Q    When there's a nonradicular pain,
12 when the complaints of pain don't follow that
13 classic roadmap, is there less certainty to
14 where in the body the pain is originating?
15   A    Yes.
16   Q    And so, it's not necessarily, in
17 those cases, related to a back problem
18 specifically?  It could be a number of other
19 things?
20   A    Well, if we think back about the
21 fact that, you know, the body is a very
22 complicated machine, the nerves aren't the
23 same in everybody.  And so, while there may
24 be problems in the back causing problems with
25 more than one nerve root, as you get further

70

1  out towards the end of the line, the
2  distinction becomes blurry -- may become
3  blurry.  Whether it will or not, no one can
4  say.  But it may become blurry to the point
5  that it's difficult to say exactly where the
6  pain is originating.
7    But, in general terms, if there is, in
8  this case, lower extremity pain, well, the
9  lower extremities, the legs, receive their
10 innervation from the lower part of the spine,
11 in the lumbar area.
12   Now, the nerves come off of the spinal
13 cord higher up, but they exit the spine in
14 the lumbar area, so that if there's a problem
15 in the lumbar spine causing an issue with a
16 nerve root as it exits the spine, while it
17 may be difficult to say specifically which
18 nerve roots are involved, in general terms,
19 you can say that leg pain may certainly be
20 related to back pain, and would more
21 particularly be related to low back pain -- a
22 low back problem.  Not pain, but problem.
23   Q    When we get to that point where --
24 in terms of attempting to isolate nerves in
25 the back and the branches off the spine as

71

1  maybe being related, maybe not, to complaints
2  of leg pain, are there tests, like, radiology
3  tests, that a doctor can use to determine
4  that?
5    A    There are several things.
6  Certainly MRIs, magnetic resonance imaging
7  scans, can be used to see if there is a
8  presence or absence of a herniated disc or a
9  bone spur or anything like that.
10   There are tests that can be done to
11 check the integrity of the nerves and the
12 muscles that those nerves serve,
13 electromyograms and nerve conduction velocity
14 studies.
15   Q    Electromyogram, is that what they
16 call an EMG sometimes?
17   A    EMG.  EMG and NCV, nerve conduction
18 velocity studies.
19   Q    I didn't see in your records
20 whether or not you had performed any of those
21 tests --
22   A    Did not.
23   Q    -- an MRI or --
24   A    Did not.  And I didn't have access
25 to any records that reflected whether he had

72

1  had those done.
2    Q    Do you know whether or not he had
3  had those done?  Have you heard?
4    A    I don't know.
5    Q    If he had had those done, or if he
6  does have those done, particularly in a
7  patient who has nonradicular complaints of
8  pain, would that be the best evidence for
9  you, as a physician, to look at, in terms of
10 determining whether or not complaints of leg
11 pain are related to the problem with the
12 back?
13   A    Well, it's not really a
14 straightforward answer.  Possibly -- it will
15 be the best answer I can give you.  The
16 purpose of those types of studies,
17 specifically the EMG/NCV, is to determine the
18 normalcy or abnormalcy of a particular nerve
19 root at a particular level in the spine or
20 more peripheral nerves, and the effect that
21 those nerves have, if any, on the muscles
22 that they're serving, if there's any -- what
23 the normalcy or abnormalcy of that response
24 is.
25   Certain assumptions are made that, if

73

1  there is, say, a disc or a spur in the part
2  of the spine where that particular nerve
3  exits that's being tested, and there's a
4  problem with the nerve, that they are
5  related. One would assume that.
6      Q    As a physician, when you have
7  access to studies like that, like an MRI that
8  you were talking about, when you have access
9  to studies like that to review, when asked to
10  state an opinion about the cause of a
11  particular problem or complaint, does that
12  put you in a position to state your opinion
13  with more certainty?
14      A    Well, in a sense, if the question
15  is, with someone who presents with left leg
16  pain, and an MRI shows a protruding or
17  bulging or herniated disc in the lower part
18  of the back, in the lumbar spine, that pokes
19  out more on the left side at a particular
20  level, and seems to pinch or impinge on a
21  particular nerve root, then I would be able
22  to -- in my mind, to my best medical
23  judgment, would say that, assuming that the
24  leg pain that we're talking about follows the
25  distribution of that particular nerve root,

74

1  and the fact that the nerve root is being
2  pinched by whatever it is that's pinching it,
3  that those two are related.
4      However, it would be impossible to say
5  what the cause of the spinal problem is. In
6  other words, where did the disc come from?
7  Where did the spur come from? It would be
8  impossible to say that.
9      Q    In terms of connecting it to a
10  particular event?
11      A    Event. Yes.
12      Q    Okay. Now, other than, say -- you
13  talked about, I think -- you used the word, I
14  think, herniation or disc bulge or a pinching
15  a nerve.
16      A    Right.
17      Q    I think these are terms that have
18  come up. Other than that particular, you
19  know, mechanism in the body, are there other
20  things that can cause a person to have pain
21  similar to the complaints that Mr. Sasser
22  reported to you?
23      A    Uh-huh.
24      Q    What are some of the other things
25  that can cause that, in terms of, you know,

75

1  bodily conditions?
2      A    As far as back pain, there are a
3  lot of things in the back. There are
4  muscles. They can hurt. There are joints in
5  the spine. They can cause pain. The discs
6  themselves can cause pain. The effect of a
7  bulging disc or an overgrown joint capsule or
8  degenerated disc, any of these things can
9  cause problems with nerves, which can cause
10  pain. So, there are a lot of things that can
11  cause back pain and leg pain.
12      Q    Now, he didn't just report pain to
13  you. Did he also report numbness or a loss
14  of sensation in his legs?
15      A    On exam, as you referred, there
16  was, in our report, the nondermatomal
17  decreased sensation to light touch.
18      Q    Now, your records, I believe, also
19  reflect a number of other health problems
20  that Mr. Sasser has had treatment for. And I
21  guess the best place to -- since you're
22  looking back at your records -- to turn to,
23  might be your initial office note.
24      A    Right.
25      Q    Could you summarize some of those

76

1  conditions that he reported to you as also
2  having?
3      A    Occasional angina, which is
4  heart-related chest pain. Angina on
5  exertion. Occasionally mild at rest.
6  Congestive heart failure. He reported having
7  had a heart attack or a myocardial infarction
8  in 1996. In 1998, he had a coronary artery
9  bypass graft operation, and, according to
10  him, apparently had a valve problem, but I
11  don't know the nature of that. He didn't
12  have any valve surgery. He also reported
13  decreased renal function, or kidney function,
14  as a result of his high blood pressure.
15      Q    Okay. Do you know the mechanism of
16  how that works? How you could have renal
17  problems, kidney problems, resulting from
18  high blood pressure?
19      A    Sure.
20      Q    What is that? How are those
21  connected?
22      A    Well, any part of the body that
23  doesn't receive adequate blood supply, the
24  cells don't do well. They don't function
25  normal. And that's, you know, renal

77

1  insufficiency, hepatic insufficiency,
2  whatever part of the body.
3      Q    Are kidney problems sometimes
4  related to numbness in the extremities?
5      A    Well, not being a nephrologist -- I
6  suspect, in their literature, one might find
7  that.  But I don't focus on that, so I can't
8  answer that question.  I wouldn't take my
9  answer as being an expert medical opinion on
10  that issue.
11      Q    Fair enough.  How about the
12  congestive heart failure?  Are you in a
13  position to state an opinion with regard to
14  that?
15      A    Well, congestive heart failure can
16  lead to swelling of the extremities as a
17  result of fluid buildup, fluid retention,
18  which can be painful.  But those, typically,
19  are more distal towards the feet and ankles,
20  lower part of the legs, can come all the way
21  up the thigh.  But that would be -- if there
22  was enough edema to cause pain, it would be
23  obvious that there was significant edema.
24  Plus, the typical complaint of the nature of
25  the pain is different than it is with pain as

78

1  a result of a back.
2      Q    Can diabetes also be related to
3  numbness in the extremities?
4      A    Uh-huh.
5      Q    Is that a "yes"?
6      A    Yes.
7      Q    We're taking it down on paper.
8      A    Yes.  You didn't hear the rattle,
9  my head shaking?
10      Q    I got it.  I don't know if the
11  court reporter did.  Do you know whether or
12  not Mr. Sasser has ever been tested for
13  diabetes?
14      A    I don't know that.
15      Q    Is diabetes, to your knowledge,
16  often related to renal insufficiency?
17      A    Can be.  But what the statistical
18  correlation is, I can't say.
19      Q    Is pain management a relatively new
20  field when you compare it to other medical
21  specialties out there?  Or how long has it
22  been around?  Rather than asking you -- we
23  can put an objective point on it.  How long
24  has the board been around?
25      A    The concept of chronic pain, as an

79

1  entity, dates back to the end of the Second
2  World War.  However, as a medical
3  subspecialty, as a medical specialty
4  subspecialty, it has really come into its own
5  in the last 20 to 25 years.
6      Q    Are there objective medical
7  findings that physicians can use to determine
8  whether or not pain exists or not or where
9  the pain is?  With a broken bone, we can use
10  an X-ray.  With a nerve, we can use an MRI.
11  Is there anything like that in the pain
12  management field?
13      A    No, not today.
14      Q    And that puts you, as a physician,
15  in a little bit of a different position,
16  then, as opposed to an orthopedic surgeon,
17  for example, in terms of what you have
18  available to you in order to diagnose and
19  treat a condition?
20      A    In a sense.
21      Q    Is pain management successful in
22  100 percent of your patients?
23      A    No.
24      Q    I'm not going to ask you to put a
25  statistical figure on it, unless you happen

80

1  to have that in your head.  But there are
2  some patients who simply don't respond to the
3  modalities and the treatments that you have
4  available.  Is that a fair statement?
5      A    That's fair.
6      Q    And that can be for a number of
7  reasons?  Would that be --
8      A    That's fair to say.
9      Q    Have you had patients that you've
10  treated where you concluded that pain
11  management was not getting them anywhere?
12      A    I have.
13      Q    Okay.  And how long would you treat
14  those patients before you made that
15  determination, before you felt comfortable
16  with the fact that we're getting nowhere?
17      A    I can't say.
18      Q    Okay.  Is there a range that you
19  think would be -- a minimum that you would
20  want to stick with a patient and work on
21  different treatments before you drew that
22  conclusion?
23      A    I can't say.
24      Q    In order to reach that conclusion
25  that the pain management was not helping,

81

1  would you rely mostly on the patient pain
2  scores, or what would you rely on?
3      A    A number of things.  First of all,
4  in order for me, personally, to reach that
5  sort of opinion, I would have to feel
6  comfortable and confident that I have tried
7  everything that I know how to do for a
8  particular pain problem, regardless of what
9  those modalities included, and that the
10  patient has not responded.
11      And by that, I mean, referring back to
12  sort of the triumvirate of our goal, that
13  being, reduce pain, subjective complaints of
14  pain, improve function, and improve quality
15  of life.  If the patient can't give me
16  feedback to make me believe that any of those
17  have been achieved, then I would have to say
18  that pain management has not been successful
19  in a given patient.
20      How long that takes -- it may take two
21  months.  It may take two years.  Sometimes it
22  takes a long time to go through the whole
23  gamut of possible treatments.  So, it's just
24  not -- and sometimes it takes even longer
25  than two years.

82

1      Let me also say that we don't ever
2  expect to get somebody pain free.  It would
3  be nice to hope that that would happen, but
4  we don't expect it.  We hopefully get the
5  patients to understand that we don't expect
6  that.  Because, sometimes, they come to us
7  expecting that.  And in someone who never
8  gives up that belief, that's a person that
9  would have a difficult time getting any
10  benefit from what we have to offer.  We don't
11  have many of those.  Most people are pretty
12  realistic about what they expect to get out
13  of what we have to offer.
14      And there are patients that we see, that
15  I've seen for years and years and years, who
16  are no better than they were to start with,
17  in a sense.  In other words, their complaints
18  of pain continue, but they're certainly no
19  worse, and they continue to function, they
20  continue to be able to be involved in family
21  life, work, in some cases, enjoy recreation,
22  those sorts of things.  I consider that to be
23  a successful outcome.
24      Q    Do you consider counseling or
25  psychological or psychiatric treatment to be

83

1  a useful component in a pain management
2  program?
3      A    Yes.
4      Q    And do y'all employ that or do you
5  have a referral system --
6      A    We do.
7      Q    -- or something like that?
8      A    We do.
9      Q    Do you do that with all of your
10  patients, or with some, or how does that --
11      A    Some, not all.
12      Q    Based on your records, can you
13  determine whether or not counseling or
14  psychological or psychiatric services were
15  recommended or employed in the course of your
16  treatment with regard to Mr. Sasser?
17      A    Part of our workup for our new
18  patients involves what's called an MMPI, or
19  Minnesota Multiphasic Personality Inventory.
20  We use a particular psychologist here in
21  town, primarily because he enjoys working
22  with chronic pain patients.
23      I have, in Mr. Sasser's record here, an
24  MMPI form and a request for an appointment.
25  However, I, unfortunately, don't have the

84

1  results of that.
2      Q    Do you have a date on the request?
3      A    Well, I have a -- let's see.  On
4  this particular -- this is a computer sheet
5  that has those little circles that are filled
6  in.  The test date is 3-19-02.  And it was
7  faxed on 3-20-02 and received on 3-20-02 from
8  Dr. Jacobs' office.  But, unfortunately, I
9  don't have a result back on that.
10      Q    Does the lack of having a result
11  back on that, does that tell you, one way or
12  the other, whether or not that was followed
13  up with or whether or not the evaluation took
14  place or anything else, or is it just an open
15  question?
16      A    It's an open question.  Let me also
17  say that, just by way of expounding on that,
18  that our request for the MMPI doesn't imply
19  in any way that we think that there is
20  psychological motivations in a patient's
21  request for our services.  It's just part of
22  what we do.
23      Just also let me say that chronic pain
24  is a very complicated issue.  There's
25  certainly the physical component, which, in

1  many cases, is the genesis of all -- the
2  whole picture. But chronic pain also has an
3  affect on a lot of aspects of a patient's
4  life which can't be objectified. It's
5  strictly subjective. And all of those
6  things, regardless of what they are, have an
7  impact on patients' abilities to function and
8  enjoy life, et cetera.
9       So, the MMPI really gives us some
10  insight into some those factors which may be
11  impacting the patient's ability to regain
12  function or enjoy life. It won't tell
13  anything about what kind of physical
14  modalities might help. It's not intended to
15  tell whether the patient is a malingerer.
16  That's not the point of it. That's not what
17  we use it for.
18      Q   It's just an example of you trying
19  to treat the whole patient as opposed to just
20  putting a Band-Aid on it?
21      A   Right.
22      Q   Now, earlier, you testified --
23  well, actually, let's start back with looking
24  at your initial intake record from September
25  5, 2000. We've used the term "pain scale."

1  And I don't know if I was the one who used
2  that. You might have used it in your
3  testimony. But I want to make sure that the
4  jury is clear what that means, in terms of a
5  pain scale. What is that? Is that as a
6  diagnostic tool that you use in evaluating
7  patients?
8       A   Well, it's not really a diagnostic
9  tool. Again, it's subjective.
10      Q   Right.
11      A   You alluded earlier to subjectivity
12  of pain. And it certainly is. It basically
13  is a ruler, so to speak, that allows us to
14  get a relative point of reference for a
15  particular patient.
16      Typically, when we describe the pain
17  scale to someone to help them tell us where
18  their pain is, we use a zero to ten. There
19  are others. But we use a zero to ten. Seems
20  to be the easiest one for everybody to grab
21  hold of.
22      And the way I describe it is that zero
23  is no pain, and ten is the worst pain that
24  you can ever imagine. And we can't say
25  specifically what that ten means, because

1  everyone's experience is different, and
2  everyone's -- and that's based on a lot of
3  different things. But, in general, everyone
4  can think of something in their life that was
5  the worst pain that they can recall, whether
6  it was childbirth, having your finger caught
7  in a door, whatever. Zero, most people can
8  relate to. Nothing.
9       So, what we ask the patient to do, then,
10  is to say where along that scale, zero, one,
11  two, three, four, et cetera, their pain is.
12  It gives us an idea of what they think their
13  pain is at that time. And it changes from
14  day to day. Changes from morning to
15  afternoon. It changes from one minute to the
16  next, sometimes. Where their pain is right
17  then. Because, tomorrow, it won't be the
18  same. It might, but it likely won't be. So,
19  even though it's a number, it's still
20  subjective.
21      Q   Right. And zero on the scale, as a
22  physician, I guess you can assume is fairly
23  uniform across the board, from one patient to
24  the next?
25      A   Well, I would say nothing is pretty

1  uniform.
2       Q   But the ten, at the other end, is
3  something that's based on that patient's own
4  personal experience?
5       A   Yes.
6       Q   And you explain this pain scale to
7  the patients before they assign a number in
8  their initial office visit?
9       A   Yes.
10      Q   Explain it kind of the same way you
11  just did for the jury?
12      A   I did.
13      Q   On September 5, 2000, did Mr.
14  Sasser give you a number on his pain scale?
15      A   He did.
16      Q   And what was his number?
17      A   His number, at that time, was a six
18  out of ten.
19      Q   And I believe you testified that,
20  by 2004, he was in the range of five, six or
21  seven, which you characterized as the middle
22  range?
23      A   Yes.
24      Q   Is that also true?
25      A   Uh-huh.

89

1    Q    And that implies reasonable pain
2  relief?
3    A    To me.
4    Q    On September 5, at his initial
5  visit, was that information taken from Mr.
6  Sasser before any treatment was administered
7  by your office or after?
8    A    Before.
9    Q    I want to change gears a little bit
10  and ask you about this Intracorp letter that
11  I believe is one of the records in your file
12  in front of you.  That letter that's dated
13  5-25, 2004.
14        MS. SHUMATE:  I'm sorry.  I thought
15            he said that was not contained
16            in his record.  He has a July.
17    Q    What's the date on the one in your
18  record, just so I'm clear?  I don't want to
19  misstate it or act on a wrong assumption.
20    A    7-12-04.
21    Q    Okay.  And you were reading from
22  that earlier.  And at the end of the letter,
23  you made a reference to some kind of appeal.
24  Could you read that out for me, so I can be
25  sure I have the language right?

90

1    A    It says -- this is the last
2  paragraph of page one.  "If you have
3  additional clinical information which
4  documents the medical necessity of the
5  service, you may appeal this determination by
6  submitting a written request providing the
7  additional information.  Please send the
8  appeal for request" -- and they give the
9  address.
10    Q    Okay.  And is it your understanding
11  that the letter indicated their opinion of a
12  lack of medical necessity for the treatment
13  that they were reviewing, for the proposed
14  treatment they were reviewing?
15    A    Would you repeat that?
16    Q    Is it your understanding from
17  reading the record that they concluded the
18  recommended treatment was not medically
19  necessary?
20        MS. SHUMATE:  I object to the form
21            of the question.
22    A    Well, I would assume that.
23    Q    Let me ask you this way.  You have
24  the letter in front you, and it's not a long
25  letter.  What is your understanding regarding

91

1  their conclusions in that letter?
2    A    Well, it's not -- the implication,
3  as I read it, is not that the treatments
4  aren't appropriate.  It's just that -- and
5  I'll just quote.  "It has been determined
6  that the medical information provided does
7  not support established standards of medical
8  necessity."  I have no idea what their
9  guidelines are.  So, what I take that to mean
10  is that they felt that the documentation was
11  inadequate, by their guidelines.
12    Q    By their guidelines.  And does it
13  make a reference --
14    A    Not that he didn't need treatment
15  of some sort, but that, based on what
16  information they had provided and their
17  guidelines, that it didn't determine
18  suitability.
19    Q    Right.  Okay.  And did that letter
20  say that your office could request a copy of
21  their guidelines?
22    A    It does say that.
23    Q    Okay.  And the letter also says
24  your office could submit additional
25  documentation concerning the medical

92

1  necessity --
2    A    It does.
3    Q    -- of the recommended treatment?
4    A    It does say that.
5    Q    Does anything in your file indicate
6  that your office made any communications or
7  sent any documentation to Intracorp following
8  that letter?
9    A    There is nothing in my chart that
10  reflects that.
11    Q    Has your office had to deal with
12  these type of peer reviews or these outside
13  review companies from time to time, just in
14  the course of the business end of your
15  practice?
16    A    Yes.
17    Q    And you, as the physician, are you
18  kind of the first point of contact with
19  regard to those companies, or do you have
20  office staff who sort of process that daily
21  paperwork?
22    A    Well, the mail doesn't come
23  directly to me.  But, typically, if there's a
24  request for further information or
25  notification of a peer review or whatever, I

93

1  eventually receive it. And it's up to me,
2  ultimately, to take it from that point on.
3      Q   There is a, I guess, process, and
4  kind of a flow of the paperwork when it comes
5  in the office and comes to you? Is that
6  right?
7      A   Yes.
8      Q   And when all things work as
9  planned, all of the records come and are
10 presented to you? Is that right?
11     A   Yes.
12     Q   Aside from the way things are
13 supposed to work, do you have an independent
14 recollection of getting that particular
15 letter from Intracorp?
16     A   This one?
17     Q   That's right.
18     A   Well, other than I see it here in
19 front of me, no.
20     Q   You see it here in front of you
21 in --
22     A   I don't recall the day it came to
23 my desk.
24     Q   Right. You see it in front of you
25 in 2007. You don't remember having that

94

1  record brought to your attention in 2004 by
2  your office staff?
3      A   Not specifically, no.
4      Q   You would have preferred it to have
5  been brought to your attention? Is that
6  right?
7      A   Well, it may have been.
8      Q   And it's your understanding, since
9  it's in your record, that it did reach your
10 office?
11     A   Obviously.
12     Q   And would you have preferred your
13 office to have followed up with that letter
14 by requesting the guidelines from Intracorp
15 and/or submitting additional medical records
16 to Intracorp in order to address that letter?
17     A   Typically, yes.
18     Q   Is that something that your office
19 does from time to time with patients when
20 there's a letter from a payer questioning the
21 need for a service? Does your office
22 sometimes forward additional information to
23 that payer in order to justify your opinion
24 and your recommendations?
25     A   Sometimes.

95

1      Q   And when your office does that,
2  does your office sometimes get favorable
3  responses?
4      A   I would assume. Basically, a
5  patient shows up, I work with the patient,
6  the patient goes home. What happens in
7  between all that, I usually don't know about.
8  I'm assuming, if they're here, everything
9  that's supposed to be approved is. I'm
10 assuming that, if they're here, they're here
11 for a legitimate reason.
12     Q   Now, I believe one of your office
13 records indicates that Mr. Sasser received
14 several injections, all the way up until
15 2003. Were those lumbar steroid injections?
16     A   No. The only injections that I
17 provided for Mr. Sasser were trigger point
18 injections in his legs, in various muscles of
19 the legs.
20     Q   And when was the last series of
21 injections your office provided for him?
22     A   5-20-04.
23     Q   5-20-04.
24     A   Uh-huh.
25     Q   Do you have a record of anyone else

96

1  providing lumbar steroid injections?
2      A   I don't have records. But Mr.
3  Sasser, in my note of 1-20-03 -- let me make
4  sure I have given you the correct date. But
5  I believe that's right. Yeah. I had already
6  referred to this earlier.
7      1-20-03, I had made a comment that the
8  patient had had five to six lumbar epidural
9  steroid injections without benefit. But I
10 don't have any records where he had them
11 done. This is simply a report by Mr. Sasser.
12     Q   I see. Do you have any outstanding
13 bills for treatment of Mr. Sasser? Bills
14 that haven't been paid?
15     A   I don't have any idea. I try not
16 to get involved with that.
17         MR. KNOTT: I may have some
18         additional questions after Amy.
19         She indicated earlier that she
20         already knew she had some
21         rebuttals before I even started
22         asking. So, I'll let her take
23         over.
24
25

EXAMINATION

RESUMED BY MS. SHUMATE:

Q    Do you have someone in your office, at that time or now, named Brenda? A lady in your office named Brenda?

A    There was a secretary named Brenda.

Q    Would she have been dealing with --

A    I have no idea.

Q    Okay. So, if Mr. Sasser talks about having called Brenda at your office, and she was dealing with Intracorp, trying to get it paid, would that give you some concern, or would that be something you would expect your patients to be dealing with somebody like her on these type problems?

A    Yes.

Q    All right. Now, I do have a couple of follow-ups. He asked you about MRIs and EMGs and NCVs, would that be the best evidence. And I think you -- it's fair to say that it doesn't hurt to have the most information possible? Is that correct?

A    That's correct.

Q    The lack of your having had them at

the time, does that change your opinion about what you testified about his back pain and the necessity for the treatment and that kind of thing?

A    No.

Q    Now, if, in fact, I do show you that he had an MRI, in 1997, that showed some impingement on the L5 nerve roots on the lateral recesses bilaterally, not to be significantly changed from February of '96, no evidence of disc herniation, basically a lumbar MRI which was consistent with degenerative disc disease, and he also had a nerve conduction study performed by a neurologist, that showed chronic bilateral L5-S1 radiculopathy -- and these took place before you ever saw him. Because he had been treated for five years before you ever saw him.

A    Right.

Q    Do those two tests, what I read to you about those tests, change your opinion in any way?

MR. KNOTT: Object to the form and the predicate. And I'll just

put on the record that he doesn't have those in front of him --

MS. SHUMATE: Sure.

MR. KNOTT: -- to review the entire record. That the question is based on the summary.

Q    Assume, hypothetically, that the -- I'll ask again. Assume, hypothetically, that the results of the nerve conduction study and EMG report, which are done by Hassan Kesserwani, the results read -- assume this is correct. The results read, "1. There is no evidence of polyneuropathy. 2. There is no evidence of carpal tunnel syndrome. 3. There is evidence of a mild chronic bilateral L5-S1 radiculopathy."

And then, assume he had an MRI in 1997 that showed impingement on the L5 nerve roots on the lateral recesses bilaterally, with no evidence of disc herniation.

Assume those statements are true, that there were MRIs and EMGs that said those things. Assume hypothetically. Does that change your opinion in any way?

MR. KNOTT: Object to the form and foundation and predicate of the hypothetical.

A    Would you mind specifying what opinion you're asking --

Q    The opinion I asked you about, whether he has back pain, in your opinion, that he's not faking, whether the treatment that you gave for him was necessary and related to that back pain, whether the problems with his legs, the pain he's having in his legs, and the need for the trigger point is related to a back jury.

A    It does not change my opinion.

Q    Do those tests bolster any of your opinions, in your mind, the fact that he had those and they showed those results? I should say, are they consistent with what you saw? Not bolster.

A    Hypothetically --

Q    Yes.

A    -- if those MRI results and EMG/NCV results are present, and, hypothetically, someone reports back pain and leg pain, then, hypothetically, there can be a relationship.

101

1    Q    And you were asked about angina,
2  coronary artery disease, kidneys, high blood
3  pressure, diabetes.  In your medical opinion,
4  are any of those conditions the cause of his
5  back and leg pain?
6            MR. KNOTT:  Object to the form and
7                 the predicate and the
8                 foundation of the hypothetical.
9    A    Unlikely.  I would have to say no.
10    Q    Thank you.  Now, the pain scale
11  that he indicated he had a six out of ten,
12  that's that one question that one day?  Is
13  that correct?
14    A    Right.
15    Q    In your opinion, was the four years
16  of treatment -- almost four years of
17  treatment you rendered for Mr. Sasser, until
18  it was cut off in May of '04, was it a
19  successful pain management regimen for him,
20  in your opinion?
21            MR. KNOTT:  Object to the form.
22                 Foundation.
23    A    Well, it really, I guess, depends
24  on how you define success.  Success that his
25  pain scores didn't go up, that his pain

102

1  didn't make him -- that they didn't get
2  worse, that he didn't become more debilitated
3  as a result of his pain, I can't say, because
4  the only way to say that would be to go back
5  and go to that same time frame and remove all
6  the medication.
7        So, does the reporting of a pain score
8  on the last day of the visit of a five out of
9  ten versus a pain score on the first day
10  being a six out of ten imply success?  Does
11  it imply that he didn't get worse?  I don't
12  know.
13    Q    Well, I guess that's what I'm
14  trying to get at.  I guess the implication
15  could be, well, it's not necessary and it's
16  not helping him, because it only went from a
17  six to a five, from the beginning to the end.
18  But, am I correct that that's not your judge
19  of success nor Mr. Sasser's indication to you
20  that this wasn't helping him any, was it?
21            MR. KNOTT:  Object to the form.
22    A    I can't speak for Mr. Sasser's
23  mind.
24    Q    He kept coming back.
25    A    Well, one would assume that if

103

1  there is a series of events that's ongoing,
2  repetitive and routine, that if it's
3  unsuccessful or just not something that
4  somebody wants to do, that they will stop at
5  some point along the way.  That's what I
6  would assume.  I can't answer how someone
7  else would operate.
8    Q    You did not come to the conclusion
9  during this time period that pain management
10  was not helping him, did you?
11    A    I did not come to that conclusion.
12    Q    And you did not cut him off
13  yourself, saying this isn't working, did you?
14    A    I did not.
15    Q    In fact, you anticipated he would
16  continue with pain management for some
17  indefinite period of time?
18            MR. KNOTT:  Object to the leading.
19    Q    Is that correct?
20            MR. KNOTT:  Object to the leading.
21    Q    He had another visit scheduled?
22            MR. KNOTT:  Object to the leading.
23    A    I intended for Mr. Sasser to
24  continue coming here, because I have a note
25  here on his trigger point injection procedure

104

1  note of 5-20-04, in which I report "Follow-up
2  already set."  So, my assumption is that we
3  had requested the next appointment.
4    Q    Okay.  Do you have patients who
5  treat with you for years, and it's intended
6  or expected they're going to treat with you
7  'til something miraculously happens or they
8  die?
9    A    Yes.
10    Q    And that's part of the process of
11  pain management?  Am I correct?
12    A    In our practice, yes.
13    Q    Was there anything about Mr. Sasser
14  that made you think that that was not going
15  to be the course for him?
16    A    Well, I can't say.  I mean, I
17  didn't anticipate stopping suddenly.  But,
18  obviously, at any point in time -- you know,
19  I can't prognosticate what's going to happen
20  at any time in the future.  So, my intent was
21  to continue treating Mr. Sasser as long as he
22  needed it.
23    Q    Is the history he gave you
24  consistent with what you saw in him?  I mean,
25  was there something about the history he gave

105

1  you of the mode of his injury that made you
2  go, hmm, that doesn't seem like what would
3  have caused this?
4      A    The nature of his injury as
5  reported to me on the initial intake was
6  consistent with the nature of the pain
7  complaint at that time.
8      Q    Is it consistent with the diagnosis
9  that Dr. McGahan had given him of lower back
10 pain, spinal stenosis, muscle spasms?
11     A    Well, first of all, I would say
12 that, hypothetically, Dr. McGahan's diagnosis
13 of stenosis came from his receiving the
14 hypothetical MRI.
15     Q    That's correct.
16     A    He, on physical examination, would
17 be unlikely to make a strict diagnosis of
18 stenosis just on physical exam alone.
19     Q    That would be something an MRI
20 would show?
21     A    Yes.
22     Q    That's the type of thing that an
23 MRI would diagnose?
24     A    Would show.  Yes.
25         MS. SHUMATE:  Okay.  That's all.

106

1              EXAMINATION
2
3  RESUMED BY MR. KNOTT:
4      Q    Dr. Marsella, the question of his
5  complaints being consistent with the story he
6  reported to you, his story could also be --
7  or his complaints could also be consistent
8  with a number of alternate or other
9  explanations for how that pain came to be?
10 Is that right?
11     A    That's correct.
12     Q    In other words, your records
13 reflected lifting something at the G. E.
14 plant?
15     A    Correct.
16     Q    And that's one thing that could
17 coexist at the same time as his pain.  That's
18 one possible explanation, I guess is one way
19 to say it?
20     A    Well --
21     Q    Is that what you mean when you say
22 "consistent"?
23     A    No.
24     Q    That's a possible explanation?
25     A    Consistent, when I use that term,

107

1  when "A" is consistent with "B," means that
2  the report of, in our case, pain, makes sense
3  based on the report of some event.  So,
4  that's what consistent means.  Doesn't mean
5  that it necessarily, 100 percent, without
6  question, that there is a causative
7  relationship.
8      But, based on the nature of a particular
9  event and the nature of a particular
10 complaint, if it's reasonable -- if I
11 oftentimes see "B" as a result of "A," then
12 my experience leads me to believe that
13 there's a relationship.
14     Q    But, as you testified earlier, it's
15 impossible to say, with certainty, that "A"
16 caused "B" in a case like this, where you
17 have a 1995 accident, and you saw him in 2000
18 with this presentation?
19     A    Well, when a patient says -- when
20 we ask, "When did your pain begin," and they
21 give a date, day or date or whatever, and we
22 ask them what caused that, and they give an
23 event, we assume that the pain that they
24 present, that started on a given day, and the
25 event that it happened on a given day, is

108

1  related.  The assumption is made.  I don't
2  usually ask, "Well, have you ever had" --
3  well, no.  I shouldn't say I don't usually
4  ask.  But, if somebody says to me, my pain
5  began on this day, then I assume that that
6  pain wasn't there before that day.  Do you
7  follow what I'm --
8      Q    I do.  On the other hand, a report
9  by a patient like Mr. Sasser, reporting that
10 a particular event caused his condition, it
11 would not change the way you treated that
12 condition -- right? -- because you're
13 treating the condition?
14     A    That's correct.
15     Q    It's not based on the event that
16 caused the condition?  Is that fair?
17     A    That's fair.
18     Q    And so, although you, as a
19 physician, will assume that the patient's
20 report is correct, it's not a
21 medically-necessary determination that you're
22 making in terms of whether the patient's
23 history is accurate in terms of this event
24 caused the condition.  That's not a
25 medically-necessary determination you make,

109

1  because it wouldn't affect your treatment.
2  Is that also a fair statement?
3         MS. SHUMATE:  Object to the form of
4            the question.
5      A    I'm going to rephrase your
6  question.
7      Q    Okay.
8      A    And make sure I rephrase it
9  correctly.  What you're asking me is, would
10 it have mattered, the causative event,
11 whether it was a sneeze or lifting whatever
12 or twisting, you know, catching a 400-pound
13 marlin or whatever.  Would it have mattered
14 how I treated the patient, based on
15 presentation of pain complaint?  The answer
16 is no.  I don't treat the cause.  I treat the
17 effect.
18     Q    And to extend that answer a step
19 further, the cause of the condition, it's not
20 medically necessary for you, as a physician,
21 to determine the cause?
22     A    That's correct.
23     Q    And so, although you're able to
24 assume that a patient's report to you is
25 accurate, that's not the primary goal in your

110

1  treatment, to determine whether the patient
2  is accurate in reporting what caused the
3  condition?
4      A    That's correct.
5      Q    And so, that's not a conclusion
6  that you, as a physician, reach with medical
7  certainty, whether or not an event caused the
8  condition, because it's not a medical
9  opinion?
10        MS. SHUMATE:  Object to the form of
11           the question.  He could reach
12           that opinion if he's asked.
13     A    That's sort of a -- to me, sort of
14 a multipart question.
15     Q    Okay.  If you can break your answer
16 up, then that's --
17     A    Certainly.  From the standpoint of,
18 does the cause of a particular pain
19 condition, regardless, have any impact on how
20 I treat a given pain condition, no.
21        If asked for an opinion about whether a
22 particular event caused the onset of a
23 particular pain condition, it doesn't matter
24 -- I can say "yes" or "no," given the right
25 -- you know, given the information, but it

111

1  wouldn't matter how I treated that pain
2  condition.
3      So, yes, I can offer an opinion about
4  cause and effect, but it doesn't matter what
5  I do.  It doesn't matter in what I do, is
6  what I should say.
7      Q    I believe, earlier, you testified
8  that it's impossible to say, with certainty,
9  whether this particular event that was
10 reported to you was, in fact, the cause of
11 the conditions that you treated Mr. Sasser.
12 And if there's a question about that, we can
13 -- the court reporter can read it back.  Do
14 you remember your testimony that way?
15     A    No.  I don't remember.
16        MS. SHUMATE:  Object to that
17           question.
18     Q    Okay.  Should we read that back?
19        MR. KNOTT:  Do you remember where
20           that was?
21        COURT REPORTER:  I certainly don't.
22           I don't know how long it would
23           take me to go through all the
24           notes.
25     Q    Setting aside for a moment the

112

1  question of the event that caused the
2  conditions, is it your understanding that Mr.
3  Sasser has been diagnosed with degenerative
4  disc disease in his lumbar spine?
5      A    Well, if a hypothetical MRI can be
6  relied upon to relate to a specific patient
7  -- is that possible?  I mean, is that
8  allowable?  As I understand it, in earlier
9  questioning, an allusion was made to an MRI,
10 but then it was hypothesized later that, if
11 an MRI showed this.
12        Well, if I had an MRI report that had
13 Mr. Sasser's name on it, and I read the
14 report, and it said that there was
15 degenerative disc disease, then I would say
16 that the patient has degenerative disc
17 disease.  So, does that answer your question?
18     Q    Degenerative disc disease can have
19 a number of causes?  Is that right?
20     A    Yes.
21     Q    And it can also occur without any
22 particular outside cause?
23     A    That's correct.
24     Q    It can be a condition that just
25 naturally develops in the person's body as a

113

1 process of aging?  Is that correct?

2    A    That's correct.

3    Q    And let me ask you about lumbar

4 stenosis.  Is lumbar stenosis also a

5 condition that can develop without an outside

6 cause?

7    A    Well, stenosis is narrowing.  So,

8 that implies that the normal caliber of the

9 spinal canal and the normal caliber of the

10 openings out of the spine, called foramina,

11 when those are smaller than they should be,

12 that is stenosis.

13    Now, the stenosis comes as a result of

14 something narrowing the caliber of those

15 cavities, whether it's an overgrown capsule

16 around a disc -- around a joint, whether it's

17 a disc that's poking out, whether it's the

18 fact that the spine bones come closer

19 together as a result of the degeneration of

20 the disc, whatever.

21    So, to extend that process, something is

22 going on in structures surrounding the

23 openings for the nerve roots, nerves, spinal

24 cord, whatever.  What that is doesn't

25 necessarily matter.  But the fact that there

114

1 is a narrowing, which is then known as

2 stenosis, occurs.

3    If those events occur spontaneously or

4 through the natural process of aging or

5 whatever, injury, whatever, that results in

6 stenosis, then, yes.  If the event that

7 caused the stenosis is spontaneous, then, in

8 a sense, the stenosis can also be

9 spontaneous.

10    Q    And by "spontaneous," you're

11 referring to what we were talking about in

12 terms of degenerative disc disease?

13    A    No distinct cause.  A natural

14 process of aging, or could be a series of

15 events.

16    Q    So, conditions like degenerative

17 disc disease and lumbar stenosis can both

18 occur in a person who has no injury, no

19 accident or event at all?

20    A    Sure.

21    Q    And by looking at an MRI, a

22 physician can't determine, necessarily,

23 whether this person's degenerative disc

24 disease and lumbar stenosis was caused by an

25 event or caused by the natural process of

115

1 aging?  Is that correct?

2    A    That's correct.

3    Q    And it feels the same -- is that

4 correct? -- to the patient?

5    A    I would have to defer to the

6 patient.

7    Q    Okay.  And Mr. Sasser's complaints

8 of pain and his physical complaints and the

9 descriptions of how his condition felt to

10 him, in your office, was that consistent with

11 a person who had pain as a natural process of

12 aging?

13        MS. SHUMATE:  Object to the form of

14        the question.

15    A    I'm not real sure I understand your

16 question.  In other words, if you're asking

17 me, just as the process of having more

18 birthdays, would one have the kind of pain

19 that Mr. Sasser presented with --

20    Q    I don't mean necessarily.

21    A    Right.

22    Q    But, is it consistent with --

23    A    Is it possible?  Well, I can't

24 answer the question the way you asked it.

25    Q    Okay.  Assume Mr. Sasser had not

116

1 told you that he had hurt his back lifting

2 something in 1995.  Without that one piece of

3 verbal history from the patient, would your

4 records give you anything to draw an opinion

5 concerning any particular event being the

6 cause of his condition?

7    A    Well, with a complaint of low back

8 pain and leg pain, and somebody said, "I have

9 back pain and leg pain, and that's all I'm

10 going to tell you.  You know.  Now your job

11 is to find out how to help me," what I would

12 do, is, if I couldn't -- if I didn't have

13 access to previous studies like MRIs, EMGs or

14 other X-rays or things like that, I would

15 order them to determine.

16    Because the nature of a complaint --

17 oftentimes what we see is the particular

18 nature of a complaint goes along with some

19 physical finding, radiographic,

20 electrodiagnostic, whatever.  So, then I

21 would try to find if there was a reason for

22 that type of pain, stenosis, degenerative

23 disc disease, whatever.

24    So, to say, does everybody have low back

25 pain and leg pain as they get older, no.  To

117

1    ask, is onset of low back pain and leg pain
2    consistent with getting older, or could it be
3    the result of getting older, not in and of
4    itself, I don't think.  There usually is some
5    reason, typically spinal reason, for specific
6    complaints of low back and leg pain.
7        Q    And in this particular case, where
8    you did have Mr. Sasser giving you his own
9    account of lifting something in 1995, you
10   felt it was adequate to rely on that, and did
11   not go back to request or order MRIs or NCVs
12   or EMGs?  Is that correct?
13       A    That's correct.
14       Q    Have you met with Mr. Sasser's
15   attorney, Ms. Shumate, before today?
16       A    On this case?
17       Q    Yeah.  On this case, I suppose.
18   Yes.
19       A    I don't recall.
20       Q    Or had any communications with her?
21       A    Not that I recall, no.
22       Q    Do you charge a fee for giving this
23   deposition in this case?
24       A    I do.
25       Q    And what is that fee?

118

1        A    We charge $1200.00 an hour.
2        Q    Okay.  Do you know whether Mr.
3    Sasser has had treatment by any neurosurgeons
4    or neurologists?
5        A    I don't know that.
6        Q    Do you think a neurosurgeon with
7    access to MRIs or NCVs or EMGs would be in a
8    good position to form an opinion with regard
9    to the nature and cause of the type of
10   conditions that Mr. Sasser reported to your
11   office for?
12           MS. SHUMATE:  Object to the form of
13           the question.
14       A    I can't say specifically.  I would
15   assume that a surgeon, neurosurgeon, who has
16   access to MRIs and EMG/NCVs of a patient
17   would be able to relate the physical findings
18   on those studies to the nature of a pain
19   condition.
20           But, as to the cause of the physical
21   findings on the studies, unless there were
22   similar studies prior to a given event that
23   you could compare, then I don't know that you
24   could make -- I can't imagine anybody,
25   neurosurgeon or anybody, being able to state

119

1    an opinion as to cause/effect.
2        Q    Do you get patients referred to you
3    by neurosurgeons?
4        A    Yes.
5        Q    And when that happens, is there
6    some sort of exchange of information between
7    you and the neurosurgeon?
8        A    Typically.
9        Q    And so, are you, I guess, in the
10   business of relying on neurosurgeons'
11   opinions in this regard to a certain degree
12   in your medical judgments?
13       A    Yes.
14           MR. KNOTT:  That's all I have right
15           now.  But Bill had made an
16           objection to the deposition
17           before, in his letter to you,
18           and I'll reserve the right, on
19           the basis of that objection,
20           and based on the --
21       MS. SHUMATE:  He didn't object to
22           the court.  He wrote me a
23           letter and said, if you're
24           going to use him as an expert,
25           I'm going to object to the

120

1            court.  And I said, if you're
2            going to object, please do so
3            before I pay Dr. Marsella.  And
4            there was no objection given.
5        MR. KNOTT:  And I'm going to
6            reserve the right --
7        MS. SHUMATE:  You can object to any
8            evidence at the trial.  I mean,
9            that's your business.
10       MR. KNOTT:  I'm going to reserve
11           the right to continue this
12           deposition at a later date, on
13           the basis of the lack of
14           designation of Dr. Marsella as
15           an expert in advance of the
16           deposition.
17       MS. SHUMATE:  You can reserve the
18           right to ask the judge to let
19           you come back and take it all
20           you want.  I'm not going to
21           agree to any kind of
22           reservation of you continuing
23           this for that purpose.
24       MR. KNOTT:  And that's on the
25           record.

121

1    MS. SHUMATE:  Thank you.  I have
2       one question.
3
4            EXAMINATION
5
6    RESUMED BY MS. SHUMATE:
7       Q    In this case, you didn't rely on
8    any neurosurgical opinions, because there
9    were none provided to you when you were
10   treating him?  Is that correct?
11      A    That's correct.
12      Q    And when you rely on the opinion of
13   a neurosurgeon or a neurologist, it's on a
14   case-specific basis for that particular
15   patient?  Is that correct?
16      A    That's correct.
17      Q    You would not, in this case, defer
18   to some neurosurgeon, neurologist, pain
19   management, anybody else's opinion, just
20   because they reviewed records and had a
21   different opinion with you regarding Mr.
22   Sasser, would you?
23      A    No.
24      MS. SHUMATE:  Okay.  Thank you.
25       That's all.

122

1            EXAMINATION
2
3    RESUMED BY MR. KNOTT:
4       Q    Would you defer to the opinion of a
5    physician who had, at his disposal,
6    additional records which were not at your
7    disposal?
8       MS. SHUMATE:  I'm going to object
9          to the form of the
10         hypothetical.  You haven't laid
11         a predicate for it properly.
12      Q    I believe plaintiff's attorney
13   asked you to assume certain studies had been
14   performed on Mr. Sasser.  If a physician had,
15   at his disposal, studies of that nature
16   regarding a patient, regarding Mr. Sasser,
17   would you defer to that physician's opinion,
18   if that physician's opinion was informed by
19   those additional studies?
20      MS. SHUMATE:  Object to the form of
21         that question.
22      A    Well, I wouldn't defer to the
23   opinion as far -- defer to an opinion as far
24   as cause and effect.  I would certainly take
25   any information, such as

123

1    radiographic studies, magnetic resonance
2    imaging studies, electromyographic studies,
3    as supportive evidence of the nature -- of
4    the cause of the nature of the pain.  But as
5    to the cause of the findings of the studies,
6    per se, another physician's having that
7    information wouldn't make any difference, in
8    my opinion, about the patient's pain
9    condition.  Does that answer your question?
10      Q    And, specifically, when you refer
11   to your opinion regarding the patient's pain
12   condition, what do you mean by that, just for
13   clarity?
14      A    Well, low back pain and leg pain.
15      Q    So, it wouldn't change your opinion
16   regarding the fact that he's having leg pain
17   and low back pain?
18      A    It would just substantiate it.
19      Q    It would substantiate it.
20      A    That it's a reasonable pain
21   response to a physical finding on diagnostic
22   study.  In other words, the presence or
23   absence of spinal stenosis, degenerative disc
24   disease, doesn't, in and of itself,
25   necessitate the presence of back pain, leg

124

1    pain.  The fact that they're both present at
2    the same time is consistent.
3       Q    Assume a physician were to review
4    the MRI findings and conclude that the
5    findings of the MRI were not consistent with
6    the nature of subjective complaints, as being
7    the cause of those subjective complaints.
8    Would you defer to an opinion such as that
9    being based on a neurologist reviewing an MRI
10   finding?
11      MS. SHUMATE:  Object to the form of
12         the question.
13      A    Not necessarily.  Opinions are
14   opinions.  I mean, we form our opinions based
15   on lots of things.  But, you know, what
16   another physician's -- not to say that I
17   don't appreciate input from other physicians,
18   because I rely on that heavily in some cases.
19   Whether I will throw my opinion out the
20   window and say, well, whatever you say is
21   right, I wouldn't normally do that.
22      Q    If my question implied that another
23   doctor was better at forming the opinion,
24   then that's not what it was meant to imply.
25   But, in terms of the information that opinion

125

1  would be based on, if a neurologist were able
2  to review an MRI that you had not had the
3  opportunity to review -- and assume a
4  neurologist did review the MRIs that you were
5  not able to personally review.
6      And assume further that that neurologist
7  or neurosurgeon concluded, based on the
8  review of that MRI that you had not had the
9  opportunity to review, that the neurologist
10  concluded that the MRI findings regarding the
11  patient's back were not consistent with the
12  patient's complaints -- with being the cause
13  of the patient's complaints in his leg.
14      Would you defer to that opinion as being
15  based on more information that was not at
16  your disposal?
17          MS. SHUMATE:  Object to the form of
18              the hypothetical.
19      A    Assuming that the nature of the
20  pain complaint to the neurologist and the
21  nature of the pain complaint to me were
22  exactly the same, I would consider it.  I
23  can't say whether I would defer to it or not,
24  because that situation wasn't present.
25      Q    And in considering it, I guess, I

126

1  would it be appropriate for you, at that
2  time, to withhold judgment until you had the
3  opportunity to review those same MRIs that
4  the neurologist or the neurosurgeon had
5  reviewed, so you could formulate your own
6  opinion based on that evidence?
7          MS. SHUMATE:  Object to the form of
8              the question.
9      A    It would certainly be nice to have
10  the data available.
11      Q    And that's something that you think
12  would be appropriate to do in that
13  eventuality?
14      A    Yes.
15          MS. SHUMATE:  Object to the form of
16              the question.
17      Q    Was that a "yes"?
18      A    Yes.
19          MR. KNOTT:  That's all I have right
20              now.
21
22          EXAMINATION
23
24  RESUMED BY MS. SHUMATE:
25      Q    Assume, hypothetically, that there

127

1  was a workers' comp case filed.  A man claims
2  he got hurt on the job.  He settled his case
3  with the workers' comp company.  And part of
4  that judgment, in a court of law, is that
5  they are to continue to pay for medical
6  treatment related to his back injury.
7      Assume also, subsequent to that, several
8  years after that, there's a dispute as to
9  whether his complaints and his treatment is
10  related, and the judge enters a second order
11  saying, I find he was injured on the job, in
12  his back, in September of '05, and
13  Dr. McGahan relates that to his work, and,
14  thus, they are responsible for future
15  medicals for that low back injury.  And then,
16  you see him starting in 2000 from Dr. McGahan
17  referring him for that low back pain.
18      Based on those hypotheticals, are you
19  treating him for the back pain he sustained,
20  that Dr. McGahan said was related, that the
21  judge has ordered was related?
22          MR. KNOTT:  Object to the form and
23              the predicate.
24      Q    Is there anything different, to
25  your knowledge, you're treating him for than

128

1  what he was sent here for by Dr. McGahan for
2  that back injury?
3          MR. KNOTT:  Object to the form and
4              the predicate and the
5              foundation.  It misstates the
6              factual record.
7      Q    You can still answer the question.
8      A    Assuming all that is correct --
9      Q    Sure.
10      A    -- yes.
11          MS. SHUMATE:  Thank you.  That's
12              all.
13          (Whereupon, Plaintiff's Exhibits 1,
14              2 and 3 marked for
15              identification.)
16
17          END OF DEPOSITION
18
19
20
21
22
23
24
25

129

PLAINTIFF'S EXHIBIT NO. 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

131

PLAINTIFF'S EXHIBIT NO. 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

130

PLAINTIFF'S EXHIBIT NO. 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

132

1  STATE OF ALABAMA
2  HOUSTON COUNTY
3
4      I, Stacey Watkins, RPR, and Notary
5  Public, State at Large, do hereby certify
6  that the foregoing transcript, pages 1
7  through 131, is a true and correct transcript
8  of the testimony and proceedings taken at
9  said time and place; and that the same was
10  taken down by me in stenograph shorthand,
11  and transcribed by me personally or under
12  my personal supervision.
13      I further certify that I have no
14  interest in this matter, financial or
15  otherwise, or how it may develop or what
16  its outcome may be.  I further certify that
17  I am not of counsel for any of the parties,
18  nor am I related to counsel or litigants or
19  associated with anyone connected with this
20  cause to my knowledge.
21      Witness my hand this 24th day of July,
22  2007.
23
24      _____
25  _____ RPR, Notary Public,
                        State at Large

**$**

$10,000.00 - 21:22
$1200.00 - 118:1

**'**

'01 - 13:19, 33:19, 33:22
'03 - 33:7, 41:4, 41:11, 41:12
'04 - 20:2, 20:4, 27:10, 31:17, 33:22, 41:9, 55:18, 101:18
'05 - 127:12
'95 - 42:25, 43:11
'96 - 98:10

**1**

1 - 4:3, 99:13, 128:13, 129:1, 132:6
1-20 - 41:9
1-20-03 - 49:6, 49:10, 62:2, 96:3, 96:7
1-20-04 - 28:13, 61:25
10-28-03 - 41:12, 41:14
100 - 51:8, 79:22, 107:5
11:30 - 8:6
12-29 - 42:9
12-29-03 - 41:12, 41:15, 42:18
12th - 27:20
131 - 132:7
13th - 19:6
15th - 44:25
16 - 5:25
17th - 13:15, 58:1
1995 - 6:16, 21:15, 22:8, 23:12, 107:17, 116:2, 117:9
1996 - 76:8
1997 - 98:7, 99:18
1998 - 23:8, 76:8

**2**

2 - 16:15, 99:14, 128:14, 130:1
2.5 - 10:24
20 - 79:5
2000 - 6:11, 13:15, 14:10, 14:11, 16:14, 19:6, 19:25, 20:4, 22:2, 23:8, 32:13, 44:6, 48:20, 66:6, 66:7, 66:8, 66:9, 85:25, 88:13, 107:17, 127:16
2001 - 13:16
2002 - 44:25, 66:7
2003 - 41:10, 42:23, 95:15
2004 - 27:21, 32:13, 41:6, 42:23, 44:6, 48:21, 58:1, 88:20, 89:13, 94:1
2007 - 1:18, 93:25, 132:22
20th - 1:17, 20:2, 20:4
24th - 132:21
25 - 79:5
29th - 33:7
2:06-cv-593-csc -

**1:7**

**3**

3 - 65:2, 99:15, 128:14, 131:1
3-17 - 41:4
3-1-02 - 11:20
3-17 - 41:4
3-19-02 - 84:6
3-20-02 - 84:7
30th - 13:19, 33:19
3rd - 22:1

**4**

4-9 - 41:11
40 - 33:4
40-hour-a-week - 54:20
400-pound - 109:12
4th - 13:16

**5**

5 - 85:25, 88:13, 89:4
5-18-04 - 33:4
5-20-04 - 20:2, 28:14, 28:17, 95:22, 95:23, 104:1
5-25 - 89:13
5th - 6:10, 8:6, 66:9

**6**

6-17-04 - 58:25
6-18-04 - 33:3
6-24 - 41:11
62 - 33:11

**7**

7-12-04 - 56:12, 89:20
7-18 - 41:12
7:10 - 1:18

**8**

800-pound - 6:19
8th - 21:15, 23:12

**9**

9-27 - 14:10, 14:19, 16:14
9-5 - 14:10, 47:25
9-8 - 42:24, 43:10

**A**

abilities - 85:7
ability - 12:17, 54:19, 85:11
able - 51:10, 51:12, 52:12, 53:3, 69:7, 73:21, 82:20, 109:23, 118:17, 118:25, 125:1, 125:5
abnormalcy - 72:18, 72:23
absence - 25:17, 71:8, 123:23
abstinence - 35:2
abstinence - 35:5
Academy - 39:20, 39:24, 40:9, 44:11
access - 15:12, 22:14, 71:24, 73:7,

**73**:8, 116:13, 118:7, 118:16
accident - 22:23, 23:11, 107:17, 114:19
according - 76:9
account - 117:9
accurate - 44:2, 108:23, 109:25, 110:2
achieved - 81:17
act - 2:6, 89:19
action - 58:22
active - 51:18
acute - 4:25, 35:2
addendum - 31:24
addicted - 12:7, 26:17
addition - 48:12
Additional - 41:4
additional - 33:10, 57:2, 57:7, 90:3, 90:7, 91:24, 94:15, 94:22, 96:18, 122:6, 122:19, 122:25
address - 25:18, 90:9, 94:16
addressed - 27:22, 61:15
adequate - 61:21, 76:23, 117:10
adjustor - 58:7
adjutant - 33:9
administered - 89:6
admitted - 16:15
advance - 120:15
advantage - 12:13
affect - 53:22, 53:25, 85:3, 109:1
afternoon - 87:15
aging - 113:1, 114:4, 114:14, 115:1, 115:12
agitation - 35:8
ago - 36:19, 67:9
agree - 30:16, 30:22, 31:2, 45:24, 49:17, 120:21
agreed - 3:25
ahead - 32:8
aid - 85:20
al - 1:8
Alabama - 1:2, 1:17, 1:23, 4:6, 132:1
allegedly - 27:21, 27:23
allowable - 112:8
allowed - 52:17
allows - 86:13
alluded - 86:11
allusion - 112:9
almost - 101:16
alone - 105:18
alter - 18:10
altered - 18:14
alternate - 106:8
American - 39:20, 39:21, 39:24, 40:9, 44:10, 44:11
amount - 17:22
Amy - 1:22, 3:8, 44:20, 65:21, 96:18
analgesic - 12:11
Anesthesia - 1:16
anesthesiology - 4:12, 5:14, 38:13, 38:20, 39:13, 39:16
Anesthesiology - 39:22
anesthetic - 17:23
angina - 76:3, 101:1
Angina - 76:4

ankles - 77:19
answer - 36:13, 47:13, 56:22, 61:13, 65:11, 72:14, 72:15, 77:8, 77:9, 103:6, 109:15, 109:18, 110:15, 112:17, 115:24, 125:19, 128:7
answered - 36:17
anti - 17:23, 48:7, 60:5, 61:20
anti-inflammatories - 60:5, 61:20
anti-inflammatory - 17:23, 48:7
anticipate - 51:25, 52:19, 104:17
anticipated - 103:15
anxiety - 35:8
appeal - 56:7, 57:5, 57:7, 89:23, 90:5, 90:8
appealing - 57:4
appear - 14:19
Appearances - 1:20
appointment - 8:7, 32:4, 32:9, 83:24, 104:3
appreciate - 47:5, 124:17
appropriate - 48:10, 50:15, 50:19, 61:23, 91:4, 126:1, 126:12
approve - 56:19
approved - 19:9, 35:18, 35:19, 95:9
approximate - 21:21
area - 4:9, 4:18, 5:24, 8:2, 44:15, 70:11, 70:14
arose - 23:12
arrest - 54:5
artery - 19:16, 76:8, 101:2
as-needed - 33:12
Aside - 93:12
aside - 111:25
aspects - 4:20, 85:3
assessment - 43:10, 43:13, 44:2, 49:16
assessments - 60:11
assign - 88:7
assigned - 2:20
associated - 5:11, 132:19
Assume - 23:19, 99:8, 99:9, 99:22, 99:24, 115:25, 124:3, 126:25, 127:7
assume - 19:4, 24:14, 29:6, 30:2, 37:13, 73:5, 87:22, 90:22, 95:4, 99:12, 99:18, 102:25, 103:6, 107:23, 108:5, 108:19, 109:24, 118:15, 122:13, 125:3, 125:6
assuming - 8:6, 28:8, 73:23, 95:8, 95:10
Assuming - 24:10, 24:11, 125:19, 128:8
assumption - 89:19, 104:2, 108:1
assumptions - 72:25

attach - 4:1
attached - 16:16, 44:23, 65:1
attack - 76:7
attempting - 6:20, 70:24
attention - 94:1, 94:5
attorney - 14:14, 117:15, 122:12
Attorney - 1:22
attorneys - 3:21
automatically - 39:25
available - 40:25, 41:2, 42:21, 79:18, 80:4, 126:10
average - 17:12
aware - 23:4

**B**

Baclofen - 14:8
Band - 85:20
Band-aid - 85:20
Barbour - 21:7
based - 33:1, 37:9, 41:23, 44:14, 45:22, 48:18, 49:22, 52:8, 52:19, 53:1, 59:19, 87:2, 88:3, 91:15, 99:7, 107:3, 107:8, 108:15, 109:14, 119:20, 124:9, 124:14, 125:1, 125:7, 125:15, 126:6
Based - 22:10, 42:20, 83:12, 127:18
basic - 13:2
basing - 42:13
basis - 119:19, 120:13, 121:14
become - 15:6, 70:2, 70:4, 102:2
becomes - 70:2
bed - 36:21
bedtime - 33:11
began - 108:5
begin - 107:20
beginning - 66:2, 66:5, 102:17
belief - 82:8
benefit - 49:8, 49:11, 62:4, 82:10, 96:9
best - 37:18, 50:1, 72:8, 72:15, 73:22, 75:21, 97:20
better - 32:17, 51:8, 55:7, 82:16, 124:23
between - 2:3, 17:13, 20:3, 36:11, 68:19, 95:7, 119:6
beyond - 46:24
bilateral - 41:7, 98:15, 99:16
bilaterally - 98:9, 99:20
Bill - 45:9, 45:11, 119:15
bills - 96:13
Bills - 96:13
Birmingham - 1:23
birthdays - 115:18
bit - 34:14, 66:1, 67:7, 79:15, 89:9
biting - 65:23
block - 48:23
blocks - 44:19
blood - 26:4, 76:14,

76:18, 76:23, 101:2
**blurry** - 70:2, 70:3, 70:4
**Board** - 44:10
**board** - 5:13, 5:16, 5:18, 38:6, 38:9, 38:12, 39:3, 39:12, 39:16, 40:5, 44:14, 44:15, 78:24, 87:23
**boards** - 39:19
**bodily** - 75:1
**body** - 7:22, 12:15, 12:16, 67:25, 68:4, 68:10, 69:14, 69:21, 74:19, 76:22, 77:2, 112:25
**bolster** - 100:15, 100:19
**bone** - 71:9, 79:9
**bones** - 113:18
**books** - 32:4
**bottles** - 36:22
**bottom** - 8:8, 8:10, 68:2
**brain** - 67:22
**branches** - 70:25
**break** - 110:15
**Brenda** - 97:5, 97:6, 97:7, 97:11
**brevity** - 16:21
**bring** - 6:24, 11:6
**broken** - 79:9
**brought** - 94:1, 94:5
**building** - 6:9, 15:10
**buildup** - 77:17
**bulge** - 74:14
**bulging** - 73:17, 75:7
**business** - 5:9, 9:1, 15:23, 16:9, 92:14, 119:10, 120:9
**bypass** - 76:9

### C

**Cabot** - 44:9, 47:18, 59:20, 60:19, 61:16
**Cabot's** - 60:1, 61:17
**Cad** - 19:11, 19:15
**calendar** - 41:9
**caliber** - 113:8, 113:9, 113:14
**canal** - 113:9
**capability** - 57:4
**capsule** - 75:7, 113:15
**carpal** - 8:9, 9:18, 9:21, 99:15
**carrier** - 27:16
**Case** - 1:7
**case** - 4:18, 4:19, 7:2, 9:10, 17:22, 21:6, 25:14, 27:5, 35:17, 48:10, 49:9, 49:16, 49:18, 58:7, 59:2, 60:11, 62:9, 62:10, 65:18, 70:8, 107:2, 107:16, 117:7, 117:16, 117:17, 117:23, 121:7, 121:14, 121:17, 127:1, 127:2
**case-specific** - 121:14
**cases** - 18:8, 69:10, 69:17, 82:21, 85:1, 124:18
**catching** - 109:12

**category** - 54:25
**caught** - 87:6
**causally** - 42:24
**causative** - 66:13, 107:6, 109:10
**cause/effect** - 119:1
**caused** - 67:4, 105:3, 107:16, 107:22, 108:10, 108:16, 108:24, 110:2, 110:7, 110:22, 112:1, 114:7, 114:24, 114:25
**causes** - 112:19
**causing** - 18:18, 69:24, 70:15
**cavities** - 113:15
**Cdt** - 1:18
**cells** - 76:24
**Center** - 14:15, 58:16, 65:5
**center** - 13:12, 15:3, 15:17
**Certain** - 72:25
**certain** - 12:20, 18:11, 25:17, 33:10, 68:10, 119:11, 122:13
**certainly** - 3:14, 7:16, 36:19, 47:6, 50:14, 54:9, 65:10, 70:19, 82:18, 84:25, 86:12, 111:21, 122:24, 126:9
**Certainly** - 3:16, 17:20, 37:20, 67:17, 71:6, 110:17
**certainty** - 55:23, 69:13, 73:13, 107:15, 110:7, 111:8
**certification** - 5:16, 5:21, 38:8, 38:10, 38:12, 39:5, 39:7, 40:11, 40:23
**certified** - 2:10, 5:13, 5:19, 38:6, 39:12, 39:25, 40:6, 44:14, 44:16
**certify** - 132:5, 132:13, 132:16
**cetera** - 57:3, 85:8, 87:11
**change** - 14:7, 89:9, 98:1, 98:22, 99:25, 100:14, 108:11, 123:15
**changed** - 20:9, 32:12, 98:10
**Changes** - 87:14
**changes** - 54:7, 87:13, 87:15
**channels** - 29:22
**characterized** - 88:21
**charge** - 117:22, 118:1
**chart** - 10:19, 14:25, 19:5, 19:10, 25:8, 27:24, 57:19, 58:16, 58:17, 58:19, 59:7, 64:24, 92:9
**charts** - 15:9
**check** - 7:18, 26:3, 71:11
**chemical** - 12:20
**chest** - 76:4
**chief** - 6:11
**childbirth** - 87:6
**chronic** - 4:24, 5:1, 12:13, 20:22, 78:25, 83:22, 84:23, 85:2,

98:15, 99:16
**chronologically** - 66:3
**chunks** - 65:23
**circles** - 84:5
**Civil** - 1:13
**claim** - 3:11
**claimant** - 28:7
**claimant's** - 28:16
**claims** - 127:1
**clarity** - 123:13
**classic** - 69:13
**clear** - 65:3, 86:4, 89:18
**clinic** - 15:10, 42:7
**clinical** - 57:2, 90:3
**Clio** - 58:6
**closer** - 113:18
**coexist** - 106:17
**cold** - 35:8, 36:22
**comfortable** - 80:15, 81:6
**coming** - 13:12, 26:22, 102:24, 103:24
**comment** - 46:3, 49:4, 49:5, 60:20, 96:7
**commission** - 2:8
**commissioner** - 2:7, 2:10
**communication** - 56:12, 56:15
**communications** - 45:10, 46:9, 92:6, 117:20
**comp** - 3:11, 7:2, 19:9, 29:24, 35:16, 58:24, 127:1, 127:3
**comp-approved** - 19:9
**companies** - 92:13, 92:19
**company** - 7:2, 15:21, 27:17, 35:16, 52:13, 127:3
**comparable** - 14:9, 67:21
**compare** - 78:20, 118:23
**compared** - 10:15
**compensation** - 27:16, 58:7, 58:12
**complaint** - 6:12, 73:11, 77:24, 105:7, 107:10, 109:15, 116:7, 116:16, 116:18, 125:20, 125:21
**complaints** - 17:16, 52:20, 66:14, 69:2, 69:8, 69:12, 71:1, 72:7, 72:10, 74:21, 81:13, 82:17, 106:5, 106:7, 115:7, 115:8, 117:6, 124:6, 124:7, 125:12, 125:13, 127:9
**completely** - 34:15
**compliance** - 28:22, 64:8
**compliant** - 62:15, 63:12
**complicated** - 38:15, 69:22, 84:24
**complying** - 62:10
**component** - 83:1, 84:25
**computer** - 84:4
**concentration** - 4:20
**concept** - 78:25

**concern** - 19:1, 26:21, 27:1, 62:21, 63:11, 97:14
**concerned** - 23:1, 34:22
**concerning** - 45:23, 67:4, 91:25, 116:5
**concerns** - 45:12
**conclude** - 124:4
**concluded** - 80:10, 90:17, 125:7, 125:10
**conclusion** - 80:22, 80:24, 103:8, 103:11, 110:5
**conclusions** - 91:1
**conclusively** - 69:8
**condition** - 20:9, 24:1, 24:2, 26:11, 32:12, 43:22, 51:25, 69:9, 79:19, 108:10, 108:12, 108:13, 108:16, 108:24, 109:19, 110:3, 110:8, 110:19, 110:20, 110:23, 111:2, 112:24, 113:5, 115:9, 116:6, 118:19, 123:9, 123:12
**conditions** - 46:1, 46:11, 52:11, 66:14, 75:1, 76:1, 101:4, 111:11, 112:2, 114:16, 118:10
**conduction** - 71:13, 71:17, 98:14, 99:10
**confident** - 81:6
**confusion** - 54:7, 54:11
**Congestive** - 76:6
**congestive** - 77:12, 77:15
**Conley** - 1:22, 65:17
**connected** - 76:21, 132:19
**connecting** - 74:9
**conservative** - 28:20, 50:1
**consider** - 82:22, 82:24, 125:22
**considering** - 125:25
**consistent** - 18:4, 19:21, 36:4, 37:3, 69:4, 98:12, 100:18, 104:24, 105:6, 105:8, 106:5, 106:7, 106:22, 107:1, 107:4, 115:10, 115:22, 117:2, 124:2, 124:5, 125:11
**Consistent** - 106:25
**consistently** - 33:21, 33:22
**constipation** - 54:3
**Consultants** - 1:16
**contact** - 44:3, 44:5, 92:18
**contained** - 9:3, 89:15
**continue** - 7:4, 23:15, 31:21, 36:12, 57:23, 82:18, 82:19, 82:20, 103:16, 103:24, 104:21, 120:11, 127:5
**continued** - 29:5, 31:4, 32:22, 55:14, 55:19, 55:25, 59:16, 62:8
**continuing** - 31:19, 62:5, 120:22

**controlled** - 26:25, 27:7
**convenience** - 15:15, 15:19, 16:3, 64:24
**copied** - 64:25
**copy** - 57:1, 91:20
**cord** - 67:18, 67:22, 70:13, 113:24
**coronary** - 19:16, 76:8, 101:2
**Correct** - 4:7, 53:11, 106:15
**correct** - 6:3, 19:18, 20:19, 29:20, 29:24, 38:13, 40:12, 40:13, 41:21, 53:7, 53:9, 55:16, 62:24, 63:24, 64:4, 96:4, 97:23, 97:24, 99:13, 101:13, 102:18, 103:19, 104:11, 105:15, 106:11, 108:14, 108:20, 109:22, 110:4, 112:23, 113:1, 113:2, 115:1, 115:2, 115:4, 117:12, 117:13, 121:10, 121:11, 121:15, 121:16, 128:8, 132:7
**correctly** - 109:9
**correlate** - 41:24, 42:1
**correlation** - 78:18
**cost** - 13:6
**counsel** - 2:3, 60:24, 132:17, 132:18
**counseling** - 82:24, 83:13
**County** - 21:7, 132:2
**couple** - 4:5, 97:18
**course** - 3:12, 9:1, 16:8, 17:3, 23:13, 24:20, 32:5, 46:6, 65:19, 65:22, 68:24, 83:15, 92:14, 104:15
**court** - 45:5, 46:17, 78:11, 111:13, 119:22, 120:1, 127:4
**Court** - 1:1, 2:18, 61:6, 111:21
**covered** - 14:17, 65:21
**cramping** - 35:9
**cramps** - 36:23
**crossover** - 68:19
**cured** - 51:8
**curing** - 5:10
**current** - 15:25
**cut** - 35:23, 37:1, 57:20, 59:2, 101:18, 103:12
**cutting** - 56:5
**Cv** - 4:1

### D

**daily** - 28:22, 92:20
**data** - 126:10
**date** - 33:1, 44:21, 49:9, 62:1, 66:9, 84:2, 84:6, 89:17, 96:4, 107:21, 120:12
**dated** - 11:20, 14:10, 20:1, 22:1, 27:20, 31:25, 44:25, 58:1, 89:12
**dates** - 13:15, 13:22, 41:24, 42:1, 56:23, 79:1

**days** - 13:17, 19:7, 34:13, 35:12, 35:14, 63:16
**deal** - 9:20, 92:11
**dealing** - 6:16, 9:21, 9:23, 97:8, 97:12, 97:15
**deals** - 57:19
**dealt** - 11:7
**debilitated** - 102:2
**December** - 33:6, 33:7
**decide** - 31:11, 33:24
**decided** - 27:18
**decision** - 12:1, 31:8, 31:11
**decreased** - 10:12, 34:14, 75:17, 76:13
**defendant** - 23:15, 35:17, 36:18, 58:2
**Defendants** - 1:9, 1:21
**defense** - 14:13
**defer** - 115:5, 121:17, 122:4, 122:17, 122:22, 122:23, 124:8, 125:14, 125:23
**define** - 101:24
**degenerated** - 75:8
**degeneration** - 113:19
**degenerative** - 6:13, 49:13, 98:13, 112:3, 112:15, 112:16, 114:12, 114:16, 114:23, 116:22, 123:23
**Degenerative** - 112:18
**degree** - 55:23, 119:11
**denied** - 30:11, 30:17, 32:21, 57:12, 57:15, 58:25
**denying** - 28:4, 28:25
**dependence** - 34:24
**Deposition** - 128:17
**deposition** - 1:11, 2:4, 2:8, 2:14, 2:17, 4:2, 16:16, 45:11, 45:17, 45:21, 61:2, 117:23, 119:16, 120:12, 120:16
**depression** - 54:5
**dermatome** - 10:19, 68:13, 68:25
**dermatomes** - 68:12, 68:20, 69:5
**describe** - 35:4, 37:11, 86:16, 86:22
**described** - 37:14
**description** - 36:25, 37:6
**descriptions** - 115:9
**designated** - 47:1
**designation** - 45:13, 120:14
**desk** - 93:23
**despite** - 61:14
**determination** - 26:9, 80:15, 90:5, 108:21, 108:25
**determine** - 21:9, 25:16, 25:23, 25:25, 28:17, 64:8, 71:3, 72:17, 79:7, 83:13,

91:17, 109:21, 110:1, 114:22, 116:15
**determined** - 64:15, 91:5
**determining** - 72:10
**develop** - 34:24, 113:5, 132:15
**developed** - 12:11
**develops** - 112:25
**diabetes** - 78:2, 78:13, 78:15, 101:3
**diabetic** - 26:5
**diagnose** - 79:18, 105:23
**diagnosed** - 112:3
**Diagnosis** - 8:8
**diagnosis** - 6:12, 18:5, 19:10, 19:13, 23:24, 105:8, 105:12, 105:17
**diagnostic** - 86:6, 86:8, 123:21
**diarrhea** - 35:9, 36:23
**dictate** - 13:13
**dictated** - 13:17, 13:18, 14:18, 14:21
**die** - 104:8
**difference** - 39:5, 123:7
**different** - 38:19, 68:13, 68:15, 77:25, 79:15, 80:21, 87:1, 87:3, 121:21, 127:24
**difficult** - 11:13, 70:5, 70:17, 82:9
**difficulty** - 35:10
**diplomate** - 44:9
**Direct** - 44:3
**direct** - 44:4
**directly** - 21:1, 25:10, 92:23
**Disability** - 44:11
**disabled** - 54:25
**disagree** - 43:9, 43:13, 59:21, 60:10
**disagreed** - 47:8
**disbursement** - 24:24
**disc** - 6:13, 8:12, 49:13, 71:8, 73:1, 73:17, 74:6, 74:14, 75:7, 75:8, 98:11, 98:13, 99:21, 112:4, 112:15, 112:16, 112:18, 113:16, 113:17, 113:20, 114:12, 114:17, 114:23, 116:23, 123:24
**discontinued** - 34:15
**discs** - 75:5
**discuss** - 61:18
**discussion** - 47:19, 66:10
**discussions** - 46:8, 56:2, 56:4
**disease** - 6:13, 19:16, 49:13, 98:13, 101:2, 112:4, 112:15, 112:17, 112:18, 114:12, 114:17, 114:24, 116:23, 123:24
**disincentives** - 25:20
**disposal** - 122:5, 122:7, 122:15, 125:16
**dispute** - 127:8

**distal** - 77:19
**distinct** - 68:22, 114:13
**distinction** - 70:2
**distribution** - 73:25
**District** - 1:1, 1:2
**Division** - 1:3
**doctor** - 4:23, 26:17, 70:13, 124:23
**Doctor** - 40:9
**doctors** - 38:2, 43:23
**doctors'** - 60:10
**document** - 18:4
**documentation** - 28:16, 28:20, 30:19, 31:1, 41:5, 41:10, 91:10, 91:25, 92:7
**documented** - 42:23, 43:2
**documents** - 16:14, 90:4
**done** - 3:13, 31:20, 42:11, 59:13, 59:15, 71:10, 72:1, 72:3, 72:5, 72:6, 96:11, 99:11
**door** - 87:7
**dosage** - 14:3, 34:10
**dose** - 34:13
**doses** - 36:6, 36:10, 36:11, 54:4, 54:6
**Dothan** - 1:17, 1:23
**down** - 2:9, 17:25, 49:14, 54:19, 68:2, 78:7, 132:10
**Dr** - 1:11, 3:1, 3:8, 3:23, 7:17, 7:21, 8:13, 8:16, 8:18, 9:13, 11:5, 18:6, 19:8, 20:12, 20:23, 21:8, 21:11, 22:6, 23:20, 23:24, 24:3, 43:5, 43:12, 46:6, 46:15, 47:18, 58:5, 58:6, 59:20, 59:25, 60:14, 60:19, 61:16, 61:17, 65:7, 65:16, 84:8, 105:9, 105:12, 106:4, 120:3, 120:14, 127:13, 127:16, 127:20, 128:1
**draw** - 116:4
**drew** - 80:21
**drowsy** - 63:3, 63:10
**drug** - 25:15, 62:14, 62:18, 63:23
**duly** - 3:2
**During** - 41:9
**during** - 17:14, 20:8, 24:20, 27:5, 41:6, 42:23, 103:9
**dying** - 36:24

## E

**early** - 62:13
**easiest** - 86:20
**eat** - 36:22
**economic** - 13:6
**edema** - 77:22, 77:23
**effect** - 13:5, 72:20, 75:6, 109:17, 111:4, 122:24
**effective** - 13:4, 13:7, 58:8, 58:25
**effects** - 53:22, 53:24

**effort** - 26:19
**eight** - 14:5, 33:5
**either** - 2:15, 2:16, 22:3, 52:13
**elaborate** - 21:23
**Electric** - 6:20, 22:24
**electrodiagnostic** - 116:20
**Electromyogram** - 71:15
**electromyograms** - 71:13
**electromyographic** - 123:2
**Emg** - 71:16, 71:17, 99:11
**Emg/ncv** - 72:17, 100:22
**Emg/ncvs** - 118:16
**Emgs** - 97:20, 99:23, 116:13, 117:12, 118:7
**employ** - 83:4
**employed** - 83:15
**employment** - 23:13
**encounters** - 41:11
**End** - 128:17
**end** - 68:7, 70:1, 79:1, 88:2, 89:22, 92:14, 102:17
**enjoy** - 51:12, 82:21, 85:8, 85:12
**enjoys** - 83:21
**entered** - 47:25
**enters** - 127:10
**entire** - 99:5
**entirely** - 38:19
**entirety** - 65:1
**entitlement** - 39:9
**entity** - 79:1
**epidural** - 44:19, 48:23, 49:8, 96:8
**epidurals** - 60:7, 61:22, 62:4
**especially** - 34:1
**essence** - 16:2, 17:11, 36:13
**established** - 91:7
**et** - 1:8, 57:3, 85:8, 87:11
**evaluate** - 7:25
**Evaluating** - 44:12
**evaluating** - 9:14, 86:6
**evaluation** - 9:6, 84:13
**evaluations** - 49:23
**evaluator** - 41:3
**event** - 66:13, 74:10, 107:3, 107:9, 107:23, 107:25, 108:10, 108:15, 108:23, 109:10, 110:7, 110:22, 111:9, 112:1, 114:6, 114:19, 114:25, 116:5, 118:22
**Event** - 74:11
**events** - 103:1, 114:3, 114:15
**eventuality** - 126:13
**eventually** - 68:7, 93:1
**evidence** - 2:17, 72:8, 97:21, 98:11, 99:14, 99:15, 99:16, 99:21, 120:8, 123:3, 126:6
**evidenced** - 62:11

**Exactly** - 37:24
**exactly** - 70:5, 125:22
**exaggerating** - 25:11
**exam** - 10:5, 10:7, 10:21, 75:15, 105:18
**Examination** - 3:5, 65:13, 97:1, 106:1, 121:4, 122:1, 126:22
**examination** - 10:3, 10:6, 10:11, 21:18, 40:3, 40:14, 105:16
**examinations** - 21:16, 22:5
**examine** - 43:19
**example** - 9:17, 85:18
**exams** - 49:22
**excellent** - 12:10
**Except** - 2:12, 42:8
**exchange** - 119:6
**excuse** - 58:2
**Excuse** - 44:20, 58:4
**exercise** - 28:23
**exertion** - 76:5
**exhibit** - 18:2
**Exhibit** - 4:3, 16:15, 65:2, 129:1, 130:1, 131:1
**Exhibits** - 128:13
**exists** - 79:8
**exit** - 68:3, 70:13
**exits** - 70:16, 73:3
**expect** - 35:21, 35:24, 36:14, 36:15, 37:4, 50:25, 52:24, 52:25, 53:2, 82:2, 82:4, 82:5, 82:12, 97:15
**expectation** - 31:19
**expected** - 104:6
**expecting** - 82:7
**expenses** - 21:22, 23:16, 23:18
**experience** - 35:1, 35:24, 37:9, 37:15, 52:9, 54:14, 87:1, 88:4, 107:12
**expert** - 45:12, 46:17, 47:16, 77:9, 119:24, 120:15
**Explain** - 88:10
**explain** - 12:8, 16:11, 17:2, 17:18, 38:16, 67:16, 88:6
**explained** - 67:14
**explanation** - 106:18, 106:24
**explanations** - 106:9
**expounding** - 84:17
**extend** - 109:18, 113:21
**extent** - 46:22, 68:15
**extra** - 4:17, 39:4, 39:10
**extremities** - 70:9, 77:4, 77:16, 78:3
**extremity** - 70:8

## F

**facility** - 15:3, 15:5
**fact** - 23:6, 31:23, 37:4, 40:8, 43:10, 47:11, 57:25, 59:12, 62:12, 69:21, 74:1,

80:16, 98:6, 100:16, 103:15, 111:10, 113:18, 113:25, 123:16, 124:1
**factors** - 85:10
**facts** - 24:10
**factual** - 128:6
**failed** - 28:20
**failure** - 76:6, 77:12, 77:15
**fair** - 5:8, 40:20, 55:13, 63:12, 80:4, 80:5, 80:8, 97:21, 108:16, 108:17, 109:2
**Fair-** 77:11
**fairly** - 87:22
**faking** - 55:6, 55:8, 55:10, 100:8
**family** - 82:20
**far** - 10:9, 23:1, 61:17, 75:2, 122:23
**fared** - 17:5
**favorable** - 95:2
**fax** - 11:19, 11:23
**faxed** - 11:12, 11:15, 84:7
**February-** 98:10
**Federal-** 1:13
**fee** - 117:22, 117:25
**feedback** - 81:16
**feet** - 77:19
**fellow** - 44:10
**fellowship** - 4:20
**felt** - 47:20, 55:15, 80:15, 91:10, 115:9, 117:10
**few** - 17:1, 19:6, 65:18
**field** - 78:20, 79:12
**figure** - 79:25
**file** - 8:22, 8:25, 28:1, 45:2, 58:3, 89:11, 92:5
**filed** - 3:10, 127:1
**filled** - 84:5
**financial** - 52:14, 132:14
**findings** - 79:7, 118:17, 118:21, 123:5, 124:4, 124:5, 125:10
**Fine-** 65:7
**finer** - 65:24
**finger** - 87:6
**First-** 22:14, 33:18, 38:18, 81:3
**first** - 3:2, 6:6, 6:8, 10:22, 17:1, 19:7, 61:16, 66:7, 92:18, 102:9, 105:11
**five** - 14:4, 34:12, 35:12, 35:14, 49:7, 52:5, 62:3, 88:20, 96:8, 98:18, 102:8, 102:17
**flow** - 93:4
**fluid** - 77:17
**focus** - 39:1, 77:7
**follow** - 10:16, 10:18, 11:3, 13:8, 13:9, 32:7, 34:1, 42:9, 43:20, 49:5, 57:6, 68:24, 69:2, 69:12, 97:19, 108:7
**Follow-** 32:1, 104:1
**follow-up** - 11:3, 32:7, 42:9, 49:5
**Follow-up-** 32:1, 104:1
**follow-ups** - 97:19

---

**followed** - 17:11, 84:12, 94:13
**following** - 13:10, 92:7
**follows** - 3:3, 73:24
**foramina** - 113:10
**foregoing** - 132:6
**form** - 2:12, 18:15, 21:3, 22:9, 24:6, 29:12, 29:25, 30:6, 30:13, 30:21, 30:23, 31:13, 36:1, 41:19, 41:22, 43:6, 43:15, 48:4, 49:2, 50:3, 50:9, 51:3, 51:20, 52:22, 53:4, 55:2, 59:4, 59:23, 60:12, 61:3, 66:23, 83:24, 90:20, 98:24, 100:1, 101:6, 101:21, 102:21, 109:3, 110:10, 115:13, 118:8, 118:12, 122:9, 122:20, 124:11, 124:14, 125:17, 126:7, 126:15, 127:22, 128:3
**formal** - 2:7, 39:7, 39:9
**forming** - 124:23
**formulate** - 126:5
**forward** - 94:22
**Foundation-** 101:22
**foundation** - 30:1, 30:7, 30:14, 31:14, 100:2, 101:8, 128:5
**four** - 11:1, 31:21, 48:15, 49:24, 52:19, 54:24, 87:11, 101:15, 101:16
**four-year** - 49:24
**frame** - 102:5
**free** - 51:9, 82:2
**front** - 56:14, 89:12, 90:24, 93:19, 93:20, 93:24, 99:2
**function** - 51:10, 53:19, 76:13, 76:24, 81:14, 82:19, 85:7, 85:12
**functioning** - 51:15
**future** - 23:16, 23:17, 104:20, 127:14

---

## G

**gain** - 21:18
**gait** - 18:10, 18:14
**gamut** - 81:23
**gears** - 89:9
**general** - 10:7, 17:3, 64:7, 68:16, 70:7, 70:18, 87:3
**General-** 6:19, 22:24
**generate** - 15:16
**generated** - 13:1, 15:4
**generically** - 56:24
**genesis** - 85:1
**GI-** 35:8
**given** - 28:13, 32:24, 48:14, 58:25, 63:11, 81:19, 96:4, 105:9, 107:24, 107:25, 110:20, 110:24, 110:25, 118:22, 120:4
**goal** - 81:12, 109:25
**grab** - 86:20

---

**graft** - 76:9
**great** - 27:1, 52:4, 63:11
**grounds** - 2:19
**Group-** 1:16
**group** - 11:6
**guess** - 10:1, 29:21, 31:18, 47:22, 61:18, 75:21, 87:22, 93:3, 101:23, 102:13, 102:14, 106:18, 119:9, 125:25
**guidelines** - 30:25, 57:1, 91:9, 91:11, 91:12, 91:17, 91:21, 94:14

---

## H

**half** - 10:24, 14:3
**hand** - 49:4, 108:8, 132:21
**handle** - 4:24
**handles** - 12:16
**hands** - 49:22
**hands-on** - 49:22
**handwritten** - 13:14, 31:24, 49:5
**happy** - 21:19
**hard** - 11:21, 11:23, 31:1
**Hassan** - 99:11
**head** - 14:22, 19:2, 78:9, 80:1
**headache** - 5:3, 35:9
**header** - 11:17
**health** - 75:19
**hear** - 78:8
**heard** - 12:3, 36:20, 59:25, 72:3
**hearsay** - 22:11
**heart** - 10:9, 76:4, 76:6, 76:7, 77:12, 77:15
**heart-related** - 76:4
**heavily** - 124:18
**help** - 12:1, 40:17, 53:11, 85:14, 86:17, 116:11
**helped** - 48:14
**helpful** - 44:1, 48:24
**helping** - 5:10, 6:18, 80:25, 102:16, 102:20, 103:10
**hepatic** - 77:1
**hereby** - 132:5
**herniated** - 8:11, 71:8, 73:17
**herniation** - 74:14, 98:11, 99:21
**HI-** 65:16
**high** - 76:14, 76:18, 101:2
**higher** - 51:14, 54:4, 70:13
**hired** - 47:15
**historically** - 68:10
**history** - 6:15, 10:2, 27:4, 104:23, 104:25, 108:23, 116:3
**hmm** - 105:2
**Hnp-** 8:11
**hold** - 54:19, 64:16, 86:21
**home** - 28:23, 36:21, 95:6
**honest** - 48:3
**hope** - 82:3
**hopefully** - 65:22,

---

82:4
**hospital** - 15:2, 15:5, 15:7, 15:9, 15:14, 15:20, 15:23, 36:21
**hour** - 118:1
**hours** - 14:5, 33:5
**Houston** - 132:2
**hurt** - 24:16, 24:18, 75:4, 97:22, 116:1, 127:2
**hypothesized** - 112:10
**hypothetical** - 24:7, 29:16, 36:3, 43:7, 43:16, 100:3, 101:8, 105:14, 112:5, 122:10, 125:18
**hypothetically** - 19:4, 23:19, 29:19, 99:8, 99:9, 99:24, 100:23, 100:25, 105:12, 126:25
**Hypothetically-** 100:20
**hypotheticals** - 127:18

---

## I

**idea** - 57:24, 68:17, 87:12, 91:8, 96:15, 97:9
**identification** - 128:15
**Imagine** - 67:18
**imagine** - 86:24, 118:24
**imaging** - 71:6, 123:2
**immediately** - 15:12, 58:9
**impact** - 85:7, 110:19
**impacting** - 85:11
**impinge** - 73:20
**impingement** - 98:8, 99:19
**implication** - 91:2, 102:14
**implied** - 124:22
**implies** - 4:17, 52:7, 89:1, 113:8
**imply** - 68:23, 84:18, 102:10, 102:11, 124:24
**impossible** - 74:4, 74:8, 107:15, 111:8
**Improper-** 30:12
**improve** - 53:18, 81:14
**inadequate** - 48:17, 91:11
**Inadequate-** 48:18
**incentives** - 25:19
**included** - 41:7, 81:9
**including** - 5:6, 38:4, 52:17
**incorrect** - 22:6
**indefinite** - 103:17
**independent** - 26:9, 57:17, 93:13
**indicate** - 27:13, 92:5
**indicated** - 45:15, 90:11, 96:19, 101:11
**indicates** - 95:13
**indicating** - 19:10, 56:17

---

**indication** - 102:19
**indicative** - 63:19
**infarction** - 76:7
**inflammatories** - 60:5, 61:20
**inflammatory** - 17:23, 17:25, 48:7
**information** - 9:3, 9:4, 21:25, 22:2, 22:15, 27:5, 31:3, 40:11, 51:23, 57:3, 59:1, 59:9, 66:11, 89:5, 90:3, 90:7, 91:6, 91:16, 92:24, 94:22, 97:23, 110:25, 119:6, 122:25, 123:7, 124:25, 125:15
**informed** - 122:18
**initial** - 11:21, 13:10, 41:2, 66:9, 75:23, 85:24, 88:8, 89:4, 105:5
**initiate** - 10:23
**injection** - 17:16, 17:21, 29:4, 30:20, 42:17, 103:25
**injections** - 5:6, 17:19, 18:20, 20:18, 20:21, 28:12, 41:7, 41:13, 42:3, 42:11, 42:15, 49:8, 50:1, 50:6, 50:24, 51:17, 95:14, 95:15, 95:16, 95:18, 95:21, 96:1, 96:9
**injured** - 127:11
**injury** - 7:3, 7:5, 11:8, 21:2, 21:9, 21:14, 21:24, 22:8, 23:10, 23:18, 23:23, 30:12, 42:24, 43:4, 43:10, 43:11, 105:1, 105:4, 114:5, 114:18, 127:6, 127:15, 128:2
**innervation** - 70:10
**input** - 124:17
**insight** - 85:10
**instead** - 48:11
**Instead** - 48:13
**insufficiency** - 77:1, 78:16
**insufficient** - 28:15, 28:19
**insurance** - 15:21
**intake** - 85:24, 105:5
**integrity** - 71:11
**intended** - 85:14, 103:23, 104:5
**intent** - 63:25, 104:20
**interest** - 132:14
**interfere** - 54:19
**interject** - 13:20
**interposed** - 2:16
**interrogatories-** 36:18
**Intracorp-** 27:21, 56:4, 57:11, 57:22, 58:4, 59:1, 89:10, 92:7, 93:15, 94:14, 94:16, 97:12
**inventory** - 83:19
**involved** - 22:22, 46:5, 68:18, 70:18, 82:20, 96:16
**involves** - 83:18
**isolate** - 70:24
**issuance** - 2:7
**issue** - 42:8, 42:16,

---

57:19, 70:15, 77:10,
84:24
**issued** - 23:21,
24:4, 33:7
**issues** - 23:14
**itching** - 54:2
**itself** - 15:4, 117:4,
123:24

**J**

**Jacobs'**- 84:8
**January**- 13:16,
13:19, 22:1, 33:19,
61:24
**Jerry**- 1:11, 3:1,
3:19
**job** - 7:5, 21:10,
22:7, 24:18, 53:10,
54:20, 116:10, 127:2,
127:11
**John**- 3:19
**Johnny**- 1:5, 1:25,
3:9, 6:2
**joint** - 75:7, 113:16
**joints** - 75:4
**Jr**- 1:12, 3:1, 3:19
**judge** - 21:6, 21:12,
23:9, 23:14, 23:21,
24:4, 102:18, 120:18,
127:10, 127:21
**judgment** - 44:24,
73:23, 126:2, 127:4
**judgments** - 119:12
**July**- 1:17, 27:20,
89:16, 132:21
**jumping** - 66:1
**June**- 58:1
**jury** - 6:5, 12:4,
17:19, 32:22, 55:7,
86:4, 88:11, 100:13
**jury's** - 16:22
**justify** - 94:23

**K**

**keep** - 8:25, 58:16
**kept** - 14:24, 16:5,
102:24
**Kesserwani**- 99:12
**kidney** - 76:13,
76:17, 77:3
**kidneys** - 101:2
**kind** - 5:4, 46:12,
66:4, 85:13, 88:10,
89:23, 92:18, 93:4,
98:3, 115:18, 120:21
**kinds** - 12:21
**Knott**- 1:22, 18:15,
21:3, 22:9, 24:6,
24:12, 29:12, 29:15,
29:25, 30:6, 30:13,
30:21, 30:23, 31:13,
36:1, 41:19, 41:22,
43:6, 43:15, 44:20,
45:1, 45:8, 45:15,
45:20, 45:25, 46:22,
48:4, 49:2, 50:3, 50:9,
51:3, 51:20, 52:22,
53:4, 53:8, 53:12,
55:2, 59:4, 59:23,
60:12, 60:18, 61:10,
65:15, 65:17, 96:17,
98:24, 99:5, 100:1,
101:6, 101:21,
102:21, 103:18,
103:20, 103:22,
106:3, 111:19,
119:14, 120:5,
120:10, 120:24,

122:3, 126:19,
127:22, 128:3
**Knott's**- 65:11
**knowledge** - 27:15,
27:19, 56:3, 57:8,
57:9, 57:13, 59:8,
59:14, 78:15, 127:25,
132:20
**known** - 38:21,
114:1

**L**

**L5**- 98:8, 99:19
**L5-s1**- 98:16, 99:17
**lack** - 64:10, 90:12,
97:25, 120:13
**lady** - 97:5
**laid** - 36:21, 122:10
**language** - 89:25
**Large**- 1:15, 2:6,
132:5, 132:25
**large** - 22:23, 67:19,
67:21
**larger** - 36:6
**last** - 20:1, 27:9,
31:16, 31:20, 33:1,
35:13, 79:5, 90:1,
95:20, 102:8
**lateral** - 98:9, 99:20
**lateralis** - 41:8
**law** - 127:4
**Law**- 1:22
**lawsuit** - 3:10
**lawyer** - 15:21
**layperson's** - 66:16
**lead** - 18:1, 22:5,
77:16
**leading** - 21:4, 24:9,
30:14, 53:12, 103:18,
103:20, 103:22
**leads** - 107:12
**learned** - 27:5
**least** - 33:21, 41:23,
51:9
**leave** - 15:9
**led** - 66:13
**left** - 10:15, 41:14,
73:15, 73:19
**leg** - 10:14, 70:19,
71:2, 72:10, 73:15,
73:24, 75:11, 100:24,
101:5, 116:8, 116:9,
116:25, 117:1, 117:6,
123:14, 123:16,
23:25, 125:13
**legal** - 50:12
**legally** - 50:17
**legitimate** - 25:24,
26:13, 95:11
**legs** - 17:17, 70:9,
75:14, 77:20, 95:18,
95:19, 100:11, 100:12
**Les**- 49:7
**less** - 69:13
**letter** - 21:11, 27:20,
28:4, 28:6, 29:7,
44:23, 58:1, 58:13,
59:6, 60:21, 89:10,
89:12, 89:22, 90:11,
90:24, 90:25, 91:1,
91:19, 91:23, 92:8,
93:15, 94:13, 94:16,
94:20, 119:17, 119:23
**letters** - 15:21
**level** - 25:3, 51:14,
54:16, 54:23, 72:19,
73:20
**levels** - 25:17, 68:1
**licensed** - 4:6

**licensing** - 3:25
**life**- 50:13, 51:11,
53:18, 81:15, 82:21,
85:4, 85:8, 85:12,
87:4
**lift** - 6:18, 6:21
**lifting** - 22:23,
106:13, 109:11,
116:1, 117:9
**light** - 10:12, 75:17
**likely** - 87:18
**limiting** - 51:19
**line** - 46:23, 56:10,
68:8, 70:1
**listed** - 42:15
**literature** - 77:6
**litigants** - 132:18
**live** - 5:10
**Lloyd**- 58:13
**local** - 17:22
**localized** - 18:1
**log** - 13:22, 13:25,
33:1
**logged** - 33:2
**logous** - 41:14
**look** - 7:8, 7:14,
7:16, 17:8, 25:18,
72:9
**looking** - 44:21,
44:22, 75:22, 85:23,
114:21
**loss** - 75:13
**low** - 6:12, 19:11,
28:7, 28:9, 43:11,
70:21, 70:22, 116:7,
116:24, 117:1, 117:6,
123:14, 123:17,
127:15, 127:17
**lower** - 18:6, 19:20,
20:5, 23:23, 50:8,
70:8, 70:9, 70:10,
73:17, 77:20, 105:9
**Ls**- 8:12
**lumbar** - 6:13, 6:14,
49:7, 70:11, 70:14,
70:15, 73:18, 95:15,
96:1, 96:8, 98:2,
112:4, 113:3, 113:4,
114:17, 114:24
**lumbosacral** - 8:12
**lungs** - 10:10

**M**

**machine** - 69:22
**magnetic** - 71:6,
123:1
**mail** - 92:22
**main** - 17:13
**maintain** - 51:10
**malingerer** - 85:15
**malingering** - 25:11
**man** - 43:14, 55:10,
127:1
**man's** - 60:11
**manage** - 5:4
**management**-
4:13, 4:16, 4:18, 4:21,
4:22, 5:1, 5:17, 5:24,
15:3, 17:15, 28:5,
29:5, 29:13, 30:12,
32:19, 38:8, 39:1,
54:24, 55:20, 55:24,
78:19, 79:12, 79:21,
80:11, 80:25, 81:18,
83:1, 101:19, 103:9,
103:16, 104:11,
121:19
**map** - 68:25

**mapped** - 68:11
**maps** - 68:16
**marked** - 128:14
**marlin** - 109:13
**Marsella** - 1:12, 3:1,
3:8, 3:19, 46:15, 58:6,
60:14, 65:7, 65:16,
106:4, 120:3, 120:14
**Marsella's** - 3:23,
46:6
**Marty** - 58:13
**matter** - 31:23,
110:23, 111:1, 111:4,
111:5, 113:25, 132:14
**mattered** - 109:10,
109:13
**Mcgahan** - 7:17,
7:21, 9:13, 11:5, 18:6,
19:8, 20:12, 20:23,
21:8, 21:11, 22:6,
24:3, 43:5, 43:12,
58:5, 105:9, 127:13,
127:16, 127:20, 128:1
**Mcgahan's** - 8:13,
8:16, 8:18, 23:20,
23:24, 105:12
**mean** - 4:15, 26:18,
29:18, 39:25, 40:21,
42:13, 53:10, 53:14,
54:11, 55:7, 81:11,
91:9, 104:16, 104:24,
106:21, 107:4, 112:7,
115:20, 120:8,
123:12, 124:14
**meaning** - 10:15,
19:15, 24:23, 33:13,
51:17
**means** - 28:11,
49:20, 86:4, 86:25,
107:1, 107:4
**meant** - 68:23,
124:24
**mechanism** - 74:19,
76:15
**med** - 58:23
**Medical** - 1:16,
14:14, 41:6, 58:16,
65:5
**medical** - 7:4, 11:5,
11:7, 21:13, 22:12,
23:16, 23:18, 26:11,
26:14, 31:9, 38:1,
40:25, 41:10, 42:22,
50:7, 50:12, 52:17,
55:23, 58:9, 73:22,
77:9, 78:20, 79:2,
79:3, 79:6, 90:4,
90:12, 91:6, 91:7,
91:25, 94:15, 101:3,
110:6, 110:8, 119:12,
127:5
**medically** - 30:5,
31:12, 50:14, 50:15,
50:21, 90:18, 108:21,
108:25, 109:20
**medically-
necessary** - 108:21,
108:25
**medicals** - 21:8,
27:17, 127:15
**Medication** - 20:16
**medication** - 10:23,
12:13, 12:25, 13:2,
13:22, 14:1, 17:14,
17:24, 20:17, 20:20,
24:22, 25:2, 25:3,
25:4, 25:14, 25:17,
26:5, 26:6, 26:10,
26:18, 26:23, 26:24,
28:5, 32:23, 33:4,

33:9, 33:10, 34:2,
34:4, 34:6, 34:15,
34:25, 35:12, 35:19,
36:7, 36:11, 48:8,
48:9, 48:20, 49:25,
50:6, 50:23, 51:6,
51:12, 51:16, 52:13,
52:16, 53:20, 54:10,
54:18, 60:8, 62:11,
62:13, 63:12, 64:5,
102:6
**medications** - 5:7,
21:1, 24:23, 25:19,
26:8, 28:18, 34:8,
34:17, 34:23, 62:16,
63:1
**Medicine** - 39:20,
39:24, 40:10
**medicine** - 4:10,
4:21, 33:8, 38:7, 38:9,
38:18, 39:1, 39:17,
39:19, 40:12
**member** - 39:23,
40:9, 40:21
**members** - 12:4
**membership** - 40:4
**mental** - 54:7
**mentioned** - 13:23,
47:21, 61:24
**met** - 117:14
**Methadone** - 10:24,
12:4, 12:5, 12:8,
12:10, 12:13, 13:3,
14:2, 26:7
**methamphetamine
s** - 12:7
**methods** - 5:5
**microwithdrawal** -
36:10
**Middle** - 1:2
**middle** - 52:6, 88:21
**might** - 12:5, 63:9,
65:25, 66:13, 75:23,
77:6, 85:14, 86:2,
87:18
**mild** - 76:5, 99:16
**milligram** - 34:10
**milligrams** - 10:24,
11:1, 14:4, 14:5, 33:5
**minimal** - 73:22, 100:4,
100:16, 102:23
**minimum** - 80:19
**Minnesota** - 83:19
**minute** - 87:15
**miraculously** -
104:7
**misstate** - 89:19
**misstates** - 128:5
**Mmpi** - 83:18,
83:24, 84:18, 85:9
**modalities** - 17:14,
80:3, 81:9, 85:14
**modality** - 38:22
**mode** - 105:1
**moment** - 111:25
**monitor** - 25:2, 26:4
**monitoring** - 25:13
**month** - 4:19, 11:3
**months** - 17:12,
81:21
**morning** - 87:14
**most** - 10:8, 50:1,
87:7, 97:22
**Most** - 82:11
**mostly** - 81:1
**motion** - 44:24
**motivations** - 84:20
**motor** - 6:19, 6:21,
22:23
**Mri** - 71:23, 73:7,

73:16, 79:10, 98:7,
98:12, 99:18, 100:22,
105:14, 105:19,
105:23, 112:5, 112:9,
112:11, 112:12,
114:21, 124:4, 124:5,
124:9, 125:2, 125:8,
125:10
 **Mris** - 71:6, 97:19,
99:23, 116:13,
117:11, 118:7,
118:16, 125:4, 126:3
 **multipart** - 110:14
 **Multiphasic** - 83:19
 **muscle** - 10:25,
14:8, 17:16, 17:21,
17:25, 18:3, 18:12,
18:13, 18:18, 19:11,
19:20, 20:6, 41:14,
105:10
 **muscles** - 18:11,
41:8, 71:12, 72:21,
75:4, 95:18
 **must** - 58:11
 **myocardial** - 76:7

## N

 **name** - 3:8, 3:18,
8:20, 65:16, 112:13
 **named** - 97:5, 97:6,
97:7
 **narcotic** - 48:8,
48:20, 55:14, 60:8
 **narcotics** - 49:13,
64:2
 **narrowing** - 113:7,
113:14, 114:1
 **natural** - 17:6,
114:4, 114:13,
114:25, 115:11
 **naturally** - 112:25
 **nature** - 12:20, 14:9,
18:4, 18:7, 21:23,
25:5, 39:10, 54:12,
63:3, 76:11, 77:24,
105:4, 105:6, 107:8,
107:9, 116:16,
116:18, 118:9,
118:18, 122:15,
123:3, 123:4, 124:6,
125:19, 125:21
 **nausea** - 54:3
 **Ncv** - 71:17
 **Ncvs** - 97:20,
117:11, 118:7
 **necessarily** - 5:9,
10:16, 12:22, 12:23,
15:22, 16:23, 60:9,
63:19, 69:16, 107:5,
113:25, 114:22,
115:20, 124:13
 **necessary** - 20:22,
21:24, 29:11, 30:5,
30:11, 32:14, 43:3,
47:12, 50:14, 50:16,
50:21, 55:25, 59:13,
59:15, 90:19, 100:9,
102:15, 108:21,
108:25, 109:20
 **necessitate** -
123:25
 **necessity** - 28:21,
50:7, 50:12, 90:4,
90:12, 91:8, 92:1,
98:3
 **need** - 2:13, 16:24,
26:10, 26:14, 32:14,
32:18, 46:19, 59:9,
60:7, 60:8, 61:8,

---

91:14, 94:21, 100:12
 **needed** - 12:2,
21:25, 28:18, 33:12,
33:13, 44:19, 104:22
 **needing** - 60:5
 **needs** - 31:8, 31:12
 **negative** - 19:2
 **nephrologist** - 77:5
 **nerve** - 5:3, 10:17,
12:21, 13:1, 67:15,
67:17, 67:24, 68:3,
68:5, 68:9, 68:14,
68:17, 68:25, 69:25,
70:16, 70:18, 71:13,
71:17, 72:18, 73:2,
73:4, 73:21, 73:25,
74:1, 74:15, 79:10,
98:8, 98:14, 99:10,
99:19, 113:23
 **nerve-generated** -
13:1
 **nerve-type** - 12:21
 **nerves** - 67:23,
68:6, 68:7, 69:22,
70:12, 70:24, 71:11,
71:12, 72:20, 72:21,
75:9, 113:23
 **neurological** -
10:11, 21:18
 **neurologist** - 98:15,
121:13, 121:18,
124:9, 125:1, 125:4,
125:6, 125:9, 125:20,
126:4
 **neurologists** -
118:4
 **neurosurgeon** -
118:6, 118:15,
118:25, 119:7,
121:13, 121:18,
125:7, 126:4
 **neurosurgeons** -
118:3, 119:3
 **neurosurgeons'** -
119:10
 **neurosurgical** -
121:8
 **never** - 37:10,
59:25, 62:12, 82:7
 **new** - 78:19, 83:17
 **next** - 13:18, 32:8,
87:16, 87:24, 104:3
 **nice** - 82:3, 126:9
 **nitpicking** - 42:12
 **nitro** - 36:23
 **nondermatomal** -
47:20, 47:21, 48:1,
75:16
 **None** - 61:6
 **none** - 42:22, 121:9
 **nonradicular** -
10:14, 67:10, 68:22,
68:23, 69:11, 72:7
 **Nonradicular** -
10:15
 **nonsteroidal** -
61:19
 **normal** - 10:9,
10:18, 16:8, 25:1,
29:22, 32:5, 76:25,
113:8, 113:9
 **normalcy** - 72:18,
72:23
 **normally** - 16:10,
124:21
 **Northern** - 1:3
 **Notary** - 1:15, 2:6,
132:4, 132:25
 **note** - 8:15, 8:21,
9:4, 11:23, 13:18,

---

14:18, 19:9, 20:1,
27:25, 31:24, 47:25,
49:6, 75:23, 96:3,
103:24, 104:1
 **noted** - 47:4
 **notes** - 7:12, 7:15,
13:13, 13:17, 14:21,
67:8, 111:24
 **nothing** - 19:17,
87:25, 92:9
 **Nothing** - 87:8
 **notice** - 1:18, 63:9
 **notification** - 92:25
 **notifying** - 58:8
 **nowhere** - 80:16
 **nucleus** - 8:11
 **number** - 13:3,
13:5, 69:18, 75:19,
80:6, 81:3, 87:19,
88:7, 88:14, 88:16,
88:17, 106:8, 112:19
 **Number** - 13:4
 **numbness** - 47:20,
48:1, 75:13, 77:4,
78:3
 **nurse's** - 13:14

## O

 **Object** - 18:15, 21:3,
21:4, 22:9, 24:6, 24:7,
24:8, 29:12, 29:15,
29:25, 30:6, 30:13,
30:21, 30:23, 31:13,
36:1, 41:19, 41:22,
43:6, 43:15, 48:4,
49:2, 50:3, 50:9, 51:3,
51:20, 52:22, 53:4,
53:8, 53:12, 55:2,
59:4, 59:23, 66:23,
98:24, 100:1, 101:6,
101:21, 102:21,
103:18, 103:20,
103:22, 109:3,
110:10, 111:16,
115:13, 118:12,
122:20, 124:11,
125:17, 126:7,
126:15, 127:22, 128:3
 **object** - 46:20,
60:12, 90:20, 119:21,
119:25, 120:2, 120:7,
122:8
 **objectified** - 85:4
 **objection** - 2:20,
24:12, 47:4, 47:17,
61:14, 119:16,
119:19, 120:4
 **objections** - 2:12,
2:13, 2:15, 61:3
 **objective** - 25:16,
28:15, 30:18, 31:1,
51:22, 78:23, 79:6
 **observation** - 48:19
 **observations** -
22:4, 25:10
 **observed** - 25:8
 **obtaining** - 7:11
 **obvious** - 77:23
 **obviously** - 68:12,
104:18
 **Obviously** - 94:11
 **occasion** - 6:2
 **Occasional** - 76:3
 **occasional** - 17:13,
17:15, 20:17, 20:21
 **Occasionally** - 76:5
 **occupational** - 5:7,
38:23
 **occur** - 112:21,

---

114:3, 114:18
 **occurred** - 23:11
 **occurs** - 114:2
 **October** - 13:15
 **offer** - 43:21, 82:10,
82:13, 111:3
 **office** - 8:16, 16:6,
21:16, 28:5, 29:10,
29:21, 32:6, 33:17,
42:5, 56:3, 59:14,
62:23, 67:8, 75:23,
84:8, 88:8, 89:7,
91:20, 91:24, 92:6,
92:11, 92:20, 93:5,
94:2, 94:10, 94:13,
94:18, 94:21, 95:1,
95:2, 95:12, 95:21,
97:4, 97:6, 97:11,
115:10, 118:11
 **offices** - 1:15
 **official** - 15:5,
15:23, 16:3
 **often** - 78:16
 **oftentimes** -
107:11, 116:17
 **older** - 116:25,
117:2, 117:3
 **on-the-job** - 22:7
 **Once** - 17:1
 **One** - 12:15, 38:5,
53:13, 73:5
 **one** - 13:3, 23:7,
33:5, 33:11, 34:21,
40:17, 43:25, 67:8,
67:25, 68:13, 69:25,
70:3, 77:6, 84:11,
86:1, 86:20, 87:10,
87:15, 87:23, 89:11,
89:17, 90:2, 93:16,
95:12, 101:12,
102:25, 106:16,
106:18, 115:18,
116:2, 121:2
 **ones** - 54:2
 **ongoing** - 29:13,
103:1
 **onset** - 110:22,
117:1
 **onward** - 49:10
 **open** - 84:14, 84:16
 **openings** - 113:10,
113:23
 **operate** - 103:7
 **operation** - 76:9
 **opinion** - 18:18,
20:20, 20:25, 21:13,
21:15, 21:21, 23:20,
24:1, 26:10, 29:8,
29:11, 29:20, 30:9,
31:7, 31:11, 31:18,
42:14, 42:22, 43:1,
43:14, 43:21, 43:25,
44:8, 44:18, 49:21,
50:7, 54:20, 55:18,
55:21, 60:1, 60:4,
60:18, 61:17, 62:12,
73:10, 73:12, 77:9,
77:13, 81:5, 90:11,
94:23, 98:1, 98:22,
99:25, 100:5, 100:6,
100:7, 100:14, 101:3,
101:15, 101:20,
110:9, 110:12,
110:21, 111:3, 116:4,
118:8, 119:1, 121:12,
121:19, 121:21,
122:4, 122:17,
122:18, 122:23,
123:8, 123:11,
123:15, 124:8,

---

124:19, 124:23,
124:25, 125:14, 126:6
 **Opinions** - 124:13
 **opinions** - 45:23,
46:4, 59:20, 59:22,
60:9, 65:20, 67:4,
100:16, 119:11,
121:8, 124:14
 **opioid** - 62:9
 **opioids** - 34:7,
34:19, 34:21
 **opportunity** - 125:3,
125:9, 126:3
 **opposed** - 46:17,
79:16, 85:19
 **order** - 23:6, 23:14,
23:21, 24:4, 43:20,
79:18, 80:24, 81:4,
94:16, 94:23, 116:15,
117:11, 127:10
 **ordered** - 7:3,
127:21
 **original** - 18:5,
66:13
 **originally** - 20:11
 **originating** - 69:14,
70:6
 **Orthopedic** - 44:10
 **orthopedic** - 79:16
 **otherwise** - 132:15
 **outcome** - 49:15,
60:9, 62:8, 82:23,
132:16
 **outside** - 11:12,
45:4, 46:2, 46:12,
57:18, 92:12, 112:22,
113:5
 **outstanding** - 96:12
 **overages** - 62:13
 **overgrown** - 75:7,
113:15
 **overmedicating** -
62:19, 63:24, 64:3
 **overuse** - 63:19
 **own** - 15:14, 22:4,
66:20, 79:4, 88:3,
117:8, 126:5
 **owner** - 15:3
 **Oxycontin** - 26:7,
28:14, 33:4, 33:15,
33:16, 33:25, 34:18,
34:20, 35:22, 37:1,
53:21

## P

 **pad** - 8:19
 **page** - 90:2
 **pages** - 132:6
 **paid** - 96:14, 97:13
 **pain** - 4:12, 4:15,
4:18, 4:21, 4:22, 4:24,
5:1, 5:2, 5:3, 5:4,
5:11, 5:17, 5:24, 6:12,
6:16, 6:23, 8:2, 9:16,
10:23, 12:13, 12:21,
12:24, 13:1, 13:12,
15:3, 15:16, 15:24,
18:1, 18:2, 18:6, 18:9,
18:12, 19:11, 19:20,
20:5, 20:22, 22:21,
26:17, 28:7, 28:9,
29:5, 29:13, 30:12,
32:15, 32:19, 33:11,
38:8, 38:9, 39:1,
39:16, 39:17, 39:19,
40:12, 48:1, 50:2,
50:8, 51:1, 51:9,
51:18, 52:1, 52:4,
52:7, 52:18, 52:20,

53:3, 53:11, 53:16,
53:17, 54:16, 54:23,
54:24, 55:20, 55:24,
55:25, 66:17, 66:21,
67:2, 67:5, 69:2, 69:8,
69:11, 69:12, 69:14,
70:6, 70:8, 70:19,
70:20, 70:21, 70:22,
71:2, 72:8, 72:11,
73:16, 73:24, 74:20,
75:2, 75:5, 75:6,
75:10, 75:11, 75:12,
76:4, 77:22, 77:25,
78:19, 78:25, 79:8,
79:9, 79:11, 79:21,
80:10, 80:25, 81:1,
81:8, 81:13, 81:14,
81:18, 82:2, 82:18,
83:1, 83:22, 84:23,
85:2, 85:25, 86:5,
86:12, 86:16, 86:18,
86:23, 87:5, 87:11,
87:13, 87:16, 88:6,
88:14, 89:1, 98:2,
100:7, 100:10,
100:11, 100:24,
101:5, 101:10,
101:19, 101:25,
102:3, 102:7, 102:9,
103:9, 103:16,
104:11, 105:6,
105:10, 106:9,
106:17, 107:2,
107:20, 107:23,
108:4, 108:6, 109:15,
110:18, 110:20,
110:23, 111:1, 115:8,
115:11, 115:18,
116:8, 116:9, 116:22,
116:25, 117:1, 117:6,
118:18, 121:18,
123:4, 123:8, 123:11,
123:14, 123:16,
123:17, 123:20,
123:25, 124:1,
125:20, 125:21,
127:17, 127:19
**Pain** - 39:20, 39:24,
40:10
**painful** - 77:18
**paper** - 78:7
**paperwork** - 92:21,
93:4
**paragraph** - 23:17,
90:2
**parameters** - 62:15
**parlance** - 66:16
**Part** - 53:13, 83:17
**part** - 7:22, 8:21,
9:19, 10:8, 11:24,
13:21, 14:18, 15:6,
25:1, 68:10, 70:10,
73:1, 73:17, 76:22,
77:2, 77:20, 84:21,
104:10, 127:3
**particular** - 6:9,
10:17, 25:20, 33:1,
34:17, 47:25, 49:18,
56:20, 60:11, 62:25,
68:14, 72:18, 72:19,
73:2, 73:11, 73:19,
73:21, 73:25, 74:10,
74:18, 81:8, 83:20,
84:4, 86:15, 93:14,
107:8, 107:9, 108:10,
110:18, 110:22,
110:23, 111:9,
112:22, 116:5,
116:17, 117:7, 121:14
**particularly** - 12:21,

34:19, 70:21, 72:6
**parties** - 2:4, 132:17
**parts** - 68:4
**party** - 2:15, 2:16
**pass** - 40:16
**past** - 11:10, 17:1
**pathway** - 10:17
**patient** - 9:7, 11:2,
12:14, 22:16, 25:20,
26:8, 33:24, 34:11,
37:19, 43:19, 43:20,
44:2, 44:3, 44:5, 49:7,
49:14, 52:6, 58:11,
69:1, 69:7, 72:7,
80:20, 81:1, 81:10,
81:15, 81:19, 85:15,
85:19, 86:15, 87:9,
87:23, 95:5, 95:6,
96:8, 107:19, 108:9,
109:14, 110:1, 112:6,
112:16, 115:4, 115:6,
116:3, 118:16,
121:15, 122:16
**patient's** - 15:7,
15:12, 16:1, 25:2,
43:21, 66:20, 66:25,
84:20, 85:3, 85:11,
88:3, 108:19, 108:22,
109:24, 123:8,
123:11, 125:11,
125:12, 125:13
**patients** - 4:23,
7:11, 12:24, 26:22,
34:22, 37:11, 37:23,
52:10, 54:22, 64:2,
79:22, 80:2, 80:9,
80:14, 82:5, 82:14,
83:10, 83:18, 83:22,
86:7, 88:7, 94:19,
97:15, 104:4, 119:2
**patients'** - 85:7
**pattern** - 10:14,
47:22, 67:10, 69:3,
69:7
**pay** - 7:4, 27:18,
30:10, 31:10, 52:14,
57:23, 120:3, 127:5
**payer** - 94:20, 94:23
**paying** - 27:17
**peer** - 38:2, 92:12,
92:25
**people** - 18:8, 36:6,
36:9, 46:4, 63:15,
82:11, 87:7
**per** - 21:22, 123:6
**percent** - 51:8,
79:22, 107:5
**percentage** - 34:9
**performed** - 41:3,
41:8, 41:13, 42:4,
42:15, 62:23, 71:20,
98:14, 122:14
**period** - 49:24,
103:9, 103:17
**periods** - 28:10
**peripheral** - 72:20
**permanent** - 15:7
**peroneus** - 41:14
**person** - 68:13,
68:15, 74:20, 82:8,
114:18, 115:11
**person's** - 26:3,
112:25, 114:23
**personal** - 37:15,
88:4, 132:12
**Personality** - 83:19
**personally** - 50:16,
81:4, 125:5, 132:11
**Pharmacy** - 58:6
**physiatry** - 38:21

**physical** - 5:6, 10:7,
15:9, 34:24, 38:6,
38:18, 38:22, 38:24,
51:15, 84:25, 85:13,
105:16, 105:18,
115:8, 116:19,
118:17, 118:20,
123:21
**physically** - 15:11
**physician** - 3:24,
4:6, 7:7, 7:13, 19:9,
22:17, 31:7, 37:17,
37:22, 43:18, 44:1,
44:14, 45:18, 46:13,
46:18, 46:25, 47:8,
47:15, 55:17, 56:8,
56:25, 66:12, 67:3,
72:9, 73:6, 79:14,
87:22, 92:17, 108:19,
109:20, 110:6,
114:22, 122:5,
122:14, 124:3
**physician's** -
122:17, 122:18,
123:6, 124:16
**Physicians** - 44:12
**physicians** - 9:5,
38:23, 38:25, 46:10,
79:7, 124:17
**picture** - 65:4,
68:21, 85:2
**piece** - 116:2
**pieces** - 60:21
**pills** - 33:11
**pinch** - 73:20
**pinched** - 74:2
**pinching** - 74:2,
74:14
**pinprick** - 10:13
**place** - 46:15,
75:21, 84:14, 98:16,
132:9
**Plaintiff** - 1:6, 1:12
**plaintiff** - 23:10
**Plaintiff's** - 4:2,
16:15, 65:2, 128:13,
129:1, 130:1, 131:1
**plaintiff's** - 23:13,
60:23, 122:12
**Plaintiffs** - 1:21
**planned** - 93:9
**plant** - 6:20, 22:24,
106:14
**pleasant** - 37:8
**Plus** - 77:24
**point** - 15:20, 17:15,
17:19, 17:20, 18:19,
20:18, 20:21, 28:12,
29:4, 30:20, 32:18,
41:7, 41:13, 42:3,
42:10, 42:14, 42:17,
49:10, 49:25, 50:6,
50:12, 50:24, 53:10,
60:14, 62:5, 65:24,
66:2, 70:4, 70:23,
78:23, 85:16, 86:14,
92:18, 93:2, 95:17,
100:13, 103:5,
103:25, 104:18
**pokes** - 73:18
**poking** - 113:17
**policy** - 15:8
**polyneuropathy** -
99:14
**poor** - 62:8
**poorly** - 11:14
**population** - 52:6
**pose** - 18:10
**position** - 73:12,
77:13, 79:15, 118:8

**possible** - 62:8,
81:23, 97:23, 106:18,
106:24, 112:7, 115:23
**Possibly** - 54:15,
72:14
**postgraduate** - 4:19
**postoperative** - 5:1
**practice** - 4:10,
5:25, 6:10, 15:24,
15:25, 25:2, 92:15,
104:12
**practiced** - 5:23
**preapproval** - 29:1,
30:4
**preauthorization** -
29:22
**precertification** -
58:12, 58:22
**precertifications** -
59:10
**predicate** - 22:10,
24:8, 36:2, 43:16,
48:5, 49:3, 50:10,
51:4, 51:21, 52:23,
53:5, 55:3, 59:5,
59:24, 60:13, 98:25,
100:2, 101:7, 122:11,
127:23, 128:4
**prefer** - 16:23,
43:18
**preferred** - 94:4,
94:12
**prescribe** - 26:6
**prescribed** - 12:9,
33:12, 33:16, 33:21,
33:25, 62:16, 64:13,
64:14
**prescription** - 8:5,
8:17, 8:19, 33:8,
33:14, 33:18, 35:19
**prescriptions** -
32:24, 33:2, 58:10
**presence** - 25:16,
7:8, 123:22, 123:25
**present** - 100:23,
107:24, 124:1, 125:24
**Present** - 1:24
**presentation** -
18:24, 22:3, 27:4,
55:9, 107:18, 109:15
**presented** - 45:5,
93:10, 115:19
**presents** - 22:16,
35:6, 35:7, 73:15
**president** - 44:13
**pressure** - 76:14,
76:18, 101:3
**pretty** - 19:18,
82:11, 87:25
**previous** - 116:13
**primarily** - 4:24,
8:3, 83:21
**primary** - 4:11,
7:11, 109:25
**private** - 5:25
**probable** - 62:7
**problem** - 5:10,
18:9, 23:2, 36:8,
50:20, 69:17, 70:14,
70:22, 72:11, 73:4,
73:11, 74:5, 76:10,
81:8
**problems** - 4:25,
5:2, 6:23, 9:14, 29:14,
55:11, 69:24, 75:9,
75:19, 76:17, 77:3,
97:16, 100:11
**procedure** - 103:25
**Procedure** - 1:14
**procedures** - 58:10,

59:13, 59:15
**proceedings** -
132:8
**process** - 17:25,
34:16, 39:3, 39:7,
39:8, 39:9, 58:12,
92:20, 93:3, 104:10,
113:1, 113:21, 114:4,
114:14, 114:25,
115:11, 115:17
**processes** - 56:8
**professional** -
42:22
**prognosticate** -
104:19
**program** - 28:23,
83:2
**prolonged** - 12:18,
13:5
**properly** - 122:11
**proposed** - 90:13
**protocol** - 34:9
**protocols** - 34:1
**protruding** - 73:16
**provide** - 40:22
**provided** - 23:17,
41:6, 43:2, 51:7,
58:10, 91:6, 91:16,
95:17, 95:21, 121:9
**providing** - 48:9,
90:6, 96:1
**psychiatric** - 82:25,
83:14
**psychological** -
82:25, 83:14, 84:20
**psychologist** -
83:20
**Public** - 1:15, 2:6,
132:5, 132:25
**pulposus** - 8:11
**purely** - 25:15
**purpose** - 12:12,
17:24, 25:13, 27:7,
47:2, 72:16, 120:23
**pursuant** - 1:13,
1:18
**put** - 8:1, 32:3,
65:24, 73:12, 78:23,
79:24, 99:1
**puts** - 79:14
**putting** - 46:14,
85:20

**Q**

**qualifications** -
3:23
**quality** - 51:11,
53:18, 81:14
**questioning** -
46:23, 94:20, 112:9
**questions** - 2:13,
3:12, 4:5, 38:1, 45:6,
47:7, 64:22, 65:9,
65:18, 96:18
**quick** - 17:9
**quiet** - 17:24
**quite** - 4:11, 68:21
**quote** - 91:5
**quoted** - 60:22

**R**

**radicular** - 69:3,
69:6
**radiculopathy** -
98:16, 99:17
**radiographic** -
116:19, 123:1
**radiology** - 71:2

**raised** - 45:11
**range** - 52:6, 80:18, 88:20, 88:22
**rather** - 26:16, 48:8
**Rather-** 78:22
**rationale** - 28:6, 28:8, 28:24, 30:17, 30:22
**rattle** - 78:8
**ray** - 79:10
**rays** - 116:14
**reach** - 80:24, 81:4, 94:9, 110:6, 110:11
**reached** - 21:15
**read** - 2:17, 11:13, 11:18, 11:22, 11:24, 24:11, 89:24, 91:3, 98:21, 99:12, 99:13, 111:13, 111:18, 112:13
**reading** - 43:22, 89:21, 90:17
**real** - 17:9, 115:15
**realistic** - 82:12
**Really-** 11:21, 25:18
**really** - 9:20, 11:17, 11:24, 12:14, 15:23, 18:21, 25:15, 56:21, 59:25, 72:13, 79:4, 85:9, 86:8, 101:23
**reason** - 6:7, 13:2, 22:17, 22:21, 23:2, 25:24, 25:25, 36:8, 65:25, 95:11, 116:21, 117:5
**reasonable** - 52:7, 55:23, 89:1, 107:10, 123:20
**reasonably** - 10:9
**reasons** - 25:19, 63:14, 80:7
**rebuttal** - 64:19
**rebuttals** - 96:21
**receive** - 9:4, 56:25, 57:1, 58:13, 59:8, 70:9, 76:23, 93:1
**received** - 14:1, 14:13, 14:18, 21:13, 22:7, 39:4, 56:16, 59:12, 84:7, 95:13
**receiving** - 105:13
**recent** - 28:15
**recesses** - 98:9, 99:20
**recollection** - 57:18, 93:14
**recommendations** - 94:24
**recommended** - 83:15, 90:18, 92:3
**record** - 3:18, 3:20, 3:22, 13:21, 15:7, 15:13, 15:15, 15:19, 15:20, 16:2, 16:4, 16:5, 27:12, 29:17, 41:2, 42:16, 44:15, 44:21, 47:5, 47:17, 56:14, 83:23, 85:24, 89:16, 89:18, 90:17, 94:1, 94:9, 95:25, 99:1, 99:6, 120:25, 128:6
**recorded** - 41:3
**records** - 11:5, 11:7, 11:12, 14:14, 15:4, 15:5, 19:5, 38:1, 41:1, 41:18, 42:10, 42:21, 43:3, 43:22, 57:7, 71:19, 71:25, 75:18, 75:22, 83:12,

89:11, 93:9, 94:15, 95:13, 96:2, 96:10, 106:12, 116:4, 121:20, 122:6
**recreation** - 82:21
**reduce** - 53:11, 53:16, 53:17, 81:13
**refer** - 7:12, 56:23, 123:10
**reference** - 86:14, 89:23, 91:13
**referral** - 7:12, 83:5
**referred** - 7:6, 20:11, 56:11, 75:15, 96:6, 119:2
**referring** - 7:13, 9:5, 81:11, 114:11, 127:17
**refill** - 33:12
**refills** - 35:19, 62:14
**reflect** - 42:10, 75:19
**reflected** - 14:2, 71:25, 106:13
**reflects** - 92:10
**regain** - 85:11
**regard** - 51:23, 66:12, 77:13, 83:16, 92:19, 118:8, 119:11
**regarding** - 3:10, 7:2, 24:5, 40:11, 47:14, 56:5, 59:21, 59:22, 60:5, 90:25, 121:21, 122:16, 123:11, 123:16, 125:10
**regardless** - 81:8, 85:6, 110:19
**Regardless-** 31:9
**regimen** - 47:9, 47:11, 54:18, 55:15, 62:11, 101:19
**regular** - 9:1, 46:16, 46:24
**regularly** - 63:22
**regulated** - 24:24, 51:2
**rehab** - 38:19
**rehabilitation** - 12:12, 38:7
**reinstated** - 56:9
**relate** - 52:2, 69:8, 87:8, 112:6, 118:17
**related** - 7:5, 21:1, 21:14, 22:22, 23:18, 23:21, 23:22, 23:23, 29:14, 42:24, 69:17, 70:20, 70:21, 71:1, 72:11, 73:5, 74:3, 76:4, 77:4, 78:2, 78:16, 100:10, 100:13, 108:1, 127:6, 127:10, 127:20, 127:21, 132:18
**relates** - 67:15, 127:13
**relationship** - 100:25, 107:7, 107:13
**relative** - 86:14
**relatively** - 78:19
**relaxer** - 10:25, 14:8
**relied** - 11:25, 67:3, 112:6
**relief** - 12:18, 52:7, 89:2
**rely** - 68:16, 81:1, 81:2, 117:10, 121:7, 121:12, 124:18
**relying** - 66:20, 119:10
**remember** - 93:25,

111:14, 111:15, 111:19
**remove** - 102:5
**renal** - 76:13, 76:16, 76:25, 78:16
**rendered** - 101:17
**Rental-** 1:8
**repeat** - 90:15
**repetitive** - 103:2
**rephrase** - 3:17, 109:5, 109:8
**report** - 21:10, 41:4, 66:25, 75:12, 75:13, 75:16, 96:11, 99:11, 104:1, 107:2, 107:3, 108:8, 108:20, 109:24, 112:12, 112:14
**reported** - 9:15, 74:22, 76:1, 76:6, 76:12, 105:5, 106:6, 111:10, 118:10
**Reporter-** 61:6, 111:21
**reporter** - 78:11, 111:13
**reporting** - 54:17, 102:7, 108:9, 110:2
**reports** - 66:20, 100:24
**represent** - 3:9, 65:17
**request** - 7:25, 28:4, 28:19, 28:22, 28:25, 56:20, 83:24, 84:2, 84:18, 84:21, 90:6, 90:19, 91:20, 92:24, 117:11
**requested** - 29:10, 29:21, 30:10, 58:23, 62:13, 104:3
**requesting** - 29:9, 94:14
**requests** - 57:10, 57:14
**required** - 18:19
**reservation** - 120:22
**reserve** - 119:18, 120:6, 120:10, 120:17
**reserved** - 61:4
**resonance** - 71:6, 123:1
**resources** - 52:15
**respiratory** - 54:4
**respond** - 48:19, 80:2
**responded** - 81:10
**response** - 28:16, 30:19, 72:23, 123:21
**responses** - 95:3
**responsible** - 23:16, 127:14
**rest** - 76:5
**result** - 18:14, 23:10, 76:14, 77:17, 78:1, 84:9, 84:10, 102:3, 107:11, 113:13, 113:19, 117:3
**resulting** - 76:17
**results** - 10:6, 84:1, 99:10, 99:12, 99:13, 100:17, 100:22, 100:23, 114:5
**Resumed-** 97:3, 106:3, 121:6, 122:3, 126:24
**retention** - 54:4, 77:17
**review** - 9:5, 16:17,

21:8, 41:2, 41:5, 42:21, 57:2, 73:9, 92:13, 92:25, 99:5, 124:3, 125:2, 125:3, 125:4, 125:5, 125:8, 125:9, 126:3
**reviewed** - 40:25, 41:18, 60:16, 121:20, 126:5
**reviewing** - 90:13, 90:14, 124:9
**reviews** - 38:3, 92:12
**riding** - 28:9
**road** - 49:14
**roadmap** - 69:2, 69:13
**role** - 46:12, 46:24
**root** - 10:17, 67:15, 68:9, 68:14, 68:17, 68:25, 69:25, 70:16, 72:19, 73:21, 73:25, 74:1
**roots** - 67:17, 67:20, 67:24, 68:3, 68:5, 70:18, 98:8, 99:19, 113:23
**routine** - 103:2
**routinely** - 63:22
**row** - 63:16
**Rpr-** 1:14, 2:5, 132:4, 132:25
**ruled** - 2:18
**ruler** - 86:13
**Rules-** 1:13
**Ryder-** 1:8, 35:17, 37:1, 38:1, 56:4, 57:25, 58:3, 58:4, 59:1, 65:17

**S**

**sake** - 16:21, 16:22
**Sasser-** 1:5, 1:25, 3:9, 6:2, 6:6, 7:1, 11:6, 13:9, 13:12, 17:11, 19:7, 19:11, 21:12, 21:17, 22:20, 24:15, 29:23, 31:19, 32:2, 35:21, 38:4, 44:19, 48:9, 49:22, 51:7, 52:9, 54:9, 57:11, 59:16, 62:1, 62:3, 66:15, 67:11, 74:21, 75:20, 78:12, 83:16, 88:14, 89:6, 95:13, 95:17, 96:3, 96:11, 96:13, 97:10, 101:17, 103:23, 104:13, 104:21, 108:9, 111:11, 112:3, 115:19, 115:25, 117:8, 118:3, 118:10, 121:22, 122:14, 122:16
**Sasser's-** 6:8, 21:21, 22:3, 25:8, 27:4, 32:12, 35:15, 49:16, 49:17, 58:23, 62:10, 83:23, 102:19, 102:22, 112:13, 115:7, 117:14
**sat** - 36:19
**save** - 64:18
**saw** - 6:6, 18:2, 27:9, 31:16, 48:14, 66:7, 98:17, 98:18, 100:19, 104:24, 107:17
**scale** - 52:3, 85:25,

86:5, 86:17, 87:10, 87:21, 88:6, 88:14, 101:10
**scan** - 16:1
**scans** - 71:7
**schedule** - 31:20, 103:21
**scheduled** - 24:23, 103:21
**schedules** - 32:8
**sciatica** - 8:10
**scope** - 45:17
**score** - 102:7, 102:9
**scores** - 52:1, 52:5, 81:2, 101:25
**screen** - 62:14
**screens** - 25:15, 62:18, 63:23, 64:8
**se** - 123:6
**second** - 22:15, 64:16, 127:10
**Second-** 79:1
**secretary** - 32:3, 32:8, 97:7
**secure** - 6:21
**sedation** - 54:7, 54:11, 63:18
**see** - 6:2, 8:4, 25:3, 37:22, 43:19, 59:15, 62:4, 71:7, 71:19, 82:14, 84:3, 93:18, 93:20, 93:24, 96:12, 107:11, 116:17, 127:16
**seeking** - 26:17, 26:18, 27:17
**seem** - 63:2, 65:25, 105:2
**selling** - 64:10
**send** - 11:6, 15:13, 57:7, 57:10, 57:14, 90:7
**sensation** - 10:12, 75:14, 75:17
**sense** - 50:20, 73:14, 79:20, 82:17, 107:2, 114:8
**sent** - 7:21, 9:13, 18:5, 20:23, 23:25, 27:21, 38:1, 92:7, 128:1
**separate** - 5:20, 15:11
**separately** - 14:24
**September-** 6:10, 8:6, 10:3, 19:6, 19:24, 20:3, 21:14, 23:12, 44:5, 48:20, 66:8, 85:24, 88:13, 89:4, 127:12
**series** - 95:20, 103:1, 114:14
**serve** - 71:12
**serves** - 68:9
**service** - 90:5, 94:21
**services** - 58:9, 83:14, 84:21
**serving** - 72:22
**set** - 11:2, 32:1, 104:2
**Setting** - 111:25
**settled** - 7:1, 127:2
**settlement** - 9:19, 23:5
**seven** - 34:13, 52:5, 88:21
**several** - 13:15, 21:16, 71:5, 95:14, 127:7
**shaking** - 19:2, 78:9

shall - 2:8, 2:18, 23:15
sheet - 8:17, 11:19, 84:4
shorthand - 132:10
show - 14:13, 98:6, 105:20, 105:24
showed - 10:8, 98:7, 98:15, 99:19, 100:17, 112:11
shown - 62:19
shows - 73:16, 95:5
Shumate - 1:22, 3:7, 3:9, 3:20, 44:22, 45:3, 45:14, 45:19, 45:24, 46:21, 47:3, 60:17, 60:25, 61:7, 61:12, 64:17, 65:8, 66:23, 89:14, 90:20, 97:3, 99:4, 105:25, 109:3, 110:10, 111:16, 115:13, 117:15, 118:12, 119:21, 120:7, 120:17, 121:1, 121:6, 121:24, 122:8, 122:20, 124:11, 125:17, 126:7, 126:15, 126:24, 128:11
side - 53:22, 53:24, 67:25, 73:19
signature - 2:11, 8:14
significant - 47:22, 47:23, 77:23
significantly - 51:1, 98:10
signs - 13:14
similar - 14:9, 52:10, 74:21, 118:22
similar-type - 52:10
simply - 27:6, 35:23, 80:2, 96:11
situation - 18:17, 35:15, 125:24
six - 4:19, 49:7, 52:5, 62:3, 88:17, 88:20, 96:8, 101:11, 102:10, 102:17
six-month - 4:19
sleepiness - 54:12, 63:18
sleeping - 35:10
sleepy - 63:10, 63:15
slur - 63:15
slurred - 63:2, 63:9, 63:18
small - 17:22
smaller - 36:9, 65:23, 67:20, 68:6, 68:7, 113:11
Smaller - 67:23
sneeze - 109:11
societies - 40:22
Society - 39:21
someone - 12:6, 15:13, 26:16, 34:1, 34:5, 37:4, 54:8, 63:2, 63:3, 63:9, 73:15, 82:7, 86:17, 97:4, 100:24, 103:6
sometimes - 33:9, 34:13, 35:9, 35:10, 52:2, 68:21, 71:16, 77:3, 81:24, 82:6, 87:16, 94:22, 95:2
Sometimes - 8:1, 68:19, 81:21, 94:25
somewhere - 64:10

sorry - 60:1, 60:25, 62:2, 64:16, 89:14
sort - 10:7, 15:1, 46:16, 52:5, 54:6, 56:24, 69:9, 81:5, 81:12, 91:15, 92:20, 110:13, 119:6
sorts - 10:10, 34:23, 82:22
sound - 37:3
source - 22:4
sources - 64:5
spasms - 17:17, 18:3, 18:13, 18:19, 19:11, 19:21, 20:6, 105:10
special - 5:3, 12:20
specialties - 78:21
specialty - 4:5, 4:9, 4:11, 38:19, 38:21, 38:25, 79:3
specific - 8:2, 34:9, 56:23, 112:6, 117:5, 121:14
specifically - 4:14, 7:13, 7:24, 9:23, 10:16, 12:22, 12:23, 23:7, 23:9, 38:5, 40:24, 63:21, 66:15, 69:18, 70:17, 72:17, 86:25, 94:3, 118:14, 123:10
specifying - 100:4
speech - 63:2, 63:9, 63:15, 63:18
speed - 6:25
spinal - 6:14, 8:9, 18:7, 19:12, 19:21, 20:6, 49:1, 67:18, 67:22, 70:12, 74:5, 105:10, 113:9, 113:23, 117:5, 123:23
spine - 6:13, 8:12, 68:1, 68:2, 68:3, 69:9, 70:10, 70:13, 70:15, 70:16, 70:25, 72:19, 73:2, 73:18, 75:5, 112:4, 113:10, 113:18
spontaneous - 114:7, 114:9, 114:10
spontaneously - 114:3
spur - 71:9, 73:1, 74:7
Stacey - 1:14, 2:5, 132:4
stack - 16:14
staff - 59:14, 92:20, 94:2
standards - 91:7
standpoint - 13:6, 22:12, 110:17
start - 35:11, 46:2, 66:5, 82:16, 85:23
started - 96:21, 107:24
starting - 66:2, 127:16
State - 1:15, 2:6, 132:1, 132:5, 132:25
state - 3:18, 12:3, 28:6, 73:10, 73:12, 77:13, 118:25
statement - 5:8, 49:12, 49:17, 49:20, 80:4, 109:2
statements - 99:22
states - 22:17, 40:24, 41:23, 42:20, 58:21

stating - 23:15
statistical - 78:17, 79:25
status - 54:7
stay - 63:16
stays - 12:16
stenograph - 132:10
stenographically - 2:9
stenosis - 6:14, 8:9, 18:7, 19:12, 19:21, 20:6, 49:1, 105:10, 105:13, 105:18, 113:4, 113:17, 113:12, 113:13, 114:2, 114:6, 114:7, 114:8, 114:17, 114:24, 116:22, 123:23
step - 109:18
steroid - 17:23, 49:8, 95:15, 96:1, 96:9
stick - 80:20
still - 28:18, 87:19, 128:7
stipulated - 2:3, 3:21, 8:3
Stipulation - 2:1
stipulations - 61:1, 61:8, 61:11
stop - 36:7, 37:18, 103:4
stopped - 27:13, 34:25, 35:13, 36:25
stopping - 104:17
story - 106:5, 106:6
straightforward - 72:14
strain - 18:11
strained - 6:21
strength - 14:10
strict - 105:17
strictly - 68:24, 85:5
structures - 113:22
studies - 71:14, 71:18, 72:16, 73:7, 73:9, 116:13, 118:18, 118:21, 118:22, 122:13, 122:15, 122:19, 123:1, 123:2, 123:5
study - 98:14, 99:10, 123:22
subjective - 53:17, 81:13, 85:5, 86:9, 87:20, 124:6, 124:7
subjectively - 54:17
subjectivity - 86:11
submit - 91:24
submitted - 21:11, 41:5, 44:9, 58:2
submitting - 90:6, 94:15
subpoenaed - 14:14
subsequent - 127:7
subspecialty - 4:12, 4:15, 38:8, 39:15, 79:3, 79:4
substance - 63:20
substances - 26:25, 27:7
substantiate - 123:18, 123:19
success - 101:24, 102:10, 102:19
Success - 101:24
successful - 79:21, 81:18, 82:23, 101:19

suddenly - 32:17, 34:25, 36:7, 36:25, 52:15, 104:17
suffered - 21:2, 50:8
sufficient - 30:18, 30:25, 31:3
sugar - 26:4
suitability - 91:18
summarize - 75:25
summarized - 60:23
summary - 44:24, 58:2, 59:7
supervision - 132:12
supply - 76:23
support - 28:18, 28:21, 91:7
supportive - 123:3
suppose - 117:17
supposed - 56:9, 93:13, 95:9
surgeon - 79:16, 118:15
surgery - 76:12
Surgery- 44:10
surprised - 36:15
surrounding - 113:22
suspect - 77:6
sustained - 23:10, 127:19
sweats - 35:8, 36:22
swelling - 77:16
sworn - 3:2
symptoms - 25:12, 53:17
syndrome - 8:9, 35:3, 35:5, 99:15
system - 15:2, 83:5

**T**

tablets - 36:23
talks - 97:10
taproot - 67:19, 67:21
techniques - 5:5
ten - 52:3, 86:18, 86:19, 86:23, 86:25, 88:2, 88:18, 101:11, 102:9, 102:10
Ten- 52:4
term - 34:23, 50:16, 50:18, 50:21, 68:22, 85:25, 106:25
terms - 64:7, 67:3, 67:8, 70:7, 70:18, 70:24, 72:9, 74:9, 74:17, 74:25, 79:17, 86:4, 108:22, 108:23, 114:12, 124:25
Terrance- 38:5
test - 25:16, 84:6
tested - 63:21, 73:3, 78:12
testified - 3:2, 64:25, 67:9, 85:22, 88:19, 98:2, 107:14, 111:7
testimony - 36:20, 66:19, 86:3, 111:14, 132:8
testing - 25:9, 25:23
tests - 55:9, 62:22, 71:2, 71:3, 71:10, 71:21, 98:21, 98:22, 100:15
themselves - 61:20, 64:4, 75:6

Theoretically- 63:5
therapists - 38:24
therapy - 5:6, 5:7, 38:22, 38:23
therefore - 58:23
thigh - 77:21
thinking - 36:24
third - 62:6
three - 10:25, 11:1, 13:5, 14:4, 14:5, 17:12, 23:17, 34:2, 34:12, 35:12, 35:13, 35:22, 63:16, 87:11
throughout - 49:23, 62:22
throw - 124:19
to-wit - 3:3
today - 7:1, 36:20, 64:25, 79:13, 117:15
together - 113:19
tomorrow - 87:17
took - 33:20, 84:13, 98:16
tool - 86:6, 86:9
top - 8:20, 68:1
Topamax- 33:8
tortuous - 15:1
totally - 59:3
touch - 10:12, 75:17
towards - 70:1, 77:19
town - 83:21
toxic - 54:6
Tpi- 28:11
Tpis- 28:10, 28:17
training - 4:17, 39:11
transcribed - 2:9, 132:11
transcript - 132:6, 132:7
transmit - 11:18
transmitted - 11:13
treat - 8:2, 7:22, 8:1, 12:20, 20:22, 31:20, 31:21, 43:4, 50:7, 79:19, 80:13, 85:19, 104:5, 104:6, 109:16, 110:20
treated - 19:24, 80:10, 98:18, 108:11, 109:14, 111:1, 111:11
treating - 9:15, 11:9, 19:9, 19:14, 20:4, 20:10, 24:2, 24:3, 31:6, 43:12, 45:17, 46:13, 46:18, 46:25, 47:14, 55:17, 56:25, 66:11, 67:3, 104:21, 108:13, 121:10, 127:19, 127:25
treatment - 7:4, 9:6, 9:20, 11:9, 12:6, 17:3, 19:22, 20:14, 24:21, 27:13, 27:18, 28:21, 29:1, 29:3, 29:9, 29:23, 30:9, 30:11, 31:4, 31:9, 32:14, 32:22, 35:18, 38:4, 41:6, 41:15, 41:18, 41:25, 42:2, 42:23, 43:1, 43:3, 45:22, 45:25, 46:7, 47:9, 47:10, 47:19, 48:25, 49:21, 50:2, 50:20, 50:25, 52:17, 53:1, 55:24, 56:20, 56:23, 57:11, 59:17, 59:21, 59:22, 65:19, 65:22,

66:5, 75:20, 82:25, 83:16, 89:6, 90:12, 90:14, 90:18, 91:14, 92:3, 96:13, 98:3, 100:8, 101:16, 101:17, 109:1, 110:1, 118:3, 127:6, 127:9
  **treatment/coverage** - 58:24
  **treatments** - 50:5, 51:7, 51:13, 60:4, 80:3, 80:21, 81:23, 91:3
  **trial** - 2:19, 10:23, 61:5, 120:8
  **tried** - 81:6
  **Trigger** - 28:12, 41:13
  **trigger** - 17:15, 17:18, 17:20, 18:19, 20:18, 20:21, 29:4, 30:19, 41:7, 42:3, 42:10, 42:14, 42:17, 49:25, 50:6, 50:24, 95:17, 100:12, 103:25
  **triumvirate** - 81:12
  **Truck** - 1:8
  **true** - 22:19, 24:10, 62:9, 66:22, 88:24, 99:22, 132:7
  **truncated** - 39:8
  **truthful** - 48:2
  **try** - 96:15, 116:21
  **trying** - 85:18, 97:12, 102:14
  **tunnel** - 8:9, 9:18, 9:21, 99:15
  **turn** - 75:22
  **twisting** - 109:12
  **two** - 10:24, 13:4, 14:3, 33:11, 60:10, 74:3, 81:20, 81:21, 81:25, 87:11, 98:21
  **twofold** - 12:14
  **type** - 8:24, 9:4, 12:21, 12:23, 37:5, 52:10, 54:11, 92:12, 97:16, 105:22, 116:22, 118:9
  **types** - 5:3, 11:9, 33:10, 72:16
  **typical** - 19:15, 52:4, 54:2, 77:24
  **Typically** - 7:10, 7:25, 35:10, 54:5, 59:11, 59:18, 68:9, 86:16, 94:17, 119:8
  **typically** - 13:13, 34:7, 34:12, 35:5, 40:22, 49:14, 52:1, 53:16, 77:18, 92:23, 117:5

**U**

  **ultimately** - 93:2
  **unable** - 36:22
  **under** - 58:24, 132:11
  **underground** - 67:19
  **understood** - 7:19
  **unexpect** - 36:15
  **unfortunately** - 13:16, 83:25, 84:8
  **Unfortunately** - 8:5
  **uniform** - 87:23, 88:1
  **unique** - 15:24
  **unless** - 16:24,

79:25, 118:21
  **Unlikely** - 101:9
  **unlikely** - 105:17
  **unpleasant** - 37:14
  **unsuccessful** - 103:3
  **unusual** - 18:23
  **up** - 6:24, 11:3, 13:8, 13:9, 15:19, 32:1, 32:7, 42:9, 49:5, 52:21, 57:6, 63:16, 64:20, 70:13, 74:18, 77:21, 82:8, 84:13, 93:1, 94:13, 95:5, 95:14, 101:25, 104:1, 110:16
  **upped** - 14:3
  **ups** - 97:19
  **urinary** - 54:3
  **urine** - 25:15, 62:14, 62:22, 63:22
  **useful** - 83:1
  **usual** - 6:18, 61:1, 61:7, 61:10

**V**

  **Valium** - 28:14
  **valve** - 76:10, 76:12
  **various** - 5:5, 68:1, 95:18
  **vastus** - 41:8
  **velocity** - 71:13, 71:18
  **verbal** - 66:25, 116:3
  **versus** - 43:22, 58:16, 65:4, 102:9
  **visit** - 6:7, 6:8, 11:3, 11:21, 13:10, 16:20, 16:24, 17:13, 19:7, 21:20, 22:18, 28:5, 29:10, 42:9, 49:5, 66:9, 88:8, 89:5, 102:8, 103:21
  **visits** - 17:2, 21:16, 21:20
  **vital** - 13:14
  **voluntarily** - 34:6
  **vomiting** - 36:23, 54:3
  **Vs** - 1:7

**W**

  **waived** - 2:11
  **Wallace** - 7:17
  **wants** - 103:4
  **War** - 79:2
  **Watkins** - 1:14, 2:5, 132:4
  **weaning** - 34:8, 34:16, 35:23
  **whole** - 53:10, 60:16, 81:22, 85:2, 85:19
  **William** - 44:9
  **Wilson** - 38:6
  **Wilson's** - 59:20
  **window** - 124:20
  **wit** - 3:3
  **withdrawal** - 35:1, 35:5, 37:5
  **withdrawals** - 35:25
  **withhold** - 126:2
  **Witness** - 14:22, 19:2, 132:21
  **witness** - 2:11
  **word** - 55:7, 55:8, 74:13

  **worded** - 7:25
  **wording** - 29:7
  **words** - 12:24, 36:5, 74:6, 82:17, 106:12, 115:16, 123:22
  **work-related** - 21:14, 22:22, 23:23
  **workers'** - 3:11, 7:2, 19:8, 27:16, 29:23, 35:16, 58:7, 58:11, 58:24, 127:1, 127:3
  **works** - 76:16
  **workup** - 83:17
  **workwise** - 55:1
  **World** - 79:2
  **worse** - 28:9, 51:1, 82:19, 102:2, 102:11
  **worst** - 86:23, 87:5
  **written** - 8:4, 60:18, 90:6
  **Written** - 8:10
  **wrote** - 119:22

**X**

  **X-ray** - 79:10
  **X-rays** - 116:14

**Y**

  **y'all** - 83:4
  **year** - 6:11, 21:23, 33:14, 36:19, 41:9, 49:24, 66:6
  **years** - 5:25, 31:21, 34:3, 35:22, 48:15, 52:19, 54:10, 54:24, 79:5, 81:21, 81:25, 82:15, 98:18, 101:15, 101:16, 104:5, 127:8
  **yourself** - 103:13

**Z**

  **Zanaflex** - 11:1, 14:7
  **zero** - 86:18, 86:19, 86:22, 87:10, 87:21
  **Zero** - 52:3, 87:7