# In The Matter Of:

*Johnny W. Sasser v.*
*Ryder Truck Rental, Inc., et al.*

---

*Margaret Lloyd*
*September 14, 2007*

---

*American Court Reporting Company, Inc.*
*52 Executive Park S, Suite 5201*
*Atlanta, Georgia 30329*
*800-445-2842*
*WWW.ACRGA.COM*

Original File 54308.TXT, Pages 2-108 (107)

**Word Index included with this Min-U-Script®**

This Page Intentionally Left Blank

11:05                                                                    Page 3

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY W. SASSER,                    )
                                     )
        Plaintiff,                   )
                                     ) CIVIL ACTION
        vs.                          )
                                     ) 2:06-cv-593-CSC
RYDER TRUCK RENTAL, INC., d/b/a )
RYDER DEDICATED LOGISTICS, INC., )
a/k/a RYDER INTEGRATED LOGISTICS,)
INC., RYDER SERVICES CORPORATION )
and MARTYE LLOYD,                    )
                                     )
        Defendants.                  )

- - -

        The deposition of MARGARET LLOYD, taken
on behalf of the Plaintiff, taken pursuant to the
stipulations contained herein; the reading and signing
of the deposition being reserved; taken before Monique
M. McNally, Certified Court Reporter, commencing at
05 a.m., on the 14th day of September, 2007, at The
Peachtree, 1355 Peachtree Street, NE, Suite 300,
Atlanta, Georgia.

---

Page 3

CONTENTS
EXAMINATION

                                                    Page
Cross-Examination by Ms. Shumate....................4
Direct Examination by Mr. Knott...................102
Further Cross-Examination by Ms. Shumate..........103

EXHIBITS

| Plaintiff's Exhibit No. | Description | Page Marked |
|---|---|---|
| 1 | Letter Dated 6/17/04 | 105 |

---

Page 2

[1] APPEARANCES OF COUNSEL:
[2] For the Plaintiff:
[3]         AMY M. SHUMATE, Esq.
            Amy M. Shumate, P.C.
[4]         519 S. Oates
            Dothan, Alabama  36301
[5]         (334) 673-0729
[6] For the Defendants:
[7]         CONLEY W. KNOTT, Esq.
            Austill, Lewis & Simms, P.C.
[8]         P.O. Box 11927
            Birmingham, Alabama  35202-1927
[9]         (205) 870-3767
[10] Also Present:
[11]        KIMBERLY GALLE

---

Page 4

PROCEEDINGS
(Whereupon, the witness was sworn in by the
court reporter.)
**MS. SHUMATE:**  Usual stipulations?
**MR. KNOTT:**  That's fine.
MARGARET LLOYD,
being first duly sworn, was deposed and testified as
follows:

**CROSS-EXAMINATION**
BY MS. SHUMATE:
Q   Ms. Lloyd, I'm Amy Shumate.  I am
Mr. Sasser's attorney and I'm going to be asking you
some questions.
Have you ever been deposed before?
A   No.
Q   Well, let me just explain briefly what
it's about.  I'm going to ask you questions.  The
purpose of my questions is to find out what you know.
You're a defendant in this lawsuit, so certainly what
you would have information for court purposes.
So I'm going to ask you questions.  It might
not be things I can't ask or will ask in court, but
it's things so I can discover what else is out there.
If at any time I ask a question and you
don't understand my question, tell me, I don't

---

**Page 5**

[1] understand what you're asking.  Because we're going to
[2] read it later in paper form.  And unfortunately, our
[3] facial expressions and our inflection is not on paper.
[4]      So I'm going to assume that what you answer,
[5] that you understood the question unless you said
[6] otherwise.  So make sure we're on the same page with
[7] the question so we don't misconstrue each other --
[8]      A    Okay.
[9]      Q    -- because that's not fair to you or to me,
[10] okay?
[11]      A    (Witness nods head affirmatively.)
[12]      Q    The court reporter is going to take down
[13] everything we both say.  It's also being recorded, so
[14] she needs audible answers.
[15]      Nods and head shakes don't do well on tape
[16] and don't do well for her.  So if we do all of our
[17] things audibly, yes, no, that kind of thing, that will
[18] help her out a lot.  Uh-huhs and uh-uhs, she can type
[19] them, but they don't read clearly later, if that's all
[20] right, okay?
[21]      A    Okay.
[22]      Q    If you need to take a break, tell your
[23] attorney.  We'll be happy to stop and take a break.
[24] If I need to take a break, I'll tell you, too, okay?
[25]      A    (Witness nods head affirmatively.)

---

**Page 6**

[1]      Q    I do have a tendency to when I get going, my
[2] speed goes faster and faster and faster.  So if that's
[3] a problem, just tell me whoa and I'll be okay with
[4] that, too.  I'm not easily offended, so you don't have
[5] to worry about that.
[6]      Can you please state your name and address
[7] for the record?
[8]      A    Margaret Mason Lloyd, 292 Harmony Lake
[9] Drive, Canton, Georgia 30115.
[10]      Q    Ms. Lloyd, how old are you?
[11]      A    44.
[12]      Q    I'm sorry to ask.
[13]      A    That's okay.
[14]      Q    What's your education background, just
[15] beginning with college for me?
[16]      A    I went to two years of college for a
[17] psychology major.  And then I finished at a local
[18] vocational school with a legal secretarial degree.
[19]      Q    And your Social Security number?
[20]      A    ████████
[21]      Q    And are you married?
[22]      A    I'm widowed.
[23]      Q    Do you have any children?
[24]      A    No.
[25]      Q    And would you just give me a brief history

---

**Page 7**

[1] of your work history.  I mean, I don't care about
[2] McDonald's and college, but what you consider
[3] professional work history, when that started and what
[4] you've done through the present.
[5]      A    I began as a secretary in a sales company in
[6] 1984.  And I had secretarial jobs up until Kemper,
[7] which is where I started in the claim department in
[8] 1993 and became a senior adjustor in 1998 at Kemper.
[9] Well, no, I'm sorry, Kemper I was a junior adjustor.
[10]      I became a senior by leaving and going to
[11] InServices, a third-party administrator.  I was there
[12] until they closed their office.  And I went to
[13] Reliance or Cambridge and they closed.
[14]      I went to Ryder, which is self-insured until
[15] 2007.  And now I'm at Berkshire Hathaway as a senior
[16] adjustor.
[17]      Q    Let's start with the Kemper.
[18]      A    Okay.
[19]      Q    What type of claims did you adjust for
[20] Kemper?
[21]      A    Workers' compensation only and I started
[22] doing just Georgia.  And then about a year into it
[23] they added Alabama.  I was an assistant to a senior
[24] and I had my own lost time claims.
[25]      Q    And what type of vocational training or

---

**Page 8**

[1] education did you get for that particular kind of
[2] job?
[3]      A    They put us through a three or four-week
[4] course at Kemper in-house, the pictorial series of
[5] medical tests, interpreting and recording statements
[6] and that kind of thing before they actually had us
[7] start claims.
[8]      Q    And when you went to InServices -- and how
[9] do you spell that?
[10]      A    I-n, capital S-e-r-v-i-c-e-s.
[11]      Q    And what did you do for them?
[12]      A    I was a senior -- I became a senior adjustor
[13] when I went there.  And I was in-house at a client's
[14] office and was their designated adjustor, strictly
[15] workers' compensation.  And they had all the southeast
[16] states, so I handled several different states.
[17]      Q    And was that all types of injuries or was
[18] there specific injuries that you dealt with or all
[19] types of workers' comp injuries?
[20]      A    All workers' comp.
[21]      Q    When you went to InServices, did you have
[22] any additional training, other than the three to
[23] four-week course you took at Kemper?
[24]      A    Near the very end of my service at
[25] InServices, I got my -- a local license for workers'

---

Page 9

[1] compensation in Georgia. It wasn't in all lines. It
[2] was strictly a certification for workers'
[3] compensation.
[4]     Q   And what does that mean? Explain that to
[5] us.
[6]     A   Well, in Georgia you're supposed to be a
[7] licensed adjustor if you work for a carrier or a
[8] self-insured. This was for people that were
[9] third-party administrators, whatever.
[10]         It was sort of like having a license for an
[11] adjustor, but just for workers' compensation. And the
[12] state board recognized it as you were considered a
[13] certified adjustor versus a licensed adjustor.
[14]     Q   So you were certified at that time?
[15]     A   I was certified in the state of Georgia,
[16] yes.
[17]     Q   And what did you have to do to become
[18] certified?
[19]     A   Take a three-day -- I think it was a
[20] three -- maybe a five-day course, lectures and so
[21] forth and then a test. And I also started my Alabama
[22] certificate process in 1996, I think.
[23]     Q   And so you also hold a certificate for
[24] Alabama?
[25]     A   I did through 2006.

Page 10

[1]     Q   And what did you have to do to get your
[2] Alabama certification?
[3]     A   Go to a seminar once a year for a day and a
[4] half.
[5]     Q   Did they have reciprocity for your Georgia
[6] certification?
[7]     A   No. Not Alabama, no.
[8]     Q   So you don't have to do any tests or take a
[9] course or anything?
[10]     A   In Georgia?
[11]     Q   Alabama?
[12]     A   In Alabama?
[13]     Q   One course a year?
[14]     A   Uh-huh (affirmative).
[15]     Q   One day?
[16]     A   Uh-huh (affirmative).
[17]     Q   Now, these courses that you took, were they
[18] geared just for workers' comp or were they insurance
[19] adjusting in general?
[20]     A   The Alabama one?
[21]     Q   The Georgia one. Let's start there first,
[22] because that's where you first got certified.
[23]     A   In the beginning the certification was just
[24] workers' compensation and just for Georgia.
[25]     Q   And then when did you get your Alabama

Page 11

[1] certification?
[2]     A   Starting in 1996.
[3]     Q   '96?
[4]     A   Yeah, I think it was '96. And then I got my
[5] Georgia independent adjustor's license in 2001, I
[6] believe, and I've had it ever since.
[7]     Q   Now, when you went to Reliance or Cambridge
[8] is what I wrote down, what did you do for them?
[9]     A   A senior workers' comp adjustor.
[10]     Q   Again, any type of injuries?
[11]     A   Any type, uh-huh (affirmative).
[12]     Q   And are those -- the InService and Reliance
[13] and Kemper, are they actually independent insurance
[14] companies or was InService a third-party
[15] administrator?
[16]     A   InService was a third party. The other two
[17] were actual carriers.
[18]     Q   And how long did you work at Kemper? You
[19] probably told me and I just didn't remember.
[20]     A   As an adjustor?
[21]     Q   Yeah.
[22]     A   Five years.
[23]     Q   And you went to Ryder. Is that in '96 when
[24] you went to Ryder?
[25]     A   No, I went to InServices from Kemper. I was

Page 12

[1] there four years.
[2]     Q   When you went to Ryder --
[3]     A   I went to Ryder in 2001.
[4]     Q   2001, okay. And you went there as a
[5] workers' comp --
[6]     A   A senior adjustor.
[7]     Q   -- senior adjustor as well?
[8]     A   Yes.
[9]     Q   And when you went to Ryder, did they send
[10] you to any additional classes or courses, other than
[11] the one year you have to take for your Alabama
[12] certification?
[13]     A   For Alabama?
[14]     Q   Did Ryder send you to anything, period,
[15] Alabama or not? Did they send you to any additional
[16] classes?
[17]     A   Well, they paid for me to continue my
[18] Georgia license for an independent adjustor.
[19]     Q   And where were you located when you worked
[20] for Ryder?
[21]     A   Alpharetta, Georgia.
[22]     Q   Have you ever worked when you actually
[23] worked in the state of Alabama?
[24]     A   No.
[25]     Q   But you needed your Alabama certification in

Margaret Lloyd
September 14, 2007

Case 2:06-cv-00593-CSC    Document 38-2    Filed 11/15/2007    Page 6 of 38    Sasser v.
Ryder Truck Rental, Inc., et al.

## Page 13

[1] order to adjust claims that occurred in Alabama?

[2]    A   Yes.

[3]    Q   And those courses, the course that you took,

[4] the one-a-year course to get your certification in

[5] Alabama, what types of things did you discuss in those

[6] courses?

[7]    A   Well, the state puts on a seminar and you

[8] just basically participate as a listener.  And they

[9] have attorneys come.  They usually have a plaintiff

[10] attorney and a defense attorney.

[11]       They talk about case law update.  They have

[12] a medical, usually a doctor give an update on, you

[13] know, new medical technology and so forth.

[14]    Q   And is there a difference in the way you

[15] handled claims when you worked for a carrier versus

[16] working for a third-party administrator?

[17]    A   What do you mean by difference?

[18]    Q   I mean, I don't know how you handle them, so

[19] I'm not sure.  Was there any difference in your mind

[20] in the way we handle cases, the way you adjust the

[21] cases, set up medical treatment differently, anything

[22] like that that's different between a carrier and a

[23] self-insured?

[24]    A   No, it's still mandated by the state

[25] statutes.

## Page 14

[1]    Q   Did you ever deal with the Alabama

[2] Department of Industrial Relations and their workers'

[3] comp division or the ombudsman program or anything

[4] like that for the state of Alabama while you were

[5] adjusting Alabama claims?

[6]    A   By dealing with them, what do you mean?

[7]    Q   Have contact with them, communicate with

[8] them.

[9]    A   I communicated with the ombudsman in

[10] Mr. Sasser's case.

[11]    Q   You did?

[12]    A   Uh-huh (affirmative).

[13]    Q   Who was that person?

[14]    A   Sally Thames.

[15]    Q   Sally Thames?

[16]    A   Uh-huh (affirmative), T-h-a-m-e-s.

[17]    Q   Did you ever speak with Brenda Hicks with

[18] the Alabama Industrial Relations?

[19]    A   I don't remember.

[20]    Q   And what was the -- well, I'll come back to

[21] Ms. Thames.  We'll get to that when we get to

[22] Mr. Sasser in particular.

[23]       In your current job, who do you work for?

[24]    A   Berkshire, B-e-r-k-s-h-i-r-e, Hathaway.

[25]    Q   Are they --

## Page 15

[1]    A   They're workers' comp.  Well, they're a

[2] carrier and I'm a workers' compensation adjustor.

[3]    Q   And you worked here this year, starting this

[4] year?

[5]    A   Yeah, February of this year.

[6]    Q   Now, on your job with Ryder, during the time

[7] you were adjusting Mr. Sasser's claim, who was your

[8] immediate supervisor?

[9]    A   Well, first it was Dale Sequin, S-e-g --

[10] S-e-q-u-i-n.  Then he left the company and it was Greg

[11] Pitz, P-i-t-z.  And then they restructured the office

[12] and it became Kathy Fortier, F-o-r-t-i-e-r.

[13]    Q   Now, do you have a specific recollection on

[14] Mr. Sasser and his case, I mean, from your own memory?

[15]    A   Yes.

[16]    Q   Have you reviewed any documents to prepare

[17] for today's deposition?

[18]    A   Yes.

[19]    Q   And specifically tell us what you reviewed.

[20]    A   I look at his deposition.  I looked at your

[21] brief.  And I looked at some of the exhibits.

[22]    Q   To my brief?

[23]    A   Uh-huh (affirmative).  Well, I'm not sure if

[24] it was your brief.  It was the letters that I had sent

[25] to the doctors and the peer review notification to the

## Page 16

[1] doctors.

[2]    Q   And is that all you've reviewed?

[3]    A   Yes.

[4]    Q   Did you review any of your file or documents

[5] from when you worked at Ryder?

[6]    A   Yes.

[7]    Q   And was that provided to you specifically in

[8] preparation for the deposition?

[9]    A   Not exactly, no.  I looked at them when I

[10] knew I was leaving the company.  I looked back to

[11] refresh my memory as to the events, just because I

[12] thought that it would be a deposition situation.  It

[13] wasn't at the time.

[14]    Q   So you left the company in February?

[15]    A   February.

[16]    Q   So you reviewed your file with Ryder on

[17] Mr. Sasser in February of 2007?

[18]    A   Actually, I think my last day was January

[19] the 31st, so it was probably right before I left in

[20] January.

[21]    Q   And you have not reviewed those documents

[22] since --

[23]    A   No.

[24]    Q   -- other than what you mentioned you were

[25] shown?

Page 17

[1]  A   Correct.

[2]  Q   Do you understand that Mr. Knott and his

[3] firm also represents Ryder?

[4]  A   Yes.

[5]  Q   They represent you individually and Ryder?

[6]  A   Yes.

[7]  Q   Let's specifically talk about Mr. Sasser.

[8] When did you take over his claim?

[9]  A   To the best of my knowledge, I had his claim

[10] when I first came there for a short period of time,

[11] which would have been in -- I came there in November

[12] of '01.

[13]      And then in early 2002, they gave Alabama to

[14] another adjustor.  And when she left a few months

[15] later, it came back to me.  So there was about a

[16] six-month period that I did not handle it.

[17]  Q   Prior to your handling it when you first

[18] came there prior to your first handling of it, put it

[19] that way, do you know who was handling his claim?

[20]  A   Diane Bojanowski, B-o-j-a-n-o-w-s-k-i.  She

[21] was the adjustor that I replaced.

[22]  Q   And did she leave the company when --

[23]  A   Yes.

[24]  Q   -- you replaced her?

[25]  A   Yes.

Page 18

[1]  Q   Do you know where she is now?

[2]  A   She quit.  She had medical problems, so she

[3] quit completely, to my knowledge.

[4]  Q   Do you have any recent contact, meaning in

[5] the last few years with her, where she might be

[6] living?  Is she living in Atlanta or something like

[7] that?

[8]  A   About three years ago a Tennessee attorney

[9] mentioned that he had spoken to her and she was in

[10] Virginia.

[11]  Q   Do you know if she's married?

[12]  A   She is married.

[13]  Q   Her husband's name?

[14]  A   I don't know.

[15]  Q   B-o-j-a-n-o-w-s-k-i?

[16]  A   Yes.

[17]  Q   Who is Ellen Seinbolt?

[18]  A   She was the nurse case manager.  She was the

[19] telephonic nurse case manager at Ryder when I first

[20] started there.

[21]  Q   Now, describe for me what a telephonic nurse

[22] case manager does.

[23]  A   She's in our Ryder office and she makes

[24] phone calls on a lot of claims, but she's just calling

[25] for medical information to authorize medical treatment

Page 19

[1] to set up appointments and that kind of thing to help

[2] the adjustors with the medical aspect.  She is an RN.

[3]  Q   Now, when you took over Mr. Sasser's claim,

[4] did you at that point review what had happened up to

[5] that point with him and know what his claim was about?

[6]  A   Not immediately.  I looked over the basics

[7] of the claim just to know what it was we were -- you

[8] know, what kind of claim it was, but I didn't get into

[9] the specifics immediately.

[10]  Q   But did you know there was already a suit

[11] and a settlement and --

[12]  A   Yes.

[13]  Q   -- this was ongoing medical care?

[14]  A   I knew that he had settled his indemnity and

[15] that there was --

[16]  Q   Future medicals, basically?

[17]  A   Future medicals, yes.

[18]  Q   Now, do you remember when the first time was

[19] that you or someone at Ryder asked for a peer review

[20] on Mr. Sasser from a medical doctor?

[21]  A   I believe it was in 2002 or 2003.

[22]  Q   And why did that occur?

[23]  A   Because I couldn't understand -- two

[24] reasons.  I couldn't understand why Mr. Sasser was on

[25] so many drugs for a lumbar strain that happened almost

Page 20

[1] ten years prior, because that's the only diagnosis we

[2] saw.

[3]      And also because he was having a lot of

[4] drugs that he was claiming related to the claim that I

[5] recognized as drugs for heart conditions and other

[6] things that didn't seem related.

[7]      So I needed to just kind of get an overall

[8] view of how he was this far into his treatment.

[9]  Q   Was that your decision to call in for a peer

[10] review?

[11]  A   Yes.

[12]  Q   And is that something that -- senior claims

[13] adjustor; is that correct?

[14]  A   Yes.

[15]  Q   Is that something that would have been

[16] within your purview?

[17]  A   Yes.

[18]  Q   Is there a system at Ryder in place or a

[19] policy, I should say, at Ryder at that time that was

[20] in place that required peer reviews on any regular

[21] basis?

[22]  A   Not that I know of.

[23]  Q   So there was no Ryder policy that says after

[24] a certain number of years or after a certain number of

[25] dollars we're just going to start doing peer reviews,

Page 21

[1] no policy along that line?
[2]    A    No.  That would be for physical therapy
[3] duration and things, but not for just general
[4] treatment, no.
[5]    Q    So if you had not chosen to do a peer
[6] review, there would have been nobody over your head
[7] saying, you know, why has this not happened yet?
[8]    A    Oh, my manager may have.  In fact, she may
[9] have requested one and I don't recall.  But managers
[10] looked at our files very regularly.
[11]    A    And what were they looking at your files
[12] for?
[13]    A    To make sure we were paying attention to the
[14] file, that the file was current, that we were -- you
[15] know, had enough reserves in the file for payment,
[16] that we had a handle on what was going on on the file.
[17]    Q    Let's talk a little bit about how you adjust
[18] a file when you're dealing with future meds.
[19]         The case is settled, comp is over, we're
[20] dealing simply with future meds, what is your process
[21] as a senior claim's adjustor with Ryder for how you
[22] would handle that on an ongoing basis?  What's your
[23] job, I guess?
[24]    A    To review the medical reports as they come
[25] in with the bills.  Hopefully they'll come in with the

Page 22

[1] bills.  Just to be sure that everything is -- there's
[2] no new injury, no aggravation, that the treatment is
[3] still related directly to the workers' compensation
[4] injury, that the treatment is appropriate, as far as
[5] that the doctor is still addressing the same injury.
[6]    Q    And in your situation on these medicals,
[7] these medicines that you recognize yourself as not --
[8] you not believing they were related, did you request
[9] from the medical doctor who was his treating physician
[10] for an explanation of those particular medicals, those
[11] medicines?
[12]         Did you ever write the doctor and say, I
[13] noticed you're sending in these, are they related to
[14] his back or anything like that?
[15]    A    I know I asked for one specifically and I
[16] never got responses.  I seem to recall that I did ask
[17] the doctor for some clarification on information,
[18] because his notes were very vague and I never got
[19] responses.
[20]    Q    Do you know which doctor that was that you
[21] asked?
[22]    A    No.  The only two names I remember are
[23] Marsella and McGahan.
[24]    Q    Would it have been one of those two doctors?
[25]    A    Yes, it would have been one of those two.

Page 23

[1]    Q    So their records, I'm assuming, would
[2] reflect that or your file at Ryder would reflect if
[3] you wrote them letters regarding --
[4]    A    Yes.
[5]    Q    And who is the custodian, I guess, of that
[6] file.
[7]    A    Of the claim file?
[8]    Q    Yeah.
[9]    A    Well, I'm not sure what you mean by who
[10] is -- it's in the claim office at Ryder's Alpharetta
[11] office.
[12]    Q    Alpharetta office, okay.  But you do believe
[13] you wrote one of those two doctors about one of the
[14] medications?
[15]    A    Yes.
[16]    Q    And did not get a response?
[17]    A    Yes.
[18]    Q    Do you remember which medication that was,
[19] the name of the medication?
[20]    A    Plavix.
[21]    Q    Plavix, okay.  Was that the only medication
[22] that gave you concern?
[23]    A    No.
[24]    Q    What other medications gave you concern?
[25]    A    He had medications.  I don't remember the

Page 24

[1] names, but he had several that were for heart or
[2] blood and that's why I asked the doctor.  That
[3] particular letter was to ask him how that related.
[4]    Q    Was it only asking about Plavix or was it
[5] asking about all of them that you had a question
[6] with?
[7]    A    That specific one was about Plavix.
[8]    Q    If there had been other medicines that you
[9] were concerned about as you indicated, would you have
[10] first asked the treating physician for an explanation
[11] before a peer review?
[12]    A    Yes.
[13]    Q    And I'm assuming the file would show then
[14] that you did, in fact, write the doctor about those
[15] other medications as well before you asked for a peer
[16] review?
[17]    A    It should, yes.
[18]    Q    And if it does not -- and I don't know if it
[19] does or not because I haven't seen it.  If it does
[20] not, would you have any explanation if it does not why
[21] that would not have occurred?
[22]    A    There might not be a copy in the file just
[23] because it might not have gotten matched up in the
[24] file.  Just in drop filing there's a lot of paper.
[25]    Q    Do you have a specific recollection today of

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

Margaret Lloyd
September 14, 2007

---

Page 25

[1] having written more than one letter to a doctor about
[2] medications on Mr. Sasser?
[3]    A    No.
[4]    Q    Now, you said that you would review the
[5] medicals to see if there was no aggravation of the
[6] injury.
[7]        What would that make a difference, in your
[8] mind, as an adjustor?
[9]    A    Well, if you have a back injury and the
[10] employee -- and the doctor's notes say the employee
[11] was involved in a motor vehicle accident and sustained
[12] a severe injury to his back, that would make a
[13] significant difference.
[14]    Q    Would that make a new injury, in your
[15] opinion, or an aggravation?
[16]    A    A new injury.
[17]        MR. KNOTT: Object to the form.
[18] BY MS. SHUMATE:
[19]    Q    Well, you used the word no aggravation and
[20] then you said no new injury and then to see if the
[21] treatment was appropriate, those were the three things
[22] you mentioned.  So I'm just trying to clarify what you
[23] mean by those terms.
[24]        When you said to check the medicals to look
[25] for -- see if there was no aggravation of the injury,

---

Page 26

[1] I need to know what you mean by aggravation.  When you
[2] say no new injury, what you mean by that, that way I
[3] can know your terminology.  I want to be on the same
[4] page.
[5]        MR. KNOTT:  You're not asking for a legal
[6] conclusion?
[7]        MS. SHUMATE:  I'm asking her what she means
[8] by the words she used.
[9]        THE WITNESS:  Okay, aggravation is an
[10] intervening incident that created a significant
[11] change in his condition.
[12] BY MS. SHUMATE:
[13]    Q    And how about no new injury?
[14]    A    The new injury would be specifically he has
[15] a fractured disk or he has multiple levels of
[16] vertebrae fractures or some significant specific new
[17] finding.
[18]    Q    And for treatment, to make sure the
[19] treatment was appropriate, what would you look for
[20] there?
[21]    A    I'm not sure how to answer that.  You know,
[22] doctors will try different things throughout the time
[23] as time goes on in a chronic back like Mr. Sasser.
[24]        They might try physical therapy.  Okay,
[25] that's fine.  Are you doing it for stabilization or

---

Page 27

[1] are you doing it for strengthening, because your
[2] diagnosis has to match, you know, what you're
[3] suggesting they do.
[4]        So we just have to make sure that what he's
[5] doing is normal medical protocol for the diagnosis
[6] that he's given.
[7]    Q    In Alabama, particularly since this is an
[8] Alabama claim, let's deal with that.
[9]        Do you have an understanding as an adjustor,
[10] who is the person in charge of deciding whether a
[11] claimant is entitled or is in need of a particular
[12] medical procedure?
[13]        Who is the person who is in charge of that
[14] decision?  Is it the doctor, the company?  I mean, who
[15] is in charge of that decision?
[16]        MR. KNOTT:  Object to the form.
[17] BY MS. SHUMATE:
[18]    Q    You can answer anyway.
[19]    A    Repeat that question.
[20]    Q    Sure.  What is your understanding under the
[21] laws of Alabama as to who is in charge, who has the
[22] decision-making ability, I should say, the power to
[23] decide if a claimant is in need of a particular
[24] treatment?
[25]        MR. KNOTT:  Object to the form.

---

Page 28

[1]        THE WITNESS:  The doctor.
[2] BY MS. SHUMATE:
[3]    Q    And is it the doctor then who would be in
[4] charge of deciding if that treatment is appropriate
[5] for that patient's medical need?
[6]        MR. KNOTT:  Object to form.
[7]        THE WITNESS:  The medical need, yes.
[8] BY MS. SHUMATE:
[9]    Q    Now, when you say you were wanting to check
[10] whether the treatment was appropriate, are you meaning
[11] something other than a medical need?
[12]    A    No.  I'm talking about a medical need
[13] directly relating to the injury that is compensable
[14] under the workers' compensation claim.
[15]    Q    In Mr. Sasser's case, I mean, I'm sure
[16] you're aware that there was already a time when a
[17] Court was asked to intervene after his settlement
[18] because there were some medicals that were either in
[19] question or were not being paid; do you know that
[20] history?
[21]    A    I do now, yes.
[22]    Q    You were not involved in that process then,
[23] were you?
[24]    A    No.
[25]    Q    At the time you were adjusting the claim,

---

Page 29

[1] were you provided with court orders and the settlement
[2] papers, the court orders from Barbour County which
[3] governed his settlement?
[4]   A   They were in the file. The file was very
[5] large. There were several volumes. So it was not in
[6] the file that I had, the working file at the moment.
[7] I was not made aware of them immediately. I was when
[8] we began the peer review process.
[9]   Q   So at the time you were initially adjusting
[10] his claim, you were looking for the standard stuff, no
[11] aggravation, no new injury, was the treatment
[12] appropriate, you were not at that point aware of a
[13] court order directing specifically a particular doctor
[14] to make the decision as to what is necessary in his
[15] case? Are you aware of --
[16]   A   Are you talking about the second?
[17]   Q   Yeah.
[18]   A   No, I was not aware of that.
[19]   Q   Let me clear that up. Are you now aware
[20] that there was an order from the judge that said
[21] Dr. McGahan decided what is necessary and Ryder will
[22] pay what Mr. McGahan says is necessary?
[23]       MR. KNOTT: Object to form.
[24]       THE WITNESS: I am now.
[25] BY MS. SHUMATE:

Page 30

[1]   Q   At what point did you become aware of that
[2] order?
[3]   A   When we began copying the file for the
[4] peer -- second peer review.
[5]   Q   And when was the second peer review, to your
[6] knowledge?
[7]   A   I believe it was in 2004.
[8]   Q   2004, okay. How did you become aware of
[9] that court order that you had not been aware of for
[10] the prior two years or so?
[11]   A   Because I was pulling -- I pulled all the
[12] volumes and began copying the file to get it ready for
[13] the utilization of review process.
[14]   Q   Did that order, when you came across that
[15] order, what did you do with it, if anything?
[16]   A   Nothing. I read it.
[17]   Q   Did you discuss it with a supervisor?
[18]   A   I don't recall.
[19]   Q   Did that affect your action on Mr. Sasser's
[20] case in any way?
[21]   A   No.
[22]   Q   Were you aware at any time while you were
[23] adjusting Mr. Sasser's claim -- did you become aware
[24] during any time you were adjusting his claim, I should
[25] say, that Mr. McGahan was either no longer available

Page 31

[1] to Mr. Sasser or had moved out of his treatment area?
[2]   A   There were two situations. One, Mr. Sasser
[3] told me, and I don't remember when, that Dr. McGahan
[4] had moved. He did not indicate that he was unable to
[5] find him. He just indicated he had moved.
[6]       Then when we did the final utilization
[7] review and I notified all parties that the utilization
[8] review deemed treatment unnecessary, et cetera,
[9] information -- bills and such came back to us
[10] undeliverable to the address.
[11]       We even paid a bill that was mailed to us
[12] after that time from his office that was sent back.
[13] The check was sent back undeliverable to the address
[14] on his bill.
[15]   Q   So are you saying today that it is your
[16] recollection that you did not know Dr. McGahan was
[17] unavailable to him as a treating physician until after
[18] you made your final utilization review and the
[19] decision from that utilization review was known?
[20]   A   To my knowledge today, yes.
[21]   Q   Did you ask Mr. Sasser when he called and
[22] indicated that Dr. McGahan had moved, any details
[23] about that, whether he was still able to go see him as
[24] a doctor, where he had moved to?
[25]       Did you ask any questions specifically to

Page 32

[1] try to find that information out?
[2]   A   Well, again, he didn't tell me he couldn't
[3] reach him. He was seeing Dr. Marsella, too, and I
[4] don't remember which one was the more current.
[5]       But he didn't indicate to me that he was
[6] having trouble getting treatment. He said a lot about
[7] him having IRS issues and not wanting to prescribe
[8] narcotics to him.
[9]   Q   What I specifically asked you is, did you
[10] inquire from him, when he indicated he had moved,
[11] whether he was still able to get treatment from him,
[12] where Dr. McGahan had moved or anything along that
[13] line to try to discover that information?
[14]   A   No, I did not ask him because I did not know
[15] it was a problem at the time.
[16]   Q   At some point you knew that Mr. Sasser was
[17] treating with Dr. Marsella --
[18]   A   Yes.
[19]   Q   -- with pain management?
[20]       Was he already treating with Dr. Marsella
[21] when you took over the case?
[22]   A   Yes.
[23]   Q   And do you have any recollection as to
[24] whether Dr. Marsella was recognized by Ryder? Is it
[25] fair to say Ryder when I say dealing with the workers'

---

Page 33

[1] comp? Do I have to say IntraCorp or what do I need to
[2] say?
[3]    A   No, Ryder, Ryder.
[4]    Q   Ryder?
[5]    A   Yeah.
[6]    Q   As to whether Dr. Marsella was recognized by
[7] Ryder as a treating physician, an approved authorized
[8] treating physician for Mr. Sasser?
[9]    A   Was I aware that he was an approved?
[10]    Q   Do you have any knowledge whether he was or
[11] was not an approved physician?
[12]    A   Yes. When I took over the file, one of
[13] their standards is to have what's called a file plan
[14] in the file as current as possible.
[15]     And when Diane's last file plan was done,
[16] she said authorized treating physicians are
[17] Dr. Marsella and Dr. McGahan.
[18]    Q   Describe what a file plan is. What does it
[19] contain?
[20]    A   It contains the compensable accepted
[21] conditions, any denied injury or conditions, the
[22] authorized physicians, the general medical status,
[23] like maintain all medications, failed back syndrome,
[24] that kind of thing.
[25]     And then it has a plan of how to -- you

Page 34

[1] know, your plan to proceed with the file, that you'll
[2] monitor it on a 90-day diary or whatever.
[3]    Q   Now, you said an accepted compensable
[4] injury?
[5]    A   Yes. Like for instance, it will say, you
[6] know, L2-3 fractured vertebrae compensable, ankle
[7] fracture noncompensable, because we've received bills
[8] or they've asked us to cover it or something and we've
[9] determined that it wasn't related.
[10]    Q   And do you remember what the compensable
[11] injury was that was on Mr. Sasser's case plan or file
[12] plan from Diane at that time?
[13]    A   I believe it just said lumbar strain, low
[14] back pain.
[15]    Q   Lumbar strain, low back pain?
[16]    A   Uh-huh (affirmative).
[17]    Q   Do you know what the settlement paperwork
[18] indicated his injury was in the Circuit Court of
[19] Barbour County?
[20]    A   I do recall it mentioned the lumbar strain.
[21] I don't recall anything beyond that. Oh, correction.
[22] I do remember it mentioning carpal tunnel.
[23]    Q   And in what way did it mention carpal
[24] tunnel?
[25]    A   Just as -- that he had claimed carpal

Page 35

[1] tunnel.
[2]    Q   Do you know if it was listed as a denied
[3] injury or as a compensable injury on the plan?
[4]    A   I don't recall.
[5]    Q   Was it your understanding there was ever a
[6] carpal tunnel injury that was compensated by workers'
[7] -- by Ryder, whether through medical treatment or
[8] anything else on Mr. Sasser?
[9]    A   Mr. Sasser told me that he had had surgery,
[10] but we never talked beyond that about it, no.
[11]    Q   Do you know if Ryder ever denied or accepted
[12] carpal tunnel as a compensable injury and paid for any
[13] of his medicals related to carpal tunnel?
[14]    A   I don't know.
[15]    Q   Would that be in the Ryder file that's in
[16] Alpharetta?
[17]    A   It could be.
[18]    Q   Could it be somewhere else?
[19]    A   No. If there was a file for -- if there was
[20] a separate claim or if it was included in that claim,
[21] they would be in Ryder -- at Ryder.
[22]    Q   I just want to make sure when you say could
[23] be, it kind of indicated that it also could not be.
[24]    A   Oh, I'm sorry.
[25]    Q   And I didn't know if it was someplace else.

Page 36

[1] So if something like that exists, it should be in that
[2] file?
[3]    A   Well, when I say could be, because if they
[4] filed it as a separate claim, it might be two separate
[5] claims is what I mean.
[6]    Q   Do you know if it was part of the lawsuit
[7] and settlement?
[8]    A   I don't know.
[9]    Q   Were you aware of what Dr. McGahan said was
[10] Mr. Sasser's medical condition that he reported to the
[11] judge in Barbour County?
[12]    A   I don't recall specifically.
[13]    Q   Would that have been something you would
[14] have looked at at the time?
[15]    A   At what time?
[16]    Q   The time -- any time that you were adjusting
[17] his claim, would you have wanted to know what his
[18] treating physician said about his injury?
[19]    A   Yes, I would have read the documents. And
[20] again, it was when we were doing the peer reviews.
[21]     When I started handling the claim, because I
[22] knew they were handling it as a low back claim, when
[23] his medical records came in, I just simply confirmed
[24] that that's what he was seeing him for.
[25]    Q   And you would not have looked at that

---

Page 37

[1] document until the peer reviews began?

[2] **A** The settlement document, no, I did not.

[3] **Q** Or the document from the doctor, his
[4] treating physician indicating the specific nature of
[5] his injury?

[6] **MR. KNOTT:** For clarification, are you
[7] referring to the letter on Dr. McGahan's
[8] letterhead dated January 3, 2000?

[9] **MS. SHUMATE:** Or any of Dr. McGahan's
[10] records prior to the settlement indicating the
[11] nature of his injury.

[12] **MR. KNOTT:** So you're not referring to -- I
[13] want to know if you're referring to one in
[14] particular or if you're referring to one in
[15] general?

[16] **MS. SHUMATE:** Well, I will refer to one in
[17] particular. When I do, I'll get more specific
[18] with it.

[19] **MR. KNOTT:** Okay.

[20] **BY MS. SHUMATE:**

[21] **Q** I just want to know before the peer reviews
[22] began, did you ever look at McGahan's records to
[23] determine specifically beyond the little file plan or
[24] case plan, what specifically about his back we're
[25] dealing with besides low back pain and lumbar strain?

Page 38

[1] **A** No.

[2] **Q** Why?

[3] **A** Because when I came there it was -- they
[4] were paying for lumbar strain and he was treating him
[5] for a lumbar strain. Or he called it low back pain in
[6] his notes.

[7] And so I just -- when I started working the
[8] files, I confirmed the diagnosis is what we accepted
[9] and paid the bills.

[10] **Q** Do you believe in your years of experience
[11] of handling medical workers' compensation claims that
[12] there is a difference between low back pain and lumbar
[13] strain?

[14] **MR. KNOTT:** Object to the form.

[15] **BY MS. SHUMATE:**

[16] **Q** Do those two -- I'll ask. Are those terms
[17] synonymous for you or do they mean individual,
[18] different things?

[19] **A** Well, if you have a lumbar strain, you do
[20] have low back pain, but low back pain can also mean
[21] other things.

[22] **Q** Sure. Did you do anything when you took
[23] over his case to determine the nature of the low back
[24] pain, other than to just say lumbar strain?

[25] **A** No.

Page 39

[1] **Q** Did you ever do anything while you were
[2] adjusting his claim to determine the nature of, quote,
[3] low back pain?

[4] **A** His low back pain?

[5] **Q** Sure.

[6] **A** Yeah, I did a peer review.

[7] **Q** So you sent it to someone else to tell you
[8] that?

[9] **A** I sent it to a doctor to tell me that, yes.

[10] **Q** Did you personally ever look at
[11] Dr. McGahan's records to determine that before you
[12] sent it to peer review?

[13] **A** Again, you're talking about prior to --

[14] **Q** Sure. Dr. McGahan's records, his treating
[15] physician's records, did you ever personally look to
[16] say, you know, I wonder why he's having so much low
[17] back pain or why he's taking this medication, let me
[18] look at his treating physician's records, did you
[19] ever do that?

[20] **A** I looked back at them. I don't know how far
[21] back I went, and they were very short. They were just
[22] two or three little lines on each office visit, low
[23] back pain and two or three things about what he, you
[24] know, complained of that day and what they prescribed.

[25] **Q** Was Dr. McGahan's records the only records

Page 40

[1] you would have looked at prior to sending the case
[2] to peer review?

[3] **A** We would have looked at -- I would have
[4] looked at any medical records available.

[5] **Q** What other medical records besides
[6] Dr. McGahan and Dr. Marsella, because I'm making the
[7] assumption his were available?

[8] What other records, if any, were available
[9] to you at that time before you sent the case to peer
[10] review?

[11] **A** The only other thing I recall is the
[12] cardiologist, because I sent him a letter. I was
[13] concerned because Mr. Sasser was on very many
[14] medications.

[15] And I sent his cardiologist a letter about
[16] all his medications. And he kind of gave me a gist of
[17] his diagnosis and so forth.

[18] **Q** Now, he was not being treated by workers'
[19] comp for cardiac problems?

[20] **A** No.

[21] **Q** And so his cardiologist was not a workers'
[22] comp approved physician?

[23] **A** No.

[24] **Q** Was there a separate release signed by
[25] Mr. Sasser specifically to allow you to discuss his

Page 41

[1] medical treatment with non-workers' comp doctors?
[2]     A    I do not recall if we --
[3]     Q    Would you, in your opinion, think you needed
[4] a separate release to allow you to speak with doctors
[5] that are unrelated to --
[6]     A    Yes.
[7]     Q    -- this workers' comp injury?
[8]         If in fact there was a release -- if in fact
[9] you spoke with or wrote the cardiologist, would it be
[10] fair to say there will be a release in that file
[11] somewhere signed by Mr. Sasser?
[12]     A    I believe so, because I don't know any other
[13] way that I would have gotten the information as to who
[14] that doctor was.
[15]     Q    Would that be a release specifically for the
[16] cardiologist?
[17]     A    Yes.
[18]     Q    And I ask this question because I don't want
[19] to come back later and ask it.
[20]         If I look in that file and there is no such
[21] release, do you have any explanation for why it would
[22] not be there?
[23]     A    Only if Mr. Sasser gave me a verbal, but I
[24] don't recall the situation.
[25]     Q    Would the doctor's office -- is it the

Page 42

[1] normal course of their business to require a written
[2] release before they will discuss a case with you
[3] versus you telling them the patient said I can talk to
[4] you?
[5]         MR. KNOTT:  Object to the form with regard
[6]     to what the normal course of doctors --
[7]         THE WITNESS:  I don't know.
[8] BY MS. SHUMATE:
[9]     Q    You can answer the question.
[10]     A    I don't know.
[11]     Q    I mean, do you normally get releases and
[12] send them off to the doctor?
[13]     A    Typically doctors outside of workers' comp
[14] do not release information to us without a release.
[15]     Q    Sure.  And that's what you would think is
[16] normal?
[17]     A    Yes.
[18]     Q    They won't do it without a written release?
[19]     A    Correct.
[20]     Q    And if you obtained such a release for
[21] Mr. Sasser, would you have specifically told him that
[22] he was to talk to his cardiologist or to write or
[23] respond with non-workers' comp doctors?
[24]     A    Yes.
[25]     Q    And is it your understanding that release

Page 43

[1] would be specific for that doctor?
[2]     A    Sure, yes.
[3]     Q    What would be the need for you to correspond
[4] with a non -- if you're dealing with a back strain,
[5] low back pain, chronic back pain, whatever he's been
[6] treated for and by Dr. McGahan and Dr. Marsella that
[7] is compensable, why would you feel it necessary to
[8] talk to his cardiologist about his cardiac problems?
[9]     A    Because the pharmacist was billing us for
[10] every drug the man was taking.  And when I asked
[11] Mr. Sasser about it, he could not give me a clear
[12] explanation.
[13]         He didn't know what half of the drugs were.
[14] So I asked him if I could talk to his cardiologist and
[15] find out which drugs were for that and was he aware of
[16] all these other ones he was on and he said okay.
[17]     Q    And so you didn't just ask the cardiologist
[18] what are these drugs for, you also asked the
[19] cardiologist, are you aware he's also taking all these
[20] other medications?
[21]     A    Yes.
[22]     Q    Why would do that?
[23]     A    Because I know certain drugs are
[24] contraindicated with others and I don't know -- did
[25] not know if all this was helping or hurting.

Page 44

[1]     Q    Did you have any indication from his medical
[2] records that a doctor was not monitoring his
[3] medications to look -- I mean, that's their job, am I
[4] correct, to look for contraindications on medications;
[5] that's their job?
[6]     A    Okay.
[7]     Q    Am I right?
[8]     A    Is that a question?
[9]     Q    Yeah.  Isn't it their job to do that?
[10]     A    Sure, sure.
[11]     Q    But you felt it necessary for yourself to
[12] point out to a doctor, this patient is taking all this
[13] medication that I as a claim's adjustor might be
[14] concerned is contraindicated, so I need that doctor
[15] who's not a work comp doctor to give me an answer to
[16] that?  Am I right about what you're doing there?
[17]     A    I'm trying to remember exactly why so that I
[18] can answer this correctly.  Part of the problem was
[19] Mr. Sasser didn't know what some of the drugs were
[20] for, so we were trying to find out.
[21]         Because he was claiming that some of those
[22] drugs like Plavix were for his legs, for clotting
[23] which was caused by his bad back.
[24]         So I needed a medical clarification.  And I
[25] couldn't get the other doctors to respond to anything.

Page 45

[1] I had asked Dr. McGahan and Dr. Marsella questions and
[2] I never got responses.
[3] **Q** You asked both of the doctors about Plavix,
[4] not just one?
[5] **A** No, not -- well, one of them. I don't know
[6] which one it was.
[7] **Q** Did you ever ask Dr. Marsella about any of
[8] these medications being contraindicated or anything
[9] prior to you contacting the cardiologist?
[10] **A** I don't recall specifically.
[11] **Q** If in fact you wrote Dr. McGahan and got no
[12] response, would you have thought to contact the other
[13] treating physician who is monitoring medication and
[14] things of that nature, to ask them first?
[15] **A** If he was one of the prescribing, yes, I
[16] would.
[17] **Q** Well, Dr. McGahan might not have been
[18] prescribing it either. I mean, it could have been
[19] prescribed by his cardiologist.
[20] **A** No, I'm just saying, I would have --
[21] whatever doctor is prescribing something, I would have
[22] tried to get him to answer the question.
[23] **Q** And did you provide to that cardiologist
[24] any information regarding Mr. Sasser's other medical
[25] conditions?

Page 46

[1] **A** I don't recall, other than telling him that
[2] we're the carrier for a back injury.
[3] **Q** Would there have been any reason for you to
[4] have done that?
[5] **A** I don't understand your question.
[6] **Q** I mean, is there anything about Mr. Sasser's
[7] case that you can remember that would have made you
[8] feel the need to tell Dr. -- the cardiologist, excuse
[9] me, about any other medical conditions other than the
[10] specific medications you were asking about?
[11] **A** I don't know how to answer that question.
[12] I'm not -- I don't know.
[13] **Q** Was there any reason, to your knowledge, why
[14] you would need to discuss with the cardiologist any
[15] medical conditions Mr. Sasser had other than the need
[16] for this medical treatment -- or excuse me, the
[17] medications and whether they are workers' comp
[18] related, whether they're related to his back?
[19] Would there have been any reason to discuss
[20] anything other than he's taking these medicines, the
[21] pharmacy is billing them for us, we're treating him
[22] for a back problem, is this medicine related to his
[23] back problem?
[24] **A** Any other reason than what you described?
[25] **Q** Sure. Any other reason?

Page 47

[1] **A** No.
[2] **Q** So if you had conversations or had
[3] information given to them, if you gave them
[4] information beyond that we're being asked to pay this,
[5] is this bill related to his back, do you have any
[6] understanding as to why you would have done that if,
[7] in fact, you did do that?
[8] **A** Other than attempts to investigate all
[9] realms, no.
[10] **Q** What realms?
[11] **A** Well, just trying to get a handle on the
[12] whole case. This man had a list of about 20 drugs and
[13] I just needed to get a clear picture of what they were
[14] for.
[15] **Q** And are those -- why don't just you tell me
[16] what you mean by investigate all realms. I mean, I
[17] want to know what you mean by that.
[18] **A** Well, part of an adjustor's job is to look
[19] at as -- get as much of the medical picture of a
[20] patient that they can know -- to understand the
[21] case. And he had a lot of pain medications.
[22] Normally you see a patient on Oxycontin or
[23] Percocet or Darvocet. You rarely see them on all of
[24] them. So that's a red flag to an adjustor. That
[25] would say to an adjustor, huh, maybe he's getting

Page 48

[1] drugs for more than one person.
[2] And the pharmacist seemed to, you know, have
[3] all the doctors' names intermingled and he had one of
[4] these doctors prescribing the Plavix. And I don't
[5] know if that was an error or he just got it while he
[6] was in the office or what. But just because that
[7] doctor prescribed it doesn't mean that we have to
[8] cover it.
[9] **Q** Well, I totally understand that.
[10] **A** So that would be why we would start
[11] inquiring.
[12] **Q** So were you inquiring in Mr. Sasser's case
[13] because you felt he was drug seeking and getting pain
[14] medication in an in appropriate way or were you
[15] inquiring specifically to determine simply if these
[16] particular prescriptions, regardless of who they came
[17] from or the purpose, were related to his back injury?
[18] **A** Both.
[19] **Q** Why would you be doing either? Let me ask
[20] this. Strike that.
[21] Were you -- did you ever speak to anyone
[22] from Dr. Marsella's office about this case and about
[23] that issue in particular?
[24] **A** I don't recall.
[25] **Q** What is your understanding of Dr. Marsella's

Page 49

[1] role in this case from Mr. Sasser back then?
[2]     A   If I remember correctly, he was pain
[3] management.
[4]     Q   And do you know whether he was prescribing
[5] medication for him?
[6]     A   I believe he was.
[7]     Q   Do you know whether he was providing
[8] treatments, shots, epidurals, things of that nature
[9] also for Mr. Sasser?
[10]     A   I know he was getting injections
[11] occasionally.  I forget which of the two doctors were
[12] doing that.
[13]     Q   Did you ever write Dr. Marsella and say,
[14] he's taking a lot of pain medicine, you're giving him
[15] this, this doctor is giving him that, that doctor is
[16] giving him that, I'd like to make sure you're aware of
[17] that as his treating physician?  Did you ever do that
[18] with Dr. Marsella?
[19]     A   I don't recall if we did it before we did
[20] the first, what we call, record review with Dr. Cabot.
[21]         But then when we did do the peer review with
[22] Dr. Cabot, we submitted his results to both doctors
[23] and asked for their comments.
[24]     Q   And did you receive any comments from either
[25] doctor?

Page 50

[1]     A   Not that I recall.
[2]     Q   And when was that?
[3]     A   2003, I believe.
[4]     Q   And did you ever have a conversation or any
[5] correspondence with Dr. Marsella where you
[6] specifically asked is he overmedicated, is there -- I
[7] mean, I'm assuming you're also concerned for
[8] Mr. Sasser?
[9]     A   Sure.
[10]     Q   I mean, your company is somewhat managing
[11] his treatment.  I mean, I'm sure you're concerned
[12] whether he's being given things, if you're also
[13] indicating he doesn't really understand what they're
[14] all for, if he's being treated correctly, am I right?
[15] You're looking out for him, too?
[16]     A   Sure.
[17]     Q   Sure.  And in your efforts to look out for
[18] him, did you contact Dr. Marsella and inquire as to
[19] whether he was on top of the medicines enough to know,
[20] look, he's getting what he needs or he's not getting
[21] what he needs or he's getting too much of something?
[22]     A   I can't recall specifically.
[23]     Q   You recall specifically contacting the
[24] cardiologist, but you cannot recall specifically
[25] whether you contacted his treating physician?

Page 51

[1]     A   Because -- yes.
[2]         MR. KNOTT:  Object to the form.
[3] BY MS. SHUMATE:
[4]     Q   Go ahead and answer.
[5]     A   First of all, I don't contact too many
[6] cardiologists.  That's why it stuck out in my mind.
[7] In my business I never have to talk to cardiologists,
[8] so that one was unusual.
[9]         Secondly, because again, Dr. McGahan and
[10] Dr. Marsella, I wasn't sure which one was doing what.
[11] I just know he was seeing both of them.  And I did try
[12] to communicate with his doctor and I don't recall ever
[13] getting responses from them.
[14]     Q   Were you reviewing Dr. -- let me ask this.
[15] Were you receiving reports from Dr. Marsella, records,
[16] updates, things as his treatment was progressing?
[17]     A   Yes.
[18]     Q   Did you sit down and look at them?
[19]     A   Yes.
[20]     Q   So if you sat and looked at his records from
[21] Dr. Marsella, is it fair to say you would have known
[22] Dr. Marsella was or was not giving him injections, was
[23] or was not giving --
[24]     A   Yes.
[25]     Q   -- him medication?

Page 52

[1]     A   Yes.  And that's why I say I don't recall.
[2]     Q   You don't know now?
[3]     A   I didn't know then, yeah.
[4]     Q   But you don't recall now whether
[5] Dr. Marsella was prescribing medication or --
[6]     A   Correct.
[7]     Q   -- whether you ever contacted Dr. Marsella
[8] about it, specifically this medication issue?
[9]     A   Correct.
[10]     Q   If Dr. Marsella, in fact, said, yeah, I'm
[11] monitoring him, I'm actually taking samples and I'm
[12] making sure he's not overmedicating, would that have
[13] put your mind at ease about that issue?
[14]     A   Perhaps.
[15]     Q   Perhaps.  Why would it perhaps not have put
[16] your mind at ease?
[17]     A   Because some doctors are not very
[18] forthcoming to claim adjustors.
[19]     Q   Well, let's talk about that.  Do you have
[20] a history with Dr. Marsella?
[21]     A   No.
[22]     Q   Dr. John Marsella in Dothan, Alabama?
[23]     A   No.
[24]     Q   Do you know whether he's board certified?
[25]     A   I don't know his credentials.

Margaret Lloyd
September 14, 2007

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

---

Page 53

[1]  Q  You don't anything about his credentials?

[2]  A  No.

[3]  Q  Do you know anything about his practice

[4] there?

[5]  A  No.

[6]  Q  Is it something that you have in the

[7] forefront of your mind, whenever you're dealing with a

[8] workers' comp doctor, that maybe they aren't

[9] forthcoming?

[10]  A  No, not on a regular basis.

[11]  Q  So why in this case -- was there anything in

[12] this particular case that made you think, I might not

[13] can trust Dr. Marsella's assessment, so let me go

[14] outside of his treating doctors and ask questions?

[15]  A  The fact that -- well, because when

[16] Mr. Sasser talked to me about his doctors, the

[17] conversations, the personal things Mr. Sasser seemed

[18] to know about these doctors, such as his whereabouts

[19] tax information, this kind of thing, he seemed to know

[20] these doctors and he had a long history with them.

[21]    So they obviously knew him pretty well. He

[22] had been treating with them for quite some time. An

[23] insurance adjustor comes in asking questions and the

[24] doctors are not always very friendly with us and say,

[25] sure, what do you want to know.

---

Page 54

[1]  Q  Well, I mean, you're paying their bill and

[2] they send you regular reports?

[3]  A  Usually.

[4]  Q  Was there anything about Dr. Marsella's

[5] reports, specifically his reports that raised a red

[6] flag for you, his reports?

[7]  A  I don't recall specifically.

[8]  Q  And you are still, I mean, I guess to this

[9] day not sure if Dr. McGahan is the one who moved or

[10] had IRS issues or whether it was Marsella?

[11]  A  Right.

[12]  Q  Well, I'm going to represent to you today

[13] that it's not Dr. Marsella. He's in the same spot.

[14] He's been in the same spot. He's been treating --

[15]  A  Okay. And he is the pain management?

[16]  Q  He's a board certified anesthesiologist pain

[17] management specialist, yes.

[18]  A  Okay.

[19]  Q  If in fact, I tell you today that he says we

[20] monitored him, that's part of my job is to monitor my

[21] patients to see if they are undermedicating, which

[22] might indicate they're selling their medication --

[23]  A  Correct.

[24]  Q  -- I want to make sure they got the correct

[25] pain medicine or there is too much of that medicine in

---

Page 55

[1] their system so they're getting extra from someplace

[2] else, would that be something you think a responsible

[3] pain management doctor would do?

[4]  A  I'm sorry, would what be something I

[5] think --

[6]  Q  Monitor their patients?

[7]  A  Oh, yes, absolutely.

[8]  Q  To see if they're undertaking it --

[9]  A  Absolutely.

[10]  Q  -- or overtaking it?

[11]  A  Absolutely.

[12]  Q  And if he says, in fact, with Mr. Sasser

[13] they did that on a regular basis and there was never

[14] an indication that he was under or overmedicated,

[15] would that change your opinion today as to whether

[16] Mr. Sasser was, in fact, doing something or was given

[17] inappropriate medications back then?

[18]    MR. KNOTT:  Object to the form.

[19]    THE WITNESS:  It would help.  I don't know

[20]    that it would change what I did.

[21] BY MS. SHUMATE:

[22]  Q  I was going to ask you that next.  Do you

[23] think it would have helped back then to have known

[24] that?

[25]  A  No.

---

Page 56

[1]  Q  Why not?  Why would that not matter to you?

[2]  A  Because the issue was not abuse of drugs.  I

[3] didn't think Mr. Sasser was selling drugs.  I knew he

[4] was taking a lot of drugs.  It was obvious by the

[5] bills.  I mean, we could see what they were.  Granted,

[6] that is the doctor's decision.

[7]    My question was how do all these heavy

[8] narcotics relate to a lumbar strain from 1995.  That

[9] was my question and motivation the entire time.

[10]  Q  But do you have any recollection whatsoever

[11] of asking his treating physician Dr. Marsella that

[12] question?  Did you ever write him and ask him?

[13]  A  My recollection is that I got no response

[14] from his doctors when I called, when I asked them

[15] those questions.

[16]  Q  Either one of them?

[17]  A  No.

[18]  Q  So is it your recollection of having

[19] contacted both of them and got no response from both

[20] of them; is that your testimony?

[21]  A  To my recollection, yes.

[22]  Q  And only after you got no response from them

[23] did you institute a record review with Dr. Cabot?

[24]  A  No, I think I instituted that before or

[25] during the whole process.

---

Min-U-Script®    American Court Reporting Company, Inc.

|  | Page 57 |
| --- | --- |

[1]     Q    Why would you go to a record review or a
[2] peer review before asking that question of his
[3] treating physicians?
[4]     A    Well, I don't recall the chronological
[5] events, but we sometimes do like to get just another
[6] opinion and that's all we were doing with Dr. Cabot.
[7]     Q    Well, what was the opinion you were asking
[8] Dr. Cabot, specifically why Mr. Sasser -- I'm sure you
[9] have dozens of cases.
[10]         Specifically, why Mr. Sasser did you say I
[11] want a doctor to look at this and I want this specific
[12] question answered?
[13]     A    Because the man's diagnosis was a lumbar
[14] strain, low back pain.  And I've never in my
[15] experience known someone to be on that many heavy
[16] narcotics for that kind of diagnosis.
[17]     Q    And your experience being --
[18]     A    In that many years.
[19]     Q    - that as an adjustor for --
[20]     A    Yes.
[21]     Q    -- an insurance company?
[22]     A    Yes.
[23]     Q    Not as a physician or a nurse or any --
[24]     A    Correct.
[25]     Q    -- medically trained individual?

|  | Page 58 |
| --- | --- |

[1]     A    Correct.
[2]     Q    Did you ask -- did you, yourself, choose
[3] Dr. Cabot or was that done through Ms. Seinbolt or
[4] through Ryder?  I mean, how is that handled?
[5]     A    I think Ms. Seinbolt actually had a rapport
[6] with Dr. Cabot doing record reviews, and I think she
[7] recommended him.
[8]     Q    Do you know if Dr. Cabot was a physician who
[9] has a practice where he sees patients?
[10]     A    Yes, he was.
[11]     Q    Did he also have a company that where he did
[12] reviews for Ryder and other insurance companies?
[13]     A    I believe he did.
[14]     Q    Do you know how much of his time was devoted
[15] to patient care versus insurance company work?
[16]     A    No.
[17]     Q    Did you -- would that matter to you?
[18]     A    Yes.  I would want to know that he had seen
[19] patients in the recent past.  I would not want a
[20] review by a doctor that was 20 years out of touch.
[21]     Q    Well, what did you do specifically to find
[22] out about Dr. Cabot in that respect?
[23]     A    Well, I had been doing claims for a while
[24] and I recognized his name as an orthopedic in the
[25] Atlanta area.

|  | Page 59 |
| --- | --- |

[1]     Q    So he's an orthopedic doctor who has a
[2] practice in Atlanta?
[3]     A    Oh, this is William Cabot.
[4]     Q    Cabot.
[5]     A    I did not check his credentials.  I let
[6] Ellen send that referral off.  I don't know what she
[7] did.
[8]     Q    And do you specifically know if -- do you
[9] know if specific questions were asked of Dr. Cabot?
[10]     A    Yes.
[11]     Q    Can you tell me what is your understanding
[12] he was asked to do for Ryder?
[13]     A    To the best of my recollection, he was asked
[14] to review the medical records and render his opinion
[15] on the appropriateness of the current treatment as it
[16] relates to the worker's injury from 1995.
[17]     Q    What records were sent to him?
[18]     A    There should have been every medical record
[19] that was in our file through that date that we sent it
[20] to him.
[21]     Q    Do you know if that occurred, if there was,
[22] in fact, every medical record?
[23]     A    I have no reason to think that it was not.
[24]     Q    So that would be your standard of practice?
[25]     A    Yes.

|  | Page 60 |
| --- | --- |

[1]     Q    Do y'all set aside a copy of what you send
[2] to a doctor so that can be answered later, like we
[3] copied them, here's specifically the packet that we
[4] sent to him, here is a copy of what we mailed so we
[5] can -- we don't just say we know we copied all of
[6] that, you actually say here is the copy, a duplicate
[7] of what we mailed him?
[8]     A    Not in every case, no.
[9]     Q    Not what?
[10]     A    Not in every case, no.
[11]     Q    Do you in some cases?
[12]     A    Yes.
[13]     Q    Why?
[14]     A    Well, I'm a little more anal than some of my
[15] coworkers and I would mark them just so I knew what I
[16] sent.  I would put a check mark on them.  But not
[17] everyone does that and I don't know that Ellen did
[18] that.
[19]     Q    Do you know if she asked Dr. Cabot whether
[20] this man ever got hurt on the job?
[21]     A    No, I don't know that.
[22]     Q    Would that be important to you to ask that
[23] question?
[24]     A    No.
[25]     Q    Tell me why.

Page 61

[1]   A   Because the courts had already determined
[2] that there was a compensable injury and I knew that.
[3] So the question was the here and now, not what had
[4] happened back then.
[5]   Q   And is that fair for the other peer reviews
[6] as well, the other doctors that you sent or that she
[7] sent things to wanting peer reviews on Mr. Sasser,
[8] that it was not relevant whether they thought he got
[9] hurt or didn't get hurt, but whether the treatment
[10] that was asked for right now, this specific treatment
[11] is related to that injury?
[12]   A   Correct.
[13]   Q   Do you have any idea why they would go into
[14] great detail in these reports to make mention of
[15] whether they thought he ever got hurt on the job or
[16] whether his injury resolved well before the settlement
[17] ever happened?
[18]   A   I can't answer that for them.
[19]   Q   You don't know if they were asked those
[20] questions?
[21]   A   No, I don't.
[22]   Q   Would you have anything to do with whether
[23] those questions were asked of those doctors?
[24]   A   I, as the adjustor, would ask those
[25] questions if I'm looking for something specific in the

Page 62

[1] utilization review. But again, I did not question
[2] whether there was a lumbar strain at that time.
[3]   Q   And you didn't question that Ryder was
[4] legally obligated to pay for anything that his
treating physician said was related to his back
correct? You have no reason to
already an order on that;

[6] injury; is that
[7] question that, there was a
[8] right?
[9]   A   Repeat that question.
[10]   Q   Would you question whether Ryder was legally
[11] obligated to pay for his medical treatment if his
[12] treating physician said it was necessary for the
[13] injury he sustained on the job?
[14]   A   Yes.
[15]   Q   Tell me why.
[16]   A   Because the question is, is the current
[17] condition that the doctor is saying is related is
[18] indeed still the same injury that he had in 1995.
[19]   Q   If the doctor says it is, his treating
[20] physician has been asked that question, specifically
[21] been asked that question by the judge and the doctor
[22] says yes and he's going to have ongoing treatment and
[23] he's going to need ongoing treatment for years down
[24] the road, is it your job as the adjustor to try to get
a different opinion as to whether that's correct or

Page 63

[1] not?
[2]   MR. KNOTT:  I object to the form and the
[3] foundation for that question.  I don't think it
[4] accurately represents McGahan's letter of January
[5] 3, 2000.
[6]   Go ahead.
[7] BY MS. SHUMATE:
[8]   Q   You can answer anyway.  Go ahead.
[9]   A   Repeat the question, please.
[10]   MS. SHUMATE:  Read it back to her.  I'm not
[11] going to do that.
[12]   (Whereupon, the reporter read the
[13]   referred-to question.)
[14]   MR. KNOTT:  Same objection.
[15]   THE WITNESS:  That's a hard one to answer,
[16] because whether it's my job or not is not
[17] really -- it's my job to make sure that we're
[18] paying for what we're required to pay.
[19]   And according to the utilization review
[20] procedures in Alabama, I have the right to
[21] question the ongoing treatment.
[22] BY MS. SHUMATE:
[23]   Q   Let's talk about the utilization review
[24] process in Alabama.  What is your understanding of the
[25] company's rights and obligations under that process,

Page 64

[1] Ryder's?
[2]   A   Rights?
[3]   Q   Uh-huh (affirmative).
[4]   A   That we send it to a doctor that is
[5] certified or board certified or whatever in the state
[6] of Alabama for a review with his opinion in writing.
[7] We notify the doctors.
[8]   And if it's an adverse opinion, as it was,
[9] the doctors must then at that point forward get any
ment requests precertified through the precert
if they're again denied or also denied,
or peer
[10] process. And it
[11] they can appeal that denial.
[12]   Q   And did you send this record review
[13] review to Mr. Sasser?
[14]   A   Yes.
[15]   Q   You sent it to him, too?
[16]   A   Yes.
[17]   Q   The actual report from the doctors?
[18]   A   Yes.
[19]   Q   Would you have had a letterhead cover over
[20] that, you know, saying here enclosed is this review
[21] from Dr. Cabot or doctor whoever?
[22]   A   To Mr. Sasser?
[23]   Q   Yes.
[24]   A   Yes.

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

Margaret Lloyd
September 14, 2007

---

Page 65

[1]   Q   So those would also be in that file, I'm
[2] assuming, at Ryder?
[3]   A   Yes.
[4]   Q   What is your understanding of the type of
[5] doctor you're supposed to choose in these cases, any
[6] kind of case in a workers' comp if you're going to do
[7] a utilization review?
[8]   A   That he's certified in Alabama.
[9]   Q   As what, just a doctor?
[10]   A   I believe he has to be a specialist of the
[11] same type of doctor that he's treating with, like with
[12] pain management, orthopedics.
[13]   Q   Sure.  So what specialty is Dr. McGahan?
[14]   A   I don't recall.  I don't know.
[15]   Q   What specialty was Dr. Marsella?
[16]   A   Anesthesiology, pain.
[17]   Q   And what specialist was Dr. Cabot?
[18]   A   Pain management.  But now, Dr. Cabot's was
[19] not done as a utilization review.
[20]   Q   What was his done as?
[21]   A   His was just a record review, peer review.
[22]   Q   Just a record review?
[23]   A   Right.  We did that to submit to his doctors
[24] for their opinion and such.
[25]   Q   If the record reviewing physician indicated

---

Page 66

[1] treatment was necessary, would you stop with the
[2] process there or would you get a different opinion
[3] from a different doctor that Ryder wanted to hire?
[4]   MR. KNOTT:  Object to the form.
[5]   THE WITNESS:  I don't know.
[6] BY MS. SHUMATE:
[7]   Q   You can answer.
[8]   A   I don't know.
[9]   Q   Are there occasions when you, as an adjustor
[10] with Ryder, would get an opinion from either a record
[11] review physician or a peer review physician and it
[12] would be favorable to the claimant and you got a
[13] second opinion or a third opinion from a different
[14] doctor?  Were there occasions when that occurred?
[15]   A   I would have to say yes.
[16]   Q   Do you know if that happened in Mr. Sasser's
[17] case?  Was there anybody else other than Dr. Cabot,
[18] Dr. Wilson -- let me see if there's another one.
[19] Well, I have those two in particular.
[20]     Were there any other doctors other than
[21] those two that were used in Mr. Sasser's case?
[22]   A   There were three that were done.  The first
[23] one was the record review by Dr. Cabot.  The second
[24] one was done when -- I sent it to IntraCorp who is our
[25] vendor.  And I said I need a utilization review per

---

Page 67

[1] the Alabama guidelines.
[2]     But I did not know that they did not know
[3] that I meant the specific statute guidelines, which is
[4] why we did a third one.  And I don't recall which --
[5] if that was Wilson or who the other one was.  That's
[6] why we did the third one.
[7]   Q   What was wrong with the second one again?
[8]   A   The doctor was out of Texas and not -- and
[9] it did not go by a specific Alabama utilization review
[10] guidelines.
[11]   Q   And the third one was who?
[12]   A   I don't recall who actually did it, but we
[13] told IntraCorp, here is a copy of the Alabama
[14] guidelines and you have to follow these and it has to
[15] be certified in the state of Alabama.
[16]   Q   And so you outsourced that job to find a
[17] peer review physician to IntraCorp?
[18]   A   That's what IntraCorp does, yes.
[19]   Q   Does IntraCorp work for other companies
[20] besides Ryder?
[21]   A   Yes.
[22]   Q   Did you take it upon yourself to find out
[23] the qualifications of the third peer review physician
[24] that they chose?
[25]   A   Beyond clarifying that he was a specialist

---

Page 68

[1] or certified in Alabama, no.
[2]   Q   At what point did you decide Mr. Sasser
[3] should no longer receive workers' comp medical
[4] treatment through Ryder?
[5]   A   The first time was the first review.
[6]   Q   Which was when?
[7]   A   2004, I think.
[8]   Q   And so that's the first time you made the
[9] decision as an adjustor that he should not receive any
[10] more treatment, period?
[11]   A   Yes.
[12]   MR. KNOTT:  This seems like a good time to
[13] take a first break.  It seems like we're about to
[14] move into, you know -- is that all right with
[15] you?
[16]   MS. SHUMATE:  If you want a break, that's
[17] fine with me.
[18]   MR. KNOTT:  Yeah, I'd like a break.  It
[19] seems like we're about to sort of shift into a
[20] different gear.
[21]   MS. SHUMATE:  Okay.
[22]     (Whereupon, there was a recess from 12:15
[23] p.m. to 12:25 p.m.)
[24] BY MS. SHUMATE:
[25]   Q   Your attorney had provided to me documents

---

Margaret Lloyd                                                                     Johnny W. Sasser v.
September 14, 2007                                              Ryder Truck Rental, Inc., et al.

---

Page 69

[1] about the peer review, specifically the Dr. Cabot
[2] review, which was done in May of '02, a doctor -- an
[3] IntraCorp workers' comp physician advisory review in
[4] March of '03 signed by Dr. Terrence Wilson. And he's
[5] the Texas medical doctor, I think, that you talked
[6] about?
[7]     A   I believe so.
[8]     Q   And is it your understanding he would be
[9] appropriate to do a peer review in Alabama?
[10]        MR. KNOTT:  Object to the form.
[11] BY MS. SHUMATE:
[12]     Q   Well, let me ask you this. Was there a
[13] problem with Dr. Terrence's first review, his March of
[14] '03 peer review? You said you had a problem with
[15] that.
[16]     A   If that's the first one, yes.
[17]     Q   Well, that's the one I have that's March of
[18] '03.
[19]     A   So the first one that was done, which I
[20] believe was going to be the peer utilization review
[21] was not.
[22]     Q   What was --
[23]     A   The person's credentials were not specific
[24] to Alabama.
[25]     Q   And now I have one that was done in May of

---

Page 70

[1] '04. Is that the third one you understand?
[2]     A   Yes.
[3]     Q   And is that the one you used then to cut off
[4] Mr. Sasser's treatment?
[5]     A   Yes.
[6]     Q   Because I believe beginning May of '04, you
[7] started asking for things to be precertified; correct?
[8]     A   After the last one, yes.
[9]     Q   So I'm just trying to make sure we know
[10] which one we're talking about. The May that was
[11] received from IntraCorp, May 24th, '04 would have been
[12] the third and final one, in your understanding?
[13]     A   Yes.
[14]     Q   You never did another one after that?
[15]     A   No.
[16]     Q   Was there any between the March of '03 one
[17] and the May of '04 one, that you're aware of?
[18]     A   Not that I recall.
[19]     Q   Again, would IntraCorp have gotten that
[20] doctor who did the final one and worried about his
[21] credentials under Alabama statutes?
[22]     A   You mean versus me doing that?
[23]     Q   Yes.
[24]     A   Yes.
[25]     Q   What is your understanding of what that

---

Page 71

[1] final peer review said that made you cut him off from
[2] treatment?
[3]     A   They just didn't find the current treatment
[4] related to the diagnosis from 1995.
[5]     Q   And again, would you have sent to IntraCorp
[6] everything that was in Ryder's file regarding his
[7] medicals?
[8]     A   Yes.
[9]     Q   Everything from Dr. McGahan, everything from
[10] Dr. Marsella, everything from Dr. Janush, any other
[11] doctors who had treated him?
[12]     A   Yes.
[13]     Q   And of course, all MRIs, x-rays, tests and
[14] results?
[15]     A   Yes.
[16]     Q   And the only purpose for that was to
[17] determine if the treatment being rendered by
[18] Dr. Marsella, because he was his only treating
[19] physician at that point?
[20]     A   I think we all know that because Dr. McGahan
[21] left, so he was seeing Dr. Marsella. So whether
[22] Dr. Marsella's specific treatment that he was giving
[23] on a regular basis was related to the original injury?
[24]     A   Yes.
[25]     Q   Do you know if Dr. Marsella was ever asked

---

Page 72

[1] that question?
[2]     A   I believe that he was, yes.
[3]     Q   You don't know what his opinion was when he
[4] was asked?
[5]     A   He believed that it was.
[6]     Q   Was he asked back then to give any kind of
[7] written justification for that?
[8]     A   Back when?
[9]     Q   Back when you cut him off, back when you cut
[10] Mr. Sasser off?
[11]     A   Dr. Marsella's office was notified by me
[12] that, you know, here is a copy of the review per the
[13] statute, any further treatment needs to be
[14] precertified.
[15]     Q   And did he do anything to precertify?
[16]     A   Not to my knowledge.
[17]     Q   Did he ever send in a request for treatment?
[18]     A   Not to my knowledge.
[19]     Q   And if he had, would it have been cut off?
[20]        MR. KNOTT:  Object to the form.
[21]        THE WITNESS:  If he had, it would have been
[22]     precertified and denied.
[23] BY MS. SHUMATE:
[24]     Q   And you know it would have been denied?
[25]     A   Yes.

---

Page 73

[1] Q   Why do you know it would have been denied?
[2] A   Because they would have referred to the peer
[3] review.
[4] Q   So the peer review was the final thing,
[5] basically?
[6] A   Basically, yeah.
[7] Q   So even if Dr. Marsella had requested 20
[8] more times for precertification for epidurals or
[9] trigger points or Oxycontin, they would have all been
[10] denied because of peer review?
[11] A   Unless he appealed it per the procedure.
[12] That was the next step after precert.
[13] Q   And do you know if Mr. Sasser knew anything
[14] about an appeal or would that be the doctors
[15] appealing?
[16] A   The way I explained it to Mr. Sasser was
[17] that the doctor would have to appeal it.
[18] Q   So this is something Mr. Sasser could not --
[19] I mean, he's the one who is hurt, he's the one who has
[20] pain, he's the one that needs the treatment, that he
[21] can do nothing to get his treatment unless his doctor
[22] acts; is that correct?
[23] MR. KNOTT:  Object to the form.
[24] THE WITNESS:  That's my understanding.
[25] MR. KNOTT:  Go ahead.

Page 74

[1] THE WITNESS:  That's my understanding of the
[2] statute, yes.
[3] BY MS. SHUMATE:
[4] Q   And he can proceed to file a lawsuit?
[5] A   Sure.
[6] Q   That's also under the same statute; correct?
[7] A   Sure.
[8] Q   If he disagrees, he can file a lawsuit,
[9] which he's done that?
[10] A   (Witness nods head affirmatively.)
[11] Q   So I want to make sure I understand that.
[12] It's not that you need to get precertification so we
[13] can make sure each individual medication or trigger
[14] point injection or epidural is causally connected, you
[15] already had determined as of that when you received
[16] that May of '04 review, that there was never going to
[17] be another precertification that was approved unless
[18] someone appealed or sued Ryder?
[19] A   I had not determined it.  I had assumed it.
[20] Q   Who would make the decision as to whether
[21] the precertifications would be denied in the future?
[22] A   Well, when the doctor would call in for
[23] precertification of a procedure, the precert process
[24] would have referred -- would have seen the utilization
[25] review and said now it's been determined that this

Page 75

[1] treatment is not directly related to the Ryder injury,
[2] therefore, we are not going to precertify it.  And if
[3] they don't precertify it, I deny it.  I deny
[4] authorization.
[5] Q   Okay.  So someone else looks at the 2004
[6] report from a doctor hired through a third-party
[7] source to review records and they look at his report
[8] and say, well, based on what he said, no, this
[9] treatment, no matter what the request pretty much is
[10] not ever going to be paid for?
[11] MR. KNOTT:  Object to the form.
[12] BY MS. SHUMATE:
[13] Q   And then based on that precertification
[14] telling you no, you denied authorization?
[15] MR. KNOTT:  Object to the form.
[16] BY MS. SHUMATE:
[17] Q   Am I correct?
[18] A   No.
[19] Q   What am I wrong about?  Please correct me.
[20] A   The precert process only -- the outside
[21] source precert process only determines if this
[22] procedure is appropriate for the given compensable
[23] injury.
[24] Q   Okay.
[25] A   Okay.  They notify the doctor and me.  We've

Page 76

[1] determined that this is not appropriate for your
[2] compensable injury.
[3] I'm the one that has to say, I'm not going
[4] to authorize it and I am basing that on the precert
[5] process.
[6] Q   Now, if the precert process on any case that
[7] you had, because I'm sure you did them on other cases,
[8] not just Mr. Sasser, am I correct?
[9] A   Yes.
[10] Q   If the precert process came back, no, we
[11] don't think it should be precertified, have you ever
[12] overridden that and authorized treatment while working
[13] for Ryder?
[14] A   I don't recall.
[15] Q   You don't recall ever having done it or just
[16] don't --
[17] A   I don't recall that I specifically did it
[18] working at Ryder.  I know that it has been done.
[19] Q   But there was nothing about Mr. Sasser's
[20] case that would make you override a precert on, let's
[21] say, a lumbar -- specifically a lumbar injection or a
[22] lumbar issue; not a cardiac medication, not Plavix,
[23] but a specific lumbar injection or something on that
[24] you would have denied anyway?
[25] A   Yes.

---

**Page 77**

[1]    **Q**    And at the point in 2004 -- when I say cut
[2]  him off, I mean, did you use that term, cut him off?
[3]  Have you ever used that term when you're dealing with
[4]  workers' comp clients, claimants?
[5]    **A**    Not for medication, no. We typically would
[6]  say something like, we're no longer going to authorize
[7]  your medication.
[8]    **Q**    If in fact, you wrote that he was cut off
[9]  effective -- let me see how we wrote it. No further
[10]  action was ever requested and decision was not
[11]  appealed, therefore, Mr. Sasser's med
[12]  treatment/coverage under workers' compensation was
[13]  denied effective June 17th, 2004 and continuing.
[14]    What do you mean his workers' compensation,
[15]  his med treatment/coverage under workers' compensation
[16]  was denied, what do you mean by that?
[17]    **A**    That his workers' compensation claim was no
[18]  longer going to pay for the bills.
[19]    **Q**    For anything to do with -- anything to do
[20]  with his low back, period?
[21]    **A**    Correct.
[22]    **Q**    And at the time you wrote that in 8 of 2005,
[23]  you understood there was an order from Judge Smithhart
[24]  in Barbour County saying you will pay for his back
[25]  injury and you will pay what Dr. McGahan says is

---

**Page 78**

[1]  related?
[2]    **MR. KNOTT:**  Object to the form.
[3]    **BY MR. SHUMATE:**
[4]    **Q**    Do you understand there was such an order?
[5]    **MR. KNOTT:**  Object to the form.
[6]    **THE WITNESS:**  I understand there was such an
[7]  order, yes.
[8]    **BY MS. SHUMATE:**
[9]    **Q**    Did you understand it at the time you cut
[10]  him off in June of 2004?
[11]    **A**    No.
[12]    **Q**    When did you learn that there was such an
[13]  order?
[14]    **A**    When I found out about your lawsuit.
[15]    **Q**    Would it have made any difference to you in
[16]  June of 2004 whether Dr. -- whether Judge Smithhart
[17]  ordered you to pay whatever Dr. McGahan said was
[18]  related, would that have mattered to you?
[19]    **A**    I don't believe so. My questions may have
[20]  been different, but I would have still taken the steps
[21]  that I took.
[22]    **Q**    Well, tell me what questions would have
[23]  changed, what questions would have been different.
[24]    **A**    Well, just when I talked to Sally Thames,
[25]  I went through the process of the utilization review.

---

**Page 79**

[1]  And I referred to the first suit. You know, we had
[2]  settled, we had lost.
[3]    We had lost, so we had to pay this man's
[4]  future medical as it relates to this injury, medically
[5]  reasonable, blah, blah, blah. At that point I did not
[6]  know that there was a second lawsuit until all this
[7]  came out.
[8]    **Q**    So when you were talking to Sally Thames,
[9]  you didn't know that information?
[10]    **A**    No.
[11]    **Q**    And whatever information you gave to Sally
[12]  Thames at the ombudsman's office would not have
[13]  included any reference to Judge Smithhart's order that
[14]  you were to pay whatever Dr. McGahan says is related?
[15]    **A**    Correct.
[16]    **Q**    Do you understand Dr. Marsella has said that
[17]  the treatment he offered -- or excuse me, that he was
[18]  rendering for Mr. Sasser was related to the injury
[19]  Dr. McGahan sent him there for?
[20]    **A**    Yes, I understand that.
[21]    **Q**    And that was only back injury --
[22]    **A**    Yes.
[23]    **Q**    -- was all he was being treated for?
[24]    **A**    (Witness nods head affirmatively.)
[25]    **Q**    And that Ryder had authorized Dr. Marsella

---

**Page 80**

[1]  to treat him with those procedures with that
[2]  medication for years before you made the decision in
[3]  June of '04 to cut him off?
[4]    **MR. KNOTT:**  Object to the form.
[5]    **BY MS. SHUMATE:**
[6]    **Q**    Do you know that?
[7]    **A**    Yes.
[8]    **Q**    What did you tell Sally Thames about the
[9]  case when you went through the process?
[10]    **A**    To the best of my recollection, I told her
[11]  that we had a settled claim that we were told to
[12]  pay medically reasonable necessary, medical as it
[13]  related to a 1995 injury, that I had done a record
[14]  review and then I had done a utilization review, but
[15]  it was done incorrectly. It was not done by the
[16]  statute.
[17]    So we needed to clarify the process and I
[18]  needed to do it over again. And she went through the
[19]  process with me about the appealing and the precerting
[20]  and everything.
[21]    **Q**    So it was your understanding that precert
[22]  was the next step, we've done a utilization review,
[23]  the next step is to have everything precertified from
[24]  now on?
[25]    **A**    Correct.

---

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

Margaret Lloyd
September 14, 2007

---

**Page 81**

[1]  **Q**   But you also understood at that very moment
[2]  that every precertification was going to be denied?
[3]  **MR. KNOTT:**  Object to the form.
[4]  **BY MS. SHUMATE:**
[5]  **Q**   Am I correct?
[6]  **MR. KNOTT:**  Object to the form.
[7]  **BY MS. SHUMATE:**
[8]  **Q**   You knew when you cut him off in June that
[9]  every precertification, unless it was appealed or sued
[10]  was going to be denied?
[11]  **A**   But I talked to her before the second
[12]  utilization review was done.
[13]  **Q**   Oh, okay.  So she said you --
[14]  **A**   So no, I didn't know that.
[15]  **Q**   -- need to do a second one?
[16]  **A**   Yes.
[17]  **Q**   You need to comply with the law and if you
[18]  do that, then the next step would be ask for precert
[19]  and then he can appeal or whatever?
[20]  **A**   Correct.
[21]  **Q**   When you got him cut off, when you made the
[22]  decision -- I'm assuming you made the decision
[23]  June 17th, '04, since you said that was the date it
[24]  was effective and continuing, when you made that
[25]  decision June 17th, '04, was it your belief and

---

**Page 82**

[1]  understanding that any precertification request for
[2]  treatment in the future was going to be denied?
[3]  **A**   Yes.
[4]  **Q**   So what's the purpose for precertification
[5]  if you've already cut him off?
[6]  **A**   Because that's what the statute requires.
[7]  **Q**   So it's not like, well, from now on before
[8]  you pay, you need to make sure your doctors make sure
[9]  it's there, that's just the step I've got to do
[10]  because I've already cut him off?
[11]  **A**   I wouldn't word it that way.
[12]  **Q**   Well, how would you word it?  Tell me how --
[13]  what precertification has to do with it if you've
[14]  already made the decision it's never going to be
[15]  agreed unless he sues us or appeals?
[16]  **MR. KNOTT:**  Object to the form.
[17]  **THE WITNESS:**  He has to go through the
[18]  precert process because that's what the statute
[19]  requires once the utilization review has
[20]  been done.
[21]  So I had to go through the same process.  I
[22]  mean, I was instructing them, just like I had
[23]  been instructed by Sally to go through the
[24]  process.
[25]  **BY MS. SHUMATE:**

---

**Page 83**

[1]  **Q**   What is the reason for precertification
[2]  after a peer review?
[3]  **A**   I can't answer that.
[4]  **Q**   Did you ask?
[5]  **A**   No.
[6]  **Q**   Was it your understanding from Sally Thames
[7]  that y'all could deny every precertification based on
[8]  that peer review?
[9]  **A**   Well, we didn't talk about it like that
[10]  because at the time we didn't know what the results
[11]  were going to be.
[12]  **Q**   Sure, sure.  And after the -- on June 17th,
[13]  in fact, you wrote Dr. McGahan and Dr. Marsella and
[14]  the pharmacy and said, from now on you've got to get
[15]  everything precertified?
[16]  **A**   Yes.
[17]  **Q**   In your opinion, would that lead the doctors
[18]  and the patient into believing that treatment is not
[19]  cut off at that point, you've just got to go through
[20]  another step before we'll pay?
[21]  **MR. KNOTT:**  Object to the form.  Calls for
[22]  speculation.
[23]  **BY MS. SHUMATE:**
[24]  **Q**   I can ask your opinion.  Tell me.
[25]  **A**   I don't know.

---

**Page 84**

[1]  **Q**   Well, let's read the letter and let's see
[2]  what we think, okay.  Dear doctors and staff, and it
[3]  is to Dr. Wallace McGahan, Dr. John Marsella and Clio
[4]  Pharmacy, patient Johnny Sasser, Claim No. blah, blah.
[5]  Dear doctors and staff, as the adjustor for
[6]  this workers' compensation case I am hereby notifying
[7]  you that effective immediately, any and all medical
[8]  services, procedures and prescriptions to this patient
[9]  must go through the workers' compensation
[10]  precertification process as per the provisions of the
[11]  Alabama Department of Industrial Relations division of
[12]  Workers' Compensation.
[13]  You then give them the precertification
[14]  company, and please accept this as written
[15]  notification that any further treatment or
[16]  prescriptions which are not precertified prior to
[17]  completion will be denied.  If you have any questions,
[18]  feel free to contact me, sincerely, Martye Lloyd,
[19]  Senior Claims Representative.
[20]  But I noticed while I was reading that your
[21]  attorney gave you a copy of that letter.  Did I read
[22]  it correctly?
[23]  **A**   Yes, you did.
[24]  **Q**   Now, the paragraph that says any further
[25]  treatment or prescriptions which are not precertified

---

Margaret Lloyd
September 14, 2007

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

---

Page 85

[1] prior to that will be denied.  Is that what it says?

[2]    A    Uh-huh (affirmative).

[3]    Q    The reality is, when you wrote that you
[4] already knew they were going to be denied unless
[5] somebody appealed or sued; correct?

[6]    A    I had -- I assumed, yeah, that, yes.

[7]    Q    And you're the one that would make that
[8] decision because you're the one that makes the
[9] authorizations?

[10]    A    Well, but you're talking about precertifying
[11] prior to completion.  Yes, I knew if they went through
[12] the precert process, the chances were very likely that
[13] it would be noncertified.

[14]    Q    So the chances are very likely it's not
[15] going to be -- it's going to be denied if they go
[16] through the process.  And you've told them if you
[17] don't go through the process, it's going to be denied.

[18]        So is it fair to say at the time you wrote
[19] this letter, the decision had already been made that
[20] it was highly unlikely Mr. Sasser would ever get
[21] authorization from you for a treatment again --

[22]    A    Yes.

[23]    Q    -- unless he sued or unless he appealed or
[24] unless his doctors appealed because he can't appeal;
[25] correct?

---

Page 86

[1]    A    Yes.

[2]    Q    So this letter is somewhat misleading, is it
[3] not?  I mean, you're saying unless you go through this
[4] process, it's going to be denied.

[5]        But you already knew, even if you go through
[6] the process it's going to be denied?

[7]    A    No.

[8]        MR. KNOTT:  Object to the form.

[9]        THE WITNESS:  I did not know that, because I
[10] was just telling them what the procedure is
[11] supposed to say.

[12]        And if they went through the precert process
[13] and the precert process said, yeah, that's okay,
[14] I would have authorized it.  I would have had to
[15] authorize it or consider it.

[16] BY MS. SHUMATE:

[17]    Q    Yeah, but you knew that wasn't going to
[18] happen.  You were pretty confident given your years of
[19] experience that wasn't going to happen, weren't you?

[20]        MR. KNOTT:  Object.  That has been asked and
[21] answered.

[22]        MS. SHUMATE:  Well, I can ask it again.

[23] BY MS. SHUMATE:

[24]    Q    Go ahead.  Given your years of experience,
[25] you've already admitted it was not likely that this

---

Page 87

[1] man was going to get anymore treatment; right?

[2]        MR. KNOTT:  Object to the form.

[3]        THE WITNESS:  Not likely.  I will say not
[4] likely.  I wouldn't say for sure.

[5] BY MS. SHUMATE:

[6]    Q    Who wrote the letter of the note on the
[7] right-hand side of that page that's inside that
[8] circle?

[9]    A    I did.

[10]    Q    Is that your signature?

[11]    A    Yes.

[12]    Q    Why did you write that letter?

[13]    A    I believe this is when I sent it to
[14] Mr. Sasser, because he said he hadn't had a copy of
[15] it.

[16]    Q    So you're saying he was cut off or his
[17] coverage and treatment was denied effective 6/17 on
[18] that note?

[19]    A    Yes.

[20]    Q    And did you send that to -- was that note
[21] for Mr. Sasser?

[22]    A    Yes.

[23]    Q    You wrote that on the side for Mr. Sasser?

[24]    A    He said he didn't get it originally, yes.

[25]    Q    So that note was for his purposes?

---

Page 88

[1]    A    I believe so.  I may have copied the other
[2] people, too.

[3]    Q    Well, if his medical treatment/coverage
[4] under workers' comp was denied effective 6/17, there
[5] would be no reason for anyone to ever submit a precert
[6] request; correct?

[7]        MR. KNOTT:  Object to the form.

[8]        THE WITNESS:  But you'll notice I didn't
[9] write that for a year.

[10] BY MS. SHUMATE:

[11]    Q    But it was denied effective 6/17?

[12]    A    Well, that's the date we were using
[13] because -- at that point, because per the procedures
[14] of the statute it says, you know, if they don't
[15] appeal.  I've never heard from another doctor after
[16] this letter was written.

[17]    Q    So no doctor ever sent in a request for
[18] anymore treatment after this letter was written; is
[19] that what you're saying?

[20]    A    I think Dr. Marsella did.  I can't recall.

[21]    Q    So if he did, in fact, ask for
[22] precertification for another procedure, then in fact,
[23] there was precertification that was requested?

[24]    A    Right.

[25]    Q    So are you saying that you know for sure no

---

Min-U-Script®          American Court Reporting Company, Inc.

Page 89

[1] further action was ever requested or that further
[2] action was requested, but was denied? Do you know
[3] which the case is?
[4]    A    I know there was no appeal.
[5]    Q    There was no appeal, but that doesn't mean
[6] there was no further requests.
[7]    A    I don't recall specifically.
[8]    Q    What did you mean by no further action (i.e.
[9] precertification) was ever requested?
[10]    A    I don't -- at that point I did not have any
[11] knowledge of a precert request since this letter was
[12] written.
[13]    Q    Do you have any knowledge after that?
[14]    A    No.
[15]    Q    Do you know what medication Mr. Sasser was
[16] taking on June 17th or in that time period of '04?
[17]    A    No. He had quite a list of them. I don't
[18] recall specifically.
[19]    Q    Do you need to take that call?
[20]    A    No, I'm just going to turn it off.
[21]    Q    Are you aware that people who are taking
[22] narcotic medication sometimes experience adverse
[23] effects physically if they are cut off, as we say,
[24] cold turkey?
[25]    A    Absolutely.

Page 90

[1]    Q    Did you take that into consideration when
[2] you denied any further treatment for Mr. Sasser?
[3]    A    Yes.
[4]    Q    What did you do to avoid that process in
[5] him?
[6]    A    Nothing.
[7]    Q    Thank you. You read Mr. Sasser's
[8] deposition; correct?
[9]    A    Part of it.
[10]    Q    Did you read the parts where he talked about
[11] conversations he had with you?
[12]    A    Yes.
[13]    Q    You know he says something along the lines
[14] of you told him you've cost us a lot of money over the
[15] years and I'm going to do everything I can do to get
[16] you cut off?
[17]    A    Yes, I read that.
[18]    Q    Is he lying?
[19]    A    I wouldn't call it lying. I think he
[20] misinterpreted conversations.
[21]    Q    Why don't you tell me what you said that he
[22] misinterpreted to be that statement.
[23]    A    Well, it's been a while, so I don't recall
[24] exactly. But I would never tell a patient you cost us
[25] a lot of money.

Page 91

[1]    Q    That wouldn't be a smart thing for an
[2] adjustor to say?
[3]    A    No.
[4]    MR. KNOTT: Object to the form.
[5]    THE WITNESS: We had conversations when I
[6] first started talking to Mr. Sasser in the very
[7] beginning about settling his claim.
[8]    And he was aware of the fact that Medicare
[9] would not cover his prescriptions at that time
[10] and that's all he was taking, so he was
[11] not interested in settlement.
[12]    So I'm sure the conversation did have
[13] something to do with the fact that the claim --
[14] we were aware of the expenses of his drugs.
[15] BY MS. SHUMATE:
[16]    Q    Let me stop you right there and ask you a
[17] question --
[18]    A    Okay.
[19]    Q    -- before I forget. Why would you discuss
[20] settlement with him at that point? I'm assuming
[21] settlement of his future medicals?
[22]    A    Yeah. Just to be able to close the claim.
[23]    Q    So Ryder wouldn't be responsible for
[24] anything else, other than what they paid him for his
[25] claim? You're going to pay him out, you're going to

Page 92

[1] buy him out of his future medicals?
[2]    A    If he was agreeable, yes.
[3]    Q    And he was not?
[4]    A    Correct.
[5]    Q    Is it your job at -- was it your job at
[6] Ryder at that time to look out for Ryder?
[7]    A    Of course.
[8]    Q    Sure. Financially look out for Ryder?
[9]    A    Of course.
[10]    Q    Was it your job as the adjustor for that
[11] company to see that Ryder paid as little as possible
[12] on these claims?
[13]    MR. KNOTT: Object to the form.
[14]    You can answer.
[15] BY MS. SHUMATE:
[16]    Q    You can answer. There's nothing wrong with
[17] that question.
[18]    A    Oh, I think there's a lot wrong with that
[19] question.
[20]    Q    Tell me what you think is wrong with it.
[21]    A    Well, I mean, you're -- you know, that's
[22] not -- I can't yes or no that question.
[23]    Q    Why?
[24]    A    Well, of course, it's my job to save Ryder
[25] money.

Margaret Lloyd
September 14, 2007

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

---

Page 93

[1] **Q** Thank you. Okay, that sounds better than
[2] saying pay as little as possible?
[3] **A** Yes.
[4] **Q** But it's the same thing? I mean, let's be
[5] honest.
[6] **MR. KNOTT:** Object.
[7] **THE WITNESS:** Okay.
[8] **BY MS. SHUMATE:**
[9] **Q** We're grown-ups in here. It's the same
[10] thing, isn't it?
[11] **A** Okay. If that's the way you want to say it,
[12] go ahead.
[13] **Q** No, I'm asking you. Is it the same thing?
[14] **A** Yeah, I guess it is.
[15] **Q** And if there's a way that you can save them
[16] money, you're going to do your job and save them
[17] money?
[18] **A** Within the law, yeah.
[19] **Q** Within the law. So is that why you set
[20] about on Mr. Sasser's claim, because he would not
[21] settle his future medicals to start doing peer reviews
[22] to get him cut off?
[23] **A** No.
[24] **Q** What point in time did you talk with him
[25] about settlement?

---

Page 94

[1] **A** Periodically for the first few months that
[2] I handled his claim.
[3] **Q** So in the first few months beginning on his
[4] claim, you started talking to him about settling, and
[5] within the next few months -- you got on this case in
[6] 2002, am I right?
[7] **A** Uh-huh (affirmative).
[8] **Q** Well, you did the first peer review in --
[9] the first record review in 2002, did you not?
[10] **A** Uh-huh (affirmative).
[11] **Q** But they were totally unconnected? Your
[12] request to settle was totally unconnected with your
[13] beginning the peer review utilization process under
[14] Alabama law as your way of getting him cut off?
[15] **A** Yes.
[16] **Q** Isn't that why, however, you did the peer
[17] review, was to see how I can get this man off our
[18] payroll?
[19] **A** Yes.
[20] **Q** Was there any pressure from Ryder superiors
[21] to get him cut off placed on you? I mean, it's
[22] understandable, you know that. Was there pressure
[23] from your superiors to get him cut off?
[24] **A** Not to cut him off, but to move the file
[25] along, as the managers would term it, call that.

---

Page 95

[1] **Q** What do you interpret -- you worked with
[2] him. What do you interpret move the file along means?
[3] I mean, if he's got chronic pain you've got to face,
[4] what does move along mean?
[5] **A** Settle it or get him off of some of the
[6] medication.
[7] **Q** Because it was costing Ryder money to pay
[8] for all of that?
[9] **A** Yes, and because of addiction fears.
[10] **Q** Do you know how much per year on average
[11] Ryder spent on Mr. Sasser's treatment after the
[12] settlement?
[13] **A** No. I recall when I was handling it, he was
[14] averaging about $1,000 per month in prescriptions.
[15] **Q** Do you know if spinal stenosis or
[16] degenerative disk disease in your back or any of that
[17] can cause blood clots in your legs?
[18] **A** No, I do not know.
[19] **Q** Mr. Sasser also has indicated that after he
[20] realized that he was cut off, and I'm not sure if it
[21] was June of '04, but sometime thereafter realized
[22] y'all really aren't ever going to pay anything again,
[23] that he had another conversation with you and you told
[24] him -- he reminded you, he says, of that prior
[25] conversation where you said you're going to get me cut

---

Page 96

[1] off and you said I did my job. Is that accurate?
[2] **A** I probably said I was just doing my job,
[3] yeah.
[4] **Q** If Dr. McGahan was no longer available for
[5] Mr. Sasser, there's no way Dr. McGahan could have
[6] asked for precertification for any treatment, was
[7] there? He had moved off and Mr. Sasser couldn't find
[8] him; that's not possible, is it?
[9] **A** No.
[10] **Q** Did you ever offer him another doctor and
[11] say, well, Dr. McGahan is gone, but you are entitled
[12] to precertification of medicals, you are entitled
[13] to ask for that, so let's get you another doctor so they
[14] can ask for that, even if you think they're going to
[15] be denied? Did you ever offer him another doctor?
[16] **A** No.
[17] **Q** Why not?
[18] **A** Well, I wasn't aware he didn't have one. I
[19] never heard from him for a long period of time after
[20] that and I assumed he was still seeing Marsella.
[21] **Q** Seeing Marsella, but not McGahan. I mean,
[22] Marsella was just for pain management.
[23] **A** But what would he need another doctor for
[24] for our chronic pain other than pain management.
[25] **Q** So you made the decision he did not need

---

Min-U-Script®    American Court Reporting Company, Inc.

Johnny W. Sasser v.                                                          Margaret Lloyd
Ryder Truck Rental, Inc., et al.                                          September 14, 2007

---

Page 97

[1] anyone else but --
[2]     **A**   No, no, no.
[3]     **Q**   -- Dr. McGahan?
[4]     **A**   No, I'm not saying that.  I'm just saying if
[5] I see that -- if I think that he's seeing the pain
[6] management doctor, I would have no reason to think
[7] that he was not getting treatment.
[8]         I don't have too many patients that are
[9] seeing more than the pain management doctor.  Usually
[10] that's all they see at that time.
[11]     **Q**   And am I correct that you have had a couple
[12] of weeks -- let me go back to make sure I've got it
[13] right.  I want to make sure I've got it all, because
[14] I'm not too clear sometimes.
[15]         Three to four-week course by Kemper to get
[16] you up to speed on workers' comp adjusting, because
[17] I'm assuming it was a workers' comp course?
[18]     **A**   Uh-huh (affirmative).
[19]     **Q**   Three to five-day course with InServices and
[20] then one course every year once you got certified in
[21] Alabama.  That's your training and then any on-the-job
[22] just doing it?
[23]     **A**   I have continuing education of 12 to 18
[24] hours a year for my state license.
[25]     **Q**   And were you doing that back then as well?

---

Page 98

[1]     **A**   Yes.
[2]     **Q**   Was that continuing education all in
[3] workers' comp?
[4]     **A**   Yes.
[5]     **Q**   Are you licensed only in workers' comp
[6] adjusting?
[7]     **A**   Yes.  Well, no, actually my license reads
[8] property and casualty, but I've only practiced
[9] workers' compensation.
[10]     **Q**   You have no medical training other than what
[11] you receive through these seminars the insurance
[12] companies give you?
[13]     **A**   Correct.
[14]         **MR. KNOTT:**  I think she said the state
[15]     sponsors some of the seminars.
[16]         **MS. SHUMATE:**  Yeah, the doctors sometimes
[17]     come, she said.
[18]         **THE WITNESS:**  Yeah.
[19] **BY MS. SHUMATE:**
[20]     **Q**   You haven't had any formal medical training?
[21]     **A**   Right.
[22]     **Q**   You just have seminars --
[23]     **A**   Right.
[24]     **Q**   -- that you go to for --
[25]     **A**   Correct.

---

Page 99

[1]     **Q**   I mean, we go to them, too.
[2]         **MR. KNOTT:**  Yes.
[3] **BY MS. SHUMATE:**
[4]     **Q**   We have doctors who often speak at ours on
[5] different topics to give us a little bit better
[6] understanding of medical --
[7]     **A**   Right.
[8]     **Q**   -- issues, medical terminology, things of
[9] that nature.
[10]         You certainly don't feel like you're in a
[11] position to make a decision on a medical issue above
[12] and beyond a doctor's decision, do you?
[13]     **A**   No.
[14]     **Q**   You're not in that position, okay.
[15]         **MS. SHUMATE:**  Give me a couple of minutes
[16]     and I'll see what else I've got, okay.
[17]         **MR. KNOTT:**  Okay.
[18]         (Whereupon, there was a recess from 12:55
[19]         p.m. to 1:10 p.m.)
[20] **BY MS. SHUMATE:**
[21]     **Q**   Why did you leave Ryder?
[22]     **A**   I was laid off from downsizing.
[23]     **Q**   And so it was nothing performance related?
[24]     **A**   No.
[25]     **Q**   It was just they cut off?

---

Page 100

[1]     **A**   They cut off several adjustors, yeah.
[2]     **Q**   And do you know if Greg Pitz or Kathy
[3] Fortier still worked for Ryder, or at least at the
[4] time you left?
[5]     **A**   Yes, they do or they did as of last week.
[6]     **Q**   Have you discussed this case or the facts of
[7] this case with anyone who works with Ryder, other than
[8] your attorney?  And I don't want to know what you
[9] talked about.  Have you discussed this with anyone
[10] else who works for Ryder?
[11]     **A**   Since I left?
[12]     **Q**   Yes.
[13]     **A**   No.
[14]     **Q**   Did you discuss it with them before you
[15] left?
[16]     **A**   Yes.
[17]     **Q**   And who specifically did you discuss the
[18] case with at Ryder?
[19]     **A**   You mean like after I stopped handling the
[20] claim itself?
[21]     **Q**   Yeah.  I mean, I presume that once you got
[22] sued, once you know there's a lawsuit?
[23]         **MR. KNOTT:**  And to be clear, she can answer
[24]     with respect to the work to the adjustment of the
[25]     workers' compensation case.

---

Margaret Lloyd
September 14, 2007

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

---

**Page 101**

[1]     But with respect to the case that's pending
[2] in federal court that's a tort case, I'm going to
[3] ask her -- I'm going to instruct her not to
[4] answer based on attorney-client privilege.
[5] **BY MS. SHUMATE:**
[6]     **Q**   Well, I'm going to ask you.  Did you speak
[7] with anybody at Ryder who works for Ryder who is not
[8] an attorney about the tort case about --
[9]     **A**   Yes.
[10]    **Q**   -- being sued?
[11]    **A**   Oh, oh, no, no, not about the tort case.
[12]    **Q**   Did you talk with anybody there about the
[13] outrage claim or can you believe this guy is suing us
[14] for this or I cut him off for this reason or that?  I
[15] mean, did you discuss anything like that with anybody?
[16]    **A**   No, just the fact that I was being deposed
[17] because we're being sued because of outrage.
[18]    **Q**   But did you ever discuss with Greg Pitz or
[19] Kathy Fortier the facts of the workers' comp case
[20] after you got sued, sit back and say, well, let's go
[21] over the file one more time or let's talk about things
[22] that happened in this case?
[23]    **A**   Yes.  I talked to Kathy who was my
[24] supervisor when I left, just clarifying where we stood
[25] with our attorneys and everything and the rule nisi

---

**Page 102**

[1] existed and the court, the outrage, that they were two
[2] different suits and that kind of thing.
[3]     But it was not based on the fact that I was
[4] leaving.  Just it happened to have come up just before
[5] I left.
[6]     **MS. SHUMATE:**  I think that's all.
[7]     **MR. KNOTT:**  I have maybe one or two.
[8]     (Whereupon, a discussion was held off the
[9]     record.)
[10]       **DIRECT EXAMINATION**
[11] **BY MR. KNOTT:**
[12]    **Q**   Martye, was the only reason for doing the
[13] peer review to see if you could -- I think the way the
[14] question was asked earlier, to get Mr. Sasser off
[15] Ryder's payroll?
[16]    **A**   No.
[17]    **Q**   What other reasons, as we sit here today,
[18] can you think of that you had at the time for
[19] submitting the peer review process?
[20]    **A**   Because as I said, I was concerned about the
[21] significant amount of heavy narcotics that he was on.
[22] And he would contact me and sound very intoxicated and
[23] very slurred.  He never asked for transportation, so I
[24] assumed he was driving.
[25]     I was just very concerned about the -- his

---

**Page 103**

[1] state.  Like I said, I've never seen somebody take so
[2] many drugs.  Even chronic failed backs, you usually
[3] don't have that combination, so I was just concerned
[4] about it.
[5]     **Q**   In taking the actions you took with regard
[6] to the adjustment of Mr. Sasser's claim, was it ever
[7] your intention to coerce him to do or refrain from
[8] doing anything?
[9]     **A**   No.
[10]    **Q**   Was it ever your intention to cause him
[11] physical and mental distress?
[12]    **A**   No.
[13]     **MR. KNOTT:**  That's all the questions I have.
[14]       FURTHER CROSS-EXAMINATION
[15] **BY MS. SHUMATE:**
[16]    **Q**   Did you ever express this deep concern you
[17] had for Mr. Sasser's medical condition to his treating
[18] physician Dr. Marsella?
[19]    **A**   Not that I recall.  I don't recall.
[20]    **Q**   Did you ever ask Dr. Marsella if the
[21] medication he was on would make him seemed slurred
[22] speech?
[23]    **A**   I believe I did ask him about the effects
[24] they were having, but I can't remember specifically
[25] when.

---

**Page 104**

[1]    **Q**   And his answer was what?
[2]    **A**   I don't recall getting one.
[3]    **Q**   You don't recall getting one?
[4]    **A**   Uh-uh (negative).
[5]    **Q**   From Dr. Marsella?
[6]    **A**   Uh-uh (negative).
[7]    **Q**   And you made an assumption that Mr. Sasser
[8] was driving?
[9]    **A**   Well, yeah.  I'm just saying because he
[10] never asked for a taxi to go to the doctor or
[11] whatever, I assumed he was driving.
[12]    **Q**   Do you know if he has a spouse or children
[13] or a neighbor that would take him?
[14]    **A**   Right.
[15]    **Q**   There's all kinds of ways people get places
[16] without asking Ryder for money; right?
[17]    **A**   Uh-huh (affirmative).
[18]    **Q**   Did you make any other assumptions about
[19] Mr. Sasser, besides that he was driving while possibly
[20] intoxicated that effected his claim?
[21]    **A**   No, no.
[22]     **MS. SHUMATE:**  Okay, that's all I have.
[23] Thank you.
[24]     (Whereupon, a discussion was held off the
[25]     record.)

---

Johnny W. Sasser v.                                                    Margaret Lloyd
Ryder Truck Rental, Inc., et al.                                      September 14, 2007

---

| Page 105 | Page 107 |
|---|---|

**Page 105**

[1]     **MS. SHUMATE:** Let me attach that June 17th,
[2]  '04 letter that we discussed as Plaintiff's
[3]  Exhibit 1.
[4]     **MR. KNOTT:** The one she was reading from and
[5]  that she was reading from at the same time?
[6]     **MS. SHUMATE:** Yeah.
[7]     **MR. KNOTT:** Sure.
[8]     **MS. SHUMATE:** That it's clear later what we
[9]  were talking about. Although, we know in this
[10]  room, it's easier later.
[11]     (Whereupon, Plaintiff's Exhibit No. 1 was
[12]  marked for the purpose of identification.)
[13]     (Whereupon, the above-entitled matter was
[14]  concluded at 1:20 p.m.)
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 107**

[1]                 DISCLOSURE STATEMENT
[2]  STATE OF GEORGIA,              Deposition of:
[3]  COUNTY OF COBB:              MARGARET LLOYD
[4]  Pursuant to Article 8.B. of the Rules and
[5]  Regulations of the Board of Court Reporting
     of the Judicial Council of Georgia, I make
[6]  the following disclosure:
[7]     I am a Georgia Certified Court
     Reporter.  I am here as (a representative of
[8]  American Court Reporting Co., Inc., an
     independent contractor for American Court
[9]  Reporting Co., Inc., a sole practitioner,
     etc.)
[10]     (I, the firm) was contacted by the
     office of Amy M. Shumate, P.C. to provide
[11]  court reporting services for this
     deposition.  (I/the firm) will not be taking
[12]  this deposition under any contract that is
     prohibited by O.C.G.A. 15-14-37 (a) and (b).
[13]     (I have/the firm) no contract to
     provide reporting services with any party to
[14]  the case, any counsel in the case or any
     reporter or reporting agency from whom a
[15]  referral might have been made to cover this
     deposition.  (I/the firm) will charge
[16]  (my/its) usual and customary rates to all
     Parties in the case, and a financial
[17]  discount will not be given to any party to
     this litigation.
[18]
     This the 4th day of October 2007
[19]
[20]  -------------------------------
     Monique M. McNally, CCR, B-1670
[21]  Certified Court Reporter
[22]
[23]
[24]
[25]

---

| Page 106 | Page 108 |
|---|---|

**Page 106**

[1]             C E R T I F I C A T E
[2]  STATE OF GEORGIA
[3]  COUNTY OF COBB
[4]     I hereby certify that the foregoing transcript
[5]  was taken down, as stated in the caption, and the
[6]  proceedings were reduced to typewriting under my
[7]  direction and control.
[8]     I further certify that the transcript is a true
[9]  and correct record of the evidence given at the said
[10]  proceedings.
[11]     I further certify that I am neither a relative
[12]  or employee or attorney or counsel to any of the
[13]  parties, nor financially or otherwise interested in
[14]  this matter.
[15]
[16]     This the 4th day of October, 2007.
[17]
[18]     _____
[19]     MONIQUE M. MCNALLY, CCR # B-1670
[20]
[21]
[22]
[23]
[24]
[25]

**Page 108**

[1]                 ERRATA SHEET
[2]     I, MARGARET LLOYD, the witness herein,
     have read the transcript of my testimony and
[3]  the same is true and correct to the best of
     my knowledge.
[4]
[5]     _____ There are no corrections.
[6]     _____ Any corrections/additions are listed
     below.
[7]  PAGE/LINE        SHOULD READ           REASON
[8]
[9]  _____
[10]  _____
[11]  _____
[12]  _____
[13]  _____
[14]  _____
[15]  _____
[16]  _____
[17]  _____
[18]  _____
[19]
[20]
[21]     --------------------
           MARGARET LLOYD
[22]
[23]  Sworn to and subscribed before me
     this ____ day of _____2007.
[24]
[25]  Notary Public.
     My commission expires

---

This Page Intentionally Left Blank

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

Margaret Lloyd
September 14, 2007

| $ |
|---|
| **$1,000** 95:14 |

| 0 |
|---|
| **01** 17:12 |
| **02** 69:2 |
| **03** 69:4,14,18;70:16 |
| **04** 70:1,6,11,17;74:16; 80:3;81:23,25;89:16; 95:21;105:2 |

| 1 |
|---|
| **1** 105:3,11 |
| **1:10** 99:19 |
| **1:20** 105:14 |
| **12** 97:23 |
| **12:15** 68:22 |
| **12:25** 68:23 |
| **12:55** 99:18 |
| **17th** 77:13;81:23,25; 83:12;89:16;105:1 |
| **18** 97:23 |
| **1984** 7:6 |
| **1993** 7:8 |
| **1995** 56:8;59:16;62:18; 71:4;80:13 |
| **1996** 9:22;11:2 |
| **1998** 7:8 |

| 2 |
|---|
| **20** 47:12;58:20;73:7 |
| **2000** 37:8;63:5 |
| **2001** 11:5;12:3,4 |
| **2002** 17:13;19:21;94:6,9 |
| **2003** 19:21;50:3 |
| **2004** 30:7,8;68:7;75:5; 77:1,13;78:10,16 |
| **2005** 77:22 |
| **2006** 9:25 |
| **2007** 7:15;16:17 |
| **24th** 70:11 |
| **292** 6:8 |

| 3 |
|---|
| **3** 37:8;63:5 |
| **30115** 6:9 |
| **31st** 16:19 |

| 4 |
|---|
| **44** 6:11 |

| 6 |
|---|
| **6/17** 87:17;88:4,11 |

| 8 |
|---|
| **8** 77:22 |

| 9 |
|---|
| **90-day** 34:2 |
| **96** 11:3,4,23 |

| A |
|---|
| **ability** 27:22 |
| **able** 31:23;32:11;91:22 |
| **above** 99:11 |
| **above-entitled** 105:13 |
| **absolutely** 55:7 |
| **Absolutely** 55:9,11; 89:25 |
| **abuse** 56:2 |
| **accept** 84:14 |
| **accepted** 33:20;34:3; 35:11;38:8 |
| **accident** 25:11 |
| **according** 63:19 |
| **accurate** 96:1 |
| **accurately** 63:4 |
| **across** 30:14 |
| **action** 30:19;77:10; 89:1,2,8 |
| **actions** 103:5 |
| **acts** 73:22 |
| **actual** 11:17;64:18 |
| **actually** 8:6;11:13; 12:22;52:11;58:5;60:6; 67:12;98:7 |
| **Actually** 16:18 |
| **added** 7:23 |
| **addiction** 95:9 |
| **additional** 8:22;12:10, 15 |
| **address** 6:6;31:10,13 |
| **addressing** 22:5 |
| **adjust** 7:19;13:1,20; 21:17 |
| **adjusting** 10:19;14:5; 15:7;28:25;29:9;30:23, 24;36:16;39:2;97:16;98:6 |
| **adjustment** 100:24; 103:6 |
| **adjustor** 7:8,9,16;8:12, 14;9:7,11,13,13;11:9,20; 12:6,7,18;15:2;17:14,21; 20:13;21:21;25:8;27:9; 44:13;47:24,25;53:23; 57:19;61:24;62:24;66:9; 68:9;84:5;91:2;92:10 |
| **adjustors** 19:2;52:18; 100:1 |
| **adjustor's** 11:5;47:18 |
| **administrator** 7:11; 11:15;13:16 |
| **administrators** 9:9 |
| **admitted** 86:25 |
| **adverse** 64:8;89:22 |
| **advisory** 69:3 |
| **affect** 30:19 |
| **affirmative** 10:14,16; 11:11;14:12,16;15:23; 34:16;64:3;85:2;94:7,10; 97:18;104:17 |
| **affirmatively** 5:11,25; 74:10;79:24 |
| **again** 32:2;36:20;51:9; 62:1;64:11;67:7;71:5; 80:18;85:21;86:22;95:22 |
| **Again** 11:10;39:13; 70:19 |
| **aggravation** 22:2;25:5, 15,19,25;26:1,9;29:11 |
| **ago** 18:8 |
| **agreeable** 92:2 |
| **agreed** 82:15 |
| **ahead** 51:4;63:6,8; 73:25;86:24;93:12 |
| **Alabama** 7:23;9:21,24; 10:2,7,11,12,20,25; 12:11,13,15,23,25;13:1, 5;14:1,4,5,18;17:13;27:7, 8,21;52:22;63:20,24; 64:6;65:8;67:1,9,13,15; 68:1;69:9,24;70:21; 84:11;94:14;97:21 |
| **allow** 40:25;41:4 |
| **almost** 19:25 |
| **along** 21:1;32:12;90:13; 94:25;95:2,4 |
| **Alpharetta** 12:21; 23:10,12;35:16 |
| **Although** 105:9 |
| **always** 53:24 |
| **amount** 102:21 |
| **Amy** 4:11 |
| **anal** 60:14 |
| **anesthesiologist** 54:16 |
| **Anesthesiology** 65:16 |
| **ankle** 34:6 |
| **answered** 57:12;60:2; 86:21 |
| **anymore** 87:1;88:18 |
| **appeal** 64:12;73:14,17; 81:19;85:24;88:15;89:4,5 |
| **appealed** 73:11;74:18; 77:11;81:9;85:5,23,24 |
| **appealing** 73:15;80:19 |
| **appeals** 82:15 |
| **appointments** 19:1 |
| **appropriate** 22:4; 25:21;26:19;28:4,10; 29:12;48:14;69:9;75:22; 76:1 |
| **appropriateness** 59:15 |
| **approved** 33:7,9,11; 40:22;74:17 |
| **area** 31:1;58:25 |
| **aside** 60:1 |
| **aspect** 19:2 |
| **assessment** 53:13 |
| **assistant** 7:23 |
| **assume** 5:4 |
| **assumed** 74:19;85:6; 96:20;102:24;104:11 |
| **assuming** 23:1;24:13; 50:7;65:2;81:22;91:20; 97:17 |
| **assumption** 40:7;104:7 |
| **assumptions** 104:18 |
| **Atlanta** 18:6;58:25;59:2 |
| **attach** 105:1 |
| **attempts** 47:8 |
| **attention** 21:13 |
| **attorney** 4:12;5:23; 13:10,10;18:8;68:25; 84:21;100:8;101:8 |
| **attorney-client** 101:4 |
| **attorneys** 13:9;101:25 |
| **audible** 5:14 |
| **audibly** 5:17 |
| **authorization** 75:4,14; 85:21 |
| **authorizations** 85:9 |
| **authorize** 18:25;76:4; 77:6;86:15 |
| **authorized** 33:7,16,22; 76:12;79:25;86:14 |
| **available** 30:25;40:4,7, 8;96:4 |
| **average** 95:10 |
| **averaging** 95:14 |
| **avoid** 90:4 |
| **aware** 28:16;29:7,12,15, 18,19;30:1,8,9,22,23; 33:9;36:9;43:15,19; 49:16;70:17;89:21;91:8, 14;96:18 |

| B |
|---|
| **back** 14:20;16:10;17:15; 22:14;25:9,12;26:23; 31:9,12,13;33:23;34:14, 15;36:22;37:24,25;38:5, 12,20,20,23;39:3,4,17, 20,21,23;41:19;43:4,5,5; 44:23;46:2,18,22,23; 47:5;48:17;49:1;55:17, 23;57:14;61:4;62:5; 63:10;72:6,9;76:10; 77:20,24;79:21;95:16; 97:12,25;101:20 |
| **Back** 72:8,9 |
| **background** 6:14 |
| **backs** 103:2 |
| **bad** 44:23 |
| **Barbour** 29:2;34:19; 36:11;77:24 |
| **based** 75:8,13;83:7; |
| **101:4;102:3** |
| **basically** 13:8;19:16; 73:5 |
| **Basically** 73:6 |
| **basics** 19:6 |
| **basing** 76:4 |
| **basis** 20:21;21:22; 53:10;55:13;71:23 |
| **became** 7:8,10;8:12; 15:12 |
| **become** 9:17;30:1,8,23 |
| **began** 7:5;29:8;30:3,12; 37:1,22 |
| **beginning** 6:15;10:23; 70:6;91:7;94:3,13 |
| **belief** 81:25 |
| **believing** 22:8;83:18 |
| **Berkshire** 7:15;14:24 |
| **B-e-r-k-s-h-i-r-e** 14:24 |
| **besides** 37:25;40:5; 67:20;104:19 |
| **best** 17:9;59:13;80:10 |
| **better** 93:1;99:5 |
| **beyond** 34:21;35:10; 37:23;47:4;99:12 |
| **Beyond** 67:25 |
| **bill** 31:11,14;47:5;54:1 |
| **billing** 43:9;46:21 |
| **bills** 21:25;22:1;31:9; 34:7;38:9;56:5;77:18 |
| **bit** 21:17;99:5 |
| **blah** 79:5,5,5;84:4,4 |
| **blood** 24:2;95:17 |
| **board** 9:12;52:24;54:16; 64:5 |
| **Bojanowski** 17:20 |
| **B-o-j-a-n-o-w-s-k-i** 17:20;18:15 |
| **both** 5:13;45:3;49:22; 51:11;56:19,19 |
| **Both** 48:18 |
| **break** 5:22,23,24;68:13, 16,18 |
| **Brenda** 14:17 |
| **brief** 6:25;15:21,22,24 |
| **briefly** 4:16 |
| **business** 42:1;51:7 |
| **buy** 92:1 |

| C |
|---|
| **Cabot** 49:20,22;56:23; 57:6,8;58:3,6,8,22;59:3, 4,9;60:19;64:22;65:17; 66:17,23;69:1 |
| **Cabot's** 65:18 |
| **call** 39:20;49:20;74:22; 89:19;90:19;94:25 |
| **called** 31:21;33:13; 38:5;56:14 |
| **calling** 18:24 |
| **calls** 18:24 |
| **Calls** 83:21 |

**Cambridge** 7:13;11:7
**came** 17:10,11,15,18;
30:14;31:9;36:23;38:3;
48:16;76:10;79:7
**can** 4:23;5:18;26:3;
27:18;38:20;42:3,9;
44:18;46:7;47:20;53:13;
60:2,5;63:8;64:12;66:7;
73:21;74:4,8,13;81:19;
83:24;86:22;90:15;92:14,
16;93:15;94:17;95:17;
96:14;100:23;101:13;
102:18
**Can** 6:6;59:11
**Canton** 6:9
**capital** 8:10
**cardiac** 40:19;43:8;
76:22
**cardiologist** 40:12,15,
21;41:9,16;42:22;43:8,
14,17,19;45:9,19,23;
46:8,14;50:24
**cardiologists** 51:6,7
**care** 7:1;19:13;58:15
**carpal** 34:22,23,25;
35:6,12,13
**carrier** 9:7;13:15,22;
15:2;46:2
**carriers** 11:17
**case** 13:11;14:10;15:14;
18:18,19,22;21:19;28:15;
29:15;30:20;32:21;34:11;
37:24;38:23;40:1;9;42:2;
46:7;47:12,21;48:12,22;
49:1;53:11,12;60:8,10;
65:6;66:17,21;76:6,20;
80:9;84:6;89:3;94:5;
100:6,7,18,25;101:1,2,8,
11,19,22
**cases** 13:20,21;57:9;
60:11;65:5;76:7
**casualty** 98:8
**causally** 74:14
**cause** 95:17;103:10
**caused** 44:23
**certain** 20:24,24;43:23
**certainly** 4:19;99:10
**certificate** 9:22,23
**certification** 9:2;10:2,
6,23;11:1;12:12,25;13:4
**certified** 9:13,14,15,18;
10:22;52:24;54:16;64:5,
5;65:8;67:15;68:1;97:20
**cetera** 31:8
**chances** 85:12,14
**change** 26:11;55:15,20
**changed** 78:23
**charge** 27:10,13,15,21;
28:4
**check** 25:24;28:9;
31:13;59:5;60:16
**children** 6:23;104:12
**choose** 58:2;65:5

**chose** 67:24
**chosen** 21:5
**chronic** 26:23;43:5;
95:3;96:24;103:2
**chronological** 57:4
**circle** 87:8
**Circuit** 34:18
**claim** 7:7;15:7;17:8,9,
19;19:3,5,7,8;20:4;23:7,
10;27:8;28:14,25;29:10;
30:23,24;35:20,20;36:4,
17,21,22;39:2;52:18;
77:17;80:11;91:7,13,22,
25;93:20;94:2,4;100:20;
101:13;103:6;104:20
**Claim** 84:4
**claimant** 27:11,23;
66:12
**claimants** 77:4
**claimed** 34:25
**claiming** 20:4;44:21
**claims** 7:19,24;8:7;
13:1,15;14:5;18:24;
20:12;36:5;38:11;58:23;
92:12
**claim's** 21:21;44:13
**Claims** 84:19
**clarification** 22:17;
37:6;44:24
**clarify** 25:22;80:17
**clarifying** 67:25;101:24
**classes** 12:10,16
**clear** 29:19;43:11;
47:13;97:14;100:23;
105:8
**clearly** 5:19
**clients** 77:4
**client's** 8:13
**Clio** 84:3
**close** 91:22
**closed** 7:12,13
**clots** 95:17
**clotting** 44:22
**coerce** 103:7
**cold** 89:24
**college** 6:15,16;7:2
**combination** 103:3
**comments** 49:23,24
**communicate** 14:7;
51:12
**communicated** 14:9
**comp** 8:19,20;10:18;
11:9;12:5;14:3;15:1;
21:19;33:1;40:19,22;
41:1,7;42:13,23;44:15;
46:17;53:8;65:6;68:3;
69:3;77:4;88:4;97:16,17;
98:3,5;101:19
**companies** 11:14;
58:12;67:19;98:12
**company** 7:5;15:10;
16:10,14;17:22;27:14;
50:10;57:21;58:11,15;

84:14;92:11
**company's** 63:25
**compensable** 28:13;
33:20;34:3,6,10;35:3,12;
43:7;61:2;75:22;76:2
**compensated** 35:6
**compensation** 7:21;
8:15;9:1,3,11;10:24;15:2;
22:3;28:14;38:11;77:12,
14,15,17;84:6,9;98:9;
100:25
**Compensation** 84:12
**complained** 39:24
**completely** 18:3
**completion** 84:17;
85:11
**comply** 81:17
**concern** 23:22,24;
103:16
**concerned** 24:9;40:13;
44:14;50:7,11;102:20,25;
103:3
**concluded** 105:14
**conclusion** 26:6
**condition** 26:11;36:10;
62:17;103:17
**conditions** 20:5;33:21,
21;45:25;46:9,15
**confident** 86:18
**confirmed** 36:23;38:8
**connected** 74:14
**consider** 7:2;86:15
**consideration** 90:1
**considered** 9:12
**contact** 14:7;18:4;
45:12;50:18;51:5;84:18;
102:22
**contacted** 50:25;52:7;
56:19
**contacting** 45:9;50:23
**contain** 33:19
**contains** 33:20
**continue** 12:17
**continuing** 77:13;
81:24;97:23;98:2
**contraindicated**
43:24;44:14;45:8
**contraindications**
44:4
**conversation** 50:4;
91:12;95:23,25
**conversations** 47:2;
53:17;90:11,20;91:5
**copied** 60:3,5;88:1
**copy** 24:22;60:1,4,6;
67:13;72:12;84:21;87:14
**copying** 30:3,12
**correction** 34:21
**correctly** 44:18;49:2;
50:14;84:22
**correspond** 43:3
**correspondence** 50:5
**cost** 90:14,24

**costing** 95:7
**County** 29:2;34:19;
36:11;77:24
**couple** 97:11;99:15
**course** 8:4,23;9:20;
10:9,13;13:3,4;42:1,6;
71:13;92:7,9,24;97:15,
17,19,20
**courses** 10:17;12:10;
13:3,6
**court** 4:3,20,22;5:12;
29:1,2,13;30:9;101:2;
102:1
**Court** 28:17;34:18
**courts** 61:1
**cover** 34:8;48:8;64:20;
91:9
**coverage** 87:17
**coworkers** 60:15
**created** 26:10
**credentials** 52:25;53:1;
59:5;69:23;70:21
**CROSS-EXAMINATION**
4:9;103:14
**current** 14:23;21:14;
32:4;33:14;59:15;62:16;
71:3
**custodian** 23:5
**cut** 70:3;71:1;72:9,9,19;
77:1,2,8;78:9;80:3;81:8,
21;82:5,10;83:19;87:16;
89:23;90:16;93:22;94:14,
21,23,24;95:20,25;99:25;
100:1;101:14

# D

**Dale** 15:9
**Darvocet** 47:23
**date** 59:19;81:23;88:12
**dated** 37:8
**day** 10:3,15;16:18;
39:24;54:9
**deal** 14:1;27:8
**dealing** 14:6;21:18,20;
32:25;37:25;43:4;53:7;
77:3
**dealt** 8:18
**Dear** 84:2,5
**decide** 27:23;68:2
**decided** 29:21
**deciding** 27:10;28:4
**decision** 20:9;27:14,15;
29:14;31:19;56:6;68:9;
74:20;77:10;80:2;81:22,
22,25;82:14;85:8,19;
96:25;99:11,12
**decision-making**
27:22
**deemed** 31:8
**deep** 103:16
**defendant** 4:19
**defense** 13:10

**degenerative** 95:16
**degree** 6:18
**denial** 64:12
**denied** 32:1;35:2,11;
64:11,11;72:22,24;73:1,
10;74:21;75:14;76:24;
77:13,16;81:2,10;82:2;
84:17;85:1,4,15,17;86:4,
6;87:17;88:4,11;89:2;
90:2;96:15
**deny** 75:3,3;83:7
**department** 7:7
**Department** 14:2;84:11
**deposed** 4:7,14;101:16
**deposition** 15:17,20;
16:8,12;90:8
**describe** 18:21
**Describe** 33:18
**described** 46:24
**designated** 8:14
**detail** 61:14
**details** 31:22
**determine** 37:23;38:23;
39:2,11;48:15;71:17
**determined** 34:9;61:1;
74:15,19,25;76:1
**determines** 75:21
**devoted** 58:14
**diagnosis** 20:1;27:2,5;
38:8;40:17;57:13,16;71:4
**Diane** 17:20;34:12
**Diane's** 33:15
**diary** 34:2
**difference** 13:14,17,19;
25:7,13;38:12;78:15
**different** 8:16;13:22;
26:22;38:18;62:25;66:2,
3,13;68:20;78:20,23;
99:5;102:2
**differently** 13:21
**DIRECT** 102:10
**directing** 29:13
**directly** 22:3;28:13;75:1
**disagrees** 74:8
**discover** 4:23;32:13
**discuss** 13:5;30:17;
40:25;42:2;46:14,19;
91:19;100:14,17;101:15,
18
**discussed** 100:6,9;
105:2
**discussion** 102:8;
104:24
**disease** 95:16
**disk** 26:15;95:16
**distress** 103:11
**division** 14:3;84:11
**doctor** 13:12;19:20;
22:5,9,12,17,20;24:2,14;
25:1;27:14;28:1,3;29:13;
31:24;37:3;39:9;41:14;
42:12;43:1;44:2,12,14,
15;45:21;48:7;49:15,15,

Case 2:06-cv-00593-CSC     Document 38-2     Filed 11/15/2007     Page 33 of 38

Johnny W. Sasser vs.
Ryder Truck Rental, Inc., et al.

Margaret Lloyd
September 14, 2007

25;51:12;53:8;55:3;
57:11;58:20;59:1;60:2;
62:17,19,21;64:4,22;
65:5,9,11;66:3,14;67:8;
69:2,5;70:20;73:17,21;
74:22;75:6,25;88:15,17;
96:10,13,15,23;97:6,9;
104:10
**doctors** 15:25;16:1;
22:24;23:13;26:22;41:1,
4;42:6,13,23;44:25;45:3;
48:4;49:11,22;52:17;
53:14,16,18,20,24;56:14;
61:6,23;64:7,9,18;65:23;
66:20;71:11;73:14;82:8;
83:17;84:2,5;85:24;
98:16;99:4
**doctor's** 25:10;41:25;
56:6;99:12
**doctors'** 48:3
**document** 37:1,2,3
**documents** 15:16;16:4,
21;36:19;68:25
**dollars** 20:25
**done** 7:4;33:15;46:4;
47:6;58:3;65:19,20;
66:22,24;69:2,19,25;
74:9;76:15,18;80:13,14,
15,15,22;81:12;82:20
**Dothan** 52:22
**down** 5:12;11:8;51:18;
62:23
**downsizing** 99:22
**dozens** 57:9
**Dr** 29:21;31:3,16,22;
32:3,12,17,20,24;33:6,
17,17;36:9;37:7,9;39:11,
14,25;40:6,6;43:6,6;45:1,
1,7,11,17;46:8;48:22,25;
49:13,18,20,22;50:5,18;
51:9,10,14,15,21,22;
52:5,7,10,20,22;53:13;
54:4,9,13;56:11,23;57:6,
8;58:3,6,8,22;59:9;60:19;
64:22;65:13,15,17,18;
66:17,18,23;69:1,4,13;
71:9,10,10,18,20,21,22,
25;72:11;73:7;77:25;
78:16,17;79:14,16,19,25;
83:13,13;84:3,3;88:20;
96:4,5,11;97:3;103:18,
20;104:5
**Drive** 6:9
**driving** 102:24;104:8,
11,19
**drop** 24:24
**drug** 43:10;48:13
**drugs** 19:25;20:4,5;
43:13,15,18,23;44:19,22;
47:12;48:1;56:2,3,4;
91:14;103:2
**duly** 4:7
**duplicate** 60:6

**duration** 21:3
**during** 15:6;30:24;
56:25

## E

**earlier** 102:14
**early** 17:13
**ease** 52:13,16
**easier** 105:10
**easily** 6:4
**education** 6:14;8:1;
97:23;98:2
**effected** 104:20
**effective** 77:9,13;81:24;
84:7;87:17;88:4,11
**effects** 89:23;103:23
**efforts** 50:17
**either** 28:18;30:25;
45:18;48:19;49:24;66:10
**Either** 56:16
**Ellen** 18:17;59:6;60:17
**else** 4:23;35:8,18,25;
39:7;55:2;66:17;75:5;
91:24;97:1;99:16;100:10
**employee** 25:10,10
**enclosed** 64:21
**end** 8:24
**enough** 21:15;50:19
**entire** 56:9
**entitled** 27:11;96:11,12
**epidural** 74:14
**epidurals** 49:8;73:8
**error** 48:5
**et** 31:8
**even** 31:11;73:7;86:5;
96:14
**Even** 103:2
**events** 16:11;57:5
**everyone** 60:17
**exactly** 16:9;44:17;
90:24
**EXAMINATION** 102:10
**excuse** 46:8,16;79:17
**Exhibit** 105:3,11
**exhibits** 15:21
**existed** 102:1
**exists** 36:1
**expenses** 91:14
**experience** 38:10;
57:15,17;86:19,24;89:22
**explain** 4:16
**Explain** 9:4
**explained** 73:16
**explanation** 22:10;
24:10,20;41:21;43:12
**express** 103:16
**expressions** 5:3
**extra** 55:1

## F

**face** 95:3

**facial** 5:3
**fact** 21:8;24:14;41:8,8;
45:11;47:7;52:10;53:15;
54:19;55:12,16;59:22;
77:8;83:13;88:21,22;
91:8,13;101:16;102:3
**facts** 100:6;101:19
**failed** 33:23;103:2
**fair** 5:9;32:25;41:10;
51:21;61:5;85:18
**far** 20:8;22:4;39:20
**faster** 6:2,2,2
**favorable** 66:12
**fears** 95:9
**February** 15:5;16:14,
15,17
**federal** 101:2
**feel** 43:7;46:8;84:18;
99:10
**felt** 44:11;48:13
**few** 17:14;18:5;94:1,3,5
**file** 16:4,16;21:14,14,15,
16,18;23:2,6,7;24:13,22,
24;29:4,4,6,6;30:3,12;
33:12,13,14,15,18;34:1,
11;35:15,19;36:2;37:23;
41:10,20;59:19;65:1;
71:6;74:4,8;94:24;95:2;
101:21
**filed** 36:4
**files** 21:10,11;38:8
**filing** 24:24
**final** 31:6,18;70:12,20;
71:1;73:4
**Financially** 92:8
**find** 4:18;31:5;32:1;
43:15;44:20;58:21;67:16,
22;71:3;96:7
**finding** 26:17
**fine** 4:5;26:25;68:17
**finished** 6:17
**firm** 17:3
**first** 4:7;10:21,22;15:9;
17:10,17,18;18:19;19:18;
24:10;45:14;49:20;66:22;
68:5,5,8,13;69:13,16,19;
79:1;91:6;94:1,3,8,9
**First** 51:5
**Five** 11:22
**five-day** 9:20;97:19
**flag** 47:24;54:6
**follow** 67:14
**follows** 4:8
**forefront** 53:7
**forget** 49:11;91:19
**form** 5:2;25:17;27:16,
25;28:6;29:23;38:14;
42:5;51:2;55:18;63:2;
66:4;69:10;72:20;73:23;
75:11,15;78:2,5;80:4;
81:3,6;82:16;83:21;86:8;
87:2;88:7;91:4;92:13
**formal** 98:20

**forth** 9:21;13:13;40:17
**forthcoming** 52:18;
53:9
**Fortier** 15:12;100:3;
101:19
**F-o-r-t-i-e-r** 15:12
**forward** 64:9
**found** 78:14
**foundation** 63:3
**four** 12:1
**four-week** 8:3,23;97:15
**fracture** 34:7
**fractured** 26:15;34:6
**fractures** 26:16
**free** 84:18
**friendly** 53:24
**further** 72:13;77:9;
84:15,24;89:1,1,6,8;90:2
**FURTHER** 103:14
**future** 21:18,20;74:21;
79:4;82:2;91:21;92:1;
93:21
**Future** 19:16,17

## G

**gave** 17:13;23:22,24;
40:16;41:23;47:3;79:11;
84:21
**gear** 68:20
**geared** 10:18
**general** 10:19;21:3;
33:22;37:15
**Georgia** 6:9;7:22;9:1,6,
15;10:5,10,21,24;11:5;
12:18,21
**gist** 40:16
**given** 27:6;47:3;50:12;
55:16;75:22;86:18
**Given** 86:24
**giving** 49:14,15,16;
51:22,23;71:22
**goes** 6:2;26:23
**good** 68:12
**governed** 29:3
**Granted** 56:5
**great** 61:14
**Greg** 15:10;100:2;
101:18
**grown-ups** 93:9
**guess** 21:23;23:5;54:8;
93:14
**guidelines** 67:1,3,10,14
**guy** 101:13

## H

**half** 10:4;43:13
**handle** 13:18,20;17:16;
21:16,22;47:11
**handled** 8:16;13:15;
58:4;94:2
**handling** 17:17,18,19;

**36:21,22;38:11;95:13;
100:19**
**happen** 86:18,19
**happened** 19:4,25;
21:7;61:4,17;66:16;
101:22;102:4
**happy** 5:23
**hard** 63:15
**Harmony** 6:8
**Hathaway** 7:15;14:24
**head** 5:11,15,25;21:6;
74:10;79:24
**heard** 88:15;96:19
**heart** 20:5;24:1
**heavy** 56:7;57:15;
102:21
**held** 102:8;104:24
**help** 5:18;19:1;55:19
**helped** 55:23
**helping** 43:25
**hereby** 84:6
**here's** 60:3
**Hicks** 14:17
**highly** 85:20
**hire** 66:3
**hired** 75:6
**history** 6:25;7:1,3;
28:20;52:20;53:20
**hold** 9:23
**honest** 93:5
**Hopefully** 21:25
**hours** 97:24
**huh** 47:25
**hurt** 60:20;61:9,9,15;
73:19
**hurting** 43:25
**husband's** 18:13

## I

**idea** 61:13
**identification** 105:12
**ie** 89:8
**immediate** 15:8
**immediately** 19:6,9;
29:7;84:7
**important** 60:22
**I-n** 8:10
**inappropriate** 55:17
**incident** 26:10
**included** 35:20;79:13
**incorrectly** 80:15
**indeed** 62:18
**indemnity** 19:14
**independent** 11:5,13;
12:18
**indicate** 31:4;32:5;
54:22
**indicated** 24:9;31:5,22;
32:10;34:18;35:23;65:25;
95:19
**indicating** 37:4,10;
50:13

Margaret Lloyd
September 14, 2007

Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

**indication** 44:1;55:14
**individual** 38:17;57:25;
74:13
**individually** 17:5
**Industrial** 14:2;18;
84:11
**inflection** 5:3
**information** 4:20;
18:25;22:17;31:9;32:1,
13;41:13;42:14;45:24;
47:3,4;53:19;79:20
**in-house** 8:4,13
**initially** 29:9
**injection** 74:14;76:21,
23
**injections** 49:10;51:22
**injuries** 8:17,18,19;
11:10
**injury** 22:2,4,5;25:6,9,
12,14,16,20,25;26:2,13,
14;28:13;29:11;33:21;
34:4,11,18;35:3,3,6,12;
36:18;37:5,11;41:7;46:2;
48:17;59:16;61:2,11,16;
62:6,13,18;71:23;75:1,
23;76:2;77:25;79:4,18,
21;80:13
**inquire** 32:10;50:18
**inquiring** 48:11,12,15
**InService** 11:12,14,16
**InServices** 7:11;8:8,21,
25;11:25;97:19
**inside** 87:7
**instance** 34:5
**institute** 56:23
**instituted** 56:24
**instruct** 101:3
**instructed** 82:23
**instructing** 82:22
**insurance** 10:18;11:13;
53:23;57:21;58:12,15;
98:11
**intention** 103:7,10
**interested** 91:11
**intermingled** 48:3
**interpret** 95:1,2
**interpreting** 8:5
**intervene** 28:17
**intervening** 26:10
**into** 7:22;19:8;20:8;
61:13;68:14,19;83:18;
90:1
**intoxicated** 102:22;
104:20
**IntraCorp** 33:1;66:24;
67:13,17,18,19;69:3;
70:11,19;71:5
**investigate** 47:8,16
**involved** 25:11;28:22
**IRS** 32:7;54:10
**issue** 48:23;52:8,13;
56:2;76:22;99:11
**issues** 32:7;54:10;99:8

## J

**January** 16:18,20;37:8;
63:4
**Janush** 71:10
**job** 8:2;14:23;15:6;
21:23;44:3,5,9;47:18;
54:20;60:20;61:15;62:13,
24;63:16,17;67:16;92:5,
5,10,24;93:16;96:1,2
**jobs** 7:6
**John** 52:22;84:3
**Johnny** 84:4
**judge** 29:20;36:11;
62:21
**Judge** 77:23;78:16;
79:13
**June** 77:13;78:10,16;
80:3;81:8,23,25;83:12;
89:16;95:21;105:1
**junior** 7:9
**justification** 72:7

## K

**Kathy** 15:12;100:2;
101:19,23
**Kemper** 7:6,8,9,17,20;
8:4,23;11:13,18,25;97:15
**kind** 5:17;8:1,6;19:1,8;
20:7;33:24;35:23;40:16;
53:19;57:16;65:6;72:6;
102:2
**kinds** 104:15
**knew** 10:19;14;
32:16;36:22;53:21;56:3;
60:15;61:2;73:13;81:8;
85:4,11;86:5,17
**Knott** 17:2
**KNOTT** 4:5;25:17;26:5;
27:16,25;28:6;29:23;
37:6,12,19;38:14;42:5;
51:2;55:18;63:2,14;66:4;
68:12,18;69:10;72:20;
73:23,25;75:11,15;78:2,
5;80:4;81:3,6;82:16;
83:21;86:8,20;87:2;88:7;
91:4;92:13;93:6;98:14;
99:2,17;100:23;102:7,11;
103:13;105:4,7
**knowledge** 17:9;18:3;
30:6;31:20;33:10;46:13;
72:16,18;89:11,13
**known** 31:19;51:21;
55:23;57:15

## L

**L2-3** 34:6
**laid** 99:22
**Lake** 6:8
**large** 29:5

**last** 16:18;18:5;33:15;
70:8;100:5
**later** 5:2,19;17:15;
41:19;60:2;105:8,10
**law** 13:11;81:17;93:18,
19;94:14
**laws** 27:21
**lawsuit** 4:19;36:6;74:4,
8;78:14;79:6;100:22
**lead** 83:17
**learn** 78:12
**least** 100:3
**leave** 17:22;99:21
**leaving** 7:10;16:10;
102:4
**lectures** 9:20
**left** 15:10;16:14,19;
17:14;71:21;100:4,11,15;
101:24;102:5
**legal** 6:18;26:5
**legally** 62:4,10
**legs** 44:22;95:17
**letter** 24:3;25:1;37:7;
40:12,15;63:4;84:1,21;
85:19;86:2;87:6,12;
88:16,18;89:11;105:2
**letterhead** 37:8;64:20
**letters** 15:24;23:3
**levels** 26:15
**license** 8:25;9:10;11:5;
12:18;97:24;98:7
**licensed** 9:7,13;98:5
**likely** 85:12,14;86:25;
87:3,4
**line** 21:1;32:13
**lines** 9:1;39:22;90:13
**list** 47:12;89:17
**listed** 35:2
**listener** 13:8
**little** 21:17;37:23;39:22;
60:14;92:11;93:2;99:5
**living** 18:6,6
**Lloyd** 4:11;6:8,10;84:18
**LLOYD** 4:6
**local** 6:17;8:25
**located** 12:19
**long** 11:18;53:20;96:19
**longer** 30:25;68:3;77:6,
18;96:4
**look** 15:20;25:24;26:19;
37:22;39:10,15,18;41:20;
44:3,4;47:18;50:17,20;
51:18;57:11;75:7;92:6,8
**looked** 15:20,21;16:9,
10;19:6;21:10;36:14,25;
39:20;40:1,3,4;51:20
**looking** 21:11;29:10;
50:15;61:25
**looks** 75:5
**lost** 7:24;79:2,3
**lot** 5:18;18:24;20:3;
24:24;32:6;47:21;49:14;
56:4;90:14,25;92:18

**low** 34:13,15;36:22;
37:25;38:5,12,20,20,23;
39:3,4,16,22;43:5;57:14;
77:20
**lumbar** 19:25;34:13,20;
37:25;38:4,5,12,19,24;
56:8;57:13;62:2;76:21,
21,22,23
**Lumbar** 34:15
**lying** 90:18,19

## M

**mailed** 31:11;60:4,7
**maintain** 33:23
**major** 6:17
**makes** 18:23;85:8
**making** 40:6;52:12
**man** 43:10;47:12;60:20;
87:1;94:17
**management** 32:19;
49:3;54:15,17;55:3;
65:12,18;96:22,24;97:6,9
**manager** 18:18,19,22;
21:8
**managers** 21:9;94:25
**managing** 50:10
**mandated** 13:24
**man's** 57:13;79:3
**many** 19:25;40:13;51:5;
57:15,18;97:8;103:2
**March** 69:4,13,17;70:16
**Margaret** 6:8
**MARGARET** 4:6
**mark** 60:15,16
**marked** 105:12
**married** 6:21;18:11,12
**Marsella** 22:23;32:3,17,
20,24;33:6,17;40:6;43:6;
45:1,7;49:13,18;50:5,18;
51:10,15,21,22;52:5,7,
10,20,22;54:10,13;56:11;
65:15;71:10,18,21,25;
73:7;79:16,25;83:13;
84:3;88:20;96:20,21,22;
103:18,20;104:5
**Marsella's** 48:22,25;
53:13;54:4;71:22;72:11
**Martye** 84:18;102:12
**Mason** 6:8
**match** 27:2
**matched** 24:23
**matter** 56:1;58:17;75:9;
105:13
**mattered** 78:18
**may** 21:8;78:19;88:1
**May** 69:2,25;70:6,10,11,
17;74:16
**maybe** 9:20;47:25;53:8;
102:7
**McDonald's** 7:2
**McGahan** 22:23;29:21,
22;30:25;31:3,16,22;

32:12;33:17;36:9;40:6;
43:6;45:1,11,17;51:9;
54:9;65:13;71:9,20;
77:25;78:17;79:14,19;
83:13;84:3;96:4,5,11,21;
97:3
**McGahan's** 37:7,9,22;
39:11,14,25;63:4
**mean** 7:1;9:4;13:17,18;
14:6;15:14;23:9;25:23;
26:1,2;27:14;28:15;36:5;
38:17,20;42:11;44:3;
45:18;46:6;47:16,16,17;
48:7;50:7,10,11;54:1,8;
56:5;58:4;70:22;73:19;
77:2,14,16;82:22;86:3;
89:5,8;92:21;93:4;94:21;
95:3,4;96:21;99:1;
100:19,21;101:15
**meaning** 18:4;28:10
**means** 26:7;95:2
**meant** 67:3
**med** 77:11,15
**medical** 8:5;13:12,13,
21;18:2,25,25;19:2,13,
20;21:24;22:9;27:5,12;
28:5,7,11,12;33:22;35:7;
36:10,23;38:11;40:4,5;
41:1;44:1,24;45:24;46:9,
15,16;47:19;59:14,18,22;
62:11;68:3;69:9;79:4;
80:12;84:7;88:3;98:10,
20;99:6,8,11;103:17
**medically** 57:25;79:4;
80:12
**medicals** 19:16,17;
22:6,10;25:5,24;28:18;
35:13;71:7;91:21;92:1;
93:21;96:12
**Medicare** 91:8
**medication** 23:18,19,
21;39:17;44:13;45:13;
48:14;49:5;51:25;52:5,8;
54:22;74:13;76:22;77:5,
7;80:2;89:15,22;95:6;
103:21
**medications** 23:14,24,
25;24:15;25:2;33:23;
40:14,16;43:20;44:3,4;
45:8;46:10,17;47:21;
55:17
**medicine** 46:22;49:14;
54:25,25
**medicines** 22:7,11;
24:8;46:20;50:19
**meds** 21:18,20
**memory** 15:14;16:11
**mental** 103:11
**mention** 34:23;61:14
**mentioned** 16:24;18:9;
25:22;34:20
**mentioning** 34:22
**might** 4:21;18:5;24:22,

23;26:24;36:4;44:13;
45:17;53:12;54:22
**mind** 13:19;25:8;51:6;
52:13,16;53:7
**minutes** 99:15
**misconstrue** 5:7
**misinterpreted** 90:20,
22
**misleading** 86:2
**moment** 29:6;81:1
**money** 90:14;25;92:25;
93:16,17;95:7;104:16
**monitor** 34:2;54:20
**Monitor** 55:6
**monitored** 54:20
**monitoring** 44:2;45:13;
52:11
**month** 95:14
**months** 17:14;94:1,3,5
**more** 25:1;32:4;37:17;
48:1;60:14;68:10;73:8;
97:9;101:21
**motivation** 56:9
**motor** 25:11
**move** 68:14;94:24;95:2,
4
**moved** 31:1,4,5,22,24;
32:10,12;54:9;96:7
**MRIs** 71:13
**much** 39:16;47:19;
50:21;54:25;58:14;75:9;
95:10
**multiple** 26:15
**must** 64:9;84:9

---

**N**

**name** 6:6;18:13;23:19;
58:24
**names** 22:22;24:1;48:3
**narcotic** 89:22
**narcotics** 32:8;56:8;
57:16;102:21
**nature** 37:4,11;38:23;
39:2;45:14;49:8;99:9
**Near** 8:24
**necessary** 29:14,21,22;
43:7;44:11;62:12;66:1;
80:12
**need** 5:22,24;26:1;
27:11,23;28:5,7,11,12;
33:1;43:3;44:14;46:8,14,
15;62:23;66:25;74:12;
81:15,17;82:8;89:19;
96:23,25
**needed** 12:25;20:7;
41:3;44:24;47:13;80:17,
18
**needs** 5:14;50:20,21;
72:13;73:20
**negative** 104:4,6
**neighbor** 104:13
**new** 13:13;22:2;25:14,

16,20;26:2,13,14,16;
29:11
**next** 55:22;73:12;80:22,
23;81:18;94:5
**nisi** 101:25
**nobody** 21:6
**nods** 5:11,25;74:10;
79:24
**Nods** 5:15
**non** 43:4
**noncertified** 85:13
**noncompensable**
34:7
**non-workers'** 41:1;
42:23
**normal** 27:5;42:1,6,16
**normally** 42:11
**Normally** 47:22
**note** 87:6,18,20,25
**notes** 22:18;25:10;38:6
**notice** 88:8
**noticed** 22:13;84:20
**notification** 15:25;
84:15
**notified** 31:7;72:11
**notify** 64:7;75:25
**notifying** 84:6
**November** 17:11
**number** 6:19;20:24,24
**nurse** 18:18,19,21;
57:23

---

**O**

**object** 63:2
**Object** 25:17;27:16,25;
28:6;29:23;38:14;42:5;
51:2;55:18;66:4;69:10;
72:20;73:23;75:11,15;
78:2,5;80:4;81:3,6;82:16;
83:21;86:8,20;87:2;88:7;
91:4;92:13;93:6
**objection** 63:14
**obligated** 62:4,11
**obligations** 63:25
**obtained** 42:20
**obvious** 56:4
**obviously** 53:21
**occasionally** 49:11
**occasions** 66:9,14
**occur** 19:22
**occurred** 13:1;24:21;
59:21;66:14
**off** 42:12;59:6;70:3;
71:1;72:9,10,19;77:2,2,8;
78:10;80:3;81:8,21;82:5,
10;83:19;87:16;89:20,23;
90:16;93:22;94:14,17,21,
23,24;95:5,20;96:1,7;
99:22,25;100:1;101:14;
102:8,14;104:24
**offended** 6:4
**offer** 96:10,15

**offered** 79:17
**office** 7:12;8:14;15:11;
18:23;23:10,11,12;31:12;
39:22;41:25;48:6,22;
72:11;79:12
**often** 99:4
**old** 6:10
**ombudsman** 14:3,9
**ombudsman's** 79:12
**once** 10:3;82:19;97:20;
100:21,22
**one** 10:20,21;12:11;
21:9;22:15,24,25;23:13,
13;24:7;25:1;32:4;33:12;
37:13,14,16;45:4,5,6,15;
48:1,3;51:8,10;54:9;
56:16;63:15;66:18,23,24;
67:4,5,6,7,11;69:16,17,
19,25;70:1,3,8,10,12,14,
16,17,20;73:19,19,20;
76:3;81:15;85:7,8;96:18;
97:20;101:21;102:7;
104:2,3;105:4
**One** 10:13,15;31:2
**one-a-year** 13:4
**ones** 43:16
**ongoing** 19:13;21:22;
62:22,23;63:21
**only** 7:21;20:1;22:22;
23:21;24:4;39:25;40:11;
56:22;71:16,18;75:20,21;
79:21;98:5,8;102:12
**Only** 41:23
**on-the-job** 97:21
**opinion** 25:15;41:3;
55:15;57:6,7;59:14;
62:25;64:6,8;65:24;66:2,
10,13,13;72:3;83:17,24
**order** 13:1;29:13,20;
30:2,9,14,15;62:7;77:23;
78:4,7,13;79:13
**ordered** 78:17
**orders** 29:1,2
**original** 71:23
**originally** 87:24
**orthopedic** 58:24;59:1
**orthopedics** 65:12
**others** 43:24
**otherwise** 5:6
**ours** 99:4
**out** 4:18,23;5:18;31:1;
32:1;43:15;44:12,20;
50:15,17;51:6;58:20,22;
67:8,22;78:14;79:7;
91:25;92:1,6,8
**outrage** 101:13,17;
102:1
**outside** 42:13;53:14;
75:20
**outsourced** 67:16
**over** 17:8;19:3,6;21:6,
19;32:21;33:12;38:23;
64:20;80:18;90:14;

101:21
**overall** 20:7
**overmedicated** 50:6;
55:14
**overmedicating** 52:12
**overridden** 76:12
**override** 76:20
**overtaking** 55:10
**own** 7:24;15:14
**Oxycontin** 47:22;73:9

---

**P**

**packet** 60:3
**page** 5:6;26:4;87:7
**paid** 12:17;28:19;31:11;
35:12;38:9;75:10;91:24;
92:11
**pain** 32:19;34:14,15;
37:25;38:5,12,20,20,24;
39:3,4,17,23;43:5,5;
47:21;48:13;49:2,14;
54:15,16,25;55:3;57:14;
65:12,16;73:20;95:3;
96:22,24,24;97:5,9
**Pain** 65:18
**paper** 5:2,3;24:24
**papers** 29:2
**paperwork** 34:17
**paragraph** 84:24
**part** 36:6;47:18;54:20
**Part** 44:18;90:9
**participate** 13:8
**particular** 8:1;14:22;
22:10;24:3;27:11,23;
29:13;37:14,17;48:16,23;
53:12;66:19
**particularly** 27:7
**parties** 31:7
**parts** 90:10
**party** 11:16
**past** 58:19
**patient** 42:3;44:12;
47:20,22;58:15;83:18;
84:4,8;90:24
**patients** 54:21;55:6;
58:9;19:97:8
**patient's** 28:5
**pay** 29:22;47:4;62:4,11;
63:18;77:18,24,25;78:17;
79:3,14;80:12;82:8;
83:20;91:25;93:2;95:7,22
**paying** 21:13;38:4;54:1;
63:18
**payment** 21:15
**payroll** 94:18;102:15
**peer** 15:25;19:19;20:9,
20,25;21:5;24:11,15;
29:8;30:4,4,5;36:20;37:1,
21;39:6,12;40:2,9;49:21;
57:2;61:5,7;64:13;65:21;
66:11;67:17,23;69:1,9,
14,20;71:1;73:2,4,10;

101:21
**overall** 20:7

83:2,8;93:21;94:8,13,16;
102:13,19
**pending** 101:1
**people** 9:8;88:2;89:21;
104:15
**per** 66:25;72:12;73:11;
84:10;88:13;95:10,14
**Percocet** 47:23
**performance** 99:23
**perhaps** 62:15
**Perhaps** 52:15
**period** 12:14;17:10,16;
68:10;77:20;89:16;96:19
**Periodically** 94:1
**person** 14:13;27:10,13;
48:1
**personal** 53:17
**personally** 39:10,15
**person's** 69:23
**pharmacist** 43:9;48:2
**pharmacy** 46:21;83:14
**Pharmacy** 84:4
**phone** 18:24
**physical** 21:2;26:24;
103:11
**physically** 89:23
**physician** 22:9;24:10;
31:17;33:7,8,11;36:18;
37:4;40:22;45:13;49:17;
50:25;56:11;57:23;58:8;
62:5,12,20;65:25;66:1,
11;67:17,23;69:3;71:19;
103:18
**physicians** 33:16,22;
57:3
**physician's** 39:15,18
**pictorial** 8:4
**picture** 47:13,19
**Pitz** 15:11;100:2;101:18
**P-i-t-z** 15:11
**place** 20:18,20
**placed** 94:21
**places** 104:15
**plaintiff** 13:9
**Plaintiff's** 105:2,11
**plan** 33:13,15,18,25;
34:1,11,12;35:3;37:23,24
**Plavix** 23:20,21;24:4,7;
44:22;45:3;48:4;76:22
**please** 6:6;63:9;84:14
**Please** 75:19
**pm** 68:23,23;99:19,19;
105:14
**point** 19:4,5;29:12;30:1;
32:16;44:12;64:4;9:68:2;
71:19;74:14;77:1;79:5;
83:19;88:13;89:10;91:20;
93:24
**points** 73:9
**policy** 20:19;23:21;1
**position** 99:11,14
**possible** 33:14;92:11;
93:2;96:8

Case 2:06-cv-00593-CSC    Document 38-2    Filed 11/15/2007    Page 36 of 38

Margaret Lloyd                                                          Johnny W. Sasser v.
September 14, 2007                                          Ryder Truck Rental, Inc., et al.

possibly 104:19
power 27:22
practice 53:3;58:9;59:2,
24
practiced 98:8
precert 64:10;73:12;
74:23;75:20,21;76:4,6,
10,20;80:21;81:18;82:18;
85:12;86:12,13;88:5;
89:11
precertification 73:8;
74:12,17,23;75:13;81:2,
9;82:1,4,13;83:1,7;84:10,
13;88:22,23;89:9;96:6,12
precertifications
74:21
precertified 64:10;
70:7;72:14,22;76:11;
80:23;83:15;84:16,25
precertify 72:15;75:2,3
precertifying 85:10
precerting 80:19
preparation 16:8
prepare 15:16
prescribe 32:7
prescribed 39:24;
45:19;48:7
prescribing 45:15,18,
21;48:4;49:4;52:5
prescriptions 48:16;
84:8,16,25;91:9;95:14
present 7:4
pressure 94:20,22
presume 100:21
pretty 53:21;75:9;86:18
prior 17:18;20:1;30:10;
37:10;39:13;40:1;45:9;
84:16;85:1,11;95:24
Prior 17:17
privilege 101:4
probably 11:19;16:19;
96:2
problem 6:3;32:15;
44:18;46:22,23;69:13,14
problems 18:2;40:19;
43:8
procedure 27:12;
73:11;74:23;75:22;86:10;
88:22
procedures 63:20;
80:1;84:8;88:13
proceed 34:1;74:4
process 9:22;21:20;
28:22;29:8;30:13;56:25;
63:24,25;64:11;66:2;
74:23;75:20,21;76:5,6,
10;78:25;80:9,17,19;
82:18,21,24;84:10;85:12,
16,17;86:4,6,12,13;90:4;
94:13;102:19
professional 7:3
program 14:3
progressing 51:16

property 98:8
protocol 27:5
provide 45:23
provided 16:7;29:1;
68:25
providing 49:7
provisions 84:10
psychology 6:17
pulled 30:11
pulling 30:11
purpose 4:18;48:17;
71:16;82:4;105:12
purposes 4:20;87:25
purview 20:16
put 8:3;17:18;52:13,15;
60:16
puts 13:7

**Q**

qualifications 67:23
quit 18:2,3
quite 52:32;89:17
quote 39:2

**R**

raised 54:5
rapport 58:5
rarely 47:23
reach 32:3
read 5:2,19;30:16;
36:19;63:12;84:1,21;
90:7,10,17
Read 63:10
reading 84:20;105:4,5
reads 98:7
ready 30:12
reality 85:3
realized 95:20,21
really 50:13;63:17;
95:22
realms 47:9,10,16
reason 46:3,13,19,24,
25;59:23;62:6;83:1;88:5;
97:6;101:14;102:12
reasonable 79:5;80:12
reasons 19:24;102:17
recall 21:9;22:16;30:18;
34:20,21;35:4;36:12;
40:11;41:2,24;45:10;
46:1;48:24;49:19;50:1,
22,23,24;51:12;52:1,4;
54:7;57:4;65:14;67:4,12;
70:18;76:14,15,17;88:20;
89:7,18;90:23;95:13;
103:19,19;104:2,3
receive 49:24;68:3,9;
98:11
received 34:7;70:11;
74:15
receiving 51:15
recent 18:4;58:19

recess 68:22;99:18
reciprocity 10:5
recognize 22:7
recognized 9:12;20:5;
32:24;33:6;58:24
recollection 15:13;
24:25;31:16;32:23;56:10,
13,18,21;59:13;80:10
recommended 58:7
record 6:7;49:20;56:23;
57:1;58:6;59:18,22;
64:13;65:21,22,25;66:10,
23;80:13;94:9;102:9;
104:25
recorded 5:13
recording 8:5
records 23:1;36:23;
37:10,22;39:11,14,15,18,
25,25;40:4,5,8;44:2;
51:15,20;59:14,17;75:7
red 47:24;54:5
refer 37:16
reference 79:13
referral 59:6
referred 73:2;74:24;
79:1
referred-to 63:13
referring 37:7,12,13,14
reflect 23:2,2
refrain 103:7
refresh 16:11
regard 42:5;103:5
regarding 23:3;45:24;
71:6
regardless 48:16
regular 20:20;53:10;
54:2;55:13;71:23
regularly 21:10
relate 56:8
related 20:4,6;22:3,8,
13;24:3;34:9;35:13;
46:18,18,22;47:5;48:17;
61:11;62:5,17;71:4,23;
75:1;78:1,18;79:14,18;
80:13;99:23
relates 59:16;79:4
relating 28:13
Relations 14:2,18;
84:11
release 40:24;41:4,8,
10,15,21;42:2,14,14,18,
20,25
releases 42:11
relevant 61:8
Reliance 7:13;11:7,12
remember 11:19;14:19;
19:18;22:22;23:18,25;
31:3;32:4;34:10,22;
44:17;46:7;49:2;103:24
reminded 95:24
render 59:14
rendered 71:17
rendering 79:18

Repeat 27:19;62:9;63:9
replaced 17:21,24
report 64:18;75:6,7
reported 36:10
reporter 4:3;5:12;63:12
reports 21:24;51:15;
54:2,5,5,6;61:14
represent 17:5;54:12
Representative 84:19
represents 17:3;63:4
request 22:8;72:17;
75:9;82:1;88:6,17;89:11;
94:12
requested 21:9;73:7;
77:10;88:23;89:1,2,9
requests 64:10;89:6
require 42:1
required 20:20;63:18
requires 82:6,19
reserves 21:15
resolved 61:16
respect 58:22;100:24;
101:1
respond 42:23;44:25
response 23:16;45:12;
56:13,19,22
responses 22:16,19;
45:2;51:13
responsible 55:2;91:23
restructured 15:11
results 49:22;71:14;
83:10
review 15:25;16:4;19:4,
19;20:10;21:6,24;24:11,
16;25:4;29:8;30:4,5,13;
31:7,8,18,19;39:6,12;
40:2,10;49:20,21;56:23;
57:1,2;58:20;59:14;62:1;
63:19,23;64:6,13,14,21;
65:7,19,21,21,22;66:11,
11,23,25;67:9,17,23;
68:5;69:1,2,3,9,13,14,20;
71:1;72:12;73:3,4,10;
74:16,25;75:7;78:25;
80:14,14,22;81:12;82:19;
83:2,8;94:8,9,13,17;
102:13,19
reviewed 15:16,19;
16:2,16,21
reviewing 51:14;65:25
reviews 20:20,25;
36:20;37:1,21;58:6,12;
61:5,7;93:21
right 5:20;16:19;44:7,
16;50:14;61:10;62:8;
63:20;68:14;87:1;91:16;
94:6;97:13;104:16
Right 54:11;65:23;
88:24;98:21,23;99:7;
104:14
right-hand 87:7
rights 63:25
Rights 64:2

RN 19:2
road 62:24
role 49:1
room 105:10
rule 101:25
Ryder 7:14;11:23,24;
12:2,3,9,14,20;15:6;16:5,
16;17:3,5;18:19,23;
19:19;20:18,19,23;21:21;
23:2;29:21;32:24,25;
33:3,3,4,7;35:7,11,15,21,
21;58:4,12;59:12;62:3,
10;65:2;66:3,10;67:20;
68:4;74:18;75:1;76:13,
18;79:25;91:23;92:6,6,8,
11,24;94:20;95:7,11;
99:21;100:3,7,10,18;
101:7,7;104:16
Ryder's 23:10;64:1;
71:6;102:15

**S**

sales 7:5
Sally 14:14,15;78:24;
79:8,11;80:8;82:23;83:6
same 5:6;22:5;26:3;
54:13,14;62:18;65:11;
74:6;82:21;93:4,9,13;
105:5
Same 63:14
samples 52:11
Sasser 14:22;15:14;
16:17;17:7;19:20,24;
25:2;26:23;31:1,2,21;
32:16;33:8;35:8,9;40:13,
25;41:11,23;42:1;43:11;
44:19;46:15;49:1,9;50:8;
53:16,17;55:12,16;56:3;
57:8,10;61:7;64:14,23;
68:22;72:10;73:13,16,18;
76:8;79:18;84:4;85:20;
87:14,21,23;89:15;90:2;
91:6;95:19;96:5,7;
102:14;104:7,19
Sasser's 4:12;14:10;
15:7;19:3;28:15;30:19,
23;34:11;36:10;45:24;
46:6;48:12;66:16,21;
70:4;76:19;77:11;90:7;
93:20;95:11;103:6,17
sat 51:20
save 92:24;93:15,16
saw 20:2
saying 21:7;31:15;
45:20;62:17;64:21;77:24;
86:3;87:16;88:19,25;
93:2;97:4,4;104:9
school 6:18
second 29:16;30:4,5;
66:13,23;67:7;79:6;
81:11,15
Secondly 51:9

Case 2:06-cv-00593-CSC    Document 38-2    Filed 11/15/2007    Page 37 of 38
Johnny W. Sasser v.
Ryder Truck Rental, Inc., et al.

secretarial 6:18;7:6
secretary 7:5
Security 6:19
seeing 32:3;36:24;
51:11;71:21;96:20;97:5,9
Seeing 96:21
seeking 48:13
seem 20:6;22:16
seemed 48:2;53:17,19;
103:21
seems 68:12,13,19
sees 58:9
S-e-g 15:9
Seinbolt 18:17;58:3,5
self-insured 7:14;9:8;
13:23
selling 54:22;56:3
seminar 10:3;13:7
seminars 98:11,15,22
send 12:9,14,15;42:12;
54:2;59:6;60:1;64:4,13;
72:17;87:20
sending 22:13;40:1
senior 7:8,10,15,23;
8:12,12;11:9;12:6,7;
20:12;21:21
Senior 84:19
sent 15:24;31:12,13;
39:7,9,12;40:9,12,15;
59:17,19;60:4,16;61:6,7;
64:16;66:24;71:5;79:19;
87:13;88:17
separate 35:20;36:4,4;
40:24;41:4
Sequin 15:9
S-e-q-u-i-n 15:10
series 8:4
service 8:24
services 84:8
S-e-r-v-i-c-e-s 8:10
set 13:21;19:1;60:1;
93:19
settle 93:21;94:12
Settle 95:5
settled 19:14;21:19;
79:2;80:11
settlement 19:11;
28:17;29:1,3;34:17;36:7;
37:2,10;61:16;91:11,20,
21;93:25;95:12
settling 91:7;94:4
several 8:16;24:1;29:5;
100:1
severe 25:12
shakes 5:15
shift 68:19
short 17:10;39:21
shots 49:8
show 24:13
shown 16:25
Shumate 4:11
SHUMATE 4:4,10;
25:18;26:7,12;27:17;

28:2,8;29:25;37:9,16,20;
38:15;42:8;51:3;55:21;
63:7,10,22;66:6;68:16,
21,24;69:11;72:23;74:3;
75:12,16;78:3,8;80:5;
81:4,7;82:25;83:23;
86:16,22,23;87:5;88:10;
91:15;92:15;93:8;98:16,
19;99:3,15,20;101:5;
102:6;103:15;104:22;
105:1,6,8
side 87:7,23
signature 87:10
signed 40:24;41:11;
69:4
significant 25:13;
26:10,16;102:21
simply 21:20;36:23;
48:15
sincerely 84:18
sit 51:18;101:20;102:17
situation 16:12;22:6;
41:24
situations 31:2
six-month 17:16
slurred 102:23;103:21
smart 91:1
Smithhart 77:23;78:16
Smithhart's 79:13
Social 6:19
somebody 85:5;103:1
someone 19:19;39:7;
57:15;74:18;75:5
someplace 35:25;55:1
sometime 95:21
sometimes 57:5;89:22;
97:14;98:16
somewhat 50:10;86:2
somewhere 35:18;
41:11
sorry 6:12;7:9;35:24;
55:4
sort 9:10;68:19
sound 102:22
sounds 93:1
source 75:7,21
southeast 8:15
speak 14:17;41:4;
48:21;99:4;101:6
specialist 54:17;65:10,
17;67:25
specialty 65:13,15
specific 8:18;15:13;
24:7,25;26:16;37:4,17;
43:1;46:10;57:11;59:9;
61:10,25;67:3,9;69:23;
71:22;76:23
specifically 15:19;
16:7;17:7;22:15;26:14;
29:13;31:25;32:9;36:12;
37:23,24;40:25;41:15;
42:21;45:10;48:15;50:6,
22,23,24;52:8;54:5,7;

57:8;58:21;59:8;60:3;
62:20;69:1;76:17,21;
89:7,18;100:17;103:24
Specifically 57:10
specifics 19:9
speculation 83:22
speech 103:22
speed 6:2;97:16
spell 8:9
spent 95:11
spinal 95:15
spoke 41:9
spoken 18:9
sponsors 98:15
spot 54:13,14
spouse 104:12
stabilization 26:25
staff 84:2,5
standard 29:10;59:24
standards 33:13
start 7:17;8:7;10:21;
20:25;48:10;93:21
started 7:3,7,21;9:21;
18:20;36:21;38:7;70:7;
91:6;94:4
starting 15:3
Starting 11:2
state 6:6;9:12,15;12:23;
13:7,24;14:4;64:5;67:15;
97:24;98:14;103:1
statement 90:22
statements 8:5
states 8:16,16
status 33:22
statute 67:3;72:13;74:2,
6;80:16;82:6,18;88:14
statutes 13:25;70:21
stenosis 95:15
step 73:12;80:22,23;
81:18;82:9;83:20
steps 78:20
still 13:24;22:3,5;31:23;
32:11;54:8;62:18;78:20;
96:20;100:3
stipulations 4:4
stood 101:24
stop 5:23;66:1;91:16
stopped 100:19
strain 19:25;34:13,15,
20;37:25;38:4,5,13,19,
24;43:4;56:8;57:14;62:2
strengthening 27:1
strictly 8:14;9:2
Strike 48:20
stuck 51:6
stuff 29:10
submit 65:23;88:5
submitted 49:22
submitting 102:19
sued 74:18;81:9;85:5,
23;100:22;101:10,17,20
sues 82:15
suggesting 27:3

suing 101:13
suit 19:10;79:1
suits 102:2
superiors 94:20,23
supervisor 15:8;30:17;
101:24
supposed 9:6;65:5;
86:11
sure 5:6;13:19;15:23;
21:13;22:1;23:9;26:18,
21;27:4;28:15;35:22;
44:10;49:16;50:11;51:10;
52:12;53:25;54:9,24;
57:8;63:17;70:9;74:11,
13;76:7;82:8,8;83:12;
87:4;88:25;91:12;95:20;
97:12,13
Sure 27:20;38:22;39:5,
14;42:15;43:2;44:10;
46:25;50:9,16,17;65:13;
74:5,7;83:12;92:8;105:7
surgery 35:9
sustained 25:11;62:13
sworn 4:2,7
syndrome 33:23
synonymous 38:17
system 20:18;55:1

## T

talk 13:11;17:7;21:17;
42:3,22;43:8,14;51:7;
52:19;63:23;83:9;93:24;
101:12,21
talked 35:10;53:16;
69:5;78:24;81:11;90:10;
100:9;101:23
talking 28:12;29:16;
39:13;70:10;79:8;85:10;
91:6;94:4;105:9
tape 5:15
tax 53:19
taxi 104:10
technology 13:13
telephonic 18:19,21
telling 42:3;46:1;75:14;
86:10
ten 20:1
tendency 6:1
Tennessee 18:8
term 77:2,3;94:25
terminology 26:3;99:8
terms 25:23;38:16
Terrence 69:4
Terrence's 69:13
test 9:21
testified 4:7
testimony 56:20
tests 8:5;10:8;71:13
Texas 67:8;69:5
Thames 14:14,15,21;
78:24;79:8,12;80:8;83:6
T-h-a-m-e-s 14:16

therapy 21:2;26:24
thereafter 95:21
therefore 75:2;77:11
third 11:16;66:13;67:4,
6,11,23;70:1,12
third-party 7:11;9:9;
11:14;13:16;75:6
thought 16:12;45:12;
61:8,15
three 8:3,22;9:20;18:8;
25:21;39:22,23;66:22
Three 97:15,19
three-day 9:19
throughout 26:22
times 81:4
today 24:25;31:15,20;
54:12,19;55:15;102:17
today's 15:17
told 11:19;31:3;35:9;
42:21;67:13;80:10,11;
85:16;90:14;95:23
took 8:23;10:17;13:3;
19:3;32:21;33:12;38:22;
78:21;103:5
top 50:19
topics 99:5
tort 101:2,8,11
totally 48:9;94:11,12
touch 58:20
trained 57:25
training 5:8;8:22;
97:21;98:10,20
transportation 102:23
treat 80:1
treated 40:18;43:6;
50:14;71:11;79:23
treating 22:9;24:10;
31:17;32:17,20;33:7,8,
16;36:18;37:4;38:4;
39:14,18;45:13;46:21;
49:17;50:25;53:14,22;
54:14;56:11;57:3;62:5,
12,19;65:11;71:18;
103:17
treatment 13:21;18:25;
20:8;21:4;22:2,4;25:21;
26:18,19;27:24;28:4,10;
29:11;31:1,8;32:6,11;
35:7;41:1;46:16;50:11;
51:16;59:15;61:9,10;
62:11,22,23;63:21;64:10;
66:1;68:4,10;70:4;71:2,3,
17,22;72:13,17;73:20,21;
75:1,9;76:12;79:17;82:2;
83:18;84:15,25;85:21;
87:1,17;88:18;90:2;
95:11;96:6;97:7
treatment/coverage
77:12,15;88:3
treatments 49:8
tried 45:22
trigger 73:9;74:13
trouble 32:6

trust 53:13
try 26:22,24;32:1,13;
51:11;62:24
trying 25:22;44:17,20;
47:11;70:9
tunnel 34:22,24;35:1,6,
12,13
turkey 89:24
turn 89:20
two 6:16;11:16;19:23;
22:22,24,25;23:13;30:10;
31:2;36:4;38:16;39:22,
23;49:11;66:19,21;102:1,
7
type 5:18;7:19,25;11:10,
11;65:4,11
types 8:17,19;13:5
typically 77:5
Typically 42:13

## U

Uh-huhs 5:18
Uh-uh 104:4,6
uh-uhs 5:18
unable 31:4
unavailable 31:17
unconnected 94:11,12
undeliverable 31:10,13
under 27:20;28:14;
55:14;63:25;70:21;74:6;
77:12,15;88:4;94:13
undermedicating
54:21
understandable 94:22
understood 5:5;77:23;
81:1
undertaking 55:8
unfortunately 5:2
unless 5:5;73:21;74:17;
81:9;82:15;85:4,23,23,
24;86:3
Unless 73:11
unlikely 85:20
unnecessary 31:8
unrelated 41:5
unusual 51:8
up 7:6;13:21;19:1,4;
24:23;29:19;97:16;102:4
update 13:11,12
updates 51:16
upon 67:22
use 77:2
used 25:19;26:8;66:21;
70:3;77:3
using 88:12
Usual 4:4
usually 13:9,12;103:2
Usually 54:3;97:9
utilization 30:13;31:6,
7,18,19;62:1;63:19,23;
65:7,19;66:25;67:9;
69:20;74:24;78:25;80:14,

22;81:12;82:19;94:13

## V

vague 22:18
vehicle 25:11
vendor 66:25
verbal 41:23
versus 9:13;13:15;42:3;
58:15;70:22
vertebrae 26:16;34:6
view 20:8
Virginia 18:10
visit 39:22
vocational 6:18;7:25
volumes 29:5;30:12

## W

Wallace 84:3
way 13:14,20,20;17:19;
26:2;30:20;34:23;41:13;
48:14;73:16;82:11;93:11,
15;94:14;96:5;102:13
ways 104:15
week 100:5
weeks 97:12
weren't 86:19
what's 33:13;82:4
What's 6:14;21:22
whatsoever 56:10
whenever 53:7
whereabouts 53:18
Whereupon 4:2;63:12;
68:22;99:18;102:8;
104:24;105:11,13
whoa 6:3
whole 47:12;56:25
who's 44:15
widowed 6:22
William 59:3
Wilson 66:18;67:5;69:4
within 20:16;94:5
Within 93:18,19
without 42:14,18;
104:16
witness 4:2
Witness 5:11,25;74:10;
79:24
WITNESS 26:9;28:1,7;
29:24;42:7;55:19;63:15;
66:5;72:21;73:24;74:1;
78:6;82:17;86:9;87:3;
88:8;91:5;93:7;98:18
wonder 39:16
word 25:19;82:11,12
words 26:8
work 7:1,3;9:7;11:18;
14:23;44:15;58:15;67:19;
100:24
worked 12:19,22,23;
13:15;15:3;16:5;95:1;
100:3

worker's 59:16
workers' 8:15,19,20,25;
9:2,11;10:18,24;11:9;
12:5;14:2;15:1,2;22:3;
28:14;32:25;35:6;38:11;
40:18,21;41:7;42:13;
46:17;53:8;65:6;68:3;
69:3;77:4,12,14,15,17;
84:6,9;88:4;97:16,17;
98:3,5,9;100:25;101:19
Workers' 7:21;84:12
working 13:16;29:6;
38:7;76:12,18
works 100:7,10;101:7
worried 70:20
worry 6:5
write 22:12;24:14;
42:22;49:13;56:12;87:12;
88:9
writing 64:6
written 25:1;42:1,18;
72:7;84:14;88:16,18;
89:12
wrong 67:7;75:19;
92:16,18,20
wrote 11:8;23:3,13;
41:9;45:11;77:8,9,22;
83:13;85:3,18;87:6,23

## X

x-rays 71:13

## Y

y'all 60:1;83:7;95:22
year 7:22;10:3,13;12:11;
15:3,4,5;88:9;95:10;
97:20,24
years 6:16;11:22;12:1;
18:5,8;20:1,24;30:10;
38:10;57:18;58:20;62:23;
80:2;86:18,24;90:15