IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHNNY W. SASSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  2:06cv593-CSC |
| | ) | (WO) |
| RYDER TRUCK RENTAL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

Plaintiff Johnny Sasser ("Sasser") filed this action in state court against defendants Ryder Truck Rental, Inc., d/b/a Ryder Dedicated Logistics Inc., a/k/a Ryder Integrated Logistics, Inc.[1] ("Ryder"), Ryder Services Corporation, and claims adjustor Martye Lloyd ("Lloyd") seeking compensatory and punitive damages for the defendants' failure to authorize continued medical treatment due to a prior on-the-job injury.  Sasser alleged state law claims of outrage, respondeat superior, and negligent/wanton supervision.  The defendants timely removed the case to this court from the Circuit Court of Barbour County, Alabama on May 24, 2006, solely on the basis of diversity of citizenship jurisdiction.  *See* 28 U.S.C. § 1441 and 28 U.S.C. § 1332.  The plaintiff did not file a motion to remand within thirty (30) days of the removal.  *See* 28 U.S.C. § 1447(c).

The court has jurisdiction of this case pursuant to 28 U.S.C. § 1332.  The parties have

---

[1]  In its notice of removal, Ryder asserts that the defendants are improperly named in the complaint. Specifically, Ryder Truck Rental, Inc. is a separate entity from Ryder Dedicated Logistics, Inc., which changed its name to Ryder Integrated Logistics, Inc. in 1996. *See* Doc. # 1, Notice of Removal, fn 1.

consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment, pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1.

This matter is now pending before the court on the defendants' motion for summary judgement. *See* Docs. # 10 - 12. Upon consideration of the motion, pleadings, responses and evidentiary material filed in support of and in opposition to the motions, the court concludes the defendants' motion for summary judgment is due to be granted.

## II. PROCEDURAL HISTORY and FACTS

Plaintiff Johnny Sasser was employed by Ryder Dedicated Logistics[2] when he injured his back on the job on September 8, 1995. (Defs' Ex. 2 at 1). In 1997, Sasser filed a worker's compensation claim for disability benefits and payment of medical expenses. On February 16, 1998, the parties entered into a settlement in which Sasser received a lump sum payment of $7000.00 in settlement of his disability claim. The defendants

> agree[d] to be responsible for reasonably necessary medical expenses incurred by plaintiff in the future as a proximate result of the alleged accident and injury to the extent and in the manner required by Section 25-5-77, CODE OF ALABAMA 1785, as amended. *Defendant shall not be responsible for payment of any future medical care for plaintiff unless authorization for such medical care is obtained in advance from defendant or its claims administrator.*

(*Id*. at 3, ¶ 11) (emphasis added). The Circuit Court of Barbour County approved the settlement ordering "[t]hat the defendant shall also be responsible for reasonably necessary medical expenses incurred by the plaintiff in the future to the extent and in the manner required by Section 25-5-77, CODE OF ALABAMA 1785, as amended." (Defs' Ex. 3 at ¶ 3).

---

[2] By the time Sasser filed his worker's compensation claim, Ryder Dedicated Logistics, Inc.'s name had changed to Ryder Integrated Logistics, Inc. (Defs' Ex. 2 at ¶ 1).

Not surprisingly, the agreement to end the dispute only created new disputes over Sasser's medical treatment. Sasser filed a Petition for Rule Nisi in the Circuit Court of Barbour County in 1999 complaining that he had not received treatment since January 15, 1999. (Defs' Ex. 4). On October 29, 1999, the Circuit Court ordered that the plaintiff's medical records be submitted to Dr. Wallace B. McGahan for evaluation. (Defs' Ex. 5). On April 11, 2000, the court entered "Findings of Fact and Judgment" in which the court found that Sasser had suffered a back injury on the job on September 8, 1995. (Defs' Ex. 6). Although the court determined that Ryder's dispute with Sasser's medical treatment "was in good faith," nonetheless, the court ordered, in pertinent part, as follows:

> (a)     That any and all medical bills that have not been paid by defendant or by insurance provided at defendant's expense that are determined by Dr. Wallace B. McGahan, the authorized treating physician for plaintiff, to be the proximate result of the injury sustained in the accident of September 8, 1995, shall be paid by defendant.
>
> (b)     That defendant shall continue to be responsible for future medical expenses as provided by Paragraph three of the Order of this Court dated February 19, 1998 approving the settlement between the parties.

(*Id.*)

On April 25, 2000, the court approved a settlement in which the plaintiff received a lump sum payment of $6000.00 and the defendants were again ordered "to be responsible for reasonably necessary medical expenses." (*Id.* at 4).

Sasser suffers from degenerative discs and herniated bulges in his back as well as

constant pain.[3] (Pl's Ex. 1, Pl's Dep. at 12-13). In 2000, Dr. McGahan was Sasser's approved, primary treating physician. (*Id*. at 75). Dr. McGahan referred Sasser to Dr. Marsella for pain management treatment in 2000. (*Id*. at 77). Dr. Marsella treated Sasser with muscle relaxers and trigger point injections until spring of 2004.[4] (*Id*. at 78-79 & 102). Sasser was last treated by Dr. Marsella in April or May, 2004.[5] (*Id*. at 102).

In November 2001, Martye Lloyd was hired by Ryder as a claims adjuster. (Lloyd's Dep., doc. #38-2, at 17). She was initially assigned Sasser's claim but in early 2002, his claim was reassigned to another adjustor. (*Id*.) When that adjustor left Ryder, Lloyd was again assigned Sasser's worker's compensation claim. (*Id*.). After she was reassigned Sasser's claim, Lloyd sought a peer review because she

> couldn't understand why Mr. Sasser was on so many drugs for a lumbar strain that happened almost ten years prior, because that's the only diagnosis we saw. And also because he was having a lot of drugs that he was claiming related to the claim that I recognized as drugs for heart conditions and other things that didn't seem related. So I needed to just kind of get an overall view of how he was this far into his treatment.

(*Id*. at 19-20).

For example, when reviewing his claim, Lloyd noticed that Sasser was taking Plavix for a heart condition, and she wanted to know how this medication was related to Sasser's lumbar

---

[3] Sasser also suffers from emphysema, carpel tunnel and heart disease but he concedes that these conditions are unrelated to his on-the-job injury. (Pl's Ex. 1, Pl's Dep. at 14-15).

[4] According to medical records shown to him during his deposition, Sasser was treated at the pain management clinic on October 21, 2002, January 20, 2003, and April 9, 2003. (*Id*. at 100).

[5] The record is not clear as to the exact date of Sasser's last treatment. (*Id*. at 102).

strain.[6]  (*Id*. at 23-24).  According to Lloyd, Sasser's pharmacist was billing Ryder for every medication that Sasser was taking, and, with respect to the Plavix, Sasser claimed that the drug was "for his legs, for clotting which was caused by his bad back."  (*Id*. at 43-44).  Lloyd wrote to Sasser's treating physicians but got no response from Dr. McGahan or Dr. Marsella.  (*Id*. at 44-45).  According to Sasser, he had talked to Dr. McGahan about his blood-thinning medication being a result of his back injury even though Sasser's cardiologist wrote the Plavix prescription for him.  (Pl's Ex. 1, Pl's Dep. at  114).

Because of her concerns, Lloyd forwarded Sasser's medical records to Dr. William Cabot for peer review.[7]  (Defs' Ex. 9).  Lloyd then sent Dr. McGahan and Dr. Marsella the results of Dr. Cabot's peer review and asked for their comments.  (Lloyd's Dep., doc. #38-2, at 49).  She received  no response from either doctor.  (*Id*. at 49-50, 56).

Thereafter, because she questioned Sasser's treatment, Lloyd began the utilization review process.[8]  Lloyd sent Sasser's medical records to Dr. Wilson for a utilization review in 2003 and 2004.  (Defs' Ex. 10 & 11).  On May 2, 2004, Dr. Wilson opined that

> [b]ased upon review of the available medical records, it is my professional medical opinion that NONE of the ongoing treatment is/was directly related to the injury of 09-08-95.  As such, any and all treatment documented is/was NOT reasonable and necessary with respect to the 1995 work injury.

---

[6] According to Ryder's claim file, Sasser's treatment plan indicated that his compensable injury was "lumbar strain, low back pain."  (Lloyd's Dep., doc. #38-2, at 33-34)

[7] The peer review process entailed sending Dr. Cabot "every medical record that was in [their] file" and asking him "to review the medical records and render his opinion on the appropriateness of the current treatment as it relates to the worker's injury from 1995."  (*Id*. at 59).

[8] Pursuant to ALA CODE § 25-5-293(k), Ryder can utilize the review process to determine the medical necessity of treatment and to require precertification for treatment.  *See* ALA. DEP'T OF INDUS. RELATIONS, ADMIN. CODE § 480-5-5-.01 - .35.

(Def's Ex. 11, doc. 12-12). Ryder sent the utilization review reports to Dr. McGahan requesting

a response which she never received. (Defs' Ex. 12 & 13).

As a result of the May 2004 utilization review, on June 17, 2004, Lloyd sent Dr.

McGahan and Dr. Marsella a letter informing them that Sasser would need to receive

precertification prior to receiving any further treatment. In pertinent part, the letter read as

follows.

> As the adjuster for this workers compensation case, I am hereby notifying you
> that **EFFECTIVE IMMEDIATELY** - any and all medical services, procedures,
> and prescriptions provided to this patient MUST go through the workers
> compensation pre-certification process as per the provisions of the Alabama
> Department of Industrial Relations division of Workers Compensation. . . .
> Please accept this as written notification that any further treatment or
> prescriptions that are not pre-certified prior to completion will be denied. . . .

(Pl's Ex. 10, doc. # 18-11 (emphasis in original); Lloyd's Dep. at 83-84).

Sasser received a copy of this letter. (Pl's Ex. 1, Pl's Dep. at 109). Sasser called Lloyd

and spoke to her regarding this letter. (*Id*.; Lloyd's Dep. at 73). According to Lloyd, she

explained to Sasser that he could have Dr. Marsella appeal this decision. (*Id*).

Sasser's recollection of his conversations with Lloyd differs greatly from Lloyd's.

Sasser admits that Lloyd informed him that he would need to get precertified before receiving

treatment. (Pl's Ex. 1, Pl's Dep. at 120 & 130).

> Well, you know, she sent me a letter where I was precertified and – had to be
> precertified through a doctor. And I said, well, you know, I'll get a nurse to do
> that. I'll asked her to. That's all I can do. She said, if they don't, you can't see
> them. And I said, I understand. So I was telling McGahan and – I hadn't really
> gotten to Marsella then. And was going to tell him – well, I did tell him over the
> phone, but they had to do that, be precertified, or they wouldn't pay it.

(*Id*. at 130). However, according to Sasser, when he spoke to Lloyd, she also said

you have cost Ryder a lot of money over the years.  In fact, you have cost Ryder
an awful lot of money over the years.  I am going to get it stopped legally through
Alabama's worker comp. laws.

(*Id*. at 123-124).  Lloyd told Sasser he was "being cut off of all drugs and all doctors, no matter

what the procedures.  That peer review overruled everybody."  (*Id*. at 134).  Sasser responded

that she could not "cut [him] off due to two circuit judges ordering it to be for life" and "both

judges ordered that I would receive my meds for life."  (*Id*. at 125 & 141).  Nonetheless,

according to Sasser, he was "cut off" from treatment on July 17, 2004.  (*Id*. at 142).

Sasser was also informed by Dr. McGahan that Ryder was requiring precertification

before approving any treatment.  (Pl's Ex. 1, Pl's Dep. at . at 106-07).  Dr. McGahan also told

Sasser that he would have his nurse contact Ryder to take care of the precertification.  However,

for reasons which the parties have not determined, Dr. McGahan left town and the practice of

medicine shortly thereafter.  (*Id*. at 107-08).

Around this time, Sasser also spoke with Dr. Marsella's office.  (*Id*. at 109).  Dr.

Marsella's office told him that the doctor would need four days to review his files before

treating him.  (*Id*. at 109-10).  After four days, Sasser was apparently approved for treatment

by Dr. Marsella because he received a trigger point injection and treatment.  (*Id*. at 110).

Although Sasser contends that Dr. Marsella's office told him that Dr. Marsella was appealing

(*Id*. at 118), Dr. Marsella's office took no action to receive pre-certification or authorization for

treatment or to appeal Lloyd's decision to require precertification.  (Lloyd' Dep., doc. # 38-2,

at 72 & 89).  It is undisputed that neither Sasser nor Dr. Marsella attempted to appeal Lloyd's

decision requiring pre-certification.  (*Id*. at 89).

7

In July 2004, Sasser had another conversation with Lloyd in which she told him that Ryder would no longer pay for medical treatment or medication. (Pl's Dep. at 140). Sasser told Lloyd that "the judges ordered that I would receive my meds for life." (*Id*. at 141). According to Sasser, Lloyd told him he "needed to precertify on the same date . . . [he'd] been cut off." (*Id*. at 120). Sasser admits, however, that after Dr. McGahan left town, he did not submit any additional bills to Ryder. (*Id*. at 115-16).

On July 5, 2005, Sasser presented to the Dale Medical Center Emergency Room because he had fallen. (*Id*. at 143-146). Sasser called Ryder requesting a doctor. (*Id*. at 163). At that point, Lloyd told Sasser that he had been cut off worker's compensation on June 17, 2004. (*Id*. at 164-66). Lloyd agreed to pay any bills up to and including June 17, 2004. (*Id*. at 165). Lloyd sent Sasser a copy of the June 17, 2004, letter requiring pre-certification with the following notation:

> Note from Adjustor 8/2005
> No further action (ie precertification) was ever requested and decision was not appealed. Therefore, Mr. Sasser's med. treatment/coverage under worker's compensation was denied effective 6-17-04 and continuing.

(Pl's Ex. 10, doc. # 18-11).

As a result of the fall, Sasser saw Dr. Granger on August 23, 2005 for his knees. (*Id*. at 168). Sasser underwent arthroscopic knee surgery by Dr. Granger. (*Id*. at 155-56). Although he told Dr. Granger that he was disabled due to a back injury, Sasser did not tell Dr. Granger that the back injury was covered by worker's compensation. (*Id*. at 159 & 165).

> They said did I have insurance or Workman's Comp or whatever. I said, no, I used to have Worker's Comp. I remember telling them that. But I didn't have it now, to the best of my knowledge.

8

(*Id*. at 169).  Dr. Granger's office indicated that they would bill Medicare.  (*Id*.)  Sasser was treated by Dr. Granger until February 2006.  (*Id*. at 177).

In 2006, the plaintiff filed a second Petition for Rule Nisi in the Circuit Court of Barbour County which remains pending in that court.

On May 24, 2006, the plaintiff filed a four count complaint in the Circuit Court of Barbour County alleging outrage,[9] respondeat superior, and negligent/wanton supervision. (Compl. at 2-5).  The defendants removed the case to this court on July 5, 2006.

### III. DISCUSSION

### A.  Remand pursuant to 28 U.S.C. § 1445(c)

As an initial but relatively straightforward matter, the court must resolve a jurisdictional issue about whether this case was properly removed to this court.  28 U.S.C. § 1445(c) specifically directs that "[a] civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States." In their briefs in support of and in opposition to the pending motion for summary judgment, the parties repeatedly assert that this litigation "arises out of a workers' compensation claim."  (Br. in Supp. of Defs' Mot. for Summ. J. at 1; Pl's Res. to Defs' Mot. for Summ. J. at 1).  In addition, they argue applicable Alabama law as related to the handling of workers' compensation claims.  As a direct result of the parties' briefs, the court ordered the parties to brief the issue of whether this case was improvidently removed.  After careful consideration of

---

[9] In Count Four of the Complaint, the plaintiff alleges that the defendants' conduct was designed to cause "severe and extreme emotion distress."  In Alabama, the torts of outrage, outrageous conduct, and intentional infliction of emotional distress are the same cause of action.  *Stewart v. Matthews Indus., Inc.*, 644 So. 2d 915, 918 (Ala. 1994).

the parties' briefs and an exhaustive review of applicable Alabama law, the court concludes that

the plaintiff's tort claims do not "arise under" Alabama workers' compensation laws and that

this case is properly before it for resolution.

The Alabama Supreme Court first recognized the tort of outrage, or severe, intentional

infliction of emotional distress, in *Am. Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).

> [W]e now recognize that one who by extreme and outrageous conduct
> intentionally or recklessly causes severe emotional distress to another is subject
> to liability for such emotional distress and for bodily harm resulting from the
> distress. The emotional distress must be so severe that no reasonable person
> could be expected to endure it. Any recovery must be reasonable and justified
> under the circumstances, liability ensuring only when the conduct is extreme.

*Id*. at 365.

Clearly, then, outrage is a common law tort and common law tort actions do not "arise

under" worker compensation laws. *See Patin v. Allied Signal, Inc.*, 77 F.3d 782, 789 (5th Cir.

1996); *Raye v. Employer's Ins. of Wausau*, 345 F. Supp. 2d 1313, 1316 (S. D. Ala. 2004).

"[S]tate causes of action that are creatures of the common law do not 'arise under' the workers'

compensation laws."[10] *Raye,* 345 F. Supp. 2d at 1316. At best, common law tort claims "relate

to" to the underlying worker's compensation claim but, because they are a creation of common

law, they cannot 'arise under' the statutory worker's compensation scheme. Consequently,

while the facts in this case may involve Sasser's underlying worker's compensation claim, the

legal claims he presents do not find their genesis in Alabama's Workers' Compensation Act.

---

[10] The Alabama Supreme Court's holding that "claims of outrage are not barred in workmen's compensation contexts by the exclusivity provisions" of Alabama's worker's compensation statutes" supports the conclusion that claims of outrage do not "arise under" Alabama's worker's compensation scheme. *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1211 (Ala. 1990).

Accordingly, the court concludes that these claims are not precluded from removal by 28 U.S.C. § 1445(c).

## B. CLAIMS OF OUTRAGE & NEGLIGENCE and WANTONNESS

**1.  The Summary Judgment Standard**.  Under FED. R. CIV. P. 56(c) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[11]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.  If the movant succeeds in demonstrating

---

[11]  In *Celotex Corp.v. Catrett*, 477 U.S. 317 (1986), the court stated:

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial...We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . .

*Id.* at 324.

the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *see also* FED. R. CIV. P. 56(e). ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); *Harris v. Ostrout,* 65 F.3d 912 (11th Cir. 1995). However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor." *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law FED. R. CIV. P.

56(c). With these principles of law in mind, the court will determine now whether summary

judgment is appropriate and should be granted.

     **2.**     **Tort of Outrage Claim**. Between October 1999 and June 2004, Sasser was

primarily treated by Dr. McGahan. Sometime around July 2004, Dr. McGahan closed his

medical practice and left town.[12] Sasser complains that Ryder's failure to continue to pay his

medical expenses or to refer him to another doctor after Dr. McGahan left was sufficiently

egregious to constitute the tort of outrage. Sasser argues that Lloyd "went on about a course of

action, a plan and scheme, to get him cut off." (Pl's Res. to Defs' Supplemental Br. at 2).

     As previously noted, the Alabama Supreme Court first recognized the tort of outrage in

*Am. Road Serv. Co. v. Inmon*, *supra*. To establish a claim of the tort of outrage, the plaintiff

must demonstrate that

> (1) the defendant[] either intended to inflict emotional distress, or knew or should
> have known that emotional distress was likely to result from the[] conduct; (2)
> that the defendant[]'s conduct was extreme and outrageous; and (3) that the
> defendant[]'s conduct caused emotional distress so severe that no reasonable
> person could be expected to endure it.

*Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000) (citing *Inmon*, 394

So. 2d at 365). *See also Soti v. Lowe's Home Ctrs., Inc.*, 906 So. 2d 916, 919 (Ala. 2005). The

Alabama Supreme Court stringently applies the *Inmon* test to claims of outrage. *See Cont'l*

*Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1211 (Ala. 1990).

> The emotional distress [resulting from the conduct] must be so severe that no
> reasonable person could be expected to endure it. Any recovery must be
> reasonable and justified under the circumstances, liability ensuing only when the

---

[12] The record is not clear exactly when or why Dr. McGahan stopped practicing medicine.

conduct is extreme. . . By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Gibbs v. Aetna Cas. & Surety Co*., 604 So.2d 414, 415 (Ala. 1992) *quoting Inmon*, 394 So. 2d at 365.  *See also Soti,* 906 So. 2d at 919; *Garvin v. Shewbart*, 564 So. 2d 428, 431 (Ala. 1990); *Travelers Indem. Co. of Ill. v. Griner*, 809 So. 2d 808, 810 (Ala. 2001); *ITT Specialty Risk Servs. Inc. v. Barr*, 842 So. 2d 638, 644 (Ala. 2002); *Farley v. CNA Ins. Co.*, 576 So. 2d 158, 159 (Ala. 1991).

In his brief, the plaintiff argues that Ryder

set out on a systematic plan and scheme to do whatever it took to cut Mr. Sasser off from his medical benefits for the **sole purpose** of saving the company money . . . It is unconscionable to think that you would cut off a man's medical treatment and pain medication simply to save a corporation money.  They were obligated under the laws of the State of Alabama and under the Court Orders from the Circuit Court of Barbour County to continue to pay for this man's medical treatment and their refusal to do so was nothing short of a tactic to save a company profit.  There can be nothing more outrageous or evil.  He was cut off "cold turkey" from Oxycontin and described the pain and withdrawal he went through because of Ryder's actions.

(Pl's Resp to Defs' Mot. for Summ. J. at 6).  Despite his rhetoric and colorful hyperbole that Ryder "set out on a scheme to save the company money," to survive the motion for summary judgment, Sasser must present evidence creating a genuine issue of material fact.  Sasser's broad conclusory arguments are not appropriate substitutes for evidence nor does the argument of counsel rise to the level of admissible evidence.

In response to the defendants' supplemental brief in support of summary judgment, Sasser relies on the deposition of Martye Lloyd to argue that Lloyd "went on about a course of

action, a plan and scheme, to get him cut off."  (Pl's Res. to Defs' Supplemental Br. at 2).  In support of his argument, Sasser relies on his conversation with Lloyd in which she allegedly said

> "[Y]ou have cost Ryder a lot of money over the years.  In fact, you have cost Ryder an awful lot of money over the years.  I am going to get it stopped legally through Alabama's worker comp laws."

(Pl's Dep. at 123-24).  This single statement is insufficient as a matter of law to preclude summary judgment.[13]

First, Sasser concedes that this conversation occurred several months before he was allegedly denied treatment, and he received further treatment after this conversation.  (*Id*. at 125).  Moreover, Sasser admits that he knew he was required to get "precertified" before Ryder would pay for treatment.  (*Id*. at 107-08 & 135).  For example, in May 2004, Sasser was told that Lloyd would have to review his medical records before he could see Dr. Marsella.  (*Id*. at 109).  After reviewing the request, Lloyd authorized Sasser's treatment and Sasser received a 'trigger point' injection.  (*Id*.) .  Sasser last saw Dr. McGahan in July 2004.  (*Id*. at 107).  Sasser admits that after Dr. McGahan left town, he did not submit any additional bills to Ryder.  (*Id*. at 115-16).  According to Sasser, Lloyd told him he "needed to precertify on the same date  . . . [he'd] been cut off."  (*Id*. at 120).

Sasser also relies on the letter from Lloyd containing her handwritten note about failure

---

[13]  At best the statement says nothing more that Ryder will pursue its legal rights.  Even though expressed harshly, that pursuit is not actionable as an outrage.  As the court said in *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 364-65 (Ala. 1980), outrage does not encompass "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities."  While some of the activities listed in *Inmon* don't seem trivial in a supposedly civil society, Alabama law plainly reserves the tort of outrage for the most extreme actions.  Nothing done by Ryder to Sasser rises to that level.

to get precertification. The letter was directed to Dr. McGahan and Dr. Marsella and informed them that "EFFECTIVE IMMEDIATELY – any and all medical services, procedures, and prescriptions provided to [Sasser] MUST go through the workers compensation pre-certification process as per the provisions of the Alabama Department of Industrial Relations divison (sic) of Workers Compensation." (Pl's Ex. 10 in Opp. to Summ. J., doc. # 18). The letter is dated June 17, 2004. Sasser contends that this note, coupled with on Lloyd's deposition testimony that she would have denied precertification for further treatment unless the doctor appealed the denial through appropriate procedures, constitutes outrageous conduct sufficient to preclude summary judgment. *See* Dep. Martye Lloyd, doc. # 38-2, at 72-73.

The handwritten note is dated August 2005 and indicates that "no further action (ie pre-certification) was ever requested and decision was not appealed. Therefore, Mr. Sasser's med. treatment/coverage under worker's compensation was denied effective 6-17-04 and continuing." (*Id*.) Regardless of Lloyd's testimony that she would have denied precertification, the undisputed evidence demonstrates that to date, Sasser has neither requested pre-certification nor appealed the decision requiring precertification.[14]

There is nothing outrageous about Ryder requiring Sasser to obtain pre-certification before authorizing treatment. Ryder was within its legal rights to insist on precertification. The original settlement agreement entered into by the parties in 1997 addresses the precertification requirement.

---

[14] Although Dr. Marsella's office was trying to work with Ryder, Sasser did not make any more appointments with Dr. Marsella because he received a $2300.00 bill from the doctor. (Pl's Dep. at 121-22).

16

> Defendant shall not be responsible for payment of any future medical care for plaintiff unless authorization for such medical care is obtained in advance from defendant or its claims administrator.

(Defs' Ex. 2  at 3, ¶ 11).

It is undisputed that Lloyd requested a peer review, two utilization reviews and precertification because reviews of Sasser's medical records indicated that Ryder was paying for medications unrelated to his 1995 on the job injury.  *See* Dep. Martye Lloyd, doc. # 38-2, at 23-24, 40, 43-44, 56-57.

> I couldn't understand why Mr. Sasser was on so many drugs for a lumbar strain that happened almost ten years, because that was the only diagnosis we saw.
> And also because he was having a lot of drugs that he was claiming related to that claim that I recognized as drugs for heart conditions and other things that did not seem related.

(Dep. Martye Lloyd, doc. # 38-2, at 19).

Ryder was required, in accordance with the state court's orders, to pay "reasonably necessary medical expenses."  Ryder was not required to pay all of Sasser's medical expenses without regard to whether the expenses were related to Sasser's on-the-job injury.  Moreover, Ryder had a right, under the terms of the settlement agreement, to insist on  precertification. "[I]nsisting upon its legal rights in a permissible way" does not rise to the level of actionable outrage.  *Gibson v. Southern Guar. Ins. Co.*, 623 So. 2d 1065, 1067 (Ala. 1993).

The Alabama Supreme Court has only imposed liability against an employer in the worker's compensation arena in two cases.  *See Travelers Indem. Co. of Ill. v. Griner*, 809 So. 2d 808 (Ala. 2001) and *Continental Cas. Ins. Co. v. McDonald,* 567 So. 2d 1208 (Ala. 1990).

*See ITT Specialty Risk Servs. Inc.*, 842 So. 2d at 644.  The leading case in Alabama is *McDonald*, *supra*, in which the Alabama Supreme Court upheld a jury verdict in favor of the plaintiff on his claim of outrage finding that the company engaged in a organized attempt to coerce McDonald into accepting an unreasonably low settlement offer.

> The jury was entitled to believe that CNA engaged in a deliberate effort to cause McDonald to suffer severe emotional distress in order to coerce him into accepting an unreasonably low lump-sum settlement that would drastically reduce CNA's liability for his medical expenses.  The evidence supports a finding that CNA systematically withheld payments in order to cause McDonald anguish over the possibility of the cessation of medical treatments for his pain and thereby cause him to accept a method of payment that would not subject him to CNA's "aggravation," as he called it.

*McDonald*, at 567 So. 2d at 1221.

To be actionable, a "company's "recalcitrance" must exceed the "minimum threshold" set forth in *McDonald*."  *Griner*, 809 So. 2d at 811.  *See also Gibbs*, 604 So. 2d at 415 (*McDonald* sets the "minimum threshold" for an outrage claim in the context of failing to pay medical expenses).  Sasser fails to meet this minimum threshold.

Refusing to refer the plaintiff to Dr. Marsella for pain management does not exceed the minimum threshold set forth in *McDonald*.  *ITT Specialty Risk Servs. Inc.*, 842 So. 2d at 645.  Failing to timely pay medical expenses does not rise to the level of outrage.  *Wooley v. Shewbert*, 569 So. 2d 712 (Ala. 1990).  Finally, a claims adjustor's "unsympathetic attitude" does not amount to outrageous conduct.  *Farley*, 576 So. 2d at 160.  Accordingly, the court concludes that the plaintiff has not come forward with sufficient evidence to survive summary judgment on this claim, and the defendants' motion for summary judgment on this claim is due

to be granted.[15]

    **3. Negligent/Wanton Supervision Claim**.  The next claim the plaintiff asserts against Ryder is a negligent/wanton supervision of "its employees" claim.  (Compl. at 4, ¶ 24).  In his complaint, Sasser sets forth his cause of action as follows:

> 23.    Plaintiff realleges and adopts paragraphs 1-22 above as if fully set out herein.
>
> 24.    Plaintiff avers that the Defendant Ryder Services Corporation negligently and/or wantonly failed to hire, train and supervise its employees.
>
> 25.    Said negligent and/or wanton failure to hire, train and supervise was a proximate and direct cause of Plaintiff's injuries and damages as described above.

(Compl. at 5).

    The defendants assert that Sasser's negligence/wantonness claim is barred by the exclusivity provisions of the Alabama Workers' Compensation Act.  *See Defs' Supplemental Br.*, at 3-6.  In response to the defendants' motion for summary judgment on this claim, the plaintiff has failed to state with any coherency or specificity why the motion should be denied.  The plaintiff's argument in opposition to the motion for summary judgment, in its entirety, is as follows:

> As to the issue of negligent supervision, it is evidenced from Ms. Lloyd's deposition that it is not likely an issue of her supervisors neglecting her in her individual decisions, but in fact were a part of the plan and scheme from the beginning to save Ryder.

---

[15] The court also notes that Sasser has failed to present evidence on each essential element of his claim.  Specifically, he failed to present any evidence that he suffered extreme emotional distress as a result of the Ryder's conduct sufficient to survive summary judgment.  Sasser presents no evidence that he has been seen by a psychiatrist or psychologist for any mental problems.

(Pl's Res. to Defs' Supplemental Br. at 3).[16]

The court could summarily grant the defendants' motion for summary judgment on this claim because the plaintiff's response does not refer the court to any evidence or legal authority in opposition to the motion, nor does he submit any affirmative evidence demonstrating that there exists genuine issues of material fact on this claim. Unfortunately for the plaintiff, it is not the court's function to distill every generality into a cogent, adversarial argument. The onus is on the party opposing summary judgment to submit affirmative evidence demonstrating that there exists a genuine issue of material fact regarding an essential element of the claim. *Celotex,* 477 U.S. at 322. The plaintiff must go beyond the pleadings and "designate 'specific facts' showing that there is a genuine issue for trial." *Id*. at 324. *See also Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment."). The court replicated the plaintiff's entire argument in response to the defendants' motion for summary judgment to demonstrate that the plaintiff has failed to state with any coherent degree of specificity why the motion on this claim should be denied. However, out of an abundance of caution and notwithstanding the plaintiff's failure to address, the court now turns to the defendants' specific argument that the exclusivity provisions of the Alabama Workers' Compensation Act bar Sasser's negligence/wantonness claim.

---

[16] Common sense should dictate that a "plan and scheme," by its very nature, cannot form the basis of a negligence claim.

Alabama law is clear that the Alabama Workers' Compensation Act provides the exclusive remedy for Sasser to pursue his claims against the compensation insurance carrier.

Sections 25-5-52 and 25-5-53 state the exclusive remedy for an injured worker as against his employer, his co-employees, the compensation insurance carrier, and the compensation service companies of the employer.

*Frazier v. St. Paul Ins. Co.*, 880 So. 2d 406, 408 (Ala. 2003) *quoting State Farm Mut. Auto. Ins. Co. v. Carlton*, 867 So. 2d 320, 326 (Ala. Civ. App. 2001), *aff'd*, *Ex parte Carlton*, 867 So.2d 332 (Ala. 2003). *See also Watts v. Sentry, Ins.*, 876 So. 2d 440, 442 (Ala. 2003).

While ALA. CODE § 25-5-11 permits an employee injured on the job to bring an action against a third-party, an action against the "corporation responsible for servicing and payment of workers' compensation claims for the employer, or any officer, director, agent, or employee of the carrier, person, firm, association, trust, fund, or corporation," may only be brought "for willful conduct which results in or proximately causes the injury." ALA. CODE § 25-5-11. The plaintiff's claims of negligence and wantonness cannot, by their very nature, constitute willful conduct under the statute. Consequently, the exclusivity provisions of Alabama's Workers' Compensation Act bar Sasser's negligence and wantonness claims. Accordingly, the court concludes that the plaintiff has not produced sufficient evidence to survive summary judgment on this claim.

**4. Respondeat Superior Claims**. To the extent that Sasser seeks to pursue claims of respondeat superior against Ryder, he is entitled to no relief on this basis. The law in Alabama is clear.

[W]hen the principal and his agent are sued in [a] joint action in tort for

21

misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of respondeat superior, a *verdict* in favor of the servant entitles the master to have the verdict against him set aside.' "

See *H & S Homes, L.L.C. v. McDonald*, ___ So. 2d ___, *6, 2007 WL 1953892 (Ala. 2007) quoting *Larry Terry Contractors, Inc. v. Bogle*, 404 So. 2d 613, 614 (Ala. 1981). *See also Louisville & N.R. Co. v. Maddox*, 236 Ala. 594, 183 So. 849, 853 (Ala. 1938); *Walker v. St. Louis-San Francisco Ry. Co.*, 214 Ala. 492, 108 So. 388 (Ala. 1926). Because the court concludes that the defendants are entitled to summary judgment on the plaintiff's claims of outrage and negligent/wanton supervision, summary judgment on his respondeat superior claims is also appropriate.

## IV.  CONCLUSION

For the reasons as stated, it is

ORDERED that the defendants' motion for summary judgment be and is hereby GRANTED.

A separate final judgment will issue.

Done this 2nd day of January, 2008.


_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE

22